

1   Andrew Hudson (DC Bar No. 996294)
2   (202) 326-2213 / ahudson@ftc.gov
    Laura Basford (DC Bar No. 993645)
3   (202) 326-2343 / lbasford@ftc.gov
    Jody Goodman (DC Bar No. 404879)
4   (202) 326-3096 / jgoodman1@ftc.gov
5   600 Pennsylvania Ave., NW, CC-8528
    Washington, DC 20580
6
7   Local Counsel
    Kenneth Abbe (CA Bar No. 172416)
8   (310) 824-4313 / kabbe@ftc.gov
9   10990 Wilshire Boulevard, Suite 400
    Los Angeles, California 90024
10
11  Attorneys for Plaintiff
    Federal Trade Commission
12

**FILED**
CLERK, U.S. DISTRICT COURT
January 29, 2018
CENTRAL DISTRICT OF CALIFORNIA
BY: ____AK____ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT
1/29/2018
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ DEPUTY

13   **IN THE UNITED STATES DISTRICT COURT**
14   **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 15  **Federal Trade Commission**, | **Filed Under Seal** |
| 16             Plaintiff, | |
| 17       vs. | **Emergency Motion** |
| 18  **Digital Altitude LLC**, a Delaware | |
| 19  limited liability company, | No. _2_ :18-CV-_729-JAK-MRW_x |
|     **Digital Altitude Limited**, a United | |
| 20  Kingdom company, | |
| 21  **Aspire Processing LLC**, a Nevada | PLAINTIFF'S MEMORANDUM OF |
|     limited liability company, | LAW IN SUPPORT OF ITS *EX PARTE* |
| 22  **Aspire Processing Limited**, a United | APPLICATION FOR (1) |
|     Kingdom company, | TEMPORARY RESTRAINING |
| 23  **Aspire Ventures Ltd**, a United | ORDER AND ORDER TO SHOW |
| 24  Kingdom company, | CAUSE WHY A PRELIMINARY |
|     **Disc Enterprises Inc.**, a Nevada | INJUNCTION SHOULD NOT ISSUE, |
| 25  corporation, | AND (2) ORDER WAIVING NOTICE |
| 26  **RISE Systems & Enterprise LLC**, a | REQUIREMENT |
|     Utah limited liability company, | |
| 27  **RISE Systems & Enterprise LLC**, a | |
| 28  Nevada limited liability company, | |
|     **Soar International Limited Liability** | |

1    **Company**, a Utah limited liability
company,

2

3    **The Upside, LLC**, a California limited
liability company,

4    **Thermography for Life, LLC, also
d/b/a Living Exceptionally, Inc.**, a

5    Texas limited liability company,

6    **Michael Force,** individually and as an
officer, member, and/or manager of

7    Digital Altitude LLC and Soar
International Limited Liability

8    Company,

9    **Mary Dee**, individually and as an
officer, member, and/or manager of

10    Digital Altitude LLC, Digital Altitude

11    Limited, Aspire Processing LLC, RISE
Systems & Enterprise LLC, The Upside,

12    LLC, and Thermography for Life, LLC,

13    **Morgan Johnson**, individually and as
an officer, member, and/or manager of

14    Digital Altitude LLC and RISE Systems

15    & Enterprise LLC,

16    **Alan Moore**, individually and as an
officer, member, and/or manager of

17    Digital Altitude LLC and Aspire
Processing Limited,

18

19    **Sean Brown**, individually and as an
officer, member, and/or manager of

20    Aspire Processing LLC, Disc
Enterprises Inc., and RISE Systems &

21    Enterprise LLC,

22                 Defendants.

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2   Table of Authorities ...................................................................................ii

3   I.   Introduction ...................................................................................1

4   II.   Statement of Facts .........................................................................2

5      A.   Defendants' Deceptive Business Practices.......................................2

6        1. The Wide Net of Advertisements ...................................................2

7        2. The Expensive Fee Structure.........................................................4

8        3. The "Aspire" Steps and the First Upsell ......................................5

9        4. The Relentless Upsell....................................................................7

10        5. Defendants' Falsehoods and Subterfuge to Evade Banks'

11        and Payment Processors' Scrutiny ....................................................9

12      B.   The Defendants...............................................................................11

13        1. The Corporate Defendants ...........................................................11

14        2. The Individual Defendants ...........................................................13

15      C.   Consumer Injury.............................................................................17

16   III.   Argument ......................................................................................18

17      A.   The FTC Act Authorizes the Requested Relief .............................18

18      B.   A Temporary Restraining Order is Appropriate and Necessary.....19

19        1. The FTC Is Likely to Succeed on the Merits ...............................19

20        2. The Equities Tip Decidedly in the Public's Favor .......................23

21      C.   The Proposed *Ex Parte* TRO Is Appropriate.................................24

22   IV.   Conclusion ....................................................................................26

23

24

25

26

27

28

i

# **TABLE OF AUTHORITIES**

<u>Statutes</u>

15 U.S.C. § 45(a) ...................................................................................1, 19

15 U.S.C. § 53(b) ........................................................................................18

<u>Cases</u>

*Canada Life Ins. Co. v. LaPeter,* 563 F. 3d 837 (9th Cir. 2009) ...................26

*In re Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319

    (F.T.C. 1984).......................................................................................20

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ....2, 18, 19, 23

*FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) ...............2, 18

*FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080

    (C.D. Cal. 1994) ..................................................................................23

*FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989)) ..................23

*FTC v. Arlington Press, Inc.*, No. 2:98-CV-9260, 1999 WL

    33562452 (C.D. Cal. Jan. 18, 1999)......................................................2

*FTC v. BunZai Media Grp., Inc.*, No. 2:15-CV-4527, 2015 WL

    5305243 (C.D. Cal. Sep. 9, 2015) .........................................................2

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048

    (C.D. Cal. 2012) ..................................................................................10

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016)................18, 23

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ......................20

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010)....................20

*FTC v. Equifin Int'l*, No. 2:97-CV-4526, 1997 U.S. Dist.

    LEXIS 10288 (C.D. Cal. July 3, 1997) .................................................2

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ................................. 19-20

*SEC v. First Fin. Group*, 645 F.2d 429 (5th Cir. 1981) ...............................26

*FTC v. Five-Star Auto*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) .................. 20-21

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ......................................19

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1221
    (D. Nev. 2011) .............................................................10, 22

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014)................. 22-23

*FTC v. Ideal Fin. Sols., Inc.*, No. 2:13-CV-0143, 2015 WL
    4032103 (D. Nev. 2015)..............................................................22

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ....... 2, 22-23

*FTC v. John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052
    (C.D. Cal. 2012) ........................................................................23

*FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282
    (D. Minn. 1985).........................................................................21

*FTC v. Lights of America, Inc.*, No. 8:10-CV-1333, 2013 WL
    5230681 (C.D. Cal. Sept. 17, 2013)....................................... 20, 22-23

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127
    (9th Cir. 2010) ..................................................................... 22-23

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ....................18, 20, 22

*FTC v. Publ'g Clearing House*, 104 F.3d 1168 (9th Cir. 1997) ...................23

*FTC v. Sage Seminars*, No. 4:95-CV-2854, 1995 WL 798938
    (N.D. Cal. Nov. 2, 1995) .............................................................21

*FTC v. Southwest Sunsites, Inc.*, 105 F.T.C. 7 (1985) .............................20

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) .................................... 19-20

*FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL
    11118111 (D. Ariz. Sept. 18, 2015).................................................21

*FTC v. Warner Communications Inc.*, 742 F.2d 1156
    (9th Cir. 1984) ..........................................................................19

*FTC v. Wealth Educators, Inc.*, No. 2:15-CV-2357,
    2015 WL 11439063 (C.D. Cal. Apr. 6, 2015) ....................................19

*FTC v. Willms*, No. 2:11-CV-0828, 2011 WL 4103542
    (W.D. Wash. Sept. 13, 2011) ............................................................18

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ....... 19, 23-24

*MOBE, Ltd. v. Digital Altitude, LLC, and Michael Force*,
    No. 2:16-CV-5708 (C.D. Cal.) .............................................................6

*SEC v. Presto Telecomm., Inc.*, 153 Fed. Appx. 428
    (9th Cir. 2005) ...................................................................................26

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172
    (9th Cir. 1987) ...................................................................................19

## TABLE OF EXHIBITS

| EX Number | Description | First Page | Last Page |
|---|---|---|---|
| 1 | Declaration of Pauline Amegbedji, Consumer | 1 | 18 |
| 2 | Declaration of Arthur David Beaman, Consumer | 19 | 54 |
| 3 | Declaration of Shanika Brown, Consumer | 55 | 62 |
| 4 | Declaration of Missy Campbell, Consumer | 63 | 64 |
| 5 | Declaration of Richard Fulton, Consumer | 65 | 86 |
| 6 | Second Declaration of Richard Fulton | 87 | 87 |
| 7 | Declaration of Gail Susan Gruber, Consumer | 88 | 123 |
| 8 | Declaration of Terry Hamilton, Consumer | 124 | 129 |
| 9 | Declaration of Stephen Lohbeck, Consumer | 130 | 151 |
| 10 | Declaration of Marcele Miguel, Consumer | 152 | 215 |
| 11 | Declaration of Amber Miller, Consumer | 216 | 237 |
| 12 | Declaration of Johanna Padilla, Consumer | 238 | 279 |
| 13 | Declaration of Leah Schmidt, Consumer | 280 | 290 |
| 14 | Declaration of Brendan Marais, Consumer | 291 | 341 |
| 15 | Documents Produced by MasterCard, Inc. | 342 | 344 |
| 16 | Documents Produced by JPMorgan Chase Bank, N.A. | 345 | 558 |
| 17 | Documents Produced by Bank of America, N.A | 559 | 609 |

| EX Number | Description | First Page | Last Page |
|:---:|---|:---:|:---:|
| 18 | Documents Produced by Domains by Proxy, LLC | 610 | 615 |
| 19 | Documents Produced by Wix.com Ltd. | 616 | 619 |
| 20 | Documents Produced by Earth Class Mail, Inc. | 620 | 625 |
| 21 | Documents Produced by Lake Worth Ship and Mail, Inc. | 626 | 630 |
| 22 | Documents Produced by Square, Inc. | 631 | 845 |
| 23 | Documents Produced by Merrick Bank Corporation | 846 | 854 |
| 24 | Documents Produced by Francis David Corporation, d/b/a Electronic Merchant Systems | 855 | 870 |
| 25 | Documents Produced by EVO Payments International, LLC | 871 | 900 |
| 26 | Documents Produced by Bright Market LLC, also d/b/a FastSpring | 901 | 909 |
| 27 | Documents Produced by ProPay, Inc. | 910 | 914 |
| 28 | Documents Produced by Pivotal Payments, Inc. | 915 | 930 |
| 29 | Documents Produced by Fifth Third Bank | 931 | 931 |
| 30 | Documents Produced by WePay, Inc. | 932 | 935 |
| 31 | Documents Produced by TSYS Merchant Solutions, LLC | 936 | 969 |
| 32 | Documents Produced by Vantiv, Inc. | 970 | 976 |
| 33 | Documents Produced by Allied Wallet, Ltd. | 977 | 996 |
| 34 | Documents Produced by PayPal Holdings, Inc. | 997 | 1031 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| EX Number | Description | First Page | Last Page |
|---|---|---|---|
| 35 | Documents filed in *MOBE Ltd. v. Digital Altitude, LLC and Michael Force*, No. 2:16-CV-5708 (C.D. Cal.) | 1032 | 1127 |
| 36 | Documents filed in *Digital Altitude, LLC v. NetCents Technology, Inc.*, No. 2:17-CV-3345 (D. Ariz.) | 1128 | 1142 |
| 37 | Documents filed in *Wealth Masters International, Ltd v. Jason "Jay" Kubassek, et al.*, No. 4:12-CV-3421 (S.D. Tex.) | 1143 | 1185 |
| 38 | Declaration of John Tan | 1186 | 1239 |
| 39 | Declaration of Patrick J. Curtin | 1240 | 1590 |
| 40 | Declaration of Diana F. Shiller | 1591 | 1592 |
| 41 | Declaration of Reeve Tyndall | 1593 | 2757 |

## I.     Introduction

The Federal Trade Commission ("FTC") respectfully requests that the Court bring an immediate halt to Defendants' fraudulent scheme that preys on consumers nationwide with false promises of earning substantial income.[1] Some victims have lost as much as $30,000,[2] and Defendants continue to injure consumers to this day. As of March 22, 2017, Defendants had already taken in over $32 million.[3]

Defendants operate "Digital Altitude," an online enterprise. Defendants state that consumers who join Digital Altitude will earn large sums of money operating their own business online. Defendants claim their program will provide "business coaching" that will enable consumers to "build a digital business" and earn "six figures online in 90-days or less." In reality, Digital Altitude is nothing more than an elaborate scheme to part consumers from their money and line the pockets of a small group of insiders. Defendants extract steep fees from consumers, but the vast majority of participating consumers earn little or nothing, much less the promised "six figures." Similarly, the "coaches" Defendants provide are merely salespeople, and their sales pitches, in the vast majority of cases, do not enable consumers to build successful businesses. Instead, the salespeople urge consumers to exhaust their savings and take on massive debt, all to pay Defendants more.

Defendants' conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and their operation is entirely permeated by fraud. To protect consumers and

---

[1] The FTC submits eight volumes of exhibits, including declarations from 13 consumers, in support of this Application. References to exhibits appear as "EX [number], [page]."

[2] *See e.g.*, EX 2, 23.

[3] EX 35, 1100-04, 1108. As stated in the Complaint, the estimated consumer injury totals at least $14 million. This is a low estimate. Defendants' financials, submitted in another case, show gross revenue through 2016 of $27.9 million, and less than $13.7 million in payments back to consumers, leaving at least $14.2 million in consumer loss. *Id.* However, the consumer harm through 2016 is likely higher, since most of the payments back to consumers likely went to a handful of individuals who profited handsomely, not to reimbursing consumers. And this figure does not account for any consumer loss in 2017 or beyond.

preserve assets for consumer redress to Defendants' victims, the FTC seeks an *ex parte* temporary restraining order ("TRO") that enjoins Defendants' unlawful conduct, freezes their assets, appoints a temporary receiver over the Corporate Defendants, permits the temporary receiver and FTC staff immediate access to Defendants' business premises and records, requires Defendants to disclose their assets, and allows limited expedited discovery. The FTC also requests that the Court order Defendants to show cause why a preliminary injunction should not issue against them. In numerous similar cases brought by the FTC, District courts across the country, including in this Circuit and District, have granted such relief.[4]

## II.    Statement of Facts

Since at least 2015, Digital Altitude has duped consumers into spending up to tens of thousands of dollars by deceptively claiming that Digital Altitude will enable them to earn substantial money online.

### A.    Defendants' Deceptive Business Practices

#### 1.    The Wide Net of Advertisements

Defendants advertise their purported money-making program through online webpages and social media platforms, including Facebook and Instagram. The focus of Defendants' advertisements—whether placed on a webpage, social media platform, or elsewhere, and whether placed by Defendants directly or by consumers or affiliates using Defendants' marketing materials[5]—is a promise that

---

[4] *See, e.g.*, *FTC v. BunZai Media Grp., Inc.*, No. 2:15-CV-4527, 2015 WL 5305243 (C.D. Cal. Sep. 9, 2015) (TRO, asset freeze against individual and corporate defendants, and receiver); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) (same); *FTC v. Arlington Press, Inc.*, No. 2:98-CV-9260, 1999 WL 33562452 (C.D. Cal. Jan. 18, 1999) (same); *FTC v. Equifin Int'l*, No. 2:97-CV-4526, 1997 U.S. Dist. LEXIS 10288 (C.D. Cal. July 3, 1997) (same). The Ninth Circuit has affirmed such cases. *See, e.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512 (9th Cir. 1987).

[5] Once consumers join, Defendants encourage them to place their own ads. *See, e.g.*, EX 9, 130; EX 5, 68; EX 2, 20. Defendants direct consumers to use Defendants' materials for these purposes. EX 39, 1295 ("Affiliates must use the sales aids and support materials produced by Digital Altitude.").

1   consumers will quickly make substantial earnings with Defendants' program.[6]

2          Typically, advertisements direct consumers to a landing page controlled by

3   Digital Altitude. That page plays a video message from Defendant Michael Force,

4   the scheme's founder and leader.[7] Force promises that the consumer is about to

5   learn how to "make six figures online in the next 90 days or less." He explains that

6   the consumer will earn this money because he, Force, will "give" the consumer

7   Force's own "million dollar business."[8] These earnings claims are false—most

8   consumers who join do not earn the substantial income advertised, and cannot even

9   make back the money they pay to Defendants. Indeed, defendants recognize that

10  most consumers receive virtually nothing.[9]

11         A key selling point is Force's promise that Digital Altitude will provide

12  consumers with business coaching to ensure they succeed. In the landing page

13  video, Force says, "I promise you we won't stop until you've earned your first six

14  figures."[10] In another video, Force tells consumers that Digital Altitude will

15  provide "private and personal one-on-one business coaching for you during your

16  start-up phase and your set-up phase and your overall scaling and success phases.

17  So we're going to hand hold you through that entire process. We have a series of

18  coaches all on standby to really help you get up the mountain, so to speak."[11] As

19  explained below, Defendants do not keep these promises.

20

21         [6] *See, e.g.*, EX 39, 1536.

22         [7] An undercover FTC investigator joined Defendants' program in January 2017,
    and documented Defendants' misrepresentations to him. EX 41, 1593-1604.

23         [8] EX 41, 2586.

24         [9] On an un-advertised and hard-to-find website, Defendants display earnings data
    showing that most "active affiliates" make less than $100 per month. EX 39, 1368-

25  73, EX 40, 1592. By "active affiliates," Defendants likely mean consumers who

26  pay a $17 monthly fee to be "eligible" to earn commissions. EX 33, 981. But many
    consumers quit without becoming "active affiliates." *See, e.g.,* EX 1, 2-3; EX 4, 63.

27  Thus, the percentage of consumers who do not make money is likely far greater.

28         [10] EX 41, 2588.

           [11] EX 41, 1709-10.

To bolster their sales pitch, Defendants tell consumers that the "coaches" are experienced and knowledgeable, touting, as evidence, their alleged successful online marketing careers. For example, in the landing page video Force claims "[y]ou'll be coached by a real internet millionaire."[12] In an email sent to consumers, Force claims "Your coach is a 6-Figure marketer. In fact, no one can be a coach in our business if they are not already making 6-Figures in their own online business."[13] These claims are not true; many of the "coaches" are not millionaires or six-figure marketers.[14] In another video, Force claims "[o]ur coaches are highly trained online business experts."[15] This, too, is false.[16]

The landing page features a number of testimonial videos from individuals who claim to have made money with Defendants' program, and buttons for the consumer to click to begin Defendants' program themselves.[17] Defendants offer many consumers a 14-day trial that is either free or costs just one dollar.

### 2.    The Expensive Fee Structure

Defendants' underlying membership program, called Aspire, requires payment of a recurring monthly fee. Defendants also use Aspire to refer to their program as a whole ("the Aspire program" or "the Aspire system").

In conjunction with the Aspire membership, Defendants induce consumers to purchase Digital Altitude's levels, or tiers: Base, Rise, Ascend, Peak, and Apex. These levels' fees are each a one-time payment. However, consumers must

---

[12] EX 41, 2595.

[13] EX 41, 2606-08; *see also* EX 35, 1093-96 (Force controls content of email).

[14] In a video consumers do not see until much later, Force admits that the "phone coaches" are a "sales team" working on commission. EX 41, 2252-53. He tells consumers, "you could do your own phone sales …. [in which case] the phone coach is actually you." *Id.* Force makes no mention of any qualifications or training needed to become a "coach," nor any need for consumers who do so to provide business coaching. *Id.*

[15] Ex 41, 2626.

[16] *See supra* note 14.

[17] EX 39, 1322-33, 1356-64.

4

continue to pay the monthly Aspire fee to remain an active member of Defendants' program, even after they buy these higher tiers. The prices for the higher tiers range from $597 for Base to $29,997 for Apex.[18]

Most consumers are not initially aware that Defendants' program will involve paying such sky-high prices. This is intentional—Defendants lure consumers in with their trial offer, and, once consumers are in the door, slowly begin inducing them to make increasingly costly payments.[19] Like the proverbial frog in slowly heating water, many consumers realize what is happening far too late, when they have already invested numerous hours and dollars in the scheme.

### 3.     The "Aspire" Steps and the First Upsell

The Aspire system consists of a series of nineteen online "training" videos, called "steps," a few PDF documents, and purported live training from a "coach."[20] However, the videos—all narrated by Force—are in fact an elaborate sales tool designed to convince consumers to purchase the higher levels—a fact laid bare in

---

[18] Digital Altitude changed its prices in August 2017, as follows:

| Level | Price: 2015 - August 2017 | Price: August 2017 - Present |
|-------|---------------------------|------------------------------|
| Aspire | $37, $67, or $127 per month | $47 or $97 per month |
| Base | $597 | $597 (no change) |
| Rise | $1,997 | $2,297 |
| Ascend | $9,997 | $9,997 (no change) |
| Peak | $16,997 | $19,997 |
| Apex | $26,997 | $29,997 |

EX 39, 1319. Certain consumers may pay more, likely due to transaction fees. EX 12, 246 (3.5% "administration fee"). Some, oddly, have been charged fees for international transactions, although Defendants are based in the U.S. *See* EX 1, 2, 9; EX 9, 132, 151; EX 11, 217, 226.

[19] One salesperson admonished others to follow this strategy in an internal chat log: "After 9 years and millions spent in testing we have learned that when a customer is offered and informed of a 2k purchase first without being informed of the 2nd and 3rd upsell at exponentially higher prices the conversion rates increase drastically at ascend and Peak price points. This is greatly due to the psychological effects of making a 2k decision first." EX 38, 1233.

[20] *See* EX 41, 1593-1604, 1621-2608.

1    recent litigation over the rights to the videos' content.[21] And the "coaches" are

2    really salespeople paid on commission.[22]

3         Once consumers join Aspire, they are assigned a "Start Up coach." Although

4    consumers pay a recurring monthly fee for membership in the Aspire program, the

5    "coaches" get paid only if the consumer purchases one of the flat-fee levels.[23] The

6    Start Up salesperson's aim is to get the consumer to pay for Rise, at about $2,000.[24]

7    The Aspire videos are a skillfully-packaged sales pitch designed to facilitate this

8    sale, repeating the claims that consumers will earn substantial income, such as "six

9    figures," through the program. The Start Up salesperson unlocks (provides access

10   to) the videos one or two at a time, checking in each time to be sure the consumer

11   has viewed every video and is taking in the sales pitch. The videos lay out a case

12   for making money online by driving traffic to a site selling expensive products

13   (called "high ticket" or "top tier")—not coincidentally the exact strategy Digital

14   Altitude employs. The process culminates with the Step 6 video, which pointedly

15   argues that the consumer should not attempt to start his or her own business, but

16   should join Digital Altitude and earn commissions by marketing its products.[25]

17

18   [21] *MOBE, Ltd. v. Digital Altitude, LLC, and Michael Force*, No. 2:16-CV-5708
     (C.D. Cal.). A competitor claimed ownership of the videos' content, and alleged
19   that Digital Altitude and Force stole them. It sued because it views the video series
     as the "precursor to all of the revenue [it] generates." EX 35, 1097. Force seems to
20   have conceded the same, stating in a declaration that the videos are a form of
     "step-by-step onboarding," a "marketing technique" that he has been using for 20
21   years, that works by "deliver[ing] incremental information or education to its users
     through achieving milestones." *Id*. at 1086-87. Force also refers to the Aspire
22   videos as a "sales funnel," which he explains is a "process for leading customers
     through when purchasing products." *Id*. at 1075-77. The case settled in September
23   2017; the terms of the settlement are not public at this time. *Id*. at 1127.

24   [22] EX 38, 1189-94, 1230-34 (Defendants' salespeople call customers "leads" and
     discuss how to maximize "upsells"); EX 41, 2250-53 (Force states "coaches" are
25   salespeople); *id*. at 1593-1604; EX 7, 88; EX 8, 124; EX 10, 154-55; EX 14, 293.

26   [23] Force concedes this in a later video. EX 41, 2250 (coaches are "working on
     pure commission").

27   [24] Rise now costs $2,297. *See supra* note 18. Defendants typically do not charge
     for Base, but include it with Rise. *See* EX 41, 1923.
28   [25] EX 41, 1896-1941.

1    After the consumer watches the Step 6 video, the Start Up salesperson

2    pitches the Rise level to the consumer.[26] The sales pitch—for which the videos

3    have prepped the consumer —is that purchasing Rise is the critical step that will

4    allow the consumer to start earning significant income. Force explains in the

5    videos that the way consumers make money with Digital Altitude is by recruiting

6    new consumers to join, and collecting commissions on the new consumers'

7    payments to Digital Altitude. But consumers learn they can only collect such

8    commissions for sales of tiers that they themselves have already purchased.

9    Because the commission is a percentage of the purchase price (either 20% or 40%),

10   commissions for sales of Rise are dramatically higher than commissions for sales

11   of Aspire memberships.[27] This is the heart of the Rise sales pitch.

12   Consumers who decline to purchase Rise are usually written off and ignored

13   by their Start Up salesperson.[28] Such consumers almost invariably do not make the

14   significant income that Defendants advertise, and most make nothing at all.

### 4.    The Relentless Upsell

16   If consumers purchase Rise, they are handed off to a "Scale Up coach," who,

17   like the "Start Up coach," is a salesperson paid on commission. The "Scale Up"

18   salesperson communicates with consumers online via written chats and audio or

19   video conferencing.[29]

20

21   [26] Because Defendants systematically use the videos as a sales tool in this
22   manner, nearly all consumers watch all the videos up to Step 6 before purchasing
     any of Digital Altitude's levels. Force has admitted that Digital Altitude acquires at
23   least 90% of its customers through the Aspire system. EX 35, 1123-25.

24   [27] 20% of Rise's $2000 price is $400, whereas 20% of even the highest Aspire
     monthly fee, $127, is only $25.40.

25   [28] EX 4, 63; EX 38, 1188 (Digital Altitude salespeople talking about staying in
26   contact with consumers only if they are trying to obtain funds to purchase Rise);
     *Id*. at 1235 (Digital Altitude salespeople discuss using "qualifying" questions to
27   avoid spending time on consumers without money); *Id*. at 1196 (Digital Altitude
     salesperson requesting that a consumer's account be cancelled because he's a "17
28   yo [sic] student with no money").

     [29] EX 9, 132, EX 14, 292, 331-35; EX 41, 1600-04.

Like the Start Up salesperson, the Scale Up salesperson unlocks the remaining Aspire videos a few at a time, at each step checking in to ensure the consumer has watched the videos and is absorbing the sales pitch. In the videos, Force doubles down on the tactic that persuaded the consumer to purchase Rise: touting the even-higher commissions the consumer can earn on sales of even-more-expensive levels.[30] For example, the Step 9 video is titled "How to Get $4500 Commissions with No Extra Work"; the answer: buy the next tier, Ascend (the commission on one Ascend sale is purportedly $4,500). Indeed, the Step 9 and later videos illustrate their claims about consumers' potential earnings with charts setting out the commissions consumers will supposedly earn if they purchase each of the successively higher, more expensive, levels.[31] In the videos, Force reads off the charts' figures, explicitly stating that consumers will make the substantial commissions listed in the charts if they purchase the relevant tier(s).[32]

The Scale Up salesperson uses the videos to support sales pitches for the three higher, more expensive tiers: Ascend, Peak, and Apex. Once the consumer purchases as many levels as he or she is going to, the Scale Up salesperson often stops communicating with the consumer.[33] Of the consumers who purchase one or more of these additional tiers, many still do not make substantial income, or even recoup their investment.

If consumers are short on funds, salespeople tell them to borrow,[34] often

---

[30] The Ascend, Peak, and Apex levels purportedly also include tickets to a training retreat in a tropical or resort locale. The dates of these events are not provided to consumers before they purchase. EX 2, 22. One former Digital Altitude salesperson has testified that for at least some time, the promised retreats did not take place, which was one of the reasons he quit. EX 35, 1121-22.

[31] Defendants compiled all such charts in a PDF. EX 41, 1598, 1972-2069.

[32] EX 41, 2161 ("you're making $30,000 a month"), 2186 ("you're a little over $38,500 per month").

[33] EX 3, 56; EX 10, 154-55; EX 11, 219.

[34] EX 1, 2; EX 2, 20; EX 9, 131; EX 10, 154-55. *See also* EX 39, 1474 (Defendants' website advocates draining retirement savings and home equity to make payments to Defendants).

offering to help consumers get a "loan" to finance the purchase of tiers that the consumers cannot afford.[35] These are not really loans; they typically consist of multiple credit cards opened in the consumer's name.[36] This places consumers in a precarious financial position; they expect to be able to pay off this debt with their Digital Altitude earnings.[37] That, of course, does not happen.

At some point, many consumers realize they are not going to make money with Digital Altitude. Some consumer declarants tried to get refunds, but Defendants refused, saying the consumer had missed the 72-hour window for "buyer's remorse."[38] Most consumers lose their entire investment.[39] Many end up thousands of dollars in debt, with huge interest obligations, unable to dig themselves out of a financial pit.[40] Others avoid incurring debt, but find they have lost their savings.[41]

### 5.   Defendants' Falsehoods and Subterfuge to Evade Banks' and Payment Processors' Scrutiny

Defendants accept a substantial portion of consumers' payments via credit card, through merchant accounts they establish with banks and payment processors. Defendants' fraudulent business model, however, has made this difficult. Many disgruntled consumers seek to recoup their credit card payments by filing disputes known as "chargebacks." The resulting high rate of chargebacks—

---

[35] EX 1, 2; EX 2, 20; EX 5, 66; EX 9, 131; EX 10, 154; EX 12, 239.

[36] EX 1, 2; EX 12, 239; EX 41, 1603-04, 1687-88.

[37] *See, e.g.*, EX 2, 21; EX 7, 89.

[38] EX 7, 89; EX 11, 219; EX 12, 240; EX 14, 293. Many consumers have not heard of any 72-hour refund policy until they try to get a refund. *Id.* Consumers often mistakenly believe they have 14 days to cancel; many enter Digital Altitude through a free or one dollar 14-day trial. EX 14, 293.

[39] *See, e.g.*, EX 1, 3; EX 2, 23; EX 8, 124-25; EX 11, 219; EX 12, 241; *see also* EX 39, 1368-73, EX 40, 1592.

[40] EX 1, 3-4; EX 8, 125; EX 11, 219; EX 12, 241.

[41] EX 2, 23; EX 3, 57.

an indicator of fraud[42]—has led multiple processors to terminate Defendants' merchant accounts.[43] Other processors have also cancelled Defendants' accounts after concluding that Defendants' business model is fraudulent or otherwise unsupportable.[44] Between July 2016 and May 2017, payment processors closed ten of Defendants' accounts for these reasons.[45] And in March 2017, a bank placed Digital Altitude on the MasterCard Alert to Control High-Risk Merchants, or "MATCH," list for "excessive fraud."[46] Placement on the MATCH list has made it extremely difficult for Digital Altitude to obtain new merchant accounts.

Rather than reform the deceptive practices that caused payment processors to drop them, Defendants employed further subterfuge. They created new corporate entities and sought merchant accounts under the new entities' names.[47] Defendants' applications for these new accounts did not disclose that they were affiliated with or would be used to process payments for Digital Altitude.[48] When processors opened the new accounts, unaware of their true purpose, Defendants used them to process consumers' payments to Digital Altitude.[49]

Defendants have also lied about Digital Altitude when seeking new merchant accounts in its name. In a February 2017 application, Defendants stated that "the business" had not previously had a merchant account terminated, even

---

[42] *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) *aff'd in part, vacated in part, remanded*, 815 F.3d 593 (9th Cir. 2016) (high chargeback rates are an indicator of fraud); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1222 (D. Nev. 2011) *aff'd in part, vacated in part*, 763 F.3d 1094 (9th Cir. 2014) (same).

[43] *See* Appendix I, summarizing Defendants' merchant account history.

[44] *See id*.

[45] App. I.

[46] EX 15, 343-44.

[47] App. I.

[48] *See, e.g.*, EX 22, 651-66, 736-45; EX 34, 1007-23.

[49] These include Aspire Processing accounts with Square and PayPal (*see* Appendix II), RISE accounts with Square and PayPal (*see* Appendix III), and a Disc account with PayPal (EX 34, 1012-14; EX 41, 1606-07).

though banks and payment processors had terminated at least ten accounts it had used, including seven in its name.[50] Defendants have also misrepresented who owned Digital Altitude. In five separate applications, they variously stated that Mary Dee owned 51%, 60%, and 90% of the entity, even though, according to Defendant Force's sworn testimony, Dee is not an owner of Digital Altitude at all.[51]

## B.   The Defendants

Five key leaders of the fraudulent scheme are defendants Michael Force, Mary Dee, Morgan Johnson, Alan Moore, and Sean Brown (collectively, the "Individual Defendants"). Since 2015, they have executed the scheme through a number of closely held corporate entities, many created solely to facilitate consumers' payments after payment processors began to terminate merchant accounts for Digital Altitude LLC.

### 1.   The Corporate Defendants

**Digital Altitude LLC** ("Digital Altitude") is a Delaware limited liability company with a registered agent address of 16192 Coastal Highway, Lewes, DE 19958—the office of a company that incorporates Delaware corporations and acts as their registered agent—and has maintained a principal place of business of 520 Broadway, Santa Monica, CA 90401.

**Digital Altitude Limited** ("Digital Altitude UK") is a United Kingdom company that uses a mail forwarding company's address of Third Floor, 207 Regent Street, London, United Kingdom, W1B 3HH.

**Aspire Processing LLC** ("Aspire Processing") is a Nevada limited liability company with a registered agent address of 701 South Carson Street, Suite 200, Carson City, NV 89701.

**Aspire Processing Limited** ("Aspire Processing UK") is a United Kingdom company with a registered address of Address 2 ███████████ London, United

---

[50] EX 23, 847-50; App. I.

[51] App. I; EX 35, 1091-92. Whether or not Dee is an owner of Digital Altitude LLC, she is deeply involved with its fraud.

Kingdom, █████, which appears to be a residence.

**Aspire Ventures Ltd** ("Aspire Ventures") is a United Kingdom company with the same registered business address as Aspire Processing UK: Address 2 █████, London, United Kingdom, █████.

**Disc Enterprises Inc.** ("Disc") is a Nevada corporation with a registered agent address of █████, Las Vegas, NV ███.

**RISE Systems & Enterprise LLC** ("RISE Utah") is a Utah limited liability company with a registered business address of 1501 North Technology Way Building B, Orem, UT 84121.

**RISE Systems & Enterprise LLC** ("RISE Nevada") is a Nevada limited liability company with a registered agent address of 701 South Carson Street, Suite 200, Carson City, NV 89701.

**Soar International Limited Liability Company** ("Soar") is a Utah limited liability company with a registered business address of 1426 E 750 N 1st Floor, Orem, UT 84097.

**The Upside, LLC** ("Upside") is a California limited liability company with a business address of 340 South Lemon Avenue, Walnut, CA 91789—a mail forwarding company with which Digital Altitude has an account.

**Thermography for Life, LLC, also d/b/a Living Exceptionally, Inc.** ("Thermography") is a Texas limited liability company with a business address of 6340 Lake Worth Boulevard #103, Fort Worth, TX 76135—a mail drop with a mail forwarding service.

Corporate Defendants operate as a common enterprise,[52] with shared ownership,[53] addresses, phone numbers, and websites,[54] and intermingled

---

[52] *See* II.B.1.b., *infra*.

[53] Each of the Individual Defendants is an officer, manager, or signatory for multiple Corporate Defendants. *See infra* § I.B.2.

[54] Appendix IV (summarizing evidence of common enterprise).

finances.[55] Corporate Defendants are all controlled by Michael Force and the other Individual Defendants, directly or indirectly, and share a common business purpose: to carry out the scheme.

### 2. The Individual Defendants

**Michael Force** ("Force") is the founder, owner, and CEO of Digital Altitude,[56] the sole shareholder of Digital Altitude UK, and a member and manager of Soar. Force created Digital Altitude and is the ringleader of the scam, which the other individual defendants participate in and perpetuate. Force personally makes the key misrepresentations in the videos that are the core of Digital Altitude's sales pitch. He also knew they were false; for example, he registered the obscure website on which Defendants publish earnings data showing that most consumers make little or no income.[57] In addition, at least one payment processor informed Force it was terminating a Digital Altitude merchant account because of "a pattern of transactions associated with high-risk activity."[58] Force has also opened bank and merchant accounts for Digital Altitude that it used to accept payments from consumers and pay out commissions to them.[59] He must know what these accounts' transactions show: most consumers do not make money.

---

[55] *Id*. Principals of the Corporate Defendants have used the companies interchangeably on merchant account applications, and Corporate Defendants have made and accepted payments on each others' behalf. *Id*. And Aspire Processing, RISE Nevada, and RISE Utah appear to have been created solely to open merchant accounts to process consumers' payments to the scheme. *See* App. I, II & III.

[56] Force has variously claimed to be the sole owner, or co-owner with Defendant Dee, or with his wife Dalila. EX 33, 990-94; EX 31, 939-40; *supra* note 51. In any event, Force controls the company. EX 35, 1091-92.

[57] EX 39, 1368-80, EX 40, 1592.

[58] EX 22, 711. Shortly thereafter, that payment processor terminated three more of Defendants' merchant accounts, in the names of Living Exceptionally, Inc., Aspire Processing LLC, and Rise Systems and Enterprise LLC, again informing Defendants that these accounts were associated with "high risk activity." *Id*. at 668 (Aspire), 750 (RISE), 812-828 (Living Exceptionally).

[59] EX 16, 357, 360, 396, 503, 533, 556, (Chase); EX 17, 561, 583-603 (Bank of America); EX 22, 670 (Square); EX 24, 855-58 (EMS); EX 25, 890-91 (PowerPay); *see also* EX 38, 1226 (Force discussing merchant accounts' status).

**Mary Dee** ("Dee") is the Chief Operating Officer of Digital Altitude and, by her own testimony, "oversee[s] all daily operations of Digital Altitude" and has "direct knowledge of all [its] business transactions."[60] She is a director of Digital Altitude UK, a member and manager of Aspire Processing, RISE Nevada, and Upside, and a manager of Thermography.[61] Dee is the sole owner of Aspire Processing and Aspire Processing UK.[62] Her roles and her own admissions show she participated in and had knowledge of Digital Altitude's fraud.

Dee also opened and managed numerous merchant and bank accounts in the names of entities other than Digital Altitude, which—she had to know—were used to process consumers' payments to Digital Altitude, or to hold money for Digital Altitude.[63] Dee knowingly and falsely claimed, in merchant account applications, that neither Aspire Processing nor Digital Altitude had ever had a merchant account terminated.[64] Her participation in the deception of banks and payment processors shows she knew the operation was unlawful.

Dee also knew of red flags, including that payment processors closed Digital Altitude's accounts because of its high risk activity.[65] She could not, in good faith, have been ignorant of the scheme's fraudulent nature.

**Morgan Johnson** ("Johnson") is Digital Altitude's Finance Officer and a member and manager of RISE Nevada. Johnson is intimately involved in both paying out commissions and facilitating consumers' payments to Digital Altitude through payment processors, including communicating directly with payment

---

[60] EX 36, 1129. In payment processing applications, Dee has claimed to be part owner of Digital Altitude, sometimes a majority owner. *See, e.g.*, EX 31, 939-41.

[61] EX 41, 2643-45, 2696-98, 2725-26, 2734-57.

[62] *Id.* at 2643-57.

[63] EX 16, 361-63 (Aspire), 364, 535 & 538 (Thermography), 505-10 (Disc), 521-23 (RISE); EX 24, 860, 865-66; EX 34, 1007-09; *see also* App. II & III. She has also applied for merchant accounts for Digital Altitude. App. I.

[64] EX 23, 847-50; EX 24, 865; App. I (showing prior terminations).

[65] *Id.*

1   processors.[66] She must know that most consumers who join Digital Altitude are

2   paid little or nothing in commissions, not the advertised substantial earnings.

3       Johnson also has joint control, with other Individual Defendants, of several

4   bank accounts in Corporate Defendants' names.[67] The accounts were used to funnel

5   consumers' payments to Digital Altitude, avoiding payment processors' scrutiny.[68]

6   Johnson also opened a merchant account in the name of one of the RISE entities

7   that accepted consumers' payments to Digital Altitude.[69]

8       Johnson knew about red flags, including that Digital Altitude's merchant

9   accounts "keep getting shut down."[70] She communicated with at least one payment

10  processor about consumer chargebacks and knew the account was shut down for "a

11  pattern of transactions associated with high-risk activity."[71] She could not, in good

12  faith, have been ignorant of the scheme's fraudulent nature.

13      **Alan Moore** ("Moore") is Digital Altitude's Chief Technology Officer and

14  secretary of Aspire Processing UK.[72] Moore is responsible for payment processing

15  technological issues, including fixing technical problems salespeople experienced

16  while submitting consumers' payments for processing.[73]

17      Moore participated in deceiving banks and payment processors on Digital

---

[66] EX 38, 1212-13, 1217 (Johnson explains details of merchant accounts and anticipated commissions payments),1222-25, (Johnson has direct visibility into all payments to Digital Altitude), 1207-08 (same), 1209 (Johnson tells "coaches," "You can now use the regular pay links to process payments and don't have to go through Payza."), 1210-11 (similar), 1236 ("Morgan is working on other options, but for now, [Payza] is what we have to use."), 1237 ("Morgan single handedly got these 2 merchants up literally a day apart of each other."), 1220-21 ("Morgan is the payroll contact" for commissions), 1204-05 (copy of an email Johnson sent to "coaches" regarding when commissions would be paid).

[67] EX 16, 361-63 (Aspire Processing), 505-10 (Disc), 521-23 (RISE).

[68] App. II & III; EX 34, 1012-14; EX 41, 1606-07.

[69] *See* App. III.

[70] EX 38, 1212-13.

[71] EX 22, 750-51.

[72] EX 41, 2299, 2646-48.

[73] EX 38, 1195, 1197-1202, 1206, 1214-16, 1218-19, 1227, 1229.

Altitude's behalf. In January 2017, after at least ten of Digital Altitude's merchant accounts had been terminated, Moore set up two dummy websites in the names of two companies seemingly unrelated to Digital Altitude, solely to obtain merchant accounts in those companies' names that could be used to facilitate consumers' payments to Digital Altitude.[74] Moore registered the sites' domain names and, on Digital Altitude's behalf, contracted for hosting and payment functionality for the sites.[75] The dummy sites feature product names that differ from Digital Altitude's products and lack substantive descriptions.[76] Importantly, the dummy sites do not make the earnings claims included in Digital Altitude's sales sites. They also contain clear statements that purchasers have 72 hours in which to seek a refund, unlike Digital Altitude's sales sites. The dummy sites are Potemkin villages, designed to camouflage any connection to Digital Altitude and trick banks and payment processors into re-opening Defendants' access to the card payment network. Moore's actions show he knew exactly what the sites were to be used for: when a payment processor declined to open a merchant account for one of the two companies, Moore immediately closed down the associated dummy website's payment functionality.[77] Moore's intimate involvement in deceiving banks and payment processors shows, at the very least, that he knew the operation was not legitimate. He could not, in good faith, have been ignorant of the scheme's fraudulent nature.

**Sean Brown** ("Brown") is the sole principal of RISE Utah and an officer of Aspire Processing.[78] He is an attorney who has represented Digital Altitude.[79] He

---

[74] App. I; EX 18, 614-15; EX 19, 618; EX 22, 713, 716, 744-45.

[75] EX 18, 614-15; EX 19, 618.

[76] EX 39, 1476-96.

[77] EX 19, 618; EX 22, 713-15.

[78] EX 41, 2643-45, 2727-33.

[79] See EX 35, 1081-84. Brown is named as a defendant because, since at least June 2016, he did not have an arms-length attorney-client relationship with Digital Altitude but was deeply involved in the scam.

claims to be on Digital Altitude's board of directors.[80] Brown communicated with at least one payment processor on Digital Altitude's behalf, attesting to the legitimacy of its business model.[81] Brown's official roles with these Corporate Defendants, and his own statements, evidence his control and knowledge of the common enterprise's activity, and thus knowledge of its fraudulent nature.

In addition, Brown has participated in deceiving banks to keep channels of funds open to Digital Altitude. He opened a bank account for RISE Utah to funnel over $500,000 in consumer payments to Digital Altitude through merchant accounts in RISE's name.[82] On the same days as such funds were received from RISE's merchant accounts, they were transferred to a Digital Altitude bank account.[83] Brown also opened a bank account for Aspire Processing using Digital Altitude's employer identification number (EIN).[84] That bank account was used solely to open a PayPal account in the name of Aspire Processing that, in turn, was used to process over $300,000 in consumer payments to Digital Altitude, which funds were transferred directly from PayPal to a Digital Altitude bank account.[85] Brown's participation in deceiving banks and payment processors shows, at the very least, that he knew the operation was not legitimate. He could not, in good faith, have been ignorant of the scheme's fraudulent nature.

## C.  Consumer Injury

Defendants have taken in over $32 million, as of March 22, 2017. More than 50 consumers victimized by this scam complained to the FTC, with many reporting

---

[80] EX 35, 1081-84. However, Force has testified there is no board of directors. *Id.* at 1092. Regardless, Brown's statement concedes he holds a high position with the enterprise, entailing knowledge of and responsibility for its activities.

[81] EX 33, 989.

[82] App. III. These include merchant accounts with Square and PayPal. *Id.*

[83] *Id.*

[84] *Compare* EX 16, 361 *with id.* at 503.

[85] App. II.

losses of over $2,000.[86] Some lost $10,000 or more, and some lost $30,000 or more.[87] Defendants' own earnings disclosure confirms that the vast majority of consumers who buy into Defendants' system do not earn the substantial income that Defendants advertise, and most make little or nothing at all.[88] Based on bank records, payment processor statements, Defendants' own financial statements, and an expert report that Digital Altitude and Michael Force submitted in other litigation, the FTC estimates that Defendants have defrauded consumers of more than $14 million through 2016.[89]

## III.   Argument

### A.   The FTC Act Authorizes the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives the Court authority to issue an injunction against violation of any provisions of law enforced by the FTC and "any ancillary relief necessary to accomplish complete justice." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)). This ancillary relief can include, among other remedies, an *ex parte* TRO, a preliminary injunction, an asset freeze, and the appointment of a receiver. *See, e.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999) (TRO and preliminary injunction, both including asset freeze); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512 (9th Cir. 1987) (TRO and preliminary injunction including asset freeze and appointment of a receiver). Courts in this District have repeatedly granted preliminary relief similar to that sought here, under Section 13(b).[90]

---

[86] EX 41, 1609. "Consumer complaints are highly probative of whether a practice is deceptive . . . ." *FTC v. Willms*, No. 2:11-CV-0828, 2011 WL 4103542, *5 (W.D. Wash. Sept. 13, 2011).

[87] EX 41, 1609.

[88] *Id*.; *see also* EX 39, 1368-73, EX 40, 1592.

[89] *See supra*, note 3.

[90] *See supra*, note 4 (collecting cases).

18

1    In determining whether to grant preliminary relief under Section 13(b), the

2    Court must consider two factors: (1) the FTC's likelihood of ultimate success, and

3    (2) whether the public equities outweigh any private equities. *Affordable Media*,

4    179 F.3d at 1233. Unlike private litigants, the FTC does not need to prove

5    irreparable injury. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir.

6    1989); *FTC v. Warner Communications Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984);

7    *see also FTC v. Wealth Educators, Inc.*, No. 2:15-CV-2357, 2015 WL 11439063, at

8    *5 (C.D. Cal. Apr. 6, 2015) (FTC faces "more lenient standard" than private

9    litigants). Because irreparable injury is presumed, the burden of establishing

10   success on the merits is decreased, and the Court "need only . . . find some chance

11   of probable success on the merits" in order to award preliminary relief. *World Wide*

12   *Factors*, 882 F.2d at 347 (quoting *United States v. Odessa Union Warehouse Co-*

13   *op*, 833 F.2d 172, 176 (9th Cir. 1987)). Moreover, when weighing the equities, the

14   public interest should receive greater weight than private interests. *Id.*

15      **B.    A Temporary Restraining Order is Appropriate and Necessary**

16   The evidence shows that the FTC is likely to succeed on its claims that

17   Defendants have violated the FTC Act and the equities weigh heavily in favor of

18   the requested preliminary relief.

19          **1.    The FTC Is Likely to Succeed on the Merits**

20              **a.    Defendants Have Violated Section 5 of the FTC Act**

21   Section 5 of the FTC Act empowers the FTC to prevent "deceptive acts or

22   practices in or affecting commerce." 15 U.S.C. § 45(a). "An act or practice is

23   deceptive if first, there is a representation, omission, or practice that, second, is

24   likely to mislead consumers acting reasonably under the circumstances, and third,

25   the representation, omission, or practice is material." *FTC v. Stefanchik*, 559 F.3d

26   924, 928 (9th Cir. 2009) (quoting *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001)). A

27   misrepresentation may be either express or implied. *FTC v. Figgie Int'l*, 994 F.2d

28   595, 604 (9th Cir. 1993). A representation is likely to mislead consumers if (1) the

express or implied message conveyed is false, or (2) the maker of the representation lacked a reasonable basis for asserting that the message was true. *Pantron I*, 33 F.3d at 1096. *See also FTC v. Lights of America, Inc.*, No. 8:10-CV-1333, 2013 WL 5230681, at *40 (C.D. Cal. Sept. 17, 2013) (holding defendants liable for claims made without adequate substantiation). Where the maker lacks adequate substantiation evidence, the maker necessarily lacks any reasonable basis for its claims. *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).

In determining whether a representation is likely to mislead consumers, courts consider the overall "net impression" it creates. *Stefanchik*, 559 F.3d at 928.[91] Claims of "potential" or "projected" earnings or rewards imply that such earnings are representative of what many consumers have achieved. *See FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

A representation, omission, or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *In re Cliffdale Assocs.*, 103 F.T.C. 110, 165, 1984 WL 565319 (F.T.C. 1984)). If consumers are likely to have chosen differently but for the deception, then a misrepresentation is material. *FTC v. Southwest Sunsites, Inc.*, 105 F.T.C. 7, 99-101, *aff'd*, 785 F.2d 1431 (9th Cir. 1986). Express claims are presumed to be material, as are claims that go to the central characteristics of a product or service. *Pantron I Corp.*, 33 F.3d at 1095-96; *Lights of Am.*, 2013 WL 5230681, at *41. Consumer reliance is presumed if defendants made material misrepresentations that were widely disseminated, and consumers purchased the defendant's product. *Figgie Int'l*, 994 F.2d at 605-6.

The FTC is likely to prevail on Count I of the Complaint, which alleges that Defendants have violated Section 5 by misrepresenting the amount of income

---

[91] "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).

consumers are likely to earn with Defendants' program. As shown above, Defendants falsely tell consumers that they can expect to earn substantial returns by buying into Defendants' program—including Force's claim, in the Aspire videos, that consumers can make "6 figures in 90 days or less." In reality, most consumers make little or no money and do not even recoup their investment. Indeed, Defendants' own earnings disclosure (un-advertised and buried on a hard-to-find website) concedes that most consumers do not make substantial income.[92] Defendants' representation that consumers are likely to earn substantial income through Defendants' "program" is false or unsubstantiated. Such false earnings claims are both likely to deceive and material.[93]

The FTC is also likely to prevail on Count II of the complaint, which alleges that Defendants made misrepresentations regarding the goods and services they sell to consumers, specifically that consumers would receive business coaching from coaches that would provide what the consumer needs to build a successful business. As shown above, to persuade consumers to sign up, Defendants tell them that they will receive training from a coach who is experienced and knowledgeable, and whose coaching will ensure the consumer's success. But the "coaches" are merely salespeople paid on commission, Defendants' claims about their background and training are untrue, and the "coaching" provided is merely an extended sales pitch and does not yield a successful business for most consumers—rather, most consumers who join Defendants' program lose money.[94]

---

[92] EX 39, 1368-73, EX 40, 1592.

[93] "Courts consistently conclude that misrepresentations regarding income potential are material …. [and] deceptive under the FTC Act." *FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL 11118111, *5 (D. Ariz. Sept. 18, 2015) (citing *Five-Star Auto*, 97 F. Supp. 2d at 528-29 & 532-33); *see also FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985) ("exaggerated profit and earning prediction cut to the core of the customer's decision to invest"); *FTC v. Sage Seminars*, No. 4:95-CV-2854, 1995 WL 798938, *3-5 (N.D. Cal. Nov. 2, 1995) (misrepresentations about potential earnings were material).

[94] *See supra* § I.A.

21

1  Consumers do not receive the product they thought they had purchased.[95]

2  Defendants' false claims are presumed material for two independent reasons: they

3  are express and they go to the central characteristics of the product.[96]

4            **b.**      **The Corporate Defendants Are Subject to Joint and**

5                     **Several Liability as a Common Enterprise**

6          The Corporate Defendants have operated as a common enterprise and thus

7  "each may be held liable for the deceptive acts and practices of the others." *FTC v.*

8  *Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (citing *FTC v. Network*

9  *Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010) (shared resources, staff,

10  funds, ownership and management)); *see also FTC v. J.K. Publ'ns, Inc.*, 99 F.

11  Supp. 2d 1176, 1202 (C.D. Cal. 2000) ("maze of interrelated companies").[97] As

12  shown in Section II.B.1, above, the Corporate Defendants share ownership,

13  addresses, phone numbers, and websites; they intermingle finances, and operate for

14  a common, singular purpose: executing the scam at issue here. Each of the

15  Corporate Defendants is therefore liable for the total injury caused by the scam.

16            **c.**      **The Individual Defendants Are Personally Liable**

17          The Individual Defendants are liable for injunctive and monetary relief

18  because they directly participated in the Digital Altitude scheme, had control over

19  it, and knew of the deception.[98] As shown in Section II.B, above, the Individual

20

---

21  [95] *See, e.g.*, EX 7, 89; EX 10, 154-55; EX 12, 241. The high chargeback rate
further evidences consumer dissatisfaction—and Defendants' deception. *FTC v.*

22  *Ideal Fin. Sols., Inc.*, No. 2:13-CV-0143, 2015 WL 4032103, at *7 (D. Nev. 2015)
(deception "may be inferred from . . . 'high . . .chargeback rates'") (quoting *FTC v.*

23  *Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1221 (D. Nev. 2011)).

24  [96] *See Pantron I*, 33 F.3d at 1095-96; *Lights of Am.*, 2013 WL 5230681, at *41.

25  [97] Courts weighing a claim of common enterprise consider non-exclusive factors
such as whether the companies were under common ownership and control;

26  whether they pooled resources and staff; whether they shared marketing and phone
numbers; and whether they jointly participated in a common venture in which they

27  benefited from a shared business scheme. *Network Servs.*, 617 F.3d at 1136, n.6
and 1143.

28  [98] An individual defendant is liable (1) for injunctive relief if he directly
participated in the unlawful acts or had some control over the acts, and (2) for

1    Defendants are officers and owners of the Corporate Defendants through which

2    they execute the scam, and so should be held to have control and knowledge of the

3    scheme's fraudulent activity.[99] And as shown in Section III.F, the Individual

4    Defendants control and participate in the unlawful acts, and have actual or

5    constructive knowledge that they are unlawful.[100] They are therefore personally

6    liable, jointly and severally, for the total injury caused by their scam. *Commerce*

7    *Planet*, 815 F.3d at 600.

8    **2.    The Equities Tip Decidedly in the Public's Favor**

9    "[W]hen a district court balances the hardships of the public interest against

10   a private interest, the public interest should receive greater weight." *Affordable*

11   *Media*, 179 F.3d at 1236 (quoting *World Wide Factors*, 882 F.2d at 347). The

12   public interest in this case is compelling—halting unlawful and injurious conduct

---

[99] monetary relief if he also possessed actual or constructive knowledge of the unlawful acts. *Network Servs.*, 617 F.3d at 1138-39; *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1170-71 (9th Cir. 1997).

[99] "Status as a corporate officer is sufficient to establish individual liability." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1080 (C.D. Cal. 2012) (granting summary judgment for FTC) (citing *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)), *aff'd,* 644 Fed. Appx. 709 (9th Cir. 2016); *J.K. Publ'ns*, 99 F. Supp. 2d at 1204 ("[S]tatus as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control."); *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.").

[100] The knowledge element is satisfied if the individual was recklessly indifferent to the possibility the business was fraudulent, or was aware of a high probability that the business was engaged in fraud and intentionally avoided learning the truth. *Network Servs.*, 617 F.3d at 1138-39. A showing that an individual has willfully ignored warning signs can meet this standard. *Id.* at 1141 (finding reckless indifference for ignoring "numerous warning signs" including "multiple customer complaints" and "suspicious financial practices"). A need to open new merchant accounts under new names is one such warning sign. *J.K. Publ'ns*, 99 F. Supp. 2d at 1204-07 (individual who opened new merchant accounts for business under circumstances that should have prompted investigation held to be recklessly indifferent). Participation in a scheme with high chargeback rates can also constitute evidence of knowledge. *Grant Connect*, 763 F.3d at 1102. Similarly, "awareness of consumer complaints is sufficient to establish" knowledge. *Lights of Am.,* 2013 WL 5230681, at *50.

1   and preserving assets for restitution to injured consumers. Defendants, by contrast,

2   have no legitimate interest in continuing their scam.[101] Based on the evidence

3   before the Court, the FTC is likely to succeed on the merits, and the equities tip

4   decidedly in the public's favor. Thus, a TRO is warranted.

5         **C.    The Proposed *Ex Parte* TRO Is Appropriate**

6         The FTC has filed this action to stop the Defendants' unlawful conduct and

7   to obtain restitution for their victims. If Defendants receive advance warning of the

8   FTC's action, they are likely to dissipate assets or destroy evidence, which will

9   frustrate the Court's ability to grant relief.[102]

10         Digital Altitude's business is riddled with fraud. Not only is it premised on a

11   lie about the essence of its product—the income consumers will likely earn—but

12   Defendants have repeatedly lied to financial institutions to perpetuate this

13   fraudulent scheme. Defendants have lied on bank and payment processor

14   applications so they could continue defrauding consumers after their conduct

15   aroused suspicions.[103] They have created new corporate entities to obtain new

16   merchant accounts in order to process consumers' payments to Digital Altitude,

17   scrupulously hiding this fact from the payment processors who issue the

18   accounts.[104] They have created dummy websites to evade payment processors'

19   fraud detection programs.[105] They have even used their spouses' names to open

20   accounts.[106] Defendants also have created new, seemingly unrelated websites to

21   attract consumers to their scheme and to thwart consumers' ability to perform their

22

---

23   [101] *See World Wide Factors*, 882 F.2d at 347 ("no oppressive hardship to
24   defendants in requiring them to comply with the FTC Act, refrain from fraudulent
     representation or preserve their assets from dissipation or concealment") (quotation
25   marks omitted).

     [102] *See* Certification and Declaration of Counsel, filed herewith.

26   [103] *See supra* §I.A.5.

27   [104] *Id.*

     [105] *Id.*

28   [106] EX 22, 632; EX 34, 1012.

own research on Defendants' purported moneymaking opportunity.[107] They process some consumers' payments through a Mexican bank.[108]

Defendant Force, the architect of the scheme, has been involved in online get-rich-quick operations for years. As early as September 2009, he was advertising on his personal website that he and his partners were "some of the best in the world" at building a "successful online business" and that he could advise consumers on how to "make ads FTC compliant"; he also warned his audience on avoiding "the attention of the good-ol' boys at the FTC."[109] And, he has reportedly bragged that he is "judgment-proof" because he has hidden his assets.[110]

To preserve the possibility of effective final relief, including restitution to the consumers who have collectively lost millions of dollars to Defendants' fraud, the proposed *ex parte* TRO would: (1) freeze the Individual and Corporate Defendants' assets;[111] (2) appoint a temporary receiver over the Corporate Defendants; (3) grant the FTC and the temporary receiver immediate access to Defendants' business premises; and (4) provide for limited expedited discovery.[112]

---

[107] EX 14, 291; EX 39, 1533.

[108] EX 1, 2; EX 14, 292; EX 41, 1600.

[109] EX 39, 1570. Two consumers filed complaints with the FTC against Force for these prior schemes. EX 41, 1609, 2637-2642. Force also failed to defend a lawsuit brought against him by one of his prior associates in these schemes. EX 37, 1185.

[110] Force's one-time colleague, Matthew Lloyd, declared:

Force has stated to me that he is judgment proof. For example, below is an excerpt from an email I received from Force:

I'd be happy to be done with you and this conversation. Fwd to your shady lawyer…could care less as they are the biggest liars on earth. Waste of time as there is nothing you can get from me. Have multiple citizenships, have no registered companies in the U.S. and hold no assets in the U.S. Good luck.

EX 38, 1073-74.

[111] As the FTC is likely to succeed in showing that the Individual Defendants are personally liable, an asset freeze should issue against them as well as the Corporate Defendants. *See supra*, note 4 (collecting cases issuing and affirming such relief).

[112] The Ninth Circuit has repeatedly upheld such relief. *See, e.g., supra* note 4.

Appointing a temporary receiver is critical. Where corporate defendants and their managers and officers have engaged in deception, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of" consumers victimized by the fraud. *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981); *see also Canada Life Ins. Co. v. LaPeter,* 563 F. 3d 837, 845 (9th Cir. 2009) (receiver appropriate to avert "danger of substantial waste and risk of loss"); *SEC v. Presto Telecomm., Inc.*, 153 Fed. Appx. 428, 430 (9th Cir. 2005) (receiver "necessary to prevent further dissipation of [defendant's] assets and to protect the interests of its investors"). The receiver will help ensure that the Corporate Defendants do not dissipate their ill-gotten gains by identifying and securing their assets and records; he may also help determine the full extent of the fraud and identify victims.[113]

Finally, Defendants' actions betray a deep disregard for the law—particularly as to their financial affairs—suggesting they may well seek to conceal assets or destroy evidence if forewarned.[114] Accordingly, the FTC requests that this Motion be filed under seal and that a TRO be issued without prior notice to Defendants, and that the FTC and the temporary receiver be granted immediate access to the business premises, to prevent Defendants from moving, destroying or secreting evidence, and dissipating or concealing assets.

**IV.   Conclusion**

For all the foregoing reasons, the FTC respectfully requests that the Court grant this Motion, issue the proposed TRO, and require Defendants to show cause why a preliminary injunction should not issue against them.

---

[113] *See id.*

[114] *See supra* §I.A.5.

1

2

3

4   Dated: January 29, 2018

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Andrew Hudson
Laura Basford
Jody Goodman
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-2213 / ahudson@ftc.gov
(202) 326-2343 / lbasford@ftc.gov
(202) 326-3096 / jgoodman1@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

## Digital Altitude Payment Processing History & Statements of Company Ownership

| Date | Event | Corporate Name on Merchant Account | Payment Processor | Record Citation |
|------|-------|-----------------------------------|-------------------|-----------------|
| 7/25/16 | Digital Altitude LLC's merchant account is terminated by Square because the account posed a "credit risk." | Digital Altitude LLC | Square | EX 22, 842 |
| 8/1/16 | Digital Altitude LLC's merchant account is terminated by WePay because of "a consistent month-over-month increase in chargeback percentage." | Digital Altitude LLC | WePay | EX 30, 934 |
| 8/2/16 | Rise Systems & Enterprise LLC is registered in Nevada, with Mary Dee and Morgan Johnson as managers. | RISE Systems & Enterprise LLC | | EX 41, 2725-26 |
| 8/2/16 | Morgan Johnson opens a RISE Systems & Enterprise LLC merchant account with Square. | RISE Systems & Enterprise LLC | Square | EX 22, 716, 842 |
| 8/4/16 | Rise Systems & Enterprise LLC is registered in Utah with Sean Brown as sole manager. | RISE Systems & Enterprise LLC | | EX 41, 2727-30 |
| 8/8/16 | Digital Altitude LLC merchant account is frozen by EVO due to "excessive declines." | Digital Altitude LLC | EVO/ PowerPay | EX 25, 887-88 |
| 8/14/16 | Aspire Processing LLC is registered in Nevada with Mary Dee as the sole manager. | Aspire Processing LLC | | EX 41, 2643-45 |
| 8/19/16 | Mary Dee opens a RISE Systems & Enterprise LLC merchant account with PayPal. | RISE Systems & Enterprise LLC | PayPal | EX 34, 1007 |
| 8/23/16 | A Disc Enterprises, LLC merchant account with PayPal is opened in the name of Robert Bell, spouse of Mary Dee. | Disc Enterprises, LLC | PayPal | EX 34, 1012 |
| 8/23/16 | An Aspire Processing LLC merchant account with PayPal is opened in the name of Alyssa Wilkerson. | Aspire Processing LLC | PayPal | EX 34, 1018 |
| 8/25/16 | PayPal places a limitation on Digital Altitude LLC's merchant account for "High Risk Selling Activity." | Digital Altitude LLC | PayPal | EX 34, 1002 |
| 8/25/16 | PayPal places a limitation on RISE Systems & Enterprise LLC's (Utah) merchant account for "High Risk Selling Activity." Internal PayPal notes explain that this limitation was placed in part because of: "Payments received for RISE: Digital Marketing Mastery Course via URL https://my.digitalaltitude.co." | RISE Systems & Enterprise LLC (Utah) | PayPal | EX 41, 1607 |
| 8/26/16 | PayPal places a limitation on Aspire Processing LLC's merchant account for "High Risk Selling Activity." Internal PayPal notes explain that this limitation was placed because of: "Multiple new accounts receiving high volume of large payments for digitalaltitude.co." | Aspire Processing LLC | PayPal | EX 41, 1607 |
| 8/26/16 | PayPal places a limitation on Disc Enterprises, LLC's merchant account for "High Risk Selling Activity." Internal PayPal notes explain that this limitation was placed because of: "Multiple new accounts receiving high volume of large payments for digitalaltitude.co." | Disc Enterprises, LLC | PayPal | EX 41, 1607 |
| 9/1/16 | RISE Systems & Enterprise LLC's merchant account with Square is terminated because the account posed a "credit risk" and was "linked to a frozen user." An internal record maintained by Square notes "claims this is a new biz [sic] when they have been processing similarly on other accts. Could be they rebranded due to the ripoff reports [i.e., online consumer complaints]." | RISE Systems & Enterprise LLC | Square | EX 22, 842-43; EX 22, 755 |
| 9/6/16 | Living Exceptionally LLC's merchant account is terminated by Square because of "declines and chargebacks." | Living Exceptionally LLC | Square | EX 22, 836 |

| Date | Event | Corporate Name on Merchant Account | Payment Processor | Record Citation |
|------|-------|-----------------------------------|-------------------|-----------------|
| 9/6/16 | An Aspire Processing LLC merchant account with Square is opened in the names of Dalila Fazai (misspelled "Fazia") and Rashard Washington (spouses, respectively, of Michael Force and Morgan Johnson). | Aspire Processing LLC | Square | EX 22, 842; EX 22, 632 |
| 9/13/16 | Aspire Processing LLC's merchant account with Square is terminated because the account was "linked to a frozen user." | Aspire Processing LLC | Square | EX 22, 843 |
| 9/13/16 | Mary Dee applies for an Aspire Processing LLC merchant account with ProPay. | Aspire Processing LLC | ProPay | EX 27, 911, 913 |
| 9/14/16 | Digital Altitude LLC merchant account, previously frozen, is formally terminated by EVO Payments International ("EVO") due to "excessive declines and processing $1 trials." | Digital Altitude LLC | EVO/ PowerPay | EX 25, 900 |
| 9/15/16 | ProPay denies Mary Dee's application for an Aspire Processing LLC merchant account, notifying Dee that the business is "high risk." | Aspire Processing LLC | ProPay | EX 27, 912 |
| 9/16/16 | Mary Dee applies for an Aspire Processing LLC merchant account with Electronic Merchant Systems ("EMS").  In that application she answers "no" in response to the question "Has the business or any associated owner ever been terminated as a VISA/MasterCard/Discover/American Express merchant?" | Aspire Processing LLC | EMS | EX 24, 865 |
| 9/16/16 | In a tax filing, Michael Force reports that he is 100% shareholder of Digital Altitude for the time period 8/15/2015 through 12/31/2016. | | | EX 28, 923-28 |
| 9/22/16 | Mary Dee submits an application for a Digital Altitude LLC merchant account to EVO stating that she is 60% owner of Digital Altitude LLC. | Digital Altitude LLC | EVO | EX 25, 872 |
| 9/29/16 | EMS denies Mary Dee's application for an Aspire Processing LLC merchant account. | Aspire Processing LLC | EMS | EX 24, 855, 860 |
| 10/10/16 | Mary Dee and Michael Force apply for a Digital Altitude LLC merchant account with MLS Direct Network, Inc./TSYS. In the application, they state that Dee owns 51% of Digital Altitude LLC and Force owns 49%. | Digital Altitude LLC | MLS Direct Network/ TSYS | EX 31, 939-42 |
| 10/14/16 | MLS Direct Network, Inc./TSYS approves Mary Dee and Michael Force's application and begins processing payments for Digital Altitude LLC. | Digital Altitude LLC | MLS Direct Network/ TSYS | EX 31, 966 |
| 10/14/16 | Mary Dee applies for a Digital Altitude LLC merchant account with Netcents Technology, Inc. ("NetCents"). | Digital Altitude LLC | NetCents | EX 36, 1129 |
| 11/1/16 | NetCents approves Mary Dee's application and begins processing payments for Digital Altitude LLC. | Digital Altitude LLC | NetCents | EX 36, 1129-30 |
| 11/13/16 | NetCents terminates Digital Altitude LLC's merchant account after processing $779,960.72 in credit card transactions. According to an June 26, 2017 email from NetCents' president to Mary Dee, "[i]n total, there were 969 transactions, of which 438 failed, and 431 were approved." | Digital Altitude LLC | NetCents | EX 36, 1130; 1140-41 |
| On or about 11/21/16 | NetCents is terminated from processing any payments.   According to an June 26, 2017 email from NetCents' president to Mary Dee, Netcents "had all their processing shut down as a result of their business dealings with Digital Altitude." | Digital Altitude LLC | NetCents | EX 36, 1140-41 |

| Date | Event | Corporate Name on Merchant Account | Payment Processor | Record Citation |
|---|---|---|---|---|
| 12/14/16 | Mary Dee and Michael Force apply for a Digital Altitude LLC merchant account with Chase Paymentec. In that application, they state that Dee owns 90% of Digital Altitude LLC and Force owns 10%. | Digital Altitude LLC | Chase Paymentech | EX 16, 346-50 |
| 12/21/16 | TSYS terminates Digital Altitude LLC's merchant account due to its "excessive foreign card activity with high decline" rates and the fact that the business appears to have "no tangible products." | Digital Altitude LLC | MLS Direct Network/ TSYS | EX 31, 958, 966 |
| 12/28/16 | EMS terminates Digital Altitude LLC's merchant account due to the account's "excessive chargeback ratio." | Digital Altitude LLC | EMS | EX 24, 856 |
| 12/29-30/2016 | Mary Dee and Morgan Johnson communicate with Bright Market LLC, dba FastSpring ("FastSpring") regarding opening a merchant account. | Digital Altitude LLC | FastSpring | EX 26, 902-06 |
| 12/29/16 | Mary Dee applies for a Digital Altitude LLC merchant account with Pivotal Payments. In that application she states that she owns 51% of Digital Altitude LLC. | Digital Altitude LLC | Pivotal Payments | EX 28, 918-21 |
| 1/4/17 | FastSpring begins processing Digital Altitude LLC credit card transactions. | Digital Altitude LLC | FastSpring | EX 26, 908 |
| 1/6/17 | Pivotal Payments denies Mary Dee's application for a Digital Altitude LLC merchant account due to the merchant's "chargeback levels & prohibited products (business opportunity)." | Digital Altitude LLC | Pivotal Payments | EX 28, 929-30 |
| 1/13/17 | FastSpring terminates Digital Altitude LLC's merchant account, notifying Morgan Johnson that FastSpring "does not process MLM transactions." Between January 4 and January 13, 2017, FastSpring processed 146 transactions for Digital Altitude, and 99 of those transactions were declined. | Digital Altitude LLC | FastSpring | EX 26, 907-09 |
| 1/17/17 | Alan Moore registers the domain name traininggrades.com. | Digital Altitude LLC | | EX 18, 615 |
| 1/19/17 | Gerard Joseph attempts to open a merchant account with Square for Martin Merriment Companies, Inc., using the email address "support@traininggrades.com," and is denied. | Martin Merriment Companies, Inc. | Square | EX 22, 713, 715 |
| 1/19/17 | Alan Moore disables the functionality on the traininggrades.com website that would allow consumers to make credit card payments through the website. | | | EX 19, 618 |
| 1/21/17 | A Digital Altitude staff member--apparently unaware of Square's denial of the Martin Merriment Companies, Inc. account--directs salespeople to use the website traininggrades.com to accept consumer's credit card payments for Digital Altitude. | | | EX 38, 1228 |
| 2/21/17 | Mary Dee applies for a Digital Altitude LLC merchant account with Unified Payments. In that application she answers "no" in response to the question "Has the merchant or owner been terminated from accepting credit card payments from any payment network for this business or any other business?" She also states that she owns 90% of Digital Altitude LLC. | Digital Altitude LLC | Unified Payments | EX 23, 847-50 |

| Date | Event | Corporate Name on Merchant Account | Payment Processor | Record Citation |
|---|---|---|---|---|
| 2/28/17 | Unified Payments accepts Dee's application and opens a Digital Altitude LLC merchant account. | Digital Altitude LLC | Unified Payments | EX 23, 853 |
| 3/10/17 | Digital Altitude LLC and Michael Force are placed on MasterCard's MATCH ("Member Alert to Control High-Risk Merchants") list by First National Bank of Omaha, the acquiring bank for MLS Direct Network, Inc. and TSYS. | Digital Altitude LLC | | EX 23, 851-52 |
| 3/1/17 | Unified Payments terminates Digital Altitude LLC's merchant account. | Digital Altitude LLC | Unified Payments | EX 23, 853 |
| 4/6/17 | In the MOBE v. Digital Altitude LLC matter (C.D. Cal.), Michael Force provides the following sworn testimony: "Q.· Who has ownership in Digital Altitude? A.· Me and my wife. Q.· Anyone else? A.· No one else." | | | EX 35, 1091 |
| 4/15/17 | Pauline Amegbedji's credit card statement lists Mexico City, Mexico as the location of the transaction when she purchases Ascend on her credit card, and she is charged a foreign currency conversion fee. | | | EX 1, 9 |
| 5/3/17 | Allied Wallet, Ltd. notifies Morgan Johnson that Digital Altitude's merchant account would be terminated because "our banking partners have advised that they cannot support the business model moving forward." | Digital Altitude LLC | Allied Wallet, Ltd. | EX 41, 1610 |
| 10/16/17 | Brendan Marais' credit card statement lists Mexico City, Mexico as the location of the transaction when he purchases Rise on his credit card. | | | EX 14, 309 |

## Aspire Processing LLC  -  Timeline

| Date | Activity | Source |
|---|---|---|
| 8/14/2016 | Sean Brown registers Aspire Processing LLC in Nevada; claims an "office or position with" Aspire, and lists Mary Dee as sole Manager. | EX 41, 2643-45 |
| 8/18/2016 | Brown (using Digital Altitude's EIN number) opens a bank account for Aspire Processing at JPMorgan Chase, with account number ending in 1576. | EX 16, 361 |
| 8/23/2016 | Aspire Processing opens a merchant account with PayPal under the name of Alyssa Wilkerson, using the x1576 bank account. | EX 34, 1018-20 |
| 8/26/2016 | PayPal **places limit** on the merchant account for "High Risk Selling Activity," in part because the account took funds "for RISE: Digital Marketing Mastery Course via URL https://my.digitalaltitude.co." | EX 41, 1607 |
| 9/6/2016 | Aspire Processing opens a merchant account with Square under the names of the spouses of Michael Force and Morgan Johnson, using the x1576 bank acount, and ad copy for the "Rise" level. | EX 22, 632, 653-59, 843 |
| 9/13/2016 | Square **terminates** Aspire Processing's merchant account because it was "linked to a frozen user." | EX 22, 843 |
| 9/13/2016 | Mary Dee applies to ProPay for a merchant account for Aspire Processing. | EX 27, 911, 913 |
| 9/15/2016 | ProPay **denies** the application. | EX 27, 912 |
| 9/16/2016 | Mary Dee applies to EMS for a merchant account for Aspire Processing; claims it has never been terminated. | EX 24, 865 |
| 9/29/2016 | EMS **denies** the application. | EX 24, 855, 860 |
| 12/19/2016 | Square **transfers $410,508.29** from Aspire Processing's merchant account to Digital Altitude's JPMorgan Chase bank account ending in 3265. | EX 16, 396 (Digital Altitude controls x3265), 425 (transfer); EX 22, 643 (transfer) |
| 4/5/2017 | PayPal **transfers $292,281** from Aspire Processing's merchant account to Digital Altitude's JPMorgan Chase bank account ending in 3280. | EX 16, 503 (Digital Altitude controls x3280); EX 41, 1606 (transfer) |

## RISE Systems Enterprise LLC  -  Timeline

| Date | Activity | Source |
|---|---|---|
| 8/2/2016 | Mary Dee registers RISE Systems & Enterprise LLC in Nevada, with herself and Morgan Johnson as managers. | EX 41, 2725-26 |
| 8/2/2016 | Morgan Johnson opens a merchant account for RISE (Nevada) with Square. | EX 22, 716, 842 |
| 8/4/2016 | RISE Systems & Enterprise LLC is registered in Utah with Sean Brown as agent and sole manager. | EX 41, 2727-30 |
| 8/5/2016 | Sean Brown opens a bank account for RISE (Utah) at JPMorgan Chase, with account number ending in 5129. | EX 16, 521 |
| 8/19/2016 | Mary Dee opens a merchant account with PayPal for RISE, listing risesystems.weebly.com as its website, and linking it to RISE (Utah)'s x5129 bank account. | EX 34, 1007-09 |
| 8/25/2016 | PayPal **places limit** on merchant account for "High Risk Selling Activity," in part because the account took funds "for RISE: Digital Marketing Mastery Course via URL https://my.digitalaltitude.co." | EX 41, 1607 |
| 8/25/2016 | Morgan Johnson links RISE (Nevada)'s merchant account with Square to RISE (Utah)'s x5129 bank account. | EX 22, 716 |
| 8/30/2016 | Square requests more information from RISE; in response Morgan Johnson claims RISE's place of business is Utah, and submits RISE (Nevada)'s registration papers. | EX 22, 735-42 |
| [unknown] | Morgan Johnson submits to Square a screenshot of risesystems.weebly.com showing ad copy for the Rise level, and a sample invoice showing purchases of the Peak and Ascend levels. | EX 22, 744 |
| 9/1/2016 | Square **terminates** its merchant account, citing "credit risk" and "linked to a frozen user." Square also doubted Johnson's "claims this is a new biz," as it was "processing similarly on other accts. Could be they rebranded due to the [online consumer complaints]." | EX 22, 755, 842-43 |
| 2/14/2017 | Square **transfers $228,078** from RISE's merchant account to RISE (Utah)'s JPMorgan Chase bank acccount ending in 5129. | EX 16, 528; EX 22, 728 |
| 2/14/2017 | RISE **transfers $225,000** from its x5129 bank account to a Digital Altitude bank account ending in 3265. | EX 16, 396 (Digital Altitude controls x3265), 472 & 528 (showing transfer) |
| 2/21/2017 - 2/23/2017 | PayPal **transfers $302,773** from RISE's merchant account to RISE (Utah)'s JPMorgan Chase bank account ending in 5129. | EX 16, 528; EX 41, 1606 |
| 2/23/2017 | RISE **transfers $305,000** from its x5129 bank account to a Digital Altitude bank account ending in 3265. | EX 16, 396 (Digital Altitude controls x3265), 473 & 528 (showing transfer) |

## Common Enterprise Evidence

### Digital Altitude

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | Digital Altitude has used numerous other entities to take consumers' credit card payments through the other entities' merchant accounts. EX 22, 632-59 (Aspire Processing), 716-45 (RISE), 757-96 (Thermography); EX 16, 396, 425, 503; EX 33, 990-96; EX 34, 1007-21; EX 41, 1606-07. |
| Commingling of Funds | Digital Altitude has sent and received substantial funds from Thermography and Disc. EX 16, 396-470; 505-19, 538, 548-53; EX 17, 561, 565, 575. Thermography's bank accounts have been used to transact Digital Altitude's business since January 2016, including sending checks to its employees labeled "DA payroll", paying commissions to Digital Altitude affiliates, and funneling proceeds from merchant accounts to Digital Altitude bank accounts. EX 16, 364-73, 396-400, 538-39, 548-49. |
| Common Ownership or Control | Michael Force controls Digital Altitude, and owns it (possibly with his wife). EX 35, 1091-92. |
| Sharing of Addresses | Digital Altitude's registered agent's Lewes, DE address (EX 41, 2722) is used by Aspire Processing (EX 34, 1018-19), Disc (EX 34, 1012-13), and RISE (Utah) (EX 22, 716-45). It has used Digital Altitude UK's London address. EX 41, 2697; EX 39, 1268-69. It has shared a a mail drop and mail forwarding service with the RISE entities. EX 20, 621 & 624 (using Nevada documents but claiming Utah incorporation). It shares a second mail drop with forwarding service with Thermography. EX 21, 627, 630. It has used Soar's address. EX 41, 1607, 2731-2732; EX 29, 931 (Fifth Third states it's Vantiv account); EX 32, 971-74 (Vantiv identifies a Digital Altitude account handled through PayZang). |
| Sharing of Phone Numbers and Websites | Digital Altitude shares a phone number with Aspire Processing (EX 39, 1268-69, 1468-72) and RISE (Utah) (EX 22, 716; EX 39, 1268-69), and another with RISE (Utah) and Upside (EX 41, 1607 & EX 16, 346; EX 20, 621; EX 34, 1007-08. |

**Common Enterprise Evidence**

**Digital Altitude UK**

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | Used to process consumers' payments to Digital Altitude. EX 33, 990-96; AspireOnline.co, a website controlled first by Digital Altitude UK, then by Aspire Processing UK, and, currently, by Aspire Ventures, markets Digital Altitude memberships; its content has stayed the same as it has transferred registrants, evidencing a continuous, single controlling party (the enterprise). EX 39, 1382-1429. Clicking to pay takes one to a site controlled by Digital Altitude. *Id*. at 1242; EX 18, 612. The site is nearly identical to portions of Digital Altitude's own site, and to a site controlled by Aspire Processing. EX 39, 1251-1285, 1382-1412, 1431-1459. |
| Commingling of Funds | Funds paid by consumers through Digital Altitude UK's merchant account were sent directly to a Digital Altitude bank account. EX 17, 561; EX 33, 995. |
| Common Ownership or Control | Owned by Michael Force, managed by Mary Dee.  EX 41, 2696-2705. |
| Sharing of Addresses | Shares its UK address with Digital Altitude and Aspire Processing UK. EX 39, 1268-69, 1424-25; EX 41, 2646-47, 2696-97. Digital Altitude has claimed the same address as its "UK address."  EX 39, 1268-69. |
| Sharing of Phone Numbers and Websites | Control of a website marketing Digital Altitude has passed from Digital Altitude UK to Aspire Procesing UK, to Aspire Ventures. EX 39, 1418-29. The site is nearly identical to portions of Digital Altitude's own site, and to a site controlled by Aspire Processing. EX 39, 1251-1285, 1382-1412, 1431-1459. |

# Common Enterprise Evidence

## Aspire Processing

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | Aspire Processing opened merchant accounts with Square and PayPal and used them to process consumers' payments to Digital Altitude. EX 16, 396, 425, 503; EX 22, 632-59;  EX 34, 1018; EX 41, 1606. Its website, "AspireReach.com" is controlled by Alan Moore, a Digital Altitude officer, and is marketing Digital Altitude memberships. EX 39, 1431- 1460, 1468-72. The site is nearly identical to portions of Digital Altitude's own site, and to "Aspireonline.co."  EX 39, 1251-1285, 1382-1412, 1431-1459. When you click through to the payment page for Rise, you are taken to a page on aspir.me, a site controlled by Digital Altitude. EX 18, 612; EX 39, 1243. |
| Commingling of Funds | Funds paid by consumers through Aspire Processing's merchant accounts with Square and PayPal were sent directly to a Digital Altitude bank account. EX 41, 1606 & EX 16, 396, 425, 503; EX 22, 632-59;  EX 34, 1018. |
| Common Ownership or Control | Brown is an officer of Aspire Processing, and opened two bank accounts in its name. EX 16, 361, 532; EX 41, 2643-45. Mary Dee is a manager, and has claimed she is the 100% owner. EX 41, 2643-45; EX 24, 865. A merchant account for Aspire Processing was opened in the names of the spouses of Force and Johnson. EX 22, 632. |
| Sharing of Addresses | Aspire Processing uses the Lewes, DE address of Digital Altitude's registered agent. EX 16, 361; EX 24, 865; EX 34, 1018-19; EX 41, 2722. It has shared a Walnut, California mail drop with Digital Altitude. EX 22, 632, 670. It has shared a Texas residential address with Thermography and Disc. EX 16, 538; EX 34, 1012-13, 1018-19, 1024-25. It has listed its address as "16192 Coastal Hwy London N15 5NU", a fabricated address combining a street address used by Aspire Processing and Digital Altitude and the city and postal code of Aspire Processing UK and Aspire Ventures. EX 39, 1460. |
| Sharing of Phone Numbers and Websites | Aspire Processing shares two phone numbers and an email address with Aspire Processing UK & Aspire Ventures. EX 39, 1385-86, 1391-92, 1424-29, 1460, 1468-69. It has listed, as its own, a website controlled by Aspire Processing UK / Aspire Ventures. EX 24, 860. Its website, AspireReach.com, states, several times that the site's owner/controller is "Aspire Ventures." EX 39, 1462-64. It shares a phone number, 323-640-0738, with RISE. EX 24, 865; EX 34, 1007-08. It also shares phone numbers with Digital Altitude (EX 39, 1268-69, 1468-72), and Digital Altitude UK, Aspire Processing UK, and Aspire Ventures (*Id* . at 1392, 1418-29, 1460). |

# Common Enterprise Evidence

### Aspire Processing UK

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | AspireOnline.co, a website controlled first by Digital Altitude UK, then by Aspire Processing UK, and, currently, by Aspire Ventures, markets Digital Altitude memberships. EX 39, 1382-1429. When you click through to the payment page, you are taken to a site controlled by Digital Altitude. *Id*. at 1242; EX 18, 612. Clicking to pay takes one to a site controlled by Digital Altitude. *Id*. at 1242; EX 18, 612. The site is nearly identical to portions of Digital Altitude's own site, and to a site controlled by Aspire Processing. EX 39, 1251-1285, 1382-1412, 1431-1459. |
| Commingling of Funds | |
| Common Ownership or Control | Aspire Processing UK's officers include Alan Moore, and Mohammed Abdul Alim, who receives frequent substantial payments from Digital Altitude, and controls Aspire Ventures. EX 41, 1609, 2299, 2646-84. Mary Dee was the original manager, as is the sole owner. *Id*. at 2646-84. |
| Sharing of Addresses | Aspire Processing UK shares an address with Aspire Ventures. EX 41, 2675, 2695. It shares an address with Digital Altitude and Digital Altitude UK. *Id*. at 2697; EX 39, 1268-69, 1424-25. |
| Sharing of Phone Numbers and Websites | Aspire Processing UK's website, "aspireonline.co", is also claimed by Aspire Processing as its website in an application for a merchant account. EX 24, 860.  It shares an email address with Aspire Processing. EX 39, 1385-86, 1460, 1468-72. It shares a phone number with Aspire Processing, Digital Altitude UK, and Aspire Ventures. *Id*. at 1392, 1418-29, 1460. |

**Common Enterprise Evidence**

**Aspire Ventures**

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | AspireOnline.co, a website controlled first by Digital Altitude UK, then by Aspire Processing UK, and, currently, by Aspire Ventures, markets Digital Altitude memberships. EX 39, 1382-1429. When you click through to the payment page, you are taken to a site controlled by Digital Altitude. *Id*. at 1242; EX 18, 612. Clicking to pay takes one to a site controlled by Digital Altitude. *Id*. at 1242; EX 18, 612. The site is nearly identical to portions of Digital Altitude's own site, and to a site controlled by Aspire Processing. EX 39, 1251-1285, 1382-1412, 1431-1459. |
| Commingling of Funds | |
| Common Ownership or Control | Aspire Ventures is controlled by Mohammed Abdul Alim, who receives payments from who receives frequent substantial payments from Digital Altitude, and is a manager of Aspire Processing Limited. EX 41, 1609, 2685-95. |
| Sharing of Addresses | Aspire Ventures shares an address with Aspire Processing UK.  EX 41, 2675, 2695. |
| Sharing of Phone Numbers and Websites | Aspire Processing's website, "AspireReach.com" states, several times, in its terms of service, that the site's owner/controller is "Aspire Ventures." EX 39, 1462-64. Aspire Ventures's website, "aspireonline.co", is also claimed by Aspire Processing as its website in an application for a merchant account. EX 24, 860. It shares two phone numbers and an email address with Aspire Processing UK & Aspire Processing. EX 39, 1385-86, 1391-92, 1424-29, 1460, 1468-69. It shares a phone number with Aspire Processing, Digital Altitude UK, and Aspire Processing UK. *Id*. at 1392, 1418-29, 1460. |

## Common Enterprise Evidence

**Disc Enterprises**

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | Disc used its merchant account to process consumers' payments to Digital Altitude. EX 34, 1012-14; EX 41, 1606. Disc's website looks very simliar to portions of Digital Altitude's website, and its links take one to Digital Altitude's website. EX 39, 1244-45; *compare id*. at 1280-85 *with* 1507-1522.  Disc has made payments to employees of Digital Altitude, and to the company that owns the offices where Soar is based. EX 16, 505-12. |
| Commingling of Funds | Digital Altitude and Thermography have both transferred substantial funds to Disc's bank account, and Disc has made payments to employees of Digital Altitude, and to the company that owns the offices where Soar is based. EX 16, 505-12. |
| Common Ownership or Control | Disc is controlled by Digital Altitude's VP of Business Development, Jashin Howell. *MOBE Ltd. v. Digital Altitude LLC*, No. 2:16-CV-5708, Dkt #93-2, p.31 (C.D. Cal. Apr. 17, 2017); EX 41, 2723-24. Sean Brown, Morgan Johnson, and Mary Dee are signatories on Disc's bank account, and Sean Brown claims to be its "President." EX 16, 505-10. |
| Sharing of Addresses | Disc uses the Lewes, DE address of Digital Altitude's registered agent. EX 34, 1012-13. And it uses a Texas residential address also used by Thermography and Aspire Processing. EX 16, 538; EX 34, 1012-13, 1018-19, 1024-1025. |
| Sharing of Phone Numbers and Websites | Disc shares a phone number (760-566-6279) with Aspire Processing. EX 34, 1012-13, 1018-19. Disc's website looks very simliar to portions of Digital Altitude's website, and its links take one to Digital Altitude's website. EX 39, 1244-45; *compare id.* at 1280-85 *with* 1507-1522. |

## Common Enterprise Evidence

### RISE (Utah)

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | RISE (Utah) opened merchant accounts with PayPal and Square and used them to process consumers' payments to Digital Altitude. EX 16, 472-73, 521, 528; EX 22, 716-28; EX 34, 1007-09; EX 41, 1606. RISE's website, risesystems.weebly.com, claims to sell "RISE", and takes one to the Digital Altitude purchase agreement, if one clicks to buy. EX 22, 736-45. EX 39, 1244, 1498-1505. |
| Commingling of Funds | RISE's bank account was opened with a $50,000 check from Digital Altitude, and it received numerous further checks from Digital Altitude. EX 16, 521-27. RISE funnelled the proceeds of its merchant accounts to Digital Altitude the same day they were deposited in its bank account. EX 16, 472-73, 521, 528; EX 22, 716-28; EX 34, 1007-09; EX 41, 1606. |
| Common Ownership or Control | Sean Brown is the sole manager of RISE (Utah) and opened its bank account. EX 16, 521; EX 41, 2727-29. Mary Dee has signatory authority on its bank account and has opened a merchant account in its name. EX 16, 521-22; EX 34, 1007. Morgan Johnson also has signatory authority on its bank account and has opened a merchant account in its name. EX 16, 521-23; EX 22, 716. |
| Sharing of Addresses | Both RISE entities shared an account with Digital Altitude at a mail drop and mail forwarding service. EX 20, 621-24. It has also used the same Lewes, DE address as Digital Altitude's registered agent. EX 22, 745. |
| Sharing of Phone Numbers and Websites | RISE (Utah) has shared a phone number with Digital Altitude:  800-820-7589 (EX 22, 745; EX 39, 1268-69); and another with both Digital Altitude and Upside:  323-640-0738 (EX 16, 346; EX 34, 1007-08; EX 41, 1607). |

**Common Enterprise Evidence**

### RISE (Nevada)

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | The individual defendants treat RISE (Utah) and RISE (Nevada) as if they were a single entity, for example referencing both entities in an application for a mail drop and mail forwarding service, and with respect to a merchant account. EX 22, 736-40 (for Square account, submitting Nevada corporate documents but claiming Utah incorporation); EX 20, 621-25 (same, for mail forwarding service). |
| Commingling of Funds | A merchant account for the RISE entities took consumers' payments to Digital Altitude. EX 16, 472, 521, 528; EX 22, 716-28, 736-40. |
| Common Ownership or Control | RISE (Nevada) is controlled by Mary Dee and Morgan Johnson. EX 41, 2725-26. |
| Sharing of Addresses | Both RISE entities shared an account with Digital Altitude at a mail drop and mail forwarding service. EX 20, 621-25 (submitting Nevada corporate documents but claiming Utah incorporation). |
| Sharing of Phone Numbers and Websites | |

**Common Enterprise Evidence**

**Soar**

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | Soar's listed address appears to be the location of a Digital Altitude call center. EX 38, 1225; EX 41, 1605, 2730-33, 2266. |
| Commingling of Funds | |
| Common Ownership or Control | Soar's owners and managers are Michael Force and Digital Altitude's VP of Business Development, Jashin Howell. EX 41, 2730-33; *MOBE Ltd. v. Digital Altitude LLC*, No. 2:16-CV-5708, Dkt #93-2, p.31 (C.D. Cal. Apr. 17, 2017). Mary Dee and Sean Brown are managers and signers on its bank accounts. EX 41, 2730-33. When an FTC investigator visited Soar's listed address, Ryan Jaten, DA's Director of Sales, was identified physically on-premises. *Id*. at 1605; *MOBE*, No. 2:16-CV-5708, Dkt #93-2, p.31. |
| Sharing of Addresses | Soar's address has been used by Digital Altitude. EX 41, 1607 (address appears in billing description for "PYZ*Digital Altitude" charges processed through Fifth Third Bank, as does Digital Altitude's 800 number); EX 29, 931 (Fifth Third states Vantiv controlled the account); EX  32, 971-74 (Vantiv letter identifying a Digital Altitude account handled through PayZang). |
| Sharing of Phone Numbers and Websites | |

# Common Enterprise Evidence

**Upside**

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | Upside has used a merchant account to take consumers' payments to Digital Altitude. EX 41, 1607. Upside's website, climbingsteps.com, was created by Alan Moore on Digital Altitude's behalf, and appears designed to process consumers' payments to Digital Altitude. EX 18, 614; EX 19, 618; EX 39, 1476-89. |
| Commingling of Funds | Upside has used a merchant account to take consumers' payments to Digital Altitude. EX 41, 1607. |
| Common Ownership or Control | The Upside is controlled by Mary Dee and an associate of hers. EX 41, 2734-38. |
| Sharing of Addresses | |
| Sharing of Phone Numbers and Websites | Upside has shared a phone number with Digital Altitude and RISE (Utah): 323-640-0738. EX 16, 346; EX 34, 1007-08; EX 41, 1607. |

## Common Enterprise Evidence

### Thermography

| | |
|---|---|
| Sharing of Business Functions, Policies, and Marketing | Thermography's bank accounts have been used to transact Digital Altitude's business since January 2016, including sending checks to its employees labeld "DA payroll", paying commissions to Digital Altitude affiliates, and funneling proceeds from merchant accounts to Digital Altitude bank accounts. EX 16, 364-77, 396-400, 538-39, 548-49. |
| Commingling of Funds | Thermography has sent and received substantial funds from Digital Altitude and Disc. EX 16, 396-470, 505-19, 538-553. |
| Common Ownership or Control | Thermography is owned and controlled by Mary Dee and her husband. EX 41, 2739-57. |
| Sharing of Addresses | Thermography shares a mail drop with forwarding service with Digital Altitude. EX 21, 627-30. Thermography has also shared a Texas residential address with Disc and Aspire Processing. EX 16, 538; EX 34, 1012-13, 1018-19, 1024-1025. |
| Sharing of Phone Numbers and Websites | |