

LODGED
CLERK, U.S. DISTRICT COURT

1/29/2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

January 29, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: ___AK___ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

**Federal Trade Commission,**

Plaintiff,

vs.

**Digital Altitude LLC, et al.,**

Defendants.

No. 2:18-cv- _LACV 18-00729-JAK (MRWx)_

FEDERAL TRADE COMMISSION'S EXHIBITS IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

**VOLUME IV**

# Table of Contents

EX 23    Documents Produced by Merrick Bank Corporation............. 846

EX 24    Documents Produced by Francis David Corporation
d/b/a Electronic Merchant Systems......................................... 855

EX 25    Documents Produced by EVO Payments International,
LLC...................................................................................... 871

EX 26    Documents Produced by Bright Market LLC, also d/b/a
FastSpring........................................................................... 901

EX 27    Documents Produced by ProPay, Inc. ................................... 910

EX 28    Documents Produced by Pivotal Payments, Inc. ................... 915

EX 29    Documents Produced by Fifth Third Bank ........................... 931

EX 30    Documents Produced by WePay, Inc..................................... 932

EX 31    Documents Produced by TSYS Merchant Solutions, LLC.... 936

EX 32    Documents Produced by Vantiv, Inc. .................................... 970

EX 33    Documents Produced by Allied Wallet, Ltd............................ 977

EX 34    Documents Produced by PayPal Holdings, Inc...................... 997

# Exhibit 23

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
**Pursuant to 28 U.S.C. § 1746**

1.      I, _Reyna Epps_ , have personal knowledge of the facts set forth below and am competent to testify as follows:

2.      I have authority to certify the authenticity of the records produced by Merrick Bank Corporation (the "Company") and attached hereto.

3.      The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

   a)      Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

   b)      Were kept in the course of the regularly conducted activity of the Company; and

   c)      Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _August 29, 2017_          _Reyna Epps_
                                  Signature

# ∞ UnifiedPay
Experience . Confidence . Growth

**MERCHANT PROCESSING APPLICATION AND AGREEMENT**

Relationship _____  Referred to Priority By _____  Sales Rep. Name _____  Application Date _____

| **1.  GENERAL INFORMATION** | **2.  BUSINESS LOCATION INFORMATION** | **3.  BUSINESS STRUCTURE** | PAGE 1 OF 3 |
|---|---|---|---|

| Client's Business Name (Doing Business As) | Client's Corporate/Legal Name |
|---|---|
| Digital Altitude, LLC | Same |
| Location Address | Corporate Address (If different than location) |
| 16192 Coastal Hwy | |
| City  Lewes   State  DE   Zip  19958 | City   State   Zip |
| Location Phone   Location Fax | Contact Name   Contact Phone |
| 800-820-7589 | |

| Customer Service Phone | Prior Security Breach? ☐ Yes ☑ No | Fed Tax ID# (Must match IRS income tax filing name)   TaxType |
|---|---|---|
| 800-820-7589 | (If yes, please attach your latest proof of PCI DSS compliance) | 473387054 |
| | | Tax Filing Name if different from Legal Name: |

| Business Website Address | Business Email | D&B# |
|---|---|---|
| http://www.digitalaltitude.co/ | mdee@digitalaltitude.com | |

| Multiple Locations? ☐ Yes ☑ No  If Yes, enter # of locations ___ | Date Business Started | Length of Current Ownership |
|---|---|---|
| Additional location to existing MID | July 2015 | 1 year , six months |

Send Retrieval/Chargeback Requests to: ☐ Corporate Address   ☑ Location Address

☐ Sole Prop  ☐ Partnership  ☑ LLC/LLP  ☐ C Corp  ☐ S Corp   ☐ Govt. (Local/State/Federal)   ☐ 501 c/Tax Ex.  State Filing _____

☐ I certify that I am a foreign entity/nonresident alien.  (If checked, please attach IRS Form W-8)   NOTE: Failure to provide accurate information may result in a withholding of merchant funding per: IRS regulations. (See Part III, Section A.3 of your Program Guide for further information)

| **4.  OWNERS/PARTNERS/OFFICERS** | |
|---|---|
| **OWNER/PARTNER/OFFICER 1** | **OWNER/PARTNER/OFFICER 2** |
| Name  Mary Dee | Name |
| Title  COO    % Of Ownership  % 90% | Title    % Of Ownership  % |
| Home Address  **Address 1** | Home Address |
| City  Fort Worth   State  TX   Zip | City   State   Zip |
| Telephone | Telephone |
| Social Security #   Date of Birth | Social Security #   Date of Birth |
| Email Address  mdee@digitalaltitude.com | Email Address  support@digitalaltitude.co |

Prior Bankruptcies ☐ Yes ☑ No  Business and/or ☐   Personal ☐   Date Discharged

| **5.  TRADE REFERENCE** | |
|---|---|
| Trade Ref.: Bus. Name   Bus. Address | City  Lewes  State  DE  Zip  19958  Contact   Telephone   Account #  2263 |

| **6.  NATURE OF BUSINESS** | **7.  TRANSACTION INFORMATION** |
|---|---|

Business Type: ☐ Retail  ☐ Restaurant  ☐ Mail/Telephone Order  ☑ Internet  ☐ Lodging  ☐ Supermarket  ☐ Government
☐ Petroleum  ☐ Utilities  ☐ Healthcare  ☐ Education  ☐ QSR  ☐ Charity/Non Profit  ☐ B2B  ☐ Other

| | | | | |
|---|---|---|---|---|
| Requested Monthly V/MC/DS Card Volume  800,000 | American Express Monthly Volume | Card Present Swiped  % | Sales to Consumers  % |
| Requested Average V/MC/DS Card Ticket  150 | American Express Average Ticket | Card Present Not Swiped  % | Sales to Business  % |
| Requested Highest Payment Card Ticket  2500 | | MOTO  % | Sales to Govt.  % |
| Seasonal Merchant ☐ Yes  ☐ No  Months Closed | | Internet (Ecommerce)  100  % | Days to Delivery |

Previous Processor  Paymentech   Reason For Leaving  Price

Has the Merchant or Owner been terminated from accepting payment cards from any payment network for this business or any other businesses? ☐ Yes ☑ No
(if yes, please explain) Reason for Termination

Description of Products or Services Sold
eLearning Digital/Virtual marketing training.

Describe your Return Policy
When an order is placed a Member receives access to this information within just a few minutes. Due to the accessibility of our product availability immediately upon purchase, there is a strict 14-day return policy on all AS

| **8.  BANKING ACCOUNT INFORMATION & MEMBER BANK DISCLOSURE** | |
|---|---|
| Bank Name  Bank of America   Bank Phone | Visa and MasterCard Member Bank Information as indicated below by agent:  ☑ Merrick Bank |
| Routing #   Account#  2263 | Mailing address: 135 Crossways Park Drive North, Ste A100, Woodbury, NY 11797  Phone Number: (800) 267-2256 |
| ACH Method: ☐ Combined  ☐ Individual  *Must be a checking account. Savings accounts are not permitted. | **Merrick Bank** |

| **9. & 10.  SERVICE ACCEPTANCE AND FEE SCHEDULE AND OTHER CARD TYPES** | |
|---|---|

Request to Accept Card Types: ☑ Visa Credit  ☑ Visa Debit  ☑ MasterCard Credit  ☐ MasterCard Debit  ☐ Discover Network  ☐ AMEX Network  ☐ PIN Debit

Select VI/MC/Discover Network Discount Plan: ☑ Tiered Basic  ☐ Pass Through I/C  ☐ Flat Rate
Assessments & Brand Fees: ☐ Included  ☐ Billed Separately   Requested Discount Payment Method: ☐ Daily  ☐ Monthly

Unified Payments is a registered ISO of Merrick Bank. South Jordan UT.

EX 23
847

## 9. & 10. SERVICE ACCEPTANCE AND FEE SCHEDULE AND OTHER CARD TYPES (CONTINUED)
PAGE 2 OF 3

### DISCOUNT FEES: Visa, MasterCard, Discover, Pin Debit | American Express OPT Blue℠ OR AMEX Direct℠

| Tiered | % | Per / Item | Pass Through | % | Per / Item | Opt Blue Discount Plan: | | | AMEX Direct: |
|---|---|---|---|---|---|---|---|---|---|
| Qualified Discount = | 5.99 | .25 | Pass Through | | | ☑ Tiered Basic ☐ Pass Through Program Pricing | | | ☐ Order New # ____ |
| Mid Qual = Qual + | 0.25 | | Debit Pass Through IC + | | | ☐ Flat Rate | | | Existing SE # ____ |
| Non Qual = Qual + | 0.25 | | Pin Debit Passthrough | | | | % | Per / Item | ☐ Use Existing |
| Debit Qual Discount = | 5.99 | .25 | Flat Rate | % | Per / Item | Credit Qual | | | CAP # ____ |
| Debit Mid Qual = Qual + | 0.25 | | Flat Rate = | | | Credit Mid-Qual | | | |
| Debit non Qual = Qual + | 0.25 | | Debit Flat Rate | | | Credit Non-Qual | | | (Flat fee of $7.95 or Discount Rate may apply) |
| | | | | | | Pass Through IC | | | |

Association fees will be passed through to the merchant. Fees include, but are not limited to, Visa's FANF and APF, Acqr ISA and MasterCard's NABU, Acqr Support, Cross Border Fee and Discover IPF, ISF, Data Usage, AMEX Network, AMEX Non-Swipe, AMEX downgrade, Assessments (MC,Visa Credit,Visa Debit,Discover,MC > $1,000), MC AVS Acqr Access, MC License, MC KiloByte, Visa AFD Partial Auth. Non Participant, Visa File Transmission, MC CVC2, DISC Network Auth, Visa Acqr International Service Assessment, Visa Misuse Auth, Visa Zero Floor, MC Digital Enablement, MC Reversal, Visa Return Data Processing (CR & DB), Visa Acqr Data Processing (Debit), Visa Tran Integrity, Visa Network Part CP, Visa Network CNP. Association fees are set by Associations and are subject to change from time to time.

### Authorization, Monthly & Miscellaneous Fees

| Authorization and Per Item Fees: | | Monthly Fees: | | Miscellaneous Fees: | | MX Merchant Fees: | |
|---|---|---|---|---|---|---|---|
| Visa/MC/Discover Network: | $ .25 | Monthly Service | $ ____ | Chargeback Fee $ 35.00 (Per Occurrence) | | MX Merchant Monthly Fee | $ ____ |
| Amex/Fleet/Other | $ ____ | Monthly Minimum | $ ____ | Retrieval Fee $ 20.00 (Per Occurrence) | | MX Gateway Transaction Fee | $ ____ |
| Pin Debit | $ ____ | Wireless Fee | $ ____ | ACH Reject Fee $25.00 (Per Occurrence) | | | |
| EBT | $ .25 | Pin Debit Monthly | $ ____ | Annual Fee $ ____ Month to Bill ____ | | Plan Type: | |
| FCS# | | PCI Non-Compliance | $ 9.95 | Industry Non-Compliance/ | $ 50 | ☐ MX6: ☐ Base ☐ Invoice ☐ Retail ☐ B2B | |
| Electronic AVS | $ .25 | Gov't Compliance | $ ____ | Non-Validated (up to $24.95) | | | |
| Voice Auth | $ 8.00 | TIN Mis-Match | $ ____ | PCI Annual Fee | $ 100 | VIMAS Fees: | |
| Voice AVS | $ 8.00 | (until Validated) | | Batch Fee (Per Item) $ .25 | | VIMAS Online Access Fee | $ ____ |
| Sales Transaction Fee | $ ____ | | | Micros Fee (Per Transaction) $ ____ | | | |
| Return Transactions | $ 20.00 | | | | | | |

☐ My Merchant Benefits Club: The representative has explained the My Merchant Benefits Club program to me and I elect to opt out of the program. I understand I can opt into the program at any time and benefit from the program which includes equipment support and replacement for merchant(s) (where applicable), as well as great discounts for items such as car rentals, hotels, office supplies, health and legal services and more for my company and employees for an additional fee of $14.95 per month.    Initials: ____

In the event that this Agreement is terminated early, Merchant will be responsible for the payment of a $ ____

Next Day Funding* ____ Per Month: *NDF is subject to approval and all POS Device batch(es) must be closed by 9pm EST/6pm PST Monday-Saturday and by 6pm EST/3pm PST on Sunday. All payments are provisional and are subject to, including but not limited to additional fees, chargebacks, withholding, set off, security and reserve rights. Priority Payment Systems or Bank will not be liable for any delay in receipt of funds, fees for any delays, or errors in debit and credit entries caused by third parties, including but not limited to, any Association or Financial institution.

Early Termination Fee in accordance with Part IV, Section A3 of the Merchant Program Guide.

## 11a. EQUIPMENT/PROCESSING METHOD

Application Type ☐ Retail ☐ Retail w/Tip ☑ MOTO ☐ Restaurant w/Tip ☐ Quick Serve Restaurant (no tip) ☐ Hotel ☐ Auto Rental

### TERMINAL FEATURES

| | Yes | No | | Yes | No | | Yes | No |
|---|---|---|---|---|---|---|---|---|
| Fraud Check (last 4-digits) | | | Purchasing Card | | | Invoice/Purchase Order # | | |
| AVS + CVV2 | | | Server/Clerk # | | | Auto Close (If Yes, time? | | |
| ACH/Check Services | | | Order Gift Card | | | EBT Food Stamps | | |
| EBT Cash Benefit | | | | | | | | |
| IP Connection ☐ Yes ☐ No | | | If Yes, Terminal Serial | | | Special Requests (Multi-mid, Dial 9, etc): | | |
| Wireless ☐ Yes ☐ No | | | Wireless Info: MAN/Serial | | | SIM Card Number | | |

| TYPE OF EQUIPMENT | | | PRODUCT NAME | QUANTITY | DEPLOYMENT | | | |
|---|---|---|---|---|---|---|---|---|
| ☐ Terminal ☐ Pin Pad ☐ Printer | | | ☐ VAR* | | ☐ Existing | ☐ Agent | ☐ New Order (attach order form) | | |
| ☐ Terminal ☐ Pin Pad ☐ Printer | | | ☐ VAR* | | ☐ Existing | ☐ Agent | ☐ New Order (attach order form) | | |
| ☐ Terminal ☐ Pin Pad ☐ Printer | | | ☐ VAR* | | ☐ Existing | ☐ Agent | ☐ New Order (attach order form) | | |
| ☐ Terminal ☐ Pin Pad ☐ Printer | | | ☐ VAR* | | ☐ Existing | ☐ Agent | ☐ New Order (attach order form) | | |

*Manufacturer/product/version of PC/Internet Software ____ NMI

For software or VAR users, by checking yes below MERCHANT certifies that it has used a certified Qualified Integrator or Reseller (QIR) to install or re-program MERCHANT's software systems. Notwithstanding MERCHANT's use of a QIR as described herein above, MERCHANT acknowledges that it is, and shall remain, fully responsible for compliance with PCI-DSS standards at all times in accordance with the Program Terms and Conditions (Program Guide).

☐ Yes ☐ No    Name of QIR Used: ____

Do you use any third party to store, process or transmit cardholder data? ☐ Yes ☐ No If yes, provide name/address: ____

☐ ORDER LEASE    Lease Company: FDGL    Lease Term ____ Months    Annual Tax Handling Fee $10.20

Total Monthly Lease Charge ____ w/o taxes, late fees or other charges that may apply – See Lease Agreement for details

This is a NON-CANCELLABLE lease for the full term indicated    Client's Initials ____

## 11b. CARD NOT PRESENT INFORMATION

If you process more than 20% of your bankcard transactions or volume, without swiping, and/or examining the credit card, please complete this section.

1. Please submit your product catalog; brochures; promotional materials; a current price list; and a copy of your service agreement with card holder if applicable. If on the internet, please include screen-prints of your website address if your site is not yet active.

2. If internet, please check your type of business.
   ☐ Web Hosting ☐ Domain Registration ☐ Web Page Design ☐ Auction ☐ Internet Service Gateway
   ☐ Selling Digital Service ☐ Advertisement ☐ Selling Hard Goods ☑ Other: eLearn via digital content
   If using the internet, list encryption method, vendor and controls used to secure transaction information: SSL

3. How will the product be advertised or promoted? Social Media/Google
4. Billing Methods (Check All that Apply)    Monthly -0-__% Yearly -0-__% Quarterly -0-__% One Time -100-__% Hourly -0-__%
5. List the name(s) and address(es) of the vendor(s) from which supplies are purchased: In House
6. Who performs product/service fulfillment? If direct from vendor, please provide Vendor Name, address and phone number in full: ____

7. Please describe how a sale takes place from beginning of order until completion of fulfillment: ____
   Customer selects to purchase eLearning digital training content online and checkout and pays at that time.

Unified Payments is a registered ISO of Merrick Bank, South Jordan UT.

EX 23
848

PAGE 3 OF 3

## 12. SITE INSPECTION (Completed by Sales Agent)

I have personally conducted a Site Inspection for this merchant, visually inspected the merchant's inventory (if applicable), verified the merchant's payment application is PA-DSS (Payment Application Data Security Standards) validated (if applicable) and represent that the information in this merchant application is accurate, as to the best of my knowledge. I am subject to criminal penalities and/or financial losses for false or misleading information.

Sales Agent Name (printed) _Doug Whitehead_____   Signature X _Doug Whitehead_____

## 13. SIGNATURES

Client certifies that all information set forth in this completed Merchant Processing Application is true and correct and that Client has received a copy of the Program Guide (Version 1709) and Confirmation Page, which is part of this Merchant Processing Application (consisting of Sections 1-13) and by this reference incorporated herein. Client acknowledges and agrees that we, our Affiliates and our third party subcontractors and/or agents may use automatic telephone dialing systems to contact Client at the telephone number(s) Client has provided in this Merchant Processing Application and/or may leave a detailed voice message in the event that Client is unable to be reached, even if the number provided is a cellular or wireless number or if Client has previously registered on a Do Not Call list or requested not to be contacted for solicitation purposes. Client hereby consents to receiving commercial electronic mail messages from us, our Affiliates and our third party subcontractors and/or agents from time to time. Client further agrees that Client will not accept more than 20% of its card transactions as non-swiped transactions in accordance with the percentages indicated in that section. This based upon contrary information stated in Section 7, Transaction Information section above, you are authorized to accept transactions in accordance with the percentages indicated in that section. This signature page also serves as a signature page to the Equipment Lease Agreement appearing in the Third Party Section of the Program Guide. If selected, the undersigned Client being the "Lease" for purposes of such Equipment Lease Program. Client authorizes PRIORITY PAYMENT SYSTEMS ("PRIORITY") and Member Bank selected on page one of the Merchant Processing Application and Agreement ("BANK") and their respective agents to investigate the references, statements and other data contained herin and to obtain additional information from credit bureaus and other lawful sources, including persons and companies named in this Merchant Processing Application. Client authorizes PRIORITY and BANK and their respective agents (a) to procure information from any consumer reporting agency bearing his/her personal credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, and (b) to contact all previous employers, personal references and educational institutions. Each of the undersigned also authorizes us and our Affiliates to provide amongst each other the information contained in this Merchant Processing Application and Agreement and any information received from all references, including banks and consumer reporting agencies. It is our policy to obtain certain information in order to verify your identity while processing your account application. If the Application is approved each of the undersigned also authorizes us to obtain subsequent consumer reports in connection with the maintenance, updating, renewal or extension of the Agreement.

Client authorizes PRIORITY and BANK and their affiliates to debit Client's designated bank account via Automated Clearing House (ACH) for costs associated with the equipment hardward, software and shipping.

You further acknowledge and agree that you will not use your merchant account and/or the Services for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C Section 5361 et seq., as may be amended from time to time or processing or acceptance of transactions in certain jurisdictions pursuant to 31 CFR Part 500 et seq. and other laws enforced by the Office of Foreign Assets Control (OFAC).

CIP – Card Identification Program
IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We will also ask for a copy of your driver's license or other identifying documents.

Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct.
Client agrees to all the terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by PRIORITY and BANK.

Client's Business Principal/Officer

Signature X _Mary Dee_____   Title _COO_____

Print Name of Signer _Mary Dee_   Date _____

Signature X _____   Title _____

Print Name of Signer _____   Date _____

Personal Guarantee: In exchange for PRIORITY and BANK (the Guaranteed Parties) acceptance of, as applicable, the Agreement, and/or the Equipment Lease Agreement, the undersigned unconditionally and irrevocably guarantees the full payment and performance of Client's obligations under the foregoing agreements, as applicable, as they now exist or as modified from time to time, whether before or after termination or expiration of such agreements and whether or not the undersigned has received notice of any amendment of such agreements. The undersigned waives notice of default by Client and agrees to indemnify the Guaranteed Parties for any and all amounts due from Client under the foregoing agreements. The Guaranteed Parties shall not be required to first proceed against Client to enforce any remedy before proceeding against the undersigned. This is a continuing personal guaranty and shall not be discharged or affected for any reason. The undersigned understands that this is a Personal Guaranty of payment and not of collection and that the Guaranteed Parties are relying upon this Personal Guaranty in entering into the foregoing agreements, as applicable.

Personal Guarantee Signature X _Mary Dee_____   Print Name: _Mary Dee_   Title _C.O.O._

Personal Guarantee Signature X _____   Print Name: _____   Title _____

Accepted By
Priority Payment Systems, LLC
P.O. Box 246, Alpharetta, GA 30009-0246

Accepted By
Merrick Bank
Mailing address: 135 Crossways Park Drive North, Ste A100, Woodbury, NY 11797

Signature X _____   Signature X _____

Title _____ Date _____   Title _____ Date _____

Unified Payments is a registered ISO of Merrick Bank, South Jordan UT.

EX 23
849

| PART IV: | CONFIRMATION PAGE |
| --- | --- |

PROCESSOR     Name: **Unified Payments**
INFORMATION: Address: **P.O. Box 246, Alpharetta GA 30009-0246**
URL: **www.mybackofficetools.com/pub/PPS1016programguide.pdf**  Customer Service #: **1-855-813-5293**

Please read the Program Guide in its entirety. It describes the terms under which we will provide merchant processing Services to you.

From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.

1. Your Discount Rates are assessed on transactions that qualify for certain reduced interchange rates imposed by MasterCard and Visa. Any transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 19 of the Program Guide).

2. We may debit your bank account from time to time for amounts owed to us under the Agreement.

3. There are many reasons why a Chargeback may occur. When they occur we will debit your settlement funds or settlement account. For a more detailed discussion regarding Chargebacks see Section 10 of Card Processing Operating Guide.

4. If you dispute any charge or funding, you must notify us within 60 days of the date of the statement where the charge or funding appears for Card Processing.

5. The Agreement limits our liability to you. For a detailed description of the limitation of liability see Section 21 of the Card Processing General Terms.

6. We have assumed certain risks by agreeing to provide you with Card processing or check services. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Card Processing General Terms in Section 24, Term; Events of Default and Section 25, Reserve Account; Security Interest), under certain circumstances.

7. By executing this Agreement with us you are authorizing us and our Affiliates to obtain financial and credit information regarding your business and the signers and guarantors of the Agreement until all your obligations to us and our Affiliates are satisfied.

8. The Agreement contains a provision that in the event you terminate the Agreement early, you will be responsible for the payment of an early termination fee as set forth in Part III, A.3 under "Additional Fee Information."

9. If you lease equipment from Processor, it is important that you review Section 1 in Third Party Agreements. Bank is not a party to this Agreement. THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM INDICATED.

10. For questions regarding your Merchant Processing Application and Agreement, please contact Customer Service at 1-855-813-5293, and / or refer to Important Phone Numbers on the Additional Important Information Page, Part III, Section A.4.

11. Card Organization Disclosure

**Visa and MasterCard Member Bank Information: Merrick Bank**

The Bank's mailing address is 135 Crossways Park Drive North, Suite A 100, Woodbury, NY 11797, and its phone number is (800) 267-2256.

Important Member Bank Responsibilities:

a) The Bank is the only entity approved to extend acceptance of Card Organization products directly to a Merchant.

b) The Bank must be a principal (signer) to the Merchant Agreement.

c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchants must comply; but this information may be provided to you by Processor.

d) The Bank is responsible for and must provide settlement funds to the Merchant.

e) The Bank is responsible for all funds held in reserves that are derived from settlement.

Important Merchant Responsibilities:

a) Ensure compliance with Cardholder data security and storage requirements. b) Maintain fraud and Chargebacks below Card Organization thresholds.

b) Review and understand the terms of the Merchant Agreement.

c) Comply with Card Organization rules.

d) Retain assigned copy of this Disclosure Page.

e) You may download "Visa Regulations" from Visa's website at: http://usa.visa.com/merchants/operations/op_regulations.html

f) You may download "MasterCard Regulations" from MasterCard's website at: http://www.mastercard.com/us/merchant/support/rules/htm

Print Client's Business  Name: Digital Altitude, LLC

By its signature below, Client acknowledges that it has received (either in person, by facsimile, or by electronic transmission) the complete Program Guide [version PPS1016] consisting of 38pages (including this confirmation).

Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed.

Client understands that a copy of the Program Guide is also available for downloading from the Internet at:
**www.mybackofficetools.com/pub/PPS1016programguide.pdf**

NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED.

Client's Business Principal:
Signature (Please sign below):

X _____

| Mary Dee | COO | 02.21.17 |
| --- | --- | --- |
| **Please Print Name of Signer** | Title | Date |

PPS1016

Contact Details for Acquirer = 1117                                                Page 1 of 1

**Acquirer MATCH Contact**

| | | | |
|---|---|---|---|
| Acquirer Bank: | First National Bank of Omaha | Region: | United States |
| Contact First Name: | Ana | Contact Last Name: | Palancica |
| Phone Number: | 4025747944 | Fax Number: | |
| Email Address: | apalancica@tsys.com | | |

| | | | |
|---|---|---|---|
| Acquirer Bank: | First National Bank of Omaha | Region: | United States |
| Contact First Name: | Jacqueline | Contact Last Name: | Hart |
| Phone Number: | 4026331924 | Fax Number: | 4026331970 |
| Email Address: | jhart@fnms.com | | |

*Close*

*This information is extracted from the Member Information Manual*



**MATCH**

### Retro Results(Detail)

sandra vancol

**Bold text** denotes an exact match
*Italic text* denotes a phonetic match

▶ Back to Index ▶  ◀ <<Prev Inquiry ▶  ◀ Next Inquiry>> ▶  ◀ <<Prev Match ▶  ◀ Next Match>> ▶

General Operations  ▶
Maintenance  ▶
Administration  ▶
File Operations  ▶
Tools  ▶
Help  ▶

|  | Inquiry | Possible Merchant Match 1 of 1 |
|---|---|---|
| Reference Number: | 51102017022400034 | Added by 1117 on 03/10/2017 |
| **Merchant Data:** | | |
| Merchant Name | **DIGITAL ALTITUDE LLC** | **DIGITAL ALTITUDE LLC** |
| Doing Business As | **DIGITAL ALTITUDE LLC** | **DIGITAL ALTITUDE LLC** |
| Merchant Id | | ▮0739 |
| Merchant Category Code | | 8299 |
| Business Address | **16192 COASTAL HWY** | **16192 COASTAL HWY** |
| Business Address | | |
| City | **LEWES** | **LEWES** |
| State | **DE** | **DE** |
| Country | **USA** | **USA** |
| Postal Code | 19958-0000 | 19958 |
| Phone Number | **8008207589** | **8008207589** |
| Alternate Phone Number | | |
| National Tax Id | ********* | ********* |
| State Tax Id | | |
| CAT | | N |
| Date Opened | | 10/14/2016 |
| Date Closed | | 12/21/2016 |
| Svc Provider Legal | | |
| Svc Provider DBA | | |
| Reason Code | | 05 - EXCESSIVE FRAUD |
| **Principal Data:** | | |
| Principal1: | | |
| Last Name | DEE | FORCE |
| First Name | MARY | MICHAEL |
| Middle Initial | | |
| Address | ▮Address 1▮ | |
| Address | | |
| City | FORT WORTH | |
| State | TX | |
| Country | USA | USA |
| Postal Code | ▮ | |
| Phone Number | **8008207589** | |
| Alternate Phone Number | | |
| National ID(SSN) | ********* | ********* |
| Driver's License Number | ************************ | |
| Driver's License State | | |
| Driver's License Country | USA | |
| **URL Data:** | | |
| URL 1 | | WWW.DIGITALALTITUDE. COM |

STATE OF UTAH
COUNTY OF SALT LAKE

Reyna Epps, being duly sworn, deposes and says; that (s)he is the Legal Administrative Assistant of Merrick Bank Corporation recipient of a Civil Investigative Demand "CID" herein and of the original and a copy of written interrogatories accompanying said CID. The answers set forth below are made from information obtained from the records of the recipient.

## WRITTEN INTERROGATORIES

**B.**    **Interrogatories:**  Provide the following information for each Subject Account:

1.    Identify the merchant associated with the Subject Account.

| MERCHANT_ID | MERCHANT_NAME |
|---|---|
| ███ 3208 | Digital Altitude, LLC |

2.    The date the Subject Account was opened.

| MERCHANT_ID | MERCHANT_NAME | Open Date |
|---|---|---|
| ███ 3208 | Digital Altitude, LLC | 2/28/2017 |

3.    For any Subject Account that was closed, the date and reason the account was closed.

| MERCHANT_ID | MERCHANT_NAME | Open Date | Closed Date |
|---|---|---|---|
| ███ 3208 | Digital Altitude, LLC | 2/28/2017 | MARCH 2017 |

4.    The amount or percent of each transaction the Company holds in reserve, if any, and the current balance of any such reserve fund or account.

   •    **There is nothing in reserves for this merchant**

5.    Identify all banks or other financial institutions associated with the Subject Account, including such bank's or financial institution's Bank Identification Number ("BIN") and the time period of that bank's or financial institution's association with the Subject Account.

   •    **Please see the account application and supporting documents.**

6.    Identify all banks, financial institutions, Payment Processors, ISOs, or other third parties to or from which the Company transmitted, forwarded, or received funds relating to the Subject Account, and provide the bank routing and account numbers to or from which funds were transmitted, forwarded, or sent.

   •    **Please see the account application and supporting documents.**

7.    State whether the Subject Account was used to transmit payments other than credit or debit card transactions, including Automated Clearinghouse ("ACH")

-1-

payments, Remotely Created Checks ("RCCs"), or Remotely Created Payment Orders ("RCPOs") and, if so, provide details and an explanation of the services the Company provided.

- **None, we pay daily credit card settlement via ACH to the Merchant. Please see original response and application for ACH account information.**

Reyna Epps,
Legal Administrative Assistant

I declare under penalty of perjury that the information set forth above is true and correct, based upon business records available.

F01-AW-0010183

EX 23
854

BEFORE THE
FEDERAL TRADE COMMISSION

In re 8/18/2017 Civil Investigative Demand ("CID"),           )           DECLARATION OF
FTC Matter No. 1723060, served on Electronic Merchant Systems )           JULIE VRAJA

Pursuant to 28 U.S.C. § 1746, the undersigned JULIE VRAJA declares:

     1.     I am Assistant Manager Risk/Operations for Francis David Corporation, an Ohio corporation doing business as Electronic Merchant Systems ("EMS"), which provides credit and debit card transaction processing services for merchants. EMS is located at 5005 Rockside Road, PH100, in Independence, Ohio 44131. My phone number at EMS is (800) 726-2117, ext. 1453.

     2.     By reason of my position, I have knowledge of the matters described in this declaration and am authorized and qualified to certify the authenticity of the records contained in the following files that are produced herewith:

     A.     Merchant application dated 10/15/15, due diligence and other materials for Digital Altitude LLC dba Digital Altitude, Merchant Identification ("MID") No. 232278 ("DA1"), said file consisting of 148 pages marked DA1-1 through DA1-148;

     B.     Merchant application dated 5/11/16, due diligence and other materials for Digital Altitude LLC dba DigitalAltitude.co, MID No. 273967 ("DA2"), said file consisting of 269 pages marked DA2-1 through DA2-269; and

     C.     Merchant application dated 9/16/16, due diligence and other materials for ASPIRE Processing LLC dba ASPIRE, MID No. 295465 ("Asp"), said file consisting of 54 pages marked Asp -1 through Asp – 54.

     3.     Pursuant to Rules 902(11) and 803(6) of the Federal Rules of Evidence, I hereby certify that the foregoing documents:

     A.     were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters;

     B.     were kept by EMS in the course of regularly conducted business activity; and

     C.     were made by the regularly conducted business activity as a regular practice by EMS.

     4.     EMS did not approve either DA1 or Asp.

     5.     The following is intended to respond to the Interrogatories included in the CID in connection with DA2, and includes references to the relevant pages in the accompanying materials:

*EMS's Response to FTC's 8/17/17 CID*

EX 24
855

**INTERROGATORY 1:**

**Identify the merchant associated with the Subject Account.**

> **Response:**

See DA2-1, DS2-114.

| | |
|---|---|
| Merchant Name: | Digital Altitude LLC dba DigitalAltitude.co |
| Merchant Address: | 520 Broadway, 2nd Floor |
| | Santa Monica, CA 94041 |
| Merchant Phone Nos.: | (800) 820-7589 |
| | (760) 566-6279 |
| Contact Name: | Michael Force |
| Contact Addresses: | 16192 Coastal Highway, Lewes, DE 19958 |
| | 340 S. Lemon Ave., #1994, Walnut, CA  91789 |
| Contact Phone No.: | (817) 993-9125 |

[For DA1, see DA1-1, DA1-109. For Asp, see Asp-1, Asp-23.]

**INTERROGATORY 2:**

**The date the Subject Account was opened.**

> **Response:**

The DA2 Merchant Application was dated 5/11/16. (DA2-1 – DA2-2.)

The DA2 Merchant file was opened on 5/19/16. (DA2-114.)

DA2 first processed transactions through EMS on or about 7/26/16. (DA2-186.)

For DA1, the Merchant Application was dated 10/15/15 (DA1-1), and the Merchant file was opened on 10/20/15 (DA1-109).

For Asp, the Merchant Application was dated 9/16/16 (Asp-1), and the Merchant file was opened on 9/17/16 (Asp-23).

**INTERROGATORY 3:**

**For any Subject Account that was closed, the date and reason the account was closed.**

> **Response:**

DA2 was closed on or about 12/28/16 for excessive chargeback ratio. (DA2-114.)

### INTERROGATORY 4:

**The amount or percent of each transaction the Company holds in reserve, if any, and the current balance of any such reserve fund or account.**

#### Response:

10% of DA2 transaction amounts were withheld in a rolling reserve account up to an amount of $300,000. (DA2-221.)

No amounts are currently held.

### INTERROGATORY 5:

**Identify all banks or other financial institutions associated with the Subject Account, including such bank's or financial institution's Bank Identification Number ("BIN") and the time period of that bank's or financial institution's association with the Subject Account.**

#### Response:

Bank of America

Account No.  2263 (DA2-1, DA2-10)

2292 (DA2-26)

2289 (DA2-60)

### INTERROGATORY 6:

**Identify all banks, financial institutions, payment processors, ISOs, or other third parties to or from which the Company transmitted, forwarded, or received funds relating to the Subject Account, and provide the bank routing and account numbers to or from which funds were transmitted, forwarded, or sent.**

#### Response:

Bank of America

Account No.  2263 (DA2-1, DA2-10)

Routing No.:

### INTERROGATORY 7:

**State whether the Subject Account was used to transmit payments other than credit or debit card transactions, including Automated Clearinghouse ("ACH") payments, Remotely Created Checks ("RCCs"), or Remotely Created Payment Orders ("RCPOs") and, if so, provide details and an explanation of the services the Company provided.**

#### Response:

No.

4

   6.      In the event EMS locates additional documents and information relating to the
CID, this Declaration will be supplemented.


I certify under penalty of perjury that the foregoing is true and correct.


Executed this 14th day of September, 2017.

                                        Julie Vraja, Assistant Manager Risk/Operations
                                        EMS

BEFORE THE
FEDERAL TRADE COMMISSION

In re 8/18/2017 Civil Investigative Demand ("CID"),          )          DECLARATION OF
FTC Matter No. 1723060, served on Electronic Merchant Systems )          JULIE VRAJA

Pursuant to 28 U.S.C. § 1746, the undersigned JULIE VRAJA declares:

1.     I am Assistant Manager Risk/Operations for Francis David Corporation, an Ohio corporation doing business as Electronic Merchant Systems ("EMS"), which provides credit and debit card transaction processing services for merchants. EMS is located at 5005 Rockside Road, PH100, in Independence, Ohio 44131. My phone number at EMS is (800) 726-2117, ext. 1453.

2.     By reason of my position, I have knowledge of the matters described in this declaration and am authorized and qualified to certify the authenticity of the following documents that are being provided to supplement the records produced along with my Declaration of September 14, 2017 in this matter:

A.     Merchant application dated 10/15/15, credit report, and Lexis Nexis report for Digital Altitude LLC dba Digital Altitude, Merchant Identification ("MID") No. ▮▮▮▮▮ ("DA1"), consisting of 9 pages marked DA1-149 through DA1-157;

B.     Merchant application dated 5/11/16, credit report, and Lexis Nexis report, and termination letter dated 12/15/2016 for Digital Altitude LLC dba DigitalAltitude.co, MID No. ▮▮▮▮▮ ("DA2"), consisting of 10 pages marked DA2-270 through DA2-279; and

C.     Merchant application dated 9/16/16, credit report, and Lexis Nexis report for ASPIRE Processing LLC dba ASPIRE, MID No. ▮▮▮▮▮ ("Asp"), consisting of 13 pages marked Asp -55 through Asp – 67.

3.     Pursuant to Rules 902(11) and 803(6) of the Federal Rules of Evidence, I hereby certify that the foregoing documents:

A.     were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters;

B.     were kept by EMS in the course of regularly conducted business activity; and

C.     were made by the regularly conducted business activity as a regular practice by EMS.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this _3_ day of October, 2017.

_____
Julie Vraja, Assistant Manager Risk/Operations
EMS

*EMS's Supplemental Response to FTC's 8/17/17 CID*

F01-AW-0010902

In re ASPIRE Processing LLC dba ASPIRE,
MID # 295465 ("Asp")

UNREDACTED PER 12 USC 1343

Comment History - MOST2 - Merchant Online Statements and Transactions          Page 1 of 2

## AMOS Information

| | | | |
|---|---|---|---|
| CN: CN152719 | **Merchant ID:** ████5465 | **Email:** ASPIREPROCESSINGLLC@GMAIL.COM | |
| ☐ DBA: ASPIRE | **MC Code:** 8299 | **Address:** 16192 COASTAL HIGHWAY | |
| Office: 453 | **Association #:** 100453 | LEWES DE 19958 | |
| Contact: MARY DEE | **Phone:** (323) 640-0738 | **WHO #:** | |

| | | |
|---|---|---|
| **Status:** Inactive | **Processing:** Canceled | **Gift Card:** N/A |
| eCommerce: N/A | **Check Service:** N/A | **Cash Adv:** N/A |
| Lease: N/A | **WHO:** N/A | **Ext. Warr:** N/A |
| Home Page: ASPIREONLINE.CO | Bet-t | **Chain:** |

## TSYS Information

**Bank:** JPMORGAN CHASE BANK

| | | |
|---|---|---|
| **MID:** ████5465 | **Status:** Delete | **Discover ID:** ████9930 |
| **Name:** ASPIRE | **Office:** 453 | **AMEX ID:** Opt Blue |
| **Owner:** MARY DEE | **MC Code:** 8299 | **Phone:** (323) 640-0738 |
| **Manager:** MARY DEE | **Open Date:** 09/17/2016 | **Address:** MARY DEE |
| **SSN:** ████ | **Close Date:** 09/30/2016 | 16192 COASTAL HWY |
| **EIN:** XXXXx4031 | **Statements:** | LEWES DE 199583608 |
| **TIN Status:** Does Not Match as of 09/20/2016 | **Equipment:** AUTH.NET | **PCI Status:** Non Compliant |
| | **Last Month Vol:** $0.00 | |

## Merchant Comments

Export to Excel                                                          Filter: [_____]

| Date | Added By | Note |
|---|---|---|
| 10/19/2016 4:44 pm | Julie Vraja | IF ACCOUNT IS REOPENED AND APPROVED, HELD FOR SITE |
| 9/30/2016 1:08 pm | cward | AutoGenerated - Discover Registration Record Closed |
| 9/30/2016 1:08 pm | cward | AutoGenerated - PER RISK CLOSED ACCOUNT DUE TO MERCHANT APP DECLINED |
| 9/30/2016 1:08 pm | cward | AutoGenerated - Charge Records Zeroed out by MOST2 Closure Process |
| 9/30/2016 1:08 pm | cward | AutoGenerated - Merchant Demographic User Data 5 set to DEC |
| 9/30/2016 1:07 pm | cward | AutoGenerated - TSYS Merchant Status Changed to D |
| 9/30/2016 12:04 pm | cward | AutoGenerated - Merchant has been submitted for the Most2 Closure process |
| 9/29/2016 11:28 am | Christie Ward | Declined per JW. |
| 9/20/2016 11:17 am | Angela Venditti | verified that the FED ID # on the W9 matches the FED ID # in AMOS. |
| 9/20/2016 11:16 am | Angela Venditti | audited DART against the BET-T sheet. |
| 9/19/2016 3:22 pm | Betty Wainwright | ENTERED RATES |
| 9/17/2016 3:05 pm | AMOS Board | MC Match Inquiry sent to TSYS |
| 9/17/2016 3:05 pm | AMOS Board | AutoGenerated - AMEX Registration sent to TSYS |

Showing 1 to 13 of 13 entries

## Risk Comments

Export to Excel                                                          Filter: [_____]

| Date | Added By | Note |
|---|---|---|
| No data available in table | | |

Showing 0 to 0 of 0 entries

## Service Ticket Comments

Export to Excel                                                          Filter: [_____]

| Date Added | Owner Grp | Added By | Problem Type | Rep | Comment |
|---|---|---|---|---|---|
| Ticket #:1208501 | | | | | |
| 10/24/2016 11:40 am | Processing | David Pattee | Site Inspection | Tiana Day | Ticket Closed |
| 10/24/2016 11:40 am | Processing | David Pattee | Site Inspection | Tiana Day | rec from spectrum - This inspection is being cancelled due to being on hold for 30 days or longer with no instruction on how to proceed. Pending Reason: The address for this order appears to be incorrect. The address pulls up to a mail drop location and the merchant has been unresponsive. Please advise. Original Order Date: 09/19/16 - account closed. |

F01-AW-0010693                EMS's Response to FTC's 8/17/17 CID, FTC Matter No. 1723060          Asp - 23

EX 24
860

In re ASPIRE Processing LLC dba ASPIRE,
MID # 295465 ("Asp")

UNREDACTED PER 12 USC 1343

Comment History - MOST2 - Merchant Online Statements and Transactions          Page 2 of 2

| Date Added | Owner Grp | Added By | Problem Type | Rep | Comment |
|---|---|---|---|---|---|
| 9/21/2016 4:29 pm | Processing | David Pattee | Site Inspection | Carla Fruner | rec from spectrum - Hello, The address for this order appears to be incorrect. The address pulls up to a mail drop location and the merchant has been unresponsive. Please advise. |
| **Ticket #:1208467** | | | | | |
| 9/23/2016 1:50 pm | Risk | Beverly Bragg | UnderWriting | Beverly Bragg | Ticket Closed |
| 9/23/2016 1:50 pm | Risk | Beverly Bragg | UnderWriting | Beverly Bragg | rec'd reply - to steve |
| 9/21/2016 3:58 pm | Risk | cward | UnderWriting | Beverly Bragg | UnderWriting - Checkout page is not secure - at the time of checkout, it must show that the order page is at a minimum of 128 bit encryption, 1024 bit exchange and https:// |
| **Ticket #:1207465** | | | | | |
| 9/21/2016 11:44 am | Risk | Beverly Bragg | UnderWriting | Beverly Bragg | Ticket Closed |
| 9/21/2016 11:43 am | Risk | Beverly Bragg | UnderWriting | Beverly Bragg | rec'd response - to steve |
| 9/19/2016 6:16 pm | Risk | cward | UnderWriting | Beverly Bragg | UnderWriting - Order page needs secure. Explain how the merchant resides in GA but the company is in Delaware? |

Showing 1 to 9 of 9 entries

EMS's Response to FTC's 8/17/17 CID, FTC Matter No. 1723060

Asp - 24

F01-AW-0010693

EX 24
861

Merchant Number

▓▓▓▓3967

0415BMO AR

**electronic merchant systems**
5005 Rockside Road, Penthouse 100,
Independence, Ohio 44131
Phone: 800-726-2117
Fax: 216-674-3110
Web: www.emscorporate.com

# MERCHANT AGREEMENT

Merchant acknowledges that its obligations to EMS and itself under this agreement relate to EMS' processing of transactions on behalf of Merchant and that, as such, this agreement is solely for commercial and business purposes, and not for personal, family or household purposes.

**BMO Harris Bank**

Sponsored by :
BMO Harris Bank, NA, Schaumburg, Illinois
150 North Martingale Road, Suite 900,
Schaumburg, Illinois 60173A

| MCC | | | MN | |
|-----|--|--|----|--|
| Office Number 774 | Account Mgr | | Account Rep | |

## BUSINESS NAME (S)

| | | | | |
|--|--|--|--|--|
| Corporate or Legal Name **Digital Altitude LLC** | No. Locations 1 | Doing Business As **DigitalAltitude.co** | | |
| Corporate Address **16192 Coastal Hwy** | | Same As Location ☐ Location Address **520 Broadway, 2nd Fl. Wework** | | |
| City **Lewes** | State **DE** | Zip **19958** | City **Santa Monica** | State **CA** Zip **94041** |
| Telephone Number (800)820 7589 X702 | Fax Number | | Telephone Number (800) 820-7589 | Alternate Phone (760) 566-6279 |
| Federal Tax ID (Not Req'd) ▓▓**7054** | Contact Person **Mary Dee** | | Email Address **billing@digitalaltitude.co** | Will Tie: ☐Corporate ☐Location |

## MERCHANT PROFILE

| | | | PROCESSING HISTORY | |
|--|--|--|--------------------|--|
| Type of Ownership ☐Sole Proprietor ☐Corporation ☐Partnership ■LLC | Type of Goods Sold digital training courses | | Has the business or any associated owner ever been terminated as a VISA®/MasterCard®/Discover®/American Express® merchant? | ☐YES ■NO |
| Length of Ownership 1 YRS ___ MOS | Length at Location 1 ___ MOS | Year Business Established 2015 | Do you currently accept VISA®/MasterCard®/Discover®/American Express®? If YES, please submit 3 most current monthly statements. | ☐YES ☐NO |
| Web Address **www.digitalaltitude.co** | | | Are there third parties/payment applications involved with your payment process? If YES, identify. | ☐YES ■NO |

## CREDIT CARD TRANSACTION PROFILE

| | | | | |
|--|--|--|--|--|
| ☐ Retail | On Premise Sales ___ % | Sales Swiped Through POS terminal ___ % | Is your business PCI compliant? | ■YES ☐NO |
| ☐ Restaurant w/Tip | Off Premise Sales ___ % | | Has your business had any ongoing or prior data compromise investigations? | ☐YES ■NO |
| ☐ Lodging | | | | |
| ☐ Trade/Craft Shows | Mail Order ___ % | Sales Keyed Into POS terminal ___ % | Additional Services | Merchant Number |
| ■ Mail/Phone Order | Telephone Order 40 % | | American Express ▓▓▓▓**3284** | ☐EDC☐Auth |
| ■ Internet | Internet 60 % | | Diners Club | ☐EDC☐Auth |
| ☐ Service | MUST TOTAL 100% | MUST TOTAL 100% | | |

## OWNERS AND OFFICERS

| Name (1) Please Print **Michael Force** | Title **CEO** | Residential Address, City, State, Zip, County **340 S Lemon Ave #1994, Walnut, CA 91789** | | Drivers License Number ▓▓▓ |
|--|--|--|--|--|
| SSN ▓▓▓▓ | Equity Ownership 100% | Time at Residence YRS ___ MOS ___ ☐Own ☐Rent | Date of Birth | Residence Telephone ▓▓▓ |
| Name (2) Please Print N\A | Title | Residential Address, City, State, Zip, County | | Drivers License Number |
| SSN | Equity Ownership ___ % | Time at Residence YRS ___ MOS ___ ☐Own ☐Rent | Date of Birth / / | Residence Telephone |

| BANK REFERENCE **Bank of America** | Account # ▓▓▓▓**2263** | Telephone Number ▓▓▓▓ | Contact **MGR** |
|--|--|--|--|
| TRADE REFERENCE **Living Exceptionally Inc** | Account # **DA 001** | Telephone Number ▓ | Contact **Mary Dee** |
| TRADE REFERENCE **The Referral Hero** | Account # **00149** | Telephone Number ▓ | Contact **Kat Dominguez** |
| TRADE REFERENCE **Inspired Solutions** | Account # **N\A** | Telephone Number ▓ | Contact **Travis Lody** |

## MERCHANT SITE INSPECTION REPORT

| | | | | | |
|--|--|--|--|--|--|
| Merchant Location Area is Zoned | ☐ Shopping Center ☐ Commercial | ☐ Retail Storefront ☐ Residential | ☐ Residence ☐ Industrial | ☐ Mobile Merchant | ☐ Office Building |
| Square Footage | ☐ 0-250 | ☐ 251-500 | ☐ 501-2000 | ☐ 2001+ | |

Does the inventory, merchandise, and staff appear to be consistent with the type of business? ☐ YES ☐ NO  If no, please explain:

| The Merchant ☐ Owns ☐ Leases | Landlord's Name Or Mortgage Holder | Telephone Number ( ) |
|--|--|--|
| General Comments by Inspector | | |

| I hereby verify that I ☐have ■have not physically inspected the business premises of the merchant at the address and the information stated above is correct to the best of my knowledge. | Signature of Rep/Inspector _[signature]_ | Date 5/17 2016 |
|--|--|--|
| ©2015 Electronic Merchant Systems | Electronic Merchant Systems is a registered ISO/MSP of BMO Harris Bank N.A. | |

In re Digital Altitude LLC dba DigitalAltitude.co,
MID # 273967 ("DA2")                    UNREDACTED PER 12 USC 1343

## MERCHANT AGREEMENT

041SBMO AR

### DEBIT · CREDIT AUTHORIZATION

MERCHANT hereby authorizes BANK and EMS to initiate debit/credit entries to MERCHANTS' checking account as indicated below. This authority is to remain in full force and effect during the term of the Agreement. This authorization extends to such entries in said account concerning lease, rental or purchase agreement applying to POS terminal, accompanying equipment, check guarantee fees and/or gift/loyalty card fees.

**DO NOT USE A DEPOSIT TICKET**
**MAKE SURE CHECK IS VOIDED PROPERLY**
**CHECK MUST BE MICR ENCODED WITH ABA ROUTING NUMBER AND ACCOUNT NUMBER**
**MAKE SURE CHECK IS PRE-PRINTED WITH MERCHANT BUSINESS NAME**

### AMERICAN EXPRESS CARD ACCEPTANCE

☐ By checking this box, Merchant elects to accept payments via American Express (ineligible Merchants will not be enrolled). Merchant may opt out of accepting American Express Cards at any time without directly or indirectly affecting its rights to accept other Cards.

☒ By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express. Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express.

### SCHEDULE OF FEES

| | | Discount | % + | ¢ Transaction | |
|---|---|---|---|---|---|
| ☐ VISA*/MasterCard*/Discover* | | Discount | % + | ¢ Transaction | $0.30 Batch Headers |
| ☐ American Express* | | Discount | % + | .30 ¢ Transaction | $0. Voice ARU |
| ☒ Interchange Plus | | Discount 1.75% % + | | ¢ Transaction | $00 Monthly 100K Data and Breach Protection |
| ☐ Pin Debit Network | | Discount | % + | ¢ Transaction | $0 Monthly Minimum (Visa*/MasterCard*/Discover*/American Express*/Discount) |
| ☐ Quote Rates | | | % + | ¢ Transaction | $00 Semi-Annual Technology Upgrade and Update |
| ☐ Quote Rates | | | % + | ¢ Transaction | $79.00 Monthly Access and Online Statements |
| ☐ Quote Rates | | | % + | ¢ Transaction | $0.25 Third party authorizations per Transaction |
| ☐ Quote Rates | | | % + | ¢ Transaction | |
| ☐ eCommerce | | Monthly $ | | ¢ Transaction | |

Additional charge of $.10 and 2.35% of sales amount for international, commercial, or Transactions that do not meet the best qualified interchange rate qualification criteria for credit card and unregulated signature debit transactions. Fees of $25.00 per retrieval request, $45.00 per chargeback and $45.00 per returned ACH item. For restaurants, supermarkets, hotel, passenger transport and gas station merchants, standard, reward, enhanced, and world Visa/MasterCard credit cards and unregulated signature debit cards will be surcharged .35%. Card association's network transaction fees, assessments and $.10 will be charged to the merchant on every transaction. PIN debit network fees include base switch, acquirer, interchange and authorization expenses. All signature debit card sales will be surcharged $.10 per transaction. Regulated signature debit card transactions will process at the lowest applicable Card brand otherwise specified. Unregulated signature debit card transactions will process at the corresponding credit card rate unless otherwise specified. Merchant will pay all applicable Card brand registration fees. Section 9 of this Agreement provides more detail as to how Merchant fees contained in this Schedule of Fees are calculated. This Schedule of Fees does not provide all information pertinent to this Merchant Agreement. Merchant is advised to thoroughly review this Agreement, including the attached terms and conditions, and to contact EMS or Bank with any questions. THE ABOVE SCHEDULE OF FEES IS PREDICATED ON THE BUSINESS:

MAX MONTHLY SALES VOLUME: $ 200,000   AVERAGE TICKET SIZE: $ 600.00   HIGHEST TICKET SIZE $ 1200

OFFICERS AND OWNERS OF MERCHANT WARRANT THAT THE AVERAGE MONTHLY SALES VOLUME AND AVERAGE TICKET SIZE ARE ACCURATE AND ACKNOWLEDGE THAT ANY VARIANCE MAY RESULT IN THE DELAY OR THE WITHHOLDING OF FUNDS SETTLEMENT OR TERMINATION OF THE MERCHANT AGREEMENT. All information contained in the attached Merchant Application was completed by owners and/or authorized officers of Merchant, who hereby represent and warrant that all such information and documentation submitted in connection with this Merchant Application is true, complete and correct No spaces were left incomplete. N/A or None is to be filled in any space where applicable. Merchant acknowledges having received and read a copy of this agreement, including the attached Terms and Conditions which are incorporated herein by reference, that it agrees to be bound by the agreement and all its terms, and that the agreement shall not be effective until approval by Bank and EMS. THIS IS AN AUTOMATICALLY RENEWABLE 24 MONTH MERCHANT CONTRACT. CANCELLATION DURING THE TERM WILL RESULT IN A $595 EARLY TERMINATION FEE. MERCHANT AGREES TO COMPLY WITH PCI COUNCIL DATA SECURITY STANDARDS (HEREINAFTER DEFINED) WITHIN 90 DAYS AFTER SIGNING THIS AGREEMENT. FAILURE TO DO SO WILL RESULT IN AN ADDITIONAL $50.00 MONTHLY FEE UNTIL MERCHANT BECOMES COMPLIANT. AN INVESTIGATIVE CONSUMER REPORT MAY BE MADE IN CONNECTION WITH THE ATTACHED APPLICATION. MERCHANT AUTHORIZES BANK, EMS, AND THEIR AGENTS AND AFFILIATES, OR ANY CREDIT REPORTING AGENCY EMPLOYED BY THEM TO INVESTIGATE THE REFERENCES GIVEN OR ANY OTHER STATEMENTS OR DATA OBTAINED FROM MERCHANT, FOR THE PURPOSE OF THIS APPLICATION OR ANY APPLICATION FOR ACCOMPANYING POS EQUIPMENT FINANCING.

### AGREED AND ACCEPTED                     CORPORATE RESOLUTION

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

The officers identified in #1 and #2 have the authority to execute the Merchant Agreement with BANK and EMS on behalf of the corporation.

Digital Altitude LLC
Print Merchant Name

(1) Sign X _____ Title ____ Date 5/11/16

Sign X _____ CEO 5/11/16

By my signature, I verify that I already own a manual imprinter and will provide imprinted sales drafts whenever necessary.

(2) Sign X _____ Title ____ Date

Sign X _____ Title ____ Date

### PERSONAL GUARANTY FROM OWNER/OFFICER

In consideration of BANK and EMS entering into this Merchant Agreement ("Agreement") with the above named Merchant, the undersigned (jointly and severally if more than one) hereby absolutely and unconditionally guarantee(s) the full and prompt payment by MERCHANT of any and all amounts it owes to BANK and EMS, and the performance of all MERCHANT's obligations, under this Agreement as may be subsequently amended from time to time, whether before or after termination or expiration of the Agreement. This Guaranty is a guaranty of payment, and not of collection, and a debt of the undersigned guarantor(s) for his or her own account. The undersigned guarantor(s) agree(s) to pay or perform upon demand and waive(s) any notice, presentment, demand, collection from others or any delay in enforcement. This Guaranty includes (i) any amount returned by the BANK and EMS and accept due to any bankruptcy or similar law and (ii) BANK's and EMS's expenses including attorney fees and costs. Any sums owing by the MERCHANT to the undersigned hereby authorized by BANK and EMS to obtain from any credit reporting agency financial or credit information pertaining to the undersigned and give(s) BANK and EMS continuing authority to obtain such information in connection with the enforcement or extension of this Agreement. Guarantor(s) acknowledge(s) and agree(s) that this guaranty is made as part of a transaction that is solely for business and commercial purposes and is not primarily for personal, family, or household purposes.

(1) Sign X _____ 5/11/16   MICHAEL FORCE
NO TITLE PERMITTED   Date   PLEASE PRINT NAME

(2) Sign X _____   _____
NO TITLE PERMITTED   Date   PLEASE PRINT NAME

### EMS AND BANK USE ONLY

EMS Approval _____   Declined By _____
Signature   Title   Date   Signature   Title   Date

Bank Approval _____   TERMINAL ID NUMBER _____
Signature   Title   Date

Merchant Setup _____   MERCHANT NUMBER _____

©2015 Electronic Merchant Systems   Electronic Merchant Systems is a registered ISO/MSP of BMO Harris Bank N.A.

In re Digital Altitude LLC dba DigitalAltitude.co,
MID # 273967 ("DA2")                                   UNREDACTED PER 12 USC 1343

MERCHANT AGREEMENT   0514360 A

utilize systems of others, including those of any Card Brands, in connection with its performances of the services described hereunder. Bank and EMS shall not be responsible or liable for any information provided by others or for the use of any system or equipment of Bank and EMS or others or for any circumstances beyond its control. The sole and exclusive liability of Bank and EMS and remedy of Merchant hereunder (including negligence) shall be general money damages not to exceed the amount of the item subject to claim or dispute, regardless of the characterization of such action. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL BANK AND EMS, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY, FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER EITHER BANK OR EMS OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. Neither Bank nor EMS shall be responsible or liable for any action taken by Bank or EMS (or the results thereof) that is authorized by this Agreement, the Rules, or applicable regulations or law. Neither Bank nor EMS shall have liability for any taxes arising under this Agreement (which liability will be that of Merchant), other than taxes based on Bank's or EMS's income.

**20. Force Majeure.** The parties to this Agreement shall be released from liability hereunder for failure to perform any of its obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, communications failure, sabotage, war, military operation, national emergency, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or either party's compliance therewith, or governmental proclamation, regulation, or priority, or any other cause beyond either party's reasonable control, whether similar or dissimilar to such causes.

**21. Notices.** Any notice, request, instruction or other document directed to Merchant required or permitted under this Agreement shall be deemed to have been given: (a) upon receipt if by (i) personal delivery or (ii) overnight courier service by way of a national courier; (b) upon transmission if by (i) e-mail to the address provided by Merchant on this Agreement, or (ii) fax to the fax number provided by Merchant on this Agreement; or (c) on the third day after the same shall be sent by first class mail, postage prepaid, to the address provided by Merchant on this Agreement or at such other address as Merchant may give to the Bank or EMS from time to time by written notice. Any notice, request, instruction or other document directed to Bank or EMS required or permitted under this Agreement shall be deemed to have been given on the third day after the same shall be sent by first class mail, postage prepaid, to EMS at 5005 Rockside Road, Suite PH100, Cleveland, Ohio 44131 and to Bank at 150 North Martingale Road, Suite 900, Schaumburg, Illinois 60173., or at such other addresses as EMS or Bank may give to the Merchant from time to time by written notice.

**22. Severability.** If any part of this Agreement is held unenforceable or invalid or prohibited by law, said part shall be deemed stricken therefrom and this Agreement shall be read and interpreted as though said part did not exist, and shall not affect the validity or enforcement of any other provision.

**23. Waiver.** Neither the failure nor any delay on the part of Bank or EMS to exercise any right, remedy, power or privilege hereunder shall operate as a waiver nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver by a party hereunder shall be effective unless it is in writing and signed by the party making such waiver, and then such waiver shall apply only to the extent specifically stated in such writing.

**24. Entire Agreement.** This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between the Merchant, Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written. Neither this Agreement nor any portion or provision hereof may be changed, waived or amended orally or in any manner other than by a writing specifically identified as such and signed by the duly authorized representatives of Bank and EMS. This Agreement is not effective and may not be modified in any respect without the express written consent of Bank, Merchant and Guarantor(s) acknowledge and agree (i) that this Agreement is made as part of a transaction solely for business and commercial purposes and is not primarily for personal, family, or household purposes, and (ii) that Bank, EMS and Merchant are "business association(s)" as defined in Ohio Revised Code Section 169.01(B)(2).

**25. Assignment and Delegation.** This Agreement may be assigned by Bank. , EMS may subcontract, sublicense, assign, license, franchise, or in any manner extend or transfer to any third party any right or obligation of EMS set forth herein but only as may be approved by Bank and permitted under the Rules. This Agreement may not be assigned by Merchant without Bank's and EMS's prior written consents and any purported assignment without such consents shall be void. This Agreement shall be binding on the parties and their permitted heirs, successors, and assigns. Bank (and EMS, if and to the extent permitted under the Rules) reserves the right, in its sole discretion, to delegate or assign to third parties the performance of certain of Bank's or EMS's, if applicable) servicing or settlement obligations to Merchant. The relationship of Bank, EMS and Merchant is solely that of independent parties contracting for services.

**26. Disputes, Governing Law, Jurisdiction, and Venue.** Bank and EMS shall have the absolute right to initiate or defend any and all disputes arising from this Agreement with Merchant. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. In the event of a claim by Bank and/or EMS for the failure of a Merchant to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) of Merchant's obligations and duties hereunder agree that personal jurisdiction and exclusive venue of any such claim shall lie in the federal or state courts of Cuyahoga County, Ohio, and Merchant and any guarantors do each hereby waive all objections to such jurisdiction and agree to submit thereto. Each party is responsible for its own costs and expenses, except that Merchant and/or guarantors shall be liable jointly and severally for all costs and expenses of Bank and EMS (including attorneys fees in connection with the enforcement of this Agreement), as a result of any breach or the collection of any sums due to Bank or EMS hereunder. In connection with any claim by Bank and/or EMS for the failure of a Merchant and/or guarantor(s) to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) hereby waive any right to assert any counterclaim or affirmative defense for set off or other relief against Bank and/or EMS, it being the parties' intention that any such counterclaims are subject to arbitration in accordance with the procedures set forth in Section 27 and that no such arbitration proceeding shall be commenced until after a final unappealed judgment is entered in the court proceedings. The parties hereby waive any right to trial by jury in connection with any dispute between them. Any claims concerning errors in the Fees charged hereunder must be made in writing within six months of the occurrence of the error on which the claim is based, and must specify the grounds for the claim. No such claim for Fees charged hereunder may be filed for Arbitration or in Court until thirty days after a written claim for such was first timely made.

**27. Arbitration.** Except as expressly provided in Section 26, any claim or dispute arising out of or related to this Agreement shall be finally resolved by final and binding arbitration. Whenever a party shall decide to institute arbitration proceedings, it shall give written notice to that effect to the other parties. The party giving such notice shall refrain from instituting the arbitration proceedings for a period of forty (30) days following such notice to allow the parties to attempt to resolve the dispute between or among themselves. If the parties are still unable to resolve the dispute, the party giving notice may institute the arbitration proceeding under the rules of the American Arbitration Association ("AAA Rules"). There shall be no right or authority for any claims or disputes to be arbitrated on a class action basis. Arbitration shall exclusively and solely be held in Cleveland, Ohio. The arbitration shall be conducted before a single arbitrator mutually chosen by the parties, but if the parties have not agreed upon a single arbitrator within fifteen (15) days after notice of the institution of the arbitration proceeding, then the arbitration shall be conducted by a panel of three (3) arbitrators. In such case, Merchant, on the one hand, and Bank and/or EMS on the other, shall within thirty (30) days after notice of the institution of the arbitration proceedings appoint one arbitrator. The presiding arbitrator shall then be appointed in accordance with AAA Rules. Decisions of the arbitrator(s) shall be final and binding on the parties. The arbitrator shall have the authority to award any remedy or relief a court of the State of Ohio could order or grant, including, without limitation, specific performance of any obligation created under this Agreement, the awarding of the issuance of an injunction or the imposition of sanctions for abuse or frustration of the arbitration process. Judgment upon the award of the arbitrator may be entered in any court of competent jurisdiction and enforced with full judicial effect thereafter. All fees and expenses of the arbitration shall be borne by the parties equally and each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentations; provided, however, that the arbitrator(s) is/are authorized to award the prevailing party such sums as shall be deemed proper for the time, expense and inconvenience of

arbitration, including arbitration fees and expenses and attorney fees and expenses. Except to the extent that entry of judgment and any subsequent enforcement may require disclosure, all matters relating to the arbitration, including the award, shall be held in confidence by the parties.

**28. Compliance and Disclosure of Information; Patriot Act.** Merchant shall provide such information and certifications as Bank and EMS may reasonably require from time to time in reviewing Merchant's compliance with the terms and conditions of this Agreement and the Rules. Merchant further agrees to produce and make available for inspection by Bank, EMS or its officers, agents or representatives, such books and records of Merchant as Bank or EMS may deem reasonably necessary to be adequately informed of the business practices and financial condition of Merchant, or the ability of Merchant to observe or perform its obligations to Bank and EMS pursuant to this Agreement. Merchant further agrees to provide to Bank or EMS within seven (7) days of notice such information as Bank or EMS may request including but not limited to, credit reports, personal and/ or business financial statements, income tax returns, or other such information as Bank or EMS may request. Merchant grants to Bank and EMS continuing authority to conduct credit checks and background investigation and inquiries concerning Merchant and its owner(s) including, but not limited to, character and business references and the financial condition of Merchant and Merchant's owner(s). Merchant expressly authorizes Bank, EMS or its agents and representatives to provide and receive such information from any and all third parties directly, without further consent or authorization on the part of Merchant. Bank and EMS may share with others its credit, sales and other information. Merchant will not transfer, sell, or merge or liquidate its business or assets or otherwise transfer control of its business, change its ownership in any amount or respect, engage in any joint venture partnership or similar business arrangement, change its basic nature or method of business, types of products sold or engage in sales by phone, internet, or mail order without providing notice to Bank or EMS and providing Bank or EMS with the opportunity to terminate this Agreement. Merchant acknowledges that Bank has implemented a customer identification program as required under the USA Patriot Act and other similar state laws and regulations. Merchant agrees to make available to Bank and/or EMS such information as may be required by Bank in connection with its customer identification program and/or as required under the USA Patriot Act and related state laws and regulations.

**29. Amendments.** This Agreement is not effective until, and not before, it is signed by the Bank, and may not be modified in any respect without the express written agreement of the Bank. This Agreement may be amended by Bank and EMS from time to time upon written notice. Any amendment to the fees and rates set forth in the Schedule of Fees, including any additional fees, shall be effective on 30 days written notice. Any other amendment to this Agreement shall be effective on the effective date specified in the notice unless otherwise provided for herein. In the event of any amendment of the terms and conditions of this Agreement or of the fees payable to Bank or EMS hereunder, Merchant shall have the right to terminate this Agreement without the payment of the termination fee provided in Section 18 above by providing Bank and EMS written notice of such termination within 30 days after Merchant received notice of the amendment, except as otherwise required by the Rules. No such termination shall effect any obligation of Merchant to pay any fees, charges, or other obligations incurred by Merchant under this Agreement prior to the date of termination. To the extent not inconsistent with the foregoing, Merchant's submission of transactions to Bank and EMS on or after any amendment effective date constitutes acceptance of such amendment. Any unrelated alteration or modification to the preprinted form of this Agreement has no effect and, at the Bank and EMS's discretion, may render this Agreement void.

**30. Privacy.** Merchant acknowledges that it has read, understood, and hereby accepts EMS' Privacy Policy which is posted online at www.emscorporate.com/privacypolicy.

**31. Survival.** All representations, warranties and covenants shall survive the termination of this Agreement.

**32. Construction.** The captions contained in this Agreement are for the convenience of the parties and shall not be construed or interpreted to limit or otherwise define the scope of this Agreement.

**33. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, such counterpart is combinable but one and the same instrument.

**34. Exclusive Agent.** For purposes of this Agreement and performance of the Services by EMS, (a) EMS is the exclusive agent of Bank, (b) Bank at all times and solely responsible for and in control of EMS's performance hereunder, and (c) Bank must approve, in advance, any fee to or obligation of Merchant arising from or related to performance of this Agreement.

**35. Default Interest Rate.** Merchant agrees that all amounts due and payable by Merchant to Bank or EMS under this Agreement shall accrue interest at the rate of one and one-half percent (1.50%) per month, or the maximum interest rate permissible under law, whichever is lesser, beginning as of date due and continuing following any judgment obtained by Bank or EMS against Merchant until paid in full.

**36. Financial Accommodation.** The acquisition, processing and settlement of Transactions is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Agreement cannot be assigned or enforced and Bank and EMS shall be excused from performance hereunder.

This Agreement shall be effective only upon acceptance and signature by Bank and EMS. Any application fee paid to Bank or EMS is nonrefundable whether or not Merchant and this Agreement are accepted by Bank and EMS.

Digital Altitude
Merchant Name (Print)

By: _____     10/11/2015
Authorized Signature                  Date

Michael Force
Authorized Signer's Name (Print)

Its: _____     10/11/2015
Guarantor                            Date

_____
Guarantor                            Date

ELECTRONIC MERCHANT SYSTEMS

By: _____
_____     Date

Its: _____
_____

BMO HARRIS BANK, NA

By: _____
_____     Date

Its: _____

In re ASPIRE Processing LLC dba ASPIRE,
MID # 295465 ("Asp")

UNREDACTED PER 12 USC 3413

DocuSign Envelope ID: 65DE4ADF-04DC-42B5-B978-4B46F235E6F3

0415 BMO A R

**electronic merchant systems***

Merchant acknowledges that its obligations to EMS and Bank under this agreement relate to EMS' processing of transactions on behalf of Merchant and that, as such, this agreement is solely for commercial and business purposes, and not for personal, family or household purposes.

**BMO** **Harris Bank**

# MERCHANT AGREEMENT

Electronic Merchant Systems
5005 Rockside Road, #PH100, Cleveland, Ohio 44131
800-726-2117

| MCC: | | |
| MN: | | |
| Office: 453 | Account Mgr: | Account Rep: |
| Branch: | Rep Code: 3154 | |

Sponsored by:
BMO Harris Bank, NA
150 North Martingale Road, Suite 900
Schaumburg, Illinois 60173A

## BUSINESS NAME (S)

| Corporate or Legal Name | No. Locations | Doing Business As |
| --- | --- | --- |
| ASPIRE Processing LLC | | ASPIRE |

| Corporate Address | Same As Corporate | Location Address |
| --- | --- | --- |
| 16192 Coastal Highway | ☐ | 16192 Coastal Highway |

| City | State | Zip | City | State | Zip |
| --- | --- | --- | --- | --- | --- |
| LEWES | DE | 19958 | LEWES | DE | 19958 |

| Telephone Number | Fax Number | Telephone Number | Alternate Phone |
| --- | --- | --- | --- |
| (323) 640-0738 | | (323) 640-0738 | |

| Federal Tax ID (Nine Digits) | Contact Person | Email Address | Mail To: |
| --- | --- | --- | --- |
| 4031 | Mary Dee | aspireprocessingllc@gmail.com | ☐ Corporate ☐ Location |

## MERCHANT PROFILE

| Type of Ownership | ☐ Sole Proprietor ☐ Corporation ☐ Partnership ■ LLC | Type of Goods Sold | Digital Business S |
| --- | --- | --- | --- |

SIC/MCC (EMS use only)

| Length of Ownership | Length at Location | Year Business Established |
| --- | --- | --- |
| 0 YRS 2 MOS | 0 YRS 2 MOS | 2016 |

| Web Address |
| --- |
| aspireonline.co |

### PROCESSING HISTORY

| Has the business or any associated owner ever been terminated as a VISA®/MasterCard®/Discover®/American Express® merchant? | ☐ YES ■ NO |
| --- | --- |
| Do you currently accept VISA®/MasterCard®/Discover®/American Express®? If YES, please submit 3 most current monthly statements. | ☐ YES ■ NO |
| Are there third parties/payment applications involved with your payment process? If YES, identify. | ☐ YES ■ NO |
| Is your business PCI compliant? | ■ YES ☐ NO |

## CREDIT CARD TRANSACTION PROFILE

| ☐ Retail | On Premise Sales 2 % | Sales Swiped Through POS terminal | 2 % |
| --- | --- | --- | --- |
| ☐ Restaurant w/Tip | Off Premise Sales 0 % | | |
| ☐ Lodging | Mail Order 0 % | Sales Keyed Into POS terminal | 98 % |
| ☐ Trade/Craft Shows | Telephone Order 3 % | | |
| ☐ Mail/Phone Order | | | |
| ■ Internet | Internet 95 % | | |
| ☐ Service | MUST TOTAL 100% | MUST TOTAL 100% | |

| Has your business had any ongoing or prior data compromise investigations? | ☐ YES ■ NO |
| --- | --- |

| Additional Services | Merchant Number | |
| --- | --- | --- |
| American Express | | ☐ EDC ☐ Auth |
| Diners Club | | ☐ EDC ☐ Auth |

## OWNERS AND OFFICERS

| Name (1) | Title | Residential Address, City, State, Zip, County | Drivers License Number |
| --- | --- | --- | --- |
| Mary Dee | Owner | CA FALLBROOK | |

| SSN | Equity Ownership 100 % | Time at Residence 1 YRS 1 MOS ☐ Own ☐ Rent | Date of Birth | Residence Telephone |
| --- | --- | --- | --- | --- |
| | | | | |

| Name (2) | Title | Residential Address, City, State, Zip, County | Drivers License Number |
| --- | --- | --- | --- |
| | | | |

| SSN | Equity Ownership % | Time at Residence YRS MOS ☐ Own ☐ Rent | Date of Birth | Residence Telephone |
| --- | --- | --- | --- | --- |
| | | | | |

| BANK REFERENCE | Account # RT/ABA : DDA : | Telephone Number | Contact |
| --- | --- | --- | --- |
| TRADE REFERENCE | Account # | Telephone Number | Contact |
| TRADE REFERENCE | Account # | Telephone Number | Contact |
| TRADE REFERENCE | Account # | Telephone Number | Contact |

## MERCHANT SITE INSPECTION REPORT (must be completed by sales representative)

| Merchant Location | ☐ Shopping Center | ☐ Retail Storefront | ☐ Residence | ☐ Mobile Merchant | ■ Office Building |
| --- | --- | --- | --- | --- | --- |
| Area is Zoned | ■ Commercial | ☐ Residential | ☐ Industrial | | |
| Square Footage | ☐ 0-250 | ☐ 251-500 | ☐ 501-2000 | ☐ 2001+ | |

Does the inventory, merchandise, and staff appear to be consistent with the type of business? ☐ YES ■ NO If no, please explain:

| The Merchant ☐ Owns ■ Leases | Landlord's Name Or Mortgage Holder Harvard Business | Telephone Number (800) 347-2677 |
| --- | --- | --- |

General Comments by Inspector

I hereby verify that I ☐ have ■ have not physically inspected the business premises of the merchant at this address and the information stated above is correct to the best of my knowledge.

| Signature of Rep/Inspector | Date |
| --- | --- |
| mlR | 9/16/2016 |

©2015 Electronic Merchant Systems                    Electronic Merchant Systems is a registered ISO/MSP of BMO Harris Bank N.A.

EMS's Response to FTC's 8/17/17 CID, FTC Matter No. 1723060

Asp - 55
EX 24
865

In re ASPIRE Processing LLC dba ASPIRE,
MID # 295465 ("Asp")

UNREDACTED PER 12 USC 3413

DocuSign Envelope ID: 65DE4ADF-04DC-42B5-B978-4B46F235E6F3

## NT AGREEMENT

0415 BMO A R

### DEBIT / CREDIT AUTHORIZATION

MERCHANT hereby authorizes BANK and EMS in accordance with this MERCHANT Agreement to initiate debit/credit entries to MERCHANTS' checking account as indicated below. This authority is to remain in full force and effect during the term of the Agreement. This authorization extends to such entries in said account concerning lease, rental or purchase agreement applying to POS terminal, accompanying equipment, check guarantee fees and/or gift/loyalty card fees.

**STAPLE CHECK HERE**

**DO NOT USE A DEPOSIT TICKET, MAKE SURE CHECK IS VOIDED PROPERLY**
**CHECK MUST BE MICR ENCODED WITH ABA ROUTING NUMBER AND ACCOUNT NUMBER**
**MAKE SURE CHECK IS PRE-PRINTED WITH MERCHANT BUSINESS NAME**

### AMERICAN EXPRESS CARD ACCEPTANCE

☑ By checking this box, Merchant elects to accept payments via American Express (Ineligible Merchants will not be enrolled). Merchant may opt out of accepting American Express Cards at any time without directly or indirectly affecting its rights to accept other Cards.

☐ By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express. Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express.

### SCHEDULE OF FEES

| | | | | | | |
|---|---|---|---|---|---|---|
| VISA®/MasterCard®/Discover® | Pass Thru | 2.95 % + | 25 ¢ Transaction | $ 79.00 Monthly Access | | |
| American Express® | Pass Thru | 2.95 % + | 25 ¢ Transaction | $ Debit Access | | |
| ☐ Pin Debit Network | Discount | % + | ¢ Transaction | ☐ Online Statements / EBT | ¢ | |
| Quote Rates _____ | | % + | ¢ Transaction | $ Monthly Cellular Transaction Fee + | ¢ /Transaction | |
| Quote Rates _____ | | % + | ¢ Transaction | 60 ¢ Voice ARU / 30 ¢ Batch Headers | | |
| Quote Rates _____ | | % + | ¢ Transaction | $ 15.00 Monthly 100K Data and Breach Protection | | |
| Quote Rates _____ | | % + | ¢ Transaction | $ 25.00 Monthly Minimum (Visa®/MasterCard®/Discover®/American Express® Discount) | | |
| Quote Rates _____ | | % + | ¢ Transaction | $ 75.00 Semi-Annual Technology Upgrade and Update | | |
| Quote Rates _____ | | % + | ¢ Transaction | ☐ Platinum Service Club $10.00 | | |
| eCommerce | Monthly $ | | Trans ¢ | ☐ $ 25.00 Application/Set up Fee | ☐ $ 25.00 Shopping Cart | |
| Third Party Authorization Fee | | | Trans ¢ | ☐ $ 99.00 WebPak | ☐ $ 25.00 Web Hosting | |

Additional charge of 10 ¢ and 2.35% of sales amount for International, commercial, or Transactions that do not meet the best qualified interchange rate qualification criteria for credit card and unregulated signature debit transactions. Fees of $ 25.00 per retrieval request, $ 45.00 per chargeback and $ 45.00 per returned ACH item. For restaurants, supermarkets, hotel, passenger transport and gas station merchants, standard, reward, enhanced, and world Visa/MasterCard credit cards and unregulated signature debit cards will be surcharged 0.95%. Card association's network transaction fees, assessments and 10¢ will be charged to the merchant on every transaction. Pin debit network fees include base switch, acquirer, interchange and authorization expenses. All signature debit card sales will be surcharged 10 ¢ per transaction. Regulated signature debit card transactions will process at the lowest qualified credit card rate unless otherwise specified. Unregulated signature debit card transactions will process at the corresponding credit card rate unless otherwise specified. Merchant will pay all applicable Card Brand registration fees. Exception to all this Agreement provides more detail as to how Merchant fees contained in this Schedule of Fees are calculated. This Schedule of Fees does not provide all information pertinent to this Merchant Agreement. Merchant is advised to thoroughly review this Agreement, including the attached terms and conditions, and to contact EMS or Bank with any questions. THE ABOVE SCHEDULE OF FEES IS PREDICATED ON THE BUSINESS:

**AVERAGE MONTHLY SALES VOLUME: $** 400000    **AVERAGE TICKET SIZE: $** 500    **HIGHEST TICKET SIZE: $** 6500

OFFICERS AND OWNERS OF MERCHANT WARRANT THAT THE AVERAGE MONTHLY SALES VOLUME AND AVERAGE TICKET SIZE ARE ACCURATE AND ACKNOWLEDGE THAT ANY VARIANCE MAY RESULT IN THE DELAY OR THE WITHHOLDING OF FUNDS SETTLEMENT OR TERMINATION OF THE MERCHANT AGREEMENT. All information contained in the attached Merchant Application was completed by owners and/or authorized officers of Merchant, who hereby represent and warrant that all such information and documentation submitted in connection with this Merchant Application is true, complete and correct No spaces were left incomplete. N/A or None is to be filled in any space where applicable. Merchant acknowledges having received and read a copy of this agreement, including the attached Terms and Conditions which are incorporated herein by reference, that it agrees to be bound by this agreement and all of its terms, and that the agreement shall not be effective until approved by Bank and EMS. THIS IS AN AUTOMATICALLY RENEWABLE 18 MONTH MERCHANT CONTRACT. CANCELLATION DURING THE TERM WILL RESULT IN A $595 EARLY TERMINATION FEE. MERCHANT AGREES TO COMPLY WITH PCI COUNCIL DATA SECURITY STANDARDS (HEREINAFTER DEFINED) WITHIN 90 DAYS AFTER SIGNING THIS AGREEMENT. FAILURE TO DO SO WILL RESULT IN AN ADDITIONAL $50.00 MONTHLY FEE UNTIL MERCHANT BECOMES COMPLIANT. AN INVESTIGATIVE CONSUMER REPORT MAY BE MADE IN CONNECTION WITH THE ATTACHED APPLICATION. MERCHANT AUTHORIZES BANK, EMS, AND THEIR AGENTS AND AFFILIATES, OR ANY CREDIT REPORTING AGENCY EMPLOYED BY THEM TO INVESTIGATE THE REFERENCES GIVEN OR ANY OTHER STATEMENTS OR DATA OBTAINED FROM MERCHANT, OR ANY OF THE UNDERSIGNED PRINCIPALS, FOR THE PURPOSE OF THIS APPLICATION OR ANY APPLICATION FOR ACCOMPANYING POS EQUIPMENT FINANCING.

### AGREED AND ACCEPTED                    CORPORATE RESOLUTION

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you, When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

ASPIRE Processing LLC

The officers _____ #1 and #2 have the authority to execute the Merchant Agreement with BANK and EMS on behalf of the corporation.

Print Merchant Name

(1) Sign X _Mary Dee_    Owner    9/16/2016
      E5ABC99EE6554F9...   Title    Date

Sign X _Mary Dee_    Owner    9/16/2016
      E5ABC99EE6554F9...   Title    Date

By my signature, I verify that I already own a manual imprinter and will provide imprinted sales drafts whenever necessary.

(2) Sign X _____    Sign X _____    9/16/2016
      Title    Date    Title    Date

### PERSONAL GUARANTY FROM OWNER/OFFICER

In consideration of BANK and EMS entering into this Merchant Agreement ("Agreement") with the above named Merchant, the undersigned (jointly and severally if more than one) hereby absolutely and unconditionally guarantee(s) the full and prompt payment by MERCHANT of any and all amounts it owes to BANK and EMS, and the performance of all MERCHANT's obligations, under this Agreement as may be subsequently amended from time to time, whether before or after termination or expiration of the Agreement. This Guaranty is a guaranty of payment, and not of collection, and a debt of the undersigned guarantor(s) for his or her own account. The undersigned guarantor(s) agree(s) to pay or perform upon demand and waive(s) any notice, presentment, demand, collection from others or any delay in enforcement. This Guaranty includes (i) any amount returned by the BANK and EMS after receipt due to any bankruptcy or similar law and (ii) BANK's and EMS's expenses including attorney fees and costs. Any sums owing by the MERCHANT to the undersigned guarantor(s) shall be subordinated to sums owed to BANK and EMS. This Guaranty is continuing, binding upon heirs and successors and may not be changed except in writing and signed by BANK and EMS. The undersigned hereby authorize(s) BANK and EMS to obtain from any credit reporting agency personal information pertaining to the undersigned and give(s) BANK and EMS continuing authority to obtain such information in connection with the maintenance, renewal or collection of the Agreement. Guarantor(s) acknowledge(s) and agree(s) that the guaranty is made as part of a transaction that is solely for business and commercial purposes and is not primarily for personal, family, or household purposes.

(1) Sign X _Mary Dee_    9/16/2016    Mary Dee
      E5ABC99EE6554F9 NO TITLE PERMITTED    Date    PLEASE PRINT NAME

(2) Sign X _____    _____    _____
      NO TITLE PERMITTED    Date    PLEASE PRINT NAME

### EMS AND BANK USE ONLY

EMS Approval _____

Declined By _____

      Signature    Title    Date    Signature    Title    Date

Bank Approval _____    TERMINAL ID NUMBER _____

      Signature    Title    Date

Bank Name _____    Merchant Setup _____    MERCHANT NUMBER _____

©2015 Electronic Merchant Systems    Electronic Merchant Systems is a registered ISO/MSP of Chesapeake Bank, and Merrick Bank.

DocuSign Envelope ID: 65DE4ADF-04DC-42B5-B978-4B46F235E6F3

MERCHANT AGREEMENT   0415 BMO A  R

**THIS MERCHANT AGREEMENT** (the "Agreement"), which includes the attached Merchant Application (the 'Application'), is made and entered into by and among BMO Harris Bank N.A., a national banking association ("Bank"), Francis David Corporation, an Ohio corporation doing business as Electronic Merchant Systems ("EMS"), and the undersigned Merchant ("Merchant") and its guarantor(s).

**WHEREAS**, Bank is engaged in the business of offering settlement services to Merchants that accept a valid credit card or valid off-line debit card (hereinafter, each a "Card") of Visa®, U.S.A., Inc. ("Visa"), MasterCard® International, Inc. ("MasterCard"), Discover® Financial Services ("Discover"), American Express® Travel Related Services Company, Inc. ("American Express") or other credit card brands (hereinafter, each a "Card Brand") and, collectively, the "Card Brands") for payment for goods and/or services sold, rented or rendered by Merchant; and

**WHEREAS**, EMS is registered with Visa as an Independent Sales Organization, with MasterCard as a Member Service Provider, and with American Express as an OptBlue® Participant Sales Entity and has agreed with the Bank to provide credit card processing, authorization and related services for Merchants that use Bank's settlement services for Card transactions (individually, a "Transaction", and, collectively, "Transactions"); and

**WHEREAS**, Merchant desires to use the services of Bank and EMS to authorize, process and settle Transactions undertaken by any authorized user of a Card (collectively, the "Services") in accordance with the rules, regulations, procedures and requirements imposed or adopted by Visa, MasterCard, American Express or other Card Brands as amended from time to time (the "Rules") and on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and of the representations, covenants and agreements set forth in this Agreement, the parties hereby agree as follows:

**1. Honoring/Acceptance of Cards.** Merchant shall honor and accept, without discrimination, all valid Cards when properly presented as payment by a cardholder or authorized user and upon obtaining authorization for each Transaction in advance from the authorization center in accordance with the terms and conditions of this Agreement. Merchant shall not accept a Card for any unlawful transaction. Merchant will submit all authorized Transactions for its business exclusively to Bank and EMS. Merchant will pay all Card Brand fines, fees, penalties and all other assessments or indebtedness levied by Card Brands and/or regulatory agencies to Bank or EMS which are attributable, at the Bank's or EMS' discretion, to Merchant's transaction processing or business. Merchant shall not indicate that Visa, MasterCard, American Express or any other Card Brand endorses its goods or services. Merchant has no right to use the proprietary name and/or symbol of Visa, MasterCard or American Express except during the term of this Agreement, or until Merchant is notified by Bank, Visa, MasterCard or American Express to cease such usage, and only to the extent the materials containing such are provided to Merchant by EMS or Bank and/or are approved in advance by EMS or Bank. Merchant and its guarantor(s) are jointly and severally liable for the obligations of Merchant's establishments under this Agreement.

**2. Point of Sale Devices.** (a) Merchant shall utilize and maintain, at Merchant's expense, Point of Sale ("POS") devices and terminal(s), proprietary software and related equipment approved by Bank and EMS for all Transactions, in a format and medium of transmission acceptable to Bank and EMS. Merchant shall implement the Integrated Circuit Card Specifications for Payment Systems (global payment industry specifications that describe the requirements for interoperability between chip based consumer payment applications and acceptance terminals to enable payment, also referred to as "EMV") when required by EMS, Bank or a Card Brand, and such implementation may require upgrade or replacement of terminal or point of sale hardware and software. Bank and EMS shall have no liability or responsibility for any negligent design or manufacture of any POS terminal or printer, or for any proprietary software or related equipment; EMS' entire liability, if any, and Merchant's exclusive remedy in all situations, shall be to perform repair services on any inoperate POS terminal or printer sold or leased by EMS. (b) Merchant shall record each transaction by "swiping" the card through the POS terminal whenever possible. Merchant acknowledges that each outlet, retail location, or business entity will have its own POS terminal and Merchant identification number. Merchant understands and agrees that sales completed at one location cannot be processed through a terminal at another location. (c) In the event of breakdown of the POS terminal or other system failure, Merchant shall immediately contact the designated Merchant Help Desk. In such case, Merchant shall imprint each sales draft with the embossed data from each card and Merchant's imprinter plate and obtain the cardholder's or authorized user's signature which must match the signature on the card. If Merchant uses an electronic printer connected to a POS terminal, Merchant must still obtain the cardholder's or authorized user's signature on the printed sales draft. As soon as a POS Terminal is operable, Merchant will enter all transactions engaged in during such period. Failure to comply with those requirements may result in a Chargeback. (d) Merchant is responsible for all telephone and communication fees and charges with respect to POS terminals.

**3. Card Brand and Payment Card Industry Rules.** (a) Merchant shall fully comply with and abide by the Rules including without limitation the following which Merchant acknowledges are strictly enforced by Visa, MasterCard and American Express: (i) any use of a mark by a Merchant in acceptance advertising, acceptance decals, or signs, must be in accordance with the Rules as may be in effect from time to time; (ii) the Merchant's use or display of any mark will terminate effective with the termination of the Merchant Agreement or upon notification by the Card Brand to discontinue such use or display; (iii) Merchant will adequately display the Visa, MasterCard or American Express service marks, and, if applicable, on promotional materials to inform the public which Cards are to be honored at Merchant's place of business; (iv) Merchant will refrain from establishing or implementing procedures that discourage, favor, or discriminate against the use of any particular Card; (v) Merchant will refrain from establishing minimum or maximum transaction amounts as a condition for accepting Cards; (vi) Merchant will refrain from imposing any surcharge or fee or any other special conditions for accepting a Card (except as permitted by the Rules); (vii) unless permitted under the Rules, Merchant will refrain from requiring a cardholder to provide any personal information, such as a home or business address or telephone number, or a driver's license or other proof of identification as a condition of honoring a Card, unless instructed by the authorization center (with exceptions for a mail/telephone order or delivery required transaction and zip code for a card-present key-entered transaction in order to obtain address verification); (viii) Merchant shall not require a cardholder to complete a postcard or similar device that includes the cardholder's account number, card expiration date, signature, or any other card account data in plain view when mailed; (ix) Merchant shall not request any Transaction that was previously charged back to the merchant, irrespective of cardholder approval; (x) Merchant shall not accept a Card to collect or refinance existing debt that has been deemed uncollectible or that represents collection of a dishonored check; (xi) Merchant shall not request or use a customer's card number of any purpose other than for payment for its goods or services; (xii) Merchant shall not disclose funds in the form of travelers cheques, if the sole purpose is to allow the cardholder to make a cash purchase of goods or services from the Merchant; (xiii) Merchant shall not disburse funds in the form of cash, unless permitted by the Rules; (xiv) Merchant will include any taxes and any handling or other fees that Merchant collects in the total transaction amount as opposed to collecting them separately in cash or processing them as additional transactions (it being understood that Merchant is responsible for the payment of all taxes applicable to Transactions); (xv) Merchant will refrain from accepting a Card for any unlawful internet gambling transaction; (xvi) Merchant may not accept cardholder payments for previous Card charges incurred at the merchant location; (xvii) Merchant may not accept a card for the purchase of Scrip; (xviii) Merchant will comply with the Rules relating to cardholder information security issues, non-disclosure of cardholder information and Transaction documents, retention and storage of cardholder and Transaction information, and other security procedures adopted by the Card Brands or the Payment Card Industry Security Standards Council (the "PCI Council"), and (xix) all indebtedness arising from Transactions will be for bona fide sales of goods and services (or both) at Merchant's establishments and free of liens, claims, and encumbrances other than ordinary sales taxes. (b) The PCI Council has implemented programs and standards to protect cardholder data. The PCI Council Data Security Standards ("DSS") as they change from time to time apply to Merchant. A copy of the complete PCI Council DSS can be obtained online at www.pcisecuritystandards.org. (c) Visa, MasterCard and American Express have implemented programs to protect cardholder data. The Visa Cardholder Information Security Program ("CISP") and MasterCard Site Data Protection Program ("SDP") apply to Merchant if Merchant processes or stores cardholder data as a result of internet or mail/telephone acceptance of Visa or MasterCard Card account information. A copy of the complete Visa CISP manual and a Self-Assessment Worksheet can be obtained online at www.visa.com/cisp. Along with the MasterCard SDP, these materials can also be obtained from EMS's customer service department. A copy of the American Express Data Security Requirements ("DSR") can be obtained online at www. americanexpress.com/dsr. (d) Merchant shall abide by and fully comply with the Rules, DSS, CISP, SDP, DSR, and any other applicable Card Brand programs and standards. To the extent they require Merchant to do so, but without limiting any other requirements imposed by the foregoing, Merchant agrees to: (i) install and maintain a working network firewall to protect data accessible via the internet; (ii) keep security patches up-to-date; (iii) encrypt stored data; (iv) encrypt data sent across networks; (v) use and regularly update anti-virus software; (vi) restrict access to data by business "need to know"; (vii) assign a unique ID to each person with computer access to data; (viii) refrain from using vendor-supplied defaults for system passwords and other security parameters; (ix) track and monitor access to data by unique user ID; (x) maintain a policy that addresses information security for employees and contractors; (xi) restrict physical access to cardholder information, and (xii) regularly test security systems and processes. If Merchant does not comply with such programs, then, among other things, Visa, MasterCard, American Express and other Card Brands may impose restrictions and/or fines on Merchant, and/or prohibit Merchant from participating in Visa, MasterCard, American Express or other Card programs. Merchant shall be required to submit to an audit to verify compliance with security procedures, (e) Merchant acknowledges that the sale or disclosure of cardholder account numbers, personal information, or other Transaction information to third parties is strictly prohibited by the Rules. Unless Merchant obtains consents from Bank and EMS, and each applicable Card Brand, issuing bank and cardholder, Merchant must not use, disclose, sell or disseminate any cardholder information obtained in connection with a Transaction (including without limitation, the names, addresses and Card account numbers of cardholders, copies of imprinted sales drafts and/or credit records, mailing lists, tapes or other media obtained in connection with a sales draft and/or credit record) except for purposes of authorizing, completing, and settling Transactions, and resolving any Chargebacks, retrieval requests, or similar issues involving Transactions,

other than pursuant to a court or governmental agency request, subpoena or order. (f) Merchant shall use proper controls for discarding all records containing cardholder account numbers and Card imprints, and shall limit access to, and render unreadable, such records prior to their being discarded. Merchant may not retain or store magnetic stripe data after a Transaction has been authorized. If Merchant stores any electronically captured signature of a cardholder, Merchant may not reproduce such signature except upon the specific request of Bank or EMS. Merchant shall store all media containing cardholder names, cardholder account information, and other personal information, as well as Card imprints (such as sales drafts and credit records, auto rental agreements, and carbons) in an area limited to selected personnel. Merchant further warrants and agrees that in the event of its failure, including bankruptcy, insolvency, or other suspension of business operations, it will not sell, transfer or disclose any materials that contain cardholder account numbers, personal information, or Transaction information to third parties, and shall return the information to Bank or EMS and provide acceptable proof of destruction to Bank and EMS. Merchant agrees to keep all information it receives from its customers confidential and only use it in connection with the transactions processed under this Agreement. Merchant further agrees to refrain from disclosing or distributing, in any way, any such information to any third party for any purpose except with the prior express consent of the customer.

**4. Mail, Telephone, E-Commerce (Internet), Recurring and Pre-Authorized Transactions.** (a) Merchant understands that mail, telephone and e-commerce (internet) Transactions have a substantially higher risk of Chargeback and cardholder dispute than Card "present" Transactions, as Merchant will not have an imprinted or magnetically "swiped" Transaction with the cardholder's signature on the sales draft. Bank and EMS discourage accepting mail or telephone orders and other Transactions in which the Card is not presented by the cardholder in person. Merchant may engage in mail, telephone and e-commerce Transactions only if it requested to do so in the Application and only for the approved percentage of Merchant's total monthly sales volume limit reflected for such Transactions on the Application, or as may otherwise have been approved in writing by Bank and EMS. If Merchant exceeds the approved percentages, payment for said Transactions may be withheld by Bank or EMS pending further review. Bank and EMS may make payment of these Transactions at their sole discretion. Bank and EMS reserve the right to establish a Reserve Account pursuant to Section 15 below to fund Chargebacks that may arise from said Transactions. Merchant acknowledges that its failure to disclose true and accurate information as part of the Application may result in the establishment by Bank and EMS of a Reserve Account, increased discount rate or fees and transaction fees, or the termination of this Agreement. Merchant hereby covenants that all of its Transactions will comply fully with all applicable provisions of Federal consumer protection and other laws including, without limitation, the Electronic Fund Transfer Act, 15 U.S.C. § 1601, et seq., the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101, et seq., the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a, et seq., the Federal Trade Commission Act, 15 U.S.C. §45(a), and any regulations adopted under or in accordance with any such laws. (b) In connection with all mail order Transactions, telephone order Transactions, periodic charges for recurring goods or services provided by Merchant ("Recurring Transactions"), preauthorized order Transactions, and e-commerce (internet) Transactions, Merchant will take reasonable precautions to protect against Chargebacks, including, but not limited to the following: (i) delivering merchandise only to the cardholder's billing address where the issuing bank sends the cardholder's billing statement; (ii) using a delivery service that maintains shipping logs and requires signatures by a person receiving merchandise; (iii) using AVS and not processing sales unless all information matches the AVS; (iv) obtaining CVV2 verification from the issuing bank; (v) obtaining the expiration date of the Card; and (vi) on the sales draft, clearly print the cardholder's account number, effective and expiration dates, date of Transaction, description of the goods and services, amount of the Transaction (including shipping, handling, insurance, etc.), cardholder's name, billing address and shipping address, Authorization code, and Merchant's name and address. (c) If Merchant processes Recurring Transactions and charges a cardholder's account periodically for recurring products or services (e.g., monthly insurance premiums, yearly subscriptions, annual membership fees, etc.), then in addition to other applicable procedures and the Rules, Merchant must do the following: (i) have the cardholder complete and deliver to Merchant a written request and consent for such products or services to be charged to cardholder's account (such request to specify, at a minimum, the transaction amounts, the frequency of recurring charges, and the duration of time for which the cardholder's consent or permission is granted, and must be provided promptly in response to a cardholder's request for a copy); (ii) if the Recurring Transaction is renewed, the cardholder must complete and deliver to Merchant a subsequent written request for the continuation of such products or services to be charged to the cardholder's account; (iii) Merchant may not complete a Recurring Transaction after receiving a cancellation notice from the cardholder or issuing bank or after a request for Authorization has been declined; (iv) Merchant must obtain an Authorization for each Transaction and type or print legibly on the signature line of the sales draft for Recurring Transactions the words "Recurring Transaction" (and "PO" for MasterCard Transaction) in lieu of the cardholder's signature, and must provide both an invoice number and the appropriate "Recurring Transaction" indicator with each Authorization request; (v) Merchant must perform an AVS inquiry for at least the first Transaction and then annually thereafter, if applicable (Merchant understands that penalties can be assessed by the Card Brands for failure to use the Recurring Payment Indicator); (vi) a Recurring Transaction or Pre-authorized order may not include partial payments for products or services purchased in a single Transaction; and (vii) no finance charge may be imposed in connection with a Recurring Transaction or Pre-authorized order. Pre-authorized Transactions may be submitted if Merchant advises the cardholder that it will be immediately billing his or her Card at the time of the transaction for prepayment of services or for full prepayment of custom-ordered merchandise to be manufactured to the cardholder's specifications. Merchant acknowledges that Transactions with an Authorization date more than thirty (30) days prior to shipping date or date of service are subject to an increased risk of Chargeback. (c) If Merchant is an e-commerce merchant and accepts orders via the Internet, in addition to other applicable procedures and the Rules, Merchant must do the following: (i) post its privacy and security policies on its websites, where such policies shall be clearly marked for consumers to see and review; (ii) prominently display the name of the Merchant (as both the identity of the Merchant and as the name that will appear on the Cardholder Statement) on its website along with all the following information: (A) complete description of the products or services offered, (B) returned merchandise and refund policy, (C) method for the cardholder to acknowledge the acceptance of the terms and conditions for returned merchandise for the refund policy (this acknowledgment to comply with Card Brand guidelines for proper disclosure), (D) customer service contact, including e-mail address and/or telephone number, (E) Transaction currency (U.S. dollars, unless permission is otherwise received from Bank and EMS), (F) any applicable export or legal restrictions, (G) delivery policy, (H) consumer data privacy policy, and (I) a description of the Transaction security used on Merchant's website. Merchant acknowledges that the Electronic Commerce Indicator must be used to identify e-commerce Transactions in the Authorization request and clearing record. Penalties may be assessed for failure to use the correct Electronic Commerce Indicator.

**5. Fraudulent Sales, Factoring or Laundering.** Merchant shall never accept or deposit or enter into its POS terminal a Transaction not authorized by the Cardholder, or a Transaction made by any entity other than the Merchant. Should Merchant do so, Bank or EMS may immediately terminate this Agreement, have all funds placed into a Reserve Account pursuant to Section 15 above and be placed on the "Combined Terminated Merchant File" as required by the Rules. Said action may result in Merchant's being restricted from settling Transactions with any bank in the future. Merchant hereby releases Bank and EMS and agrees to hold Bank and EMS harmless from any claims, liabilities, losses or damages arising out of or resulting from Merchant's being placed on any such restrictive list.

**6. Authorization.** Approval by, or on behalf of, a cardholder's bank or the bank that issued the Card (hereinafter, "Authorization") is required on all Transactions. Merchant understands and acknowledges that an Authorization only confirms the availability of the cardholder's credit at the time of the Authorization; it does not warrant that the person presenting the Card is the rightful cardholder, nor is it an unconditional promise, guarantee or representation by Bank or EMS that a Transaction is or will be deemed valid and not subject to dispute, debit or Chargeback (as hereinafter defined). Merchant acknowledges and understands that its floor limit shall be Zero and that all Transactions must be authorized in advance through the authorization center. Merchant shall request Authorization for the exact amount of the Transaction on the date the Transaction takes place by swiping the Card through the terminal or keying the account number, expiration date, amount and address verification ("AVS") information into the terminal. If the electronic Card terminal is not functioning, Merchant may obtain Authorization by telephone, calling the voice authorization phone number provided by Bank or EMS. Merchant must provide the voice authorization center the Card account number, expiration date and the amount of the sale. In order to process any approved voice Authorization, when the electronic credit card terminal is functioning, the transaction must be entered utilizing the "force", "offline", or "post authorization" function. Merchant agrees that in connection with the acceptance of Cards (in addition to, and not in lieu of, other applicable procedures and Rules) it will comply with the following procedures and Rules: (a) it will not accept any Card that is not valid or has expired; (b) it will verify that the Card is not stolen, fraudulent or counterfeit; (c) it will use due diligence to verify that a Cardholder is authorized to use the Card presented; (d) at the point of sale, it will (i) carefully examine the signature on every Card present and carefully compare the signature on the Card to the sales record, and (ii) compare the date on which the Card becomes valid and the date on which the Card expires; (e) for Card present Transactions when the signature panel on a Card is not signed Merchant shall ask the Cardholder to sign the Card and (i) obtain additional identification in the signature panel for a Visa Card is not signed Merchant shall in addition to requesting an Authorization (i) review cosmetic identification bearing the Cardholder's signature to validate the cardholder's identity; (ii) indicate the cardholder's identification information, including account number and expiration date, on the Transaction receipt; and (iii) require the cardholder to sign the signature panel of the Card prior to completing the Transaction; (f) if the signature panel of a MasterCard Card is not signed and the Cardholder refuses to sign it, Merchant shall not accept the Card for the Transaction; (g) for Visa and MasterCard, a signature panel bearing the words "See I.D." or equivalent language shall be deemed to be blank, and in either case, if such identification is uncertain, or if Merchant otherwise questions or has suspicions regarding the validity of the Card, Merchant shall contact Bank's designated authorization center for instructions. If Authorization is denied, the Transaction shall not be completed and Merchant shall follow instructions

In re ASPIRE Processing LLC dba ASPIRE,
MID # 295465 ("Asp")

UNREDACTED PER 12 USC 3413

DocuSign Envelope ID: 65DE4ADF-04DC-42B5-B978-4B46F235E6F3

MERCHANT AGREEMENT   0415 BMO A  H

from the authorization center, including recovery of Cards by reasonable and peaceful means. Merchant shall retain or retrieve Cards, as required by the Rules, which are expired or for which reasonable grounds exist to believe that such Cards are counterfeit, fraudulent or stolen.

**7. Settlement.** Merchant agrees to balance and settle its POS device transactions daily and to electronically submit sales no later than the day following the date of Authorization. Transactions submitted for settlement more than one day after the date of Authorization may be refused, become subject to Chargeback, or assessed additional fees by Bank and EMS. Transactions charged to a Card issued by a foreign (non-U.S.A.) issuer or a commercial card issued for business purposes may be assessed additional fees. Merchant acknowledges that all transactions between Merchant, Bank and EMS under this Agreement shall be treated as a single transaction and that all settlements are provisional subject to the cardholder's rights under the Rules for charging charges against the cardholder's account. In submitting transactions to Bank and EMS, Merchant endorses and assigns to Bank and EMS all right, title and interest to such items with rights of endorsement. Bank and EMS have the right to receive payment on all Transactions acquired and Merchant will not attempt to collect any such Transactions. If any payment is received, Merchant will hold it in trust and promptly deliver it to Bank or EMS.

**8. Payment.** Merchant may not assign to any third party any payments due to it under this Agreement, provided, however, that Merchant may sell and assign future Transaction receivables to EMS, its affiliated entities and/or any other cash advance funding source that partners with EMS or its affiliated entities. Unless the context indicates otherwise, when used in this Section 8, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). Merchant shall at all times maintain a commercial checking account with Bank or with another financial institution of Merchant's choice acceptable to Bank and EMS that belongs to the Automated Clearing House ("ACH") network, that can accept ACH transactions, and that Bank will use to debit and/or credit funds on a daily or monthly basis ("Merchant's Bank"). Bank will debit Merchant's Designated Deposit Account ("DDA") daily for the Discount Fees. Merchant agrees to cooperate with Bank to help resolve any problems in crediting/debiting Merchant's DDA. Merchant agrees to be bound by the terms of the operating rules of the National Automated Clearing House Association as in effect and modified from time to time. Merchant hereby authorizes Bank to access information from the DDA and to initiate credit and/or debit entries and adjustments to Merchant's DDA by bank wire or ACH transfer process and/or through direct instructions to Merchant's Bank for amounts due under this Agreement and under any agreements with Bank or its affiliates for any related services, as well as for any credit entries in error. Merchant hereby authorizes the Merchant's Bank to effect all such debits and credits to the Merchant DDA. This authorization is without respect to the source of any funds in the DDA, is irrevocable and is coupled with an interest, and shall remain in full force and effect until Bank gives written notice to Merchant's Bank that all monies due under this Agreement and under any other agreements with Bank or its affiliates for any related services have been paid in full. All settlements for Visa, MasterCard and American Express Card Transactions will be net of credits/ refunds, adjustments, applicable Discount Fees when due, Transaction Fees, Chargebacks, reserves, lease payments, rental fees, Minimum Discount Fees, or other adjustments, charges and any other amounts then due from Merchant. All credits to Merchant's DDA or other payments to Merchant are provisional and are subject to, among other things, final audit by Bank, Chargebacks (including Bank and/or EMS related losses) fees, assessments, and fines imposed by the Card Brands. Merchant agrees that Bank may credit all of Merchant's DDA for any deficiencies, overages, fees, fines, charges, and pending Chargebacks, or may deduct such amounts from settlement funds due to Merchant. Merchant hereby also agrees and authorizes Bank in its sole discretion, to debit any other banking account maintained by Merchant for any and all such amounts. Alternatively, Bank and/or EMS may elect to invoice Merchant for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified. Bank and/or EMS cannot guarantee the timeliness with which any ACH payment may be credited by Merchant's Bank. Merchant understands that, due to the nature of the ACH and the electronic networks utilized for the movement of funds and the fact that not all banks belong to the ACH Network, payment to Merchant can be delayed. Bank and EMS will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties, by Bank and/or EMS, including but not limited to any Card Brand or Merchant's financial institution. Merchant acknowledges that the funds due for Visa, MasterCard and American Express Transactions will generally be processed and transferred to the Merchant's DDA within two (2) business days from the time a batch is closed. Bank reserves the right to divert and hold all funds when Bank and/or EMS is investigating suspicious Transactions, the breach of any warranty, covenant, representation, or agreement by Merchant or has reasonable cause to believe that Merchant may have violated a provision of this Agreement, the Rules and/or is engaged in illegal, fraudulent or suspicious activity. In the event that a payment is rejected by Merchant's Bank or fails to arrive within five (5) business days after Bank's attempted ACH payment, Bank may periodically wire transfer any funds due Merchant until the ACH problem is resolved, and all such wire transfers and resolution of all issues shall be solely at the Merchant's expense. If Merchant receives settlement funds by wire transfer, Bank and/or EMS may charge a wire transfer fee per wire, which fee will not be subject to refund. Not all fees will be debited on a daily basis, but may be subject to a month end debit to the DDA or other available funds.

**9. Discount Fees, Transaction Fees, and Access Fees.** (a) The Bank must approve, in advance, any fee to or obligation of the Merchant arising from or related to performance of this Agreement. (b) Merchant agrees to pay to Bank and EMS the Discount Fees, Transaction Fees, Access Fees, and other fees stated in the Schedule of Fees. (c) For the purposes of calculating fees and other amounts to be paid by Merchant under this Section 9 and the Schedule of Fees (as such is amended from time to time), the following terms have the following meanings: (i) "Discount Fees" means a fee charged on the total value of a Transaction at the applicable Discount Fee disclosed in the Schedule of Fees on the face of this Agreement and incorporated herein; (ii) "Transaction Fee" means a fee charged on each sales draft and each credit record regardless of the total stated and shall also mean a fee charged for any other Transaction which utilizes a POS device for transmission or reception of Card data or information, including but not limited to, debit card transactions, batch closing, Authorizations and any other communications using the POS device.; (iii) the terms "Pass-through," "Interchange Plus" (or "IC Plus") mean that in addition to the Discount Rate, per Transaction charge and Assessments, Merchant shall pay the interchange fees applicable to the type of card presented for payment, and, in the case of American Express, the OptBlue® program fees applicable to the Transaction. Interchange and program fees are set and changed by the Card Brands from time to time and vary based on the Card Brand, regions or jurisdictions, the type of credit or debit card, the type of the accepting merchant, the value of the Transaction, and the type of the Transaction (e.g. transaction size, industry type, online, in-store, phone order, whether the card is present for the transaction, etc.). In certain circumstances, the Schedule of Fees may also provide for interchange surcharges on certain categories of cards presented for payment as defined herein or as commonly used in the payments industry; (iv) the term "Bundled Pricing" means that the Discount Rate and per Transaction charges are the same for all cards, while the term "Tiered Rate Pricing" means that the Discount Rate and per Transaction charges will vary for certain Tiers (certain categories of cards presented for payment as defined herein or as commonly used in the payments industry) as described in the Schedule of Fees. (v) "Qualified cards" or "Best Qualified cards" have the lowest interchange fees. Of the remaining card types (also known as "Non Best Qualified cards"), Non-Qualified cards are those with the highest interchange fees, while the "Mid Qualified cards" have interchange fees that are lower than Non-Qualified cards and higher than Qualified cards. (vi) Other types of cards sometimes bundled in Tiered pricing include "PIN Debit" (debit cards used with a PIN), "Check Cards" (debit cards which are used without a PIN, also called "signature debit"), "Regulated cards" (Check Cards which are issued by certain larger banks and have interchange fees regulated by the Federal Reserve Bank), "Unregulated cards" (Check Cards which are issued by smaller banks and do not have regulated interchange fees), International (cards issued by non-U.S. banks), "Rewards", "Rewards 1" and "Rewards II" cards (cards which have specified card holder rewards), "EIRF" type cards, "Business cards" or "Corporate cards" (certain cards issued to businesses), and "EBT" (electronic benefit transaction) cards. (vii) Transactions involving these cards are described as "Keyed" or "Hand Entered" transactions (Transactions where the card is not physically swiped in to a point of sale device), or "Swiped Transactions" (transactions which are not Keyed). (viii) Merchant agrees that the classification of the thousands of individual interchange and card types in to these types of broad categories is complex and is made at the discretion of EMS. (ix) As disclosed in the Schedule of Fees, Transaction fees are sometimes charged per "Authorization" (the process by which a card presented for payment and the payment amount are sent to the Card Brand and approved or denied by the card issuing bank), or by cleared and settled transactions. An Authorization Transaction Fee shall still be payable under this Agreement even if Merchant contracts separately with American Express for settlement of American Express Transactions. (x) "Voice Authorizations" (or Voice ARU) are those obtained by telephone. (xi) The term "Assessments" includes dues, assessments, acquirer fees, network fees, or other Card Brand fees and expenses assessed to Merchant. EMS or Bank (EMS and Bank sometimes referred to as the "Acquirer"). Examples of these types of charges include NABU, NAPF, APF, FANF, switch charges, international transaction surcharge fees or cross border fees, network fees, Integrity fee, Card Brand Authorization fees, and Card Brand Assessments. With respect to American Express, Assessments shall also include, but not be limited to the OptBlue® Network Fee, Inbound Fee, Non-Swiped Transaction Fee, Non Compliance Fee, Data Quality Fee, and Excessive Disputes Fee. (xii) A "Batch Header" or "Data Capture" fee is one charged for each batch submitted by or on behalf of the Merchant. (xiii) "Monthly Minimum" fees will be charged to the extent the Transaction fees for Bank Card (Visa, MasterCard or Discover credit cards or signature debit cards, plus American Express if settled to Merchant under this Agreement) Transactions are less than the specified minimum. (xiv) Other one-time or recurring monthly fees are as described in the Schedule of Fees. (xv) The term "e-Commerce" means those Transactions accepted through the use of a web site. (xvi) An "Access Fee" is a monthly fee charged for Merchant's access to the applicable Card Brand networks. (d) Merchant acknowledges that the monthly fees apply to each Merchant identification number assigned to Merchant. Merchant agrees that the amounts of such fees set forth on said Schedule may be amended from time to time by EMS and Bank. (e) Merchant acknowledges that in determining whether to accept the Application and in setting the Discount Rate and Fees and Transaction Fees to be charged Merchant, Bank and EMS have relied upon the information contained in the Application including but not limited to the type of business in which Merchant is engaged, the product or service sold, the average transaction or ticket size and monthly volume, the amount of telephone and

mail order sales, and the ratio of keyed/swiped transactions. If any of the foregoing information on which Bank and EMS relied is materially misstated, or if Merchant changes the nature of its business from that indicated on the Application or otherwise changes its business or goods sold or services rendered in a way that may increase EMS's costs or lead to excessive Chargebacks, or if Merchant's percentage of on and off premises, mail, telephone, and internet transaction sales varies from that disclosed in the Application, the Discount Rate, as amended from time to time, shall be the sum of (i) the otherwise applicable Discount Rate, plus (ii) Five Percent (5.00%) for each lower amount that is acceptable to Bank and EMS. In the event of a change in the parameters stated above or should special circumstances arise which shall change either temporarily or permanently the existing conditions, Merchant must notify Bank or EMS prior to those changes, so that necessary adjustments can be made. (f) Fees become due at the time a Transaction is submitted to Bank and EMS. Merchant agrees to close batches at least once every business day, and acknowledges the Discount Fees quoted in the accompanying Application, as amended from time to time, are contingent upon fore going, and further understands that in the event that batches are not closed at least daily, (i) Bank and EMS may initiate batch closing on Merchant's behalf, and (ii) the interchange qualification of Transactions may change, resulting in additional charges as described in the Schedule of Fees. (g) Merchant acknowledges that Higher Assessment and / or interchange fees apply to sales or credit drafts emanating from foreign (non-U.S.A.) credit cards or commercial cards issued for business purposes. (h) For every Transaction, an Authorization matching the sales amount exactly (or within 16% for hotels and car rentals, 20% for restaurants, bars and night clubs) must be obtained, or higher Assessment and / or interchange charges apply. (i) Merchant benefits of Data and Breach protection (i) are provided solely through a third party vendor and neither EMS nor Bank shall have any obligation therefor, and (ii) are only available in any particular month to the extent Merchant timely documents full compliance in that month with PCI Council Data Security Standards. PLEASE REFER TO THE SCHEDULE OF FEES INCORPORATED INTO THIS AGREEMENT, AS AMENDED FROM TIME TO TIME, FOR THE AMOUNT OF THESE FEES.

**10. Sales Drafts.** Merchant agrees to use a POS device, computer, telephone and related equipment approved by Bank and EMS for transmission of all Transaction data and to record each Transaction by "swiping" the Card through the POS device whenever a Card is present, or if a Card cannot be electronically read, to enter the Card number and expiration date into the POS device manually. Merchant shall prepare a sales draft in legible form for each Transaction. All items, goods and services purchased in a single transaction shall be included in the total amount on a single sales draft. Merchant shall legibly type, print or imprint the following information on each sales draft: (a) the cardholder's name or number of authorized user; (b) the cardholder's account number and expiration date; (c) Merchant's correct name and address of business; (d) the date of the Transaction; (e) the total cash price of the sale (including all applicable state, federal or local surcharges and taxes); (f) the amount to be charged if a partial payment is made in cash or by check, or the amount to be charged if a partial payment is made as a deposit or as the balance owing after a deposit has been accepted; (g) a brief description of the goods or services; (h) the words "deposit" or "balance" if full payment is to be made in this manner at different times on different sales drafts; (i) the authorization approval code from the authorization center; and (j) for telephone orders transactions, the designation "TO," for mail order transactions, the designation "MO," for preauthorized transactions, the designation "PO," and for recurring transactions, the phrase "Recurring Transaction" in each instance shall be typed or printed on the signature line. Merchant will take reasonable steps to verify card information in accordance with the Rules for each Transaction. Merchant warrants the cardholder's identity whether or not Authorization is received and whether or not Card is present. Merchant shall deliver to the cardholder a true and completed copy of the sales draft. Failure to comply with the above requirements will, in addition to other remedies, subject Merchant to immediate termination, the establishment of a Reserve Account under Section 15 hereof, and the Merchant's indemnification obligations to Bank and EMS under Section 19 hereof.

**11. Retention of Records.** Bank and/or EMS may examine and verify at reasonable times all records of Merchant pertaining to all Transactions processed hereunder. Merchant will be responsible for the retrieval of all sales drafts and receipts and credit receipts requested by Bank or EMS within the time limits established by the Rules. Merchant will retain originals or copies of sales drafts and receipts and credit receipts for at least three (3) years from the processing date of the Transaction. Merchant agrees to deliver the paper copy or facsimile of any such sales drafts and credit receipts in its files to Bank and/or EMS, or to such person as Bank or EMS may designate, within such period after request therefor as is required by law or by the Rules. Such requested copies must be legible. Merchant will be responsible for all liabilities arising from any failure to provide an acceptable copy of any sales draft as required by law or the Rules. Prior to discarding any sales drafts or other records of Transactions, Merchant will destroy, in a manner rendering data unreadable, all material containing cardholder account numbers, Card imprints, and carbons. Merchant shall not under any circumstances retain cardholder information including cardholder name, account number, expiration dates, billing addresses, etc. in a database that can be accessed via a web-based application. Merchant shall indemnify and hold Bank and EMS harmless from all judgments, losses, costs and expenses, including reasonable attorneys' fees, incurred by Bank or EMS and arising out of any claim by cardholders whose security has been breached due to violation of Merchant of this Section. Merchant acknowledges that EMS may perform research fees of up to $75 per hour resulting from research of archived records that are the responsibility of the Merchant. Merchant further acknowledges that it is responsible for examining its monthly Merchant Statement for billing accuracy. EMS reserves the right to limit billing error corrections and refunds to those occurring within the last ninety (90) days. Merchant further agrees that Bank or EMS or their representatives may, during normal business hours, inspect, audit, and make copies of Merchant's books, accounts, records and files pertaining to any transactions, refunds or adjustments thereon.

**12. Chargebacks.** For purposes of this Agreement, "Chargeback" shall mean the procedure by which a sales draft or other indicia of a Transaction (or disputed portion thereof) is denied or returned to Bank or the issuing bank after it was entered into the appropriate settlement network for payment, in accordance with the Rules, for failing to comply with the Rules or due to a cardholder dispute, the liability of which is the Merchant's responsibility. As used in this Section 12, "Bank" refers to the Bank and/or EMS (to the extent authorized by the Rules), unless the context indicates otherwise. Merchant understands and acknowledges that an authorized sale does not constitute a guarantee of payment, only available credit, and may be subject to dispute or chargeback. Notwithstanding any nonrecourse provisions contained herein, Merchant is responsible for any and all Chargebacks, as well as Card Brand fines, assessments and fees related to or arising out of such Chargebacks, and will pay Bank, upon demand and without notice, the face amount of any Chargeback, and Bank shall have the right to debit the Merchant's DDA, incoming transactions, or any other funds of the Merchant in Bank's direct or indirect control, by reason of Bank's security interest granted by Merchant under Section 14 below, for the face amount of any Chargeback including without limitation and by way of example, in any of the following circumstances: (a) a mail order, e-commerce order, or telephone order Transaction is disputed by the cardholder; (b) merchandise has been returned or service canceled by cardholder and cardholder requested a credit from Merchant and such credit was not processed by Merchant; (c) the purchase had not been authorized as required or the denial of an Authorization was disregarded; (d) a Transaction is for a type of merchandise or services other than as described in the Application and that was charged back (by the cardholder); (e) the cardholder contests a Transaction, EMS or the appropriate issuing bank (fails to (i) the goods or services were not received by cardholder or their authorized user do not conform to what was on the sales draft or (ii) goods or services of value different than those agreed to and purchased were received or (iii) the dispute reflects a claim or defense authorized against card issuers or creditors by a relevant statute or regulation; (f) Merchant fails to honor a retrieval request from Bank or EMS for an original sales draft in accordance with the requirements hereof; (g) a sales draft is illegible, incomplete or does not contain a Transaction date on the face or such dollar amount that was, been altered or incorrectly entered and sales draft has been charged back by the Card issuer; (h) the sales draft contains the imprinted or otherwise transcribed description of a Card other than the Card specified; (i) the transaction represents the use of an invalid, altered, counterfeit or expired Card; (j) no signature appears on the sales draft or sales draft does not contain the embossed legend found from a Card or Merchant has failed to take or obtain Authorization from a designated Authorization Center to complete the Transaction and/or the Authorization is untimely. In the event of a Chargeback, Bank, EMS or the issuing bank that he did not make or authorize the Transaction; (k) security procedures have not been followed or where the signature on the sales draft is different from the signature appearing on the signature panel of the Card and the sales slip is charged back; (l) a Card issuer, Bank of EMS determine that Merchant fraud occurred at the time of the Transaction, whether or not such Transaction was authorized by the issuer and the cardholder neither participated in nor authorized the Transaction; (m) the ratio of questionable Merchant activity standards, in the sole determination of Bank or EMS. If, with respect to any one of Merchant's outlets, the amount of any Card counterfeited indications becomes excessive, in the sole and absolute discretion of Bank or EMS, Merchant may be charged back for all Transactions involving excessive, in the sole determination thereof, including but not limited to those reoccurring Transactions and in Merchant's DDA and Reserve Account shall be held pursuant to the provisions of this Agreement. Merchant agrees to accept and understands that it is responsible for all Chargebacks and understands that some Chargebacks cannot be rebutted or remedied. Merchant agrees to satisfy directly with the cardholder any claim or dispute arising from a Transaction. Bank and EMS will provide Merchant with any information possessed by them that will enable Merchant to recover from others the amount of any Chargeback. Bank and EMS shall retain any discount and/or other fee related to a Chargeback. Merchant understands that Bank and EMS will assess up to $45 per Chargeback, or other charges that may be established by Bank and EMS from time to time. Furthermore, Bank and EMS may assess Merchant a for any fines imposed by MasterCard, Visa and American Express plus a processing fee for such fine as may be required by Bank and EMS at their sole discretion. Disputes relating to Chargebacks shall be governed by the Rules, including Merchant's obligation to provide required documentation. If the actual Card is "not present" Merchant acknowledges and understands and agrees that Merchant bears one hundred percent (100%) of the risk of Chargeback under the Rules, for all Transactions and any fees resulting from any losses, claims, and costs arising from or associated with each of said Transactions, including any Authorizations.

**13. Returns and Credits.** Merchant shall maintain a fair policy permitting refunds, exchanges, returns and

In re ASPIRE Processing LLC dba ASPIRE,
MID # 295465 ("Asp")

UNREDACTED PER 12 USC 3413

MERCHANT AGREEMENT    D415 BMO A  R

DocuSign Envelope ID: 65DE4ADF-04DC-42B5-B978-4B46F235E6F3

adjustments in accordance with applicable law, if, with respect to any Transaction, any goods are accepted for return or any services are refunded, terminated or canceled, or any price adjustment is allowed by Merchant and except where otherwise required by law or governmental regulations, Merchant shall not under any circumstances, except as permitted by certain debit card networks, during the term of this Agreement, issue cash for return of goods or cancellations of service where goods or services were originally purchased in a Transaction. Instead, Merchant shall utilize a credit record evidencing such refund or adjustment. Merchant must process the credit record Transaction within three (3) business days of the original Transaction. Merchant shall date each credit record with the credit date and include thereon a brief description of the goods returned, services canceled or adjustment made and the amount of the credit, in sufficient detail to identify the Transaction. A completed copy of the credit record shall be delivered to the cardholder at the time of each return or cancellation of a transaction. The credit shall not exceed the amount of the original Transaction. The per item Transaction Fee will be applicable and Merchant may not receive a refund of Discount Fees paid for the original Transaction. With proper disclosure at the time of the Transaction, Merchant may: (a) refuse to accept goods in return or exchange and refuse to issue a refund to a cardholder; (b) accept returned goods in exchange for the Merchant's promise to deliver goods or services of equal value available from Merchant at no additional cost to cardholder; or (c) stipulate special circumstances agreed to by the cardholder. Proper disclosure shall be deemed to have been given only if, at the time of the Transaction, the following notice appears on all copies of the sales draft in legible letters at least one-quarter (1/4) inch high and in close proximity to the space provided for the cardholder's signature stating "NO REFUND" or "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" or any special terms as applicable, or equivalent language, provided and to the extent such sales practices are permitted under applicable law.

**14. Security Interest.** Unless the context indicates otherwise, when used in this Section 14, "Bank" refers to Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). IN ORDER TO SECURE ALL OBLIGATIONS OF MERCHANT TO BANK AND EMS ARISING FROM THIS AGREEMENT, MERCHANT HEREBY GRANTS BANK AND EMS A CONTINUING SECURITY INTEREST IN AND TO ALL DEPOSITS, REGARDLESS OF SOURCE, TO MERCHANT'S DDA AND OTHER ACCOUNTS IN THE DIRECT OR INDIRECT CONTROL OF THE BANK (INCLUDING THE RESERVE ACCOUNT), ESTABLISHED IN MERCHANT'S NAME OR IN ANY PARTY SIGNING THE PERSONAL GUARANTY AS PART OF THIS AGREEMENT, AND TO ALL PROCEEDS OF SAID DEPOSITS. Said security interest may be set-off or otherwise exercised by BANK without notice or demand of any kind by making an immediate withdrawal from or holding said account, upon Bank's or EMS's reasonable determination that a breach of any obligation of Merchant under this Agreement has occurred. The exercise of this security interest shall be in addition to any other rights of Bank and EMS under this Agreement or applicable laws. The parties specifically acknowledge and affirm that pursuant to the Uniform Commercial Code, Bank is a general lien and right of offset upon all funds on deposit with Bank, which shall stand as one continuing collateral security for the timely performance by Merchant of all of its obligations to Bank and EMS. Bank and EMS shall also have the right to require Merchant to furnish such other and different security as Bank or EMS shall deem appropriate in their sole discretion in order to secure Merchant's obligations under this Agreement. Merchant agrees to execute any documents or take any actions required in order to comply with and perfect any security interest under this Section, at Merchant's cost. To the extent permitted by law and the Rules, Merchant irrevocably authorizes Bank and EMS to record any financing statement or other documents relating to this security interest. Merchant represents and warrants that no other person or entity has a security interest in the property described herein and that this security interest is a first lien security interest and secures Merchant's obligations to Bank under this Agreement. Merchant must obtain the prior written consent of Bank before granting any subsequent security interest in the property described herein.

**15. Reserve Account.** Unless the context indicates otherwise, when used in this Section 15, "Bank" refers to the Bank and/or EMS (to the extent authorized by Bank and not prohibited by the Rules). In addition to the security interest and Chargeback rights granted to Bank and EMS by Merchant, Merchant hereby authorizes Bank or EMS to establish a non-interest bearing "Reserve Account" with or without notice to the Merchant, at any time prior to, at, or after the termination of this Agreement, when the Bank or EMS have determined that any of the following has occurred: (a) reasonable doubt exists concerning Merchant's ability to comply with this Agreement; (b) Merchant's breach of this Agreement or other applicable Rules and regulations; (c) excessive Chargebacks, customer disputes, ACH rejects, retrieval requests or the reasonable possibility of any of the foregoing occurring; (d) inability of the Merchant to fund any potential Chargebacks, past termination fees, charges or other expenses and fees payable to the Bank or EMS; (e) suspicious Transaction activity or Transaction activity which requires further research to verify or substantiate. The Reserve Account is not a bank account, but is an account payable to Merchant by Bank or EMS, as the case may be. Bank may elect to deposit all or a portion of the balance of the Reserve Account in a depository account or trust account at Bank or at another financial institution, however, neither Merchant nor its creditors shall have any rights of withdrawal, charge or assignment with respect to any such bank account. The Reserve Account may be funded, supplemented or replenished by the Bank or EMS in any or all of the following methods to the extent permitted by the Rules: (a) one or more debits to Merchant's DDA; (b) one or more deductions from payments due Merchant (including but not limited to regular deductions calculated as a percentage of net batch amounts); or (c) if Bank, EMS and Merchant agree, delivery of letter of credit or certificate of deposit issued by a financial institution acceptable to Bank and EMS. Merchant hereby agrees that Bank or EMS shall have a full right of offset with respect to the Reserve Account, and that Bank may deduct from this Reserve Account any amount owed to such party in accordance with this Agreement or any other agreement with Merchant. Any balance in the Reserve Account may be held until the expiration of any applicable Chargeback rights under applicable Rules of the Card issuer, whose holding period may extend beyond the termination of this Agreement. Bank may fund, supplement or replenish the Reserve Account in such an amount as Bank or EMS may reasonably estimate is necessary to secure Merchant's payment obligations under this Agreement. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Agreement, maintain sufficient balance in the Reserve Account in such amount as may be reasonably required by Bank or EMS until all of the Chargeback rights of the Transactions processed preceding termination have expired. If, after all such Chargeback rights have expired, Bank and EMS are unable to return the funds in the Reserve Account to Merchant after using reasonable efforts to contact Merchant, a fee of $95 per month shall be deducted from the Reserve Account in order to offset the administrative, clerical, legal, and risk management costs incurred by Bank and EMS to monitor the funds remaining in the Reserve Account. Merchant hereby agrees that any financial institution at which Merchant maintains a deposit account may rely upon an executed copy of the Agreement provided by Bank as Merchant's express, written instruction and authorization to permit such offset by Bank, and Merchant's agreement that said financial institution shall be released from any liability for any good faith compliance with the express written instruction and authorization as set forth herein to permit such offset by Bank.

**16. Warranties by Merchant.** Merchant represents and warrants to Bank and EMS that Merchant has taken all necessary action and has the authority to enter into this Agreement with Bank and EMS and that the person(s) signing for or on behalf of Merchant is (are) specifically authorized and directed to do so by Merchant. This Agreement constitutes the legal, valid and binding obligation of Merchant, enforceable against Merchant in accordance with its terms. Without limiting any other representations, warranties, covenants and agreements hereunder, Merchant agrees, represents and warrants to Bank and EMS that at all times during the term of this Agreement: (a) Merchant is engaged and will engage in the lawful business shown on the front of the Application and is duly licensed under the laws of the State, County and City in which Merchant is located to conduct such business; (b) Merchant currently accepts or desires to accept Cards for the purchase of goods and services through Transactions with cardholders; (c) Merchant has not been terminated from the settlement of card transactions by any financial institution or determined to be in violation of the rules and regulations of Bank, EMS, MasterCard, Visa, American Express or any other Card Brand or network; (d) Merchant will fully comply with all federal, state, and local laws, rules and regulations, as amended from time to time, including all laws with respect to consumer protection and credit, and the Rules; (e) Merchant is aware that Visa, MasterCard, American Express and other Card Brands maintain and publish various guides and best practices policies with respect to risk management, cardholder data security, chargeback management, fraud prevention, and dispute resolution and will familiarize itself with those materials and any amendments to them, and will accept Cards in accordance with the terms of this Agreement and the operating and other rules and regulations of the Card Brands including without limitation the American Express Merchant Operating Guide as such terms may be amended from time to time; (f) except to the extent inconsistent with specific provisions of this Agreement, Merchant also will comply with any and all best practices guidelines provided by EMS; (g) Merchant will provide Bank and EMS sixty (60) days prior written notice of its intent to (i) transfer or sell 10% or more of its total stock, assets and/or liquidate, (ii) change the nature of its business, or (iii) convert all or part of its retail sales to mail, e-commerce, or telephone orders or any other sales method in which the Card is not present and swiped through the POS terminal; (h) as to each Transaction presented to Bank and EMS for payment: (i) the sales draft is and will be valid in form and has been completed in accordance with the Rules, all applicable laws and requirements, (ii) Merchant has delivered goods to the Cardholder or completed the service described on the sales draft in accordance with Merchant's agreement with the Cardholder, (iii) such sales draft represents a bona fide Transaction directly between the Merchant and the cardholder in the Merchant's ordinary course of business and the sales draft shows the cardholder's indebtedness for the total amount shown, (iv) the cardholder has no claim, defense, right of offset, or dispute against Merchant in connection with the purchase of the goods or services and Merchant will provide adequate services to cardholders and will honor all warranties applicable thereto, (v) Merchant has not charged cardholder any separate or additional fee(s) in connection with the Transaction other than as may be required by law or permitted by the Rules (the foregoing shall not prohibit Merchant from extending discounts to customers paying by cash, check, or any other means, other than by Card), and (vi) each Transaction was and will be placed by a person who is the cardholder or authorized user of the Card; (i) all of Merchant's business locations engage and will engage in the same or substantially similar business activity as that listed on the face of this Agreement; (j) the percentage of mail and/or telephone order sales listed by Merchant is and will be consistent with all of Merchant's locations; (k) Merchant does not and will not offer enticements or incentives to cardholders in connection with Transactions for the sale of

Merchant Services: (l) Merchant uses and will use both the name and address shown on the front of the Agreement on all sales drafts and does not and will not use any other name; (m) Merchant shall include all items of goods and services purchased in a single Transaction in the total amount on a single sales draft or transaction record (i.e., Merchant shall not "split tickets") and shall not submit duplicates of any Transaction; (n) Merchant will process no Transaction between a cardholder and an entity other than Merchant; (o) Merchant shall be responsible for its employees' and agents' actions whether or not authorized by Merchant; (p) Merchant will not knowingly submit, and hereby acknowledges that Bank and EMS will not knowingly accept, for submission any Transaction that is illegal or that the Merchant should have known was illegal (q) in the event Merchant was undergoing a forensic investigation at the time this Agreement was signed, Merchant fully cooperate with the investigation until it was completed; and (r) Merchant certifies that it has provided Bank and EMS its correct federal tax identification number; is not subject to backup withholding; and is a U.S. citizen or other U.S. person. Merchant further warrants and agrees that it shall not, without the cardholder's consent and as permitted by law and the Rules, sell, purchase, provide, or exchange card account information in the form of sales drafts, mailing lists, tapes, or any other media obtained by reason of a Transaction or otherwise, to any third party other than to Merchant's agents approved by Bank and EMS for the purpose of assisting Merchant in its business, to Bank, EMS, or the respective card issuer or Card Brand or pursuant to lawful government demand. All media containing card account numbers must be stored in an area limited to selected personnel until destroyed in a manner that will render the data unreadable. Merchant will not disclose and will keep confidential the terms and conditions of this Agreement. If Merchant processes and stores Card data and/or has access to that information via the Internet, Merchant agrees to comply with Rules in respect of protecting Card data and maintaining security measures, including the PCI Council DSS. Failure to comply with the Rules or foregoing requirements, the occurrence of any significant circumstance that may create harm or loss of goodwill to any Card Brand, and/or any security breach compromising Card data shall make the Merchant liable for any network fines, bank and/or unauthorized charges to compromised Card accounts. Merchant understands and agrees that violation of any of the foregoing warranties, representations, covenants and agreements or otherwise provided in this Agreement shall constitute an event of default and breach by Merchant of this Agreement, and may cause this Agreement to be immediately terminated, or be subject to termination, and may result in all funds being placed in a Reserve Account pursuant to Section 15 hereof.

**17.Term.** The term of this Agreement shall be twenty four (24) months commencing on the acceptance of the Application and this Agreement by Bank and EMS and the issuance of a merchant account identification number to Merchant identifying Merchant for accounting, billing, customer service and related purposes in connection with the Services. Thereafter, the Term shall automatically renew for additional consecutive twenty four (24) month terms, unless written notice of termination (to be effective upon the expiration of the then current term) is provided by Merchant to Bank and EMS or by Bank and EMS to Merchant at least ninety (90) days prior to the then existing term, unless earlier terminated in accordance with the provisions of this Agreement.

**18. Termination and Events of Default.** Bank and/or EMS, in addition to any rights of immediate termination without notice as may be contained elsewhere in this Agreement, may terminate this Agreement, and at Bank's and/or EMS's discretion, any merchant processing agreement(s) of any other business that is commonly owned with or controlled by Merchant for any reason or cause (or for no reason) whatsoever upon ten (10) business days prior written notice to Merchant; provided, that Bank and/or EMS may immediately suspend operation of this Agreement and/or take other steps Bank and/or EMS consider necessary. Such termination shall become effective on the later of ten (10) business days from the date such notice is given in the manner prescribed for notices herein or the date specified in such notice; provided, however, that in the event of termination by Bank or EMS due to breach by Merchant of any of the terms and conditions of this Agreement, such termination shall become effective immediately, and Merchant shall pay to EMS a termination fee in the amount of $595. This Agreement may also be terminated effective immediately upon the giving of notice at the discretion of Bank and/or EMS for reasons including but not limited to: (a) Bank and/or EMS determines that Merchant's type of business as indicated on the Application differs from the actual type of business that Merchant operates; (b) Merchant moves or relocates to a new location without giving Bank and EMS at least thirty (30) days prior written notice; (c) the business as conducted by Merchant could endanger the safety and/or soundness of Bank and/or EMS and such relationship has been terminated by Bank and/or EMS; (e) Merchant and/or any of its guarantors files for bankruptcy or is otherwise shown to be insolvent; (f) Merchant has Chargebacks and or returns and credit Transactions which exceed one-half of one percent (0.50%) of the total number of Transactions or the total dollar value of Transactions completed by Merchant in any thirty (30) calendar day period; (g) Merchant owes money to Bank and/or EMS or any of their respective affiliates, and fails to make a timely payment thereof; (h) Merchant has breached or is in default under an End-User Agreement or similar agreement regarding the provision of web hosting, e-mail, electronic commerce, domain name and/or other internet application or system services; (i) Merchant fails to notify Bank and EMS if it knows or suspects that cardholder personal information has been compromised; (j) EMS and / or Bank is otherwise not secure (as determined by EMS and / or Bank, in its sole and absolute discretion) with respect to Merchant's financial position; (k) the continued provision of services to Merchant would pose a level of risk and/or exposure to EMS or Bank (including, without limitation, credit, operational, reputational, financial, technological, security and/or fraud risk or exposure) that Bank or EMS considers, in its sole discretion, to be unacceptable; or (l) the Rules require that EMS and/or Bank terminate and/or suspend this Agreement. In addition, Merchant hereby acknowledges that the Card Brands have the right to terminate or limit this Agreement. Upon the occurrence of an event of default or the termination of this Agreement by Bank or EMS in accordance with the terms hereof, Bank and EMS shall be entitled to pursue all rights and remedies available to it or them under applicable law or in equity, including but not limited to placing the Merchant in the "Terminated Merchant File."All obligations of confidentiality and of any party to this Agreement to pay funds to another shall survive any termination hereof. Nothing herein shall be construed as relieving Merchant of the obligation for the Minimum Discount Fees as provided in Schedule of Fees for the term of this Agreement.

**19. Indemnification: Bank and EMS Liability.** Merchant agrees to indemnify and hold Bank and EMS harmless from and against any Card Brand fines, assessments, or fees, and all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach of any warranty, covenant or agreement (including, without limitation, a violation of the Rules), or any misrepresentation by Merchant under this Agreement, or arising out of Merchant's or Merchant's employees' or agents' negligence or willful misconduct, in connection with Transactions or otherwise arising from Merchant's provision of products and services to cardholders. Except as expressly provided in this Agreement, Bank and EMS make no warranties either express, implied or statutory, in connection with this Agreement. Without limiting the foregoing, BANK AND EMS DISCLAIM ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Bank or EMS may utilize systems of others, including those of any Card Brands, in connection with its performance of the services described hereunder. Bank and EMS shall not be responsible or liable for any information provided by others or for the use of any system or equipment of Bank and EMS or others or for any circumstances beyond its control. The sole and exclusive liability of Bank and EMS and remedy of Merchant hereunder (including negligence) shall be general money damages not to exceed the amount of the item subject to claim or dispute, regardless of the characterization of such action. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL BANK AND EMS, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY, FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. Neither Bank nor EMS shall be responsible or liable for any action taken by Bank or EMS (or the results thereof) that is authorized by this Agreement, the Rules, or applicable regulations or law. Neither Bank nor EMS shall have liability for any taxes arising under this Agreement (which liability will be that of Merchant), other than taxes based on Bank's or EMS's income. Merchant acknowledges that Bank is directly involved in the administration of Merchant's Visa and Master Card Transactions (as a result of Bank's membership in those Card Brand associations), but Bank has no similar relationship with respect to its Discover Transactions or American Express Transactions. Merchant's relationship with those Card Brands is established (directly or indirectly) through EMS.

**20. Force Majeure.** The parties to this Agreement shall be released from liability hereunder for failure to perform any of the obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, communications failure, sabotage, war, military operation, national emergency, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or either party's compliance therewith, or governmental proclamation, regulation, or priority, or any other cause beyond either party's reasonable control, whether similar or dissimilar to such causes.

**21. Notices.** Any notice, request, instruction or other document directed to Merchant required or permitted under this Agreement shall be deemed to have been given: (a) upon receipt if by (i) personal delivery or (ii) overnight courier service by way of a national courier; (b) upon transmission if by (i) e-mail to the address provided by Merchant on this Agreement, or (ii) fax to the fax number provided by Merchant on this Agreement; or (c) on the third day after the same shall be sent by first class mail, postage prepaid, to the address provided by Merchant on this Agreement or at such other address as Merchant may give to the Bank or EMS from time to time by written notice. Any notice, request, instruction or other document directed to Bank or EMS required or permitted under this Agreement shall be deemed to have been given on the third day after the same shall be sent by first class mail, postage prepaid, to EMS 5000 Rockside Road, Suite PH100, Cleveland, Ohio 44131 and to BMO Harris Bank N.A., at 150 North Martingale Road, Suite 900, Schaumburg, Illinois 60173 or at such other addresses as EMS or Bank may give to the Merchant from time to time by written notice.

DocuSign Envelope ID: 65DE4ADF-04DC-42B5-B978-4B46F235E6F3

MERCHANT AGREEMENT   0416 BMO A   R

**22. Severability.** If any part of this Agreement is held unenforceable or invalid or prohibited by law, said part shall be deemed stricken therefrom and this Agreement shall be read and interpreted as though said part did not exist, and shall not affect the validity or enforcement of any other provision.

**23. Waiver.** Neither the failure nor any delay on the part of Bank or EMS to exercise any right, remedy, power or privilege hereunder shall operate as a waiver nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver by a party hereunder shall be effective unless it is in writing and signed by the party making such waiver, and then such waiver shall apply only to the extent specifically stated in such writing.

**24. Entire Agreement.** This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between the Merchant, Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written. Neither this Agreement nor any portion or provision hereof may be changed, waived or amended orally or in any manner other than by a writing specifically identified as such and signed by the duly authorized representatives of Bank and EMS. This Agreement is not effective and may not be modified in any respect without the express written consent of Bank, Merchant and Guarantor(s) acknowledge and agree (i) that this Agreement is made as part of a transaction solely for business and commercial purposes and is not primarily for personal, family, or household purposes, and (ii) that Bank, EMS and Merchant are "business association(s)" as defined in Ohio Revised Code Section 169.01(B)(2).

**25. Assignment and Delegation.** This Agreement may be assigned by Bank . EMS may subcontract, sublicense, assign, license, franchise, or in any manner extend or transfer to any third party any right or obligation of EMS set forth herein but only as may be approved by Bank and permitted under the Rules. This Agreement may not be assigned by Merchant without Bank's and EMS's prior written consents and any purported assignment without such consents shall be void. This Agreement shall be binding on the parties and their permitted heirs, successors, and assigns. Bank (and EMS, if and to the extent permitted under the Rules) reserves the right, in its sole discretion, to delegate or assign to third parties the performance of certain of Bank's (or EMS's, if applicable) servicing or settlement obligations to Merchant. The relationship of Bank, EMS and Merchant is solely that of independent parties contracting for services.

**26. Dispute, Governing Law, Jurisdiction, and Venue.** Bank and EMS shall have the absolute right to initiate or defend any and all disputes arising from this Agreement with Merchant. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. In the event of a claim by Bank and/or EMS for the failure of a Merchant to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) of Merchant's obligations and duties hereunder agree that personal jurisdiction and exclusive venue of any such claim shall lie in the federal or state courts of Cuyahoga County, Ohio, and Merchant and any guarantors do each hereby waive all objections to said jurisdiction and agree to submit thereto. Each party is responsible for its own costs and expenses, except that Merchant and/or guarantors shall be liable jointly and severally for all costs and expenses of Bank and EMS (including attorneys fees in connection with the enforcement of this Agreement), as a result of any breach or the collection of any sums due to Bank or EMS hereunder. In connection with any claim by Bank and/or EMS for the failure of a Merchant and/or guarantor(s) to pay any Chargebacks, fees, settlement costs or other amounts due hereunder, Merchant and guarantor(s) hereby waive any right to assert any counterclaim or affirmative defense for set off or other relief against Bank and/or EMS, it being the parties' intention that any such counterclaims are subject to arbitration in accordance with the procedures set forth in Section 27 and that no such arbitration proceeding shall be commenced until after a final unappealed judgment is entered in the court proceedings. The parties hereby waive any right to trial by jury in connection with any dispute between them. Any claims concerning errors in the Fees charged hereunder must be made in writing within six months of the occurrence of the error on which the claim is based, and must specify the grounds for the claim. No such claim for Fees charged hereunder may be filed for Arbitration or in Court until thirty days after a written claim for such was first timely made. Merchant acknowledges and agrees that, in addition to clearing and settling Transactions, Bank collects fees, costs, and other charges due from Merchant under this Agreement at EMS' instruction. Merchant agrees that Bank has no duty to verify, audit, review or otherwise oversee the fees, costs, or other charges that Bank collects from Merchant.

**27. Arbitration.** Except as expressly provided in Section 26 any claim or dispute arising out of or related to this Agreement shall be finally resolved by final and binding arbitration. Whenever a party shall decide to institute arbitration proceedings, it shall give written notice to that effect to the other parties. The party giving such notice shall refrain from instituting the arbitration proceedings for a period of thirty (30) days following such notice to allow the parties to attempt to resolve the dispute between or among themselves. If the parties are still unable to resolve the dispute, the party giving notice may institute the arbitration proceeding under the rules of the American Arbitration Association ("AAA Rules"). There shall be no right or authority for any claims or disputes to be arbitrated on a class action basis. Arbitration shall exclusively and solely be held in Cleveland, Ohio. The arbitration shall be conducted before a single arbitrator mutually chosen by the parties, but if the parties have not agreed upon a single arbitrator within fifteen (15) days after notice of the institution of the arbitration proceeding, then the arbitration shall be conducted by a panel of three (3) arbitrators. In such case, Merchant, on the one hand, and Bank and/or EMS on the other, shall within thirty (30) days after notice of the institution of the arbitration proceedings appoint one arbitrator. The presiding arbitrator shall then be appointed in accordance with AAA Rules. Decisions of the arbitrator(s) shall be final and binding on the parties. The arbitrator shall have the authority to remedy any wrong or relief a court of the State of Ohio could order or grant, including, without limitation, specific performance of any obligation created under this Agreement, the awarding of the issuance of an injunction or the imposition of sanctions for abuse or frustration of the arbitration process. Judgment upon the award of the arbitrator may be entered in any court of competent jurisdiction and enforced with full judicial effect thereafter. All fees and expenses of the arbitration shall be borne by the parties equally and each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentation, provided, however, that the arbitrator(s) is/are authorized to award the prevailing party such sums as shall be deemed proper for the time, expense and inconvenience of arbitration, including arbitration fees and expenses and attorney fees and expenses. Except to the extent that entry of judgment and any subsequent enforcement may require disclosure, all matters relating to the arbitration, including the award, shall be held in confidence by the parties.

**28. Compliance and Disclosure of Information; Patriot Act.** Merchant shall provide such information and certifications as Bank and EMS may reasonably require from time to time in reviewing Merchant's compliance with the terms and conditions of this Agreement and the Rules. Merchant further agrees to produce and make available for inspection by Bank, EMS or its officers, agents or representatives, such books and records of Merchant as Bank or EMS may deem reasonably necessary to be adequately informed of the business practices and financial condition of Merchant, or the ability of Merchant to observe or perform its obligations to Bank and EMS pursuant to this Agreement. Merchant further agrees to provide to Bank or EMS within seven (7) days of notice such information as Bank or EMS may request including but not limited to, credit reports, personal and/or business financial statements, income tax returns, or other such information as Bank or EMS may request. Merchant grants to Bank and EMS continuing authority to conduct credit checks and background investigation and inquiries concerning Merchant and its owner(s) including, but not limited to, character and business references and the financial condition of Merchant and Merchant's owner(s). Merchant expressly authorizes Bank, EMS or its agents and representatives to provide and receive such information from any and all third parties directly, without further consent or authorization on the part of Merchant. Bank and EMS may share with others its credit, sales and other information. Merchant will not transfer, sell or merge or liquidate its business or assets or otherwise transfer control of its business, change its ownership in any amount or respect, engage in any joint venture partnership or similar business arrangement, change its basic nature or method of business, types of products sold or engage in sales by phone, internet, or mail order without providing notice to Bank or EMS and providing Bank or EMS with the opportunity to terminate this Agreement. Merchant acknowledges that Bank has implemented a customer identification program as required under the USA Patriot Act and other similar state laws and regulations. Merchant agrees to make available to Bank and/or EMS such information as may be required by Bank in connection with its customer identification program and/or as required under the USA Patriot Act and related state laws and regulations. Merchant hereby expressly consents to disclosure by EMS of Transaction data, Merchant data, and other information about the Merchant to American Express, and, further, expressly consents to American Express' use of such information to perform its responsibilities in connection with its Card program, promote the American Express network, perform analytics and create reports, and for any other lawful business purposes, including commercial marketing communications purposes and important transactional or relationship communications from American Express. American Express may use the information obtained in this application at the time of setup to screen and/or monitor Merchant in connection with Card marketing and administrative purposes.

**29. Amendments.** This Agreement is not effective until, and not before, it is signed by the Bank, and may not be modified in any respect without the express written agreement of the Bank. This Agreement may be amended by Bank and EMS from time to time upon written notice. Any amendment to the fees and rates set forth in the Schedule of Fees, including any additional fees, shall be effective on 30 days written notice. Any other amendment to this Agreement shall be effective on the effective date specified in the notice unless otherwise provided for herein. In the event of any amendment of the terms and conditions of this Agreement or of the fees payable to Bank or EMS hereunder, Merchant shall have the right to terminate this Agreement without the payment of the termination fee provided in Section 18 above by providing Bank and EMS written notice of such termination within 30 days after Merchant received notice of the amendment, except as otherwise required by the Rules. No such termination shall effect any obligation of Merchant to pay any fees, charge, or other obligations incurred by Merchant under this Agreement prior to the date of termination. To the extent not inconsistent with the foregoing, Merchant's submission of transactions to Bank and EMS on or after any amendment effective date constitutes acceptance of such

amendment. Any unrelated alteration or modification to the preprinted form of this Agreement has no effect and, at the Bank and EMS's discretion, may render this Agreement void.

**30. Privacy.** Merchant acknowledges that it has read, understood, and hereby accepts EMS' Privacy Policy which is posted online at www.emscorporate.com/privacypolicy.

**31. Survival.** All representations, warranties and covenants shall survive the termination of this Agreement.

**32. Construction.** The captions contained in this Agreement are for the convenience of the parties and shall not be construed or interpreted to limit or define the scope of this Agreement.

**33. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, such counterparts to constitute but one and the same instrument.

**34. Exclusive Agent.** For purposes of this Agreement and performance of the Services by EMS, (a) EMS is the exclusive agent of Bank, (b) Bank is at all times and entirely responsible for and in control of EMS's performance hereunder, and (c) Bank must approve, in advance, any fee to or obligation of Merchant arising from or related to performance of this Agreement.

**35. Default Interest Rate.** Merchant agrees that all amounts due and payable by Merchant to Bank or EMS under this Agreement shall accrue interest at the rate of one and one-half percent (1.50%) per month, or the maximum interest rate permissible under law, whichever is lesser, beginning as of date due and continuing following any judgment obtained by Bank or EMS against Merchant until paid in full.

**36. Financial Accommodation.** The acquisition, processing and settlement of Transactions is a financial accommodation and, as such, in the event of the appointment of a Receiver becomes a debtor in bankruptcy, this Agreement cannot be assigned or enforced and Bank and EMS shall be excused from performance hereunder.

**37. Covenants applicable to American Express acceptance.** The provisions of the American Express Operating Guide are incorporated herein by reference and made a part hereof (see http://www.americanexpress.com/merchantopguide). Merchant hereby expressly authorizes EMS to submit Transactions to, and receive settlement from, American Express on behalf of the Merchant. American Express is hereby conferred third-party beneficiary rights, but not obligations, to this Agreement that will fully provide American Express with the ability to enforce the terms of this Agreement against the Merchant. Merchant may, at any time, opt out of accepting American Express Cards without directly or indirectly affecting its rights to accept other Cards.

Merchant acknowledges that it may be converted from the OptBlue® Program to a direct Card acceptance relationship with American Express if and when it becomes a High CV Merchant in accordance with the Rules and expressly agrees that upon conversion, (i) the Merchant will be bound by American Express' then-current Card Acceptance Agreement; (ii) American Express will set pricing and other fees payable by the Merchant for American Express Card acceptance; and (iii) Authorization or other Transaction Fees may still be payable to EMS pursuant to the Schedule of Fees in this Agreement. Neither Bank nor EMS is a party to the American Express Card acceptance agreement.

Merchant may not bill or collect from any Card Member for any purchase or payment on the American Express Card unless Chargeback has been exercised, the Merchant has fully paid for such Charge, and it otherwise has the right to do so.

Merchant's refund policies for purchases on the American Express Card must be at least as favorable as its refund policy for purchase on any other Card and the refund policy be disclosed to Card Members at the time of purchase and in compliance with Applicable Law.

Any and all American Express Card Member Information is confidential and the sole property of the Issuer, American Express or its Affiliates. Except as otherwise specified, Merchant must not disclose American Express Card Member Information, nor use nor store it, other than to facilitate Transactions at Merchant's establishments in accordance with this Agreement. Merchant must ensure that it and any third parties it enlists to facilitate Transaction processing complies with the American Express Technical Specifications (valid and accurate data must be provided for all data elements in accordance with the American Express Technical Specifications). Failure to comply with the American Express Technical Specifications may impact Merchant's ability to successfully process Transactions. Merchants may be assessed non-compliance fees if Merchant fails to comply with the Technical Specifications. To ensure compliance with the Technical Specifications, Merchants should work with EMS.

If a Merchant closes any of its Establishments, Merchant must follow these guidelines: (i) notify EMS immediately; (ii) policies must be conveyed to the Card Member prior to completion of the Charge and printed on the copy of a receipt or Charge Record the Card Member signs; (iii) if not providing refunds or exchanges, post notices indicating that all sales are final (e.g., at the front doors, by the cash registers, on the Charge Record and on websites and catalogs); (iv) return and cancellation policies must be clearly disclosed at the time of sale; and (v) for Advance Payment Charges or Delayed Delivery Charges, Merchant must either deliver the goods or services for which Merchant has already charged the Card Member or issue Credit for any portion of the Charge for which Merchant has not delivered the goods or services.

This Agreement shall be effective only upon acceptance and/or signature by EMS and Bank. Merchant's submission of transactions under this Agreement shall constitute Merchant's acknowledgment of acceptance of this Agreement by Bank and EMS notwithstanding the absence of any Bank or EMS signature. Any application face paid to Bank or EMS is nonrefundable whether or not Merchant and this Agreement are accepted by Bank and EMS.

ASPIRE Processing LLC

By: _Mary Dee_ (DocuSigned by)   9/16/2016
Authorized Signature   Date
E5A8C99EE6554F9...

Authorized Signer's Name (Print)   Owner

_Mary Dee_   9/16/2016
E5A8C99EE6554F9...   Date

Guarantor _____   _____
Date

ELECTRONIC MERCHANT SYSTEMS

By: _____   _____
Date

Its: _____

BANK

By: _____   _____
Date

Its: _____
BANK

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
**Pursuant to 28 U.S.C. § 1746**

1.  I, _Herbert Ramirez_, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by EVO Payments International, LLC (the "Company") and attached hereto.

3.  The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

    a)  Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    b)  Were kept in the course of the regularly conducted activity of the Company; and

    c)  Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _9/20/2017_          _____
                          Signature

F01-AW-0010185                                                    EX 25
                                                                 871




**Deutsche Bank**

Phone: 888-888-4009 • Fax: 888-204-4040 • Email: underwritingsupport@bankcardhelp.biz

New to EVO Payments International ☑     Additional Location ☐     Owner Change ☐     Entered Online ☐

## MERCHANT APPLICATION

| | |
|---|---|
| Digital Altitude | Digital Altitude LLC |
| d/b/a Name<br>16192 Coastal Highway | IRS Reporting / Legal Business Name<br>Lewes DE 19958 |
| Location Address (No P.O. Boxes)<br>16192 Coastal Highway | City / State / Zip<br>Lewes DE 19958 |
| Mailing Address (If Different)<br>(800) 820-7589 | City / State / Zip |
| Company Phone          Customer Service Phone | Legal Phone          Fax Number<br>billing@digitalaltitude.co |
| Website<br>www.digitalaltitude.co | Email Address (Required) |

## BUSINESS PROFILE

☐ Corporation  ☑ LLC  ☐ Sole Proprietor  ☐ Other_____
☐ Government  ☐ Partnership  ☐ Tax Exempt Organization (501c)

Has Merchant or any associated principal disclosed below filed bankruptcy or been subject to any involuntary bankruptcy?  ☐ Yes  ☑ No
If yes, date filed: _____

| 2015 | 1 | 1 | ••••••54 |
|---|---|---|---|
| Year Formed | Years Owned | # of Locations | Fed ID # (SSN If Sole Proprietor) |

Has Merchant been previously identified by Visa/MasterCard Risk Programs?  ☐ Yes  ☑ No
If yes, what programs and when: _____

| Trade Reference | Contact Name | Telephone # |
|---|---|---|

## OWNERS / OFFICERS

| Mary Dee | Owner | 60.0 | | | |
|---|---|---|---|---|---|
| Name | Title | Ownership % | Name | Title | Ownership % |
| ▮▮▮▮▮ | ▮▮▮▮  ▮▮▮▮▮▮ | | | | |
| SS # | DOB          Primary Tel # | | SS # | DOB          Primary Tel # | |
| ▮▮▮▮▮▮▮ | Fallbrook CA ▮▮▮▮▮ | | | | |
| Home Address (No P.O. Box) | City/State/Zip | | Home Address (No P.O. Box) | City/State/Zip | |
| #Years Of Residence | Cell Phone | | #Years Of Residence | Cell Phone | |
| Drivers License Number | State Issued | | Drivers License Number | State Issued<br>billing@digitalaltitude.co | |
| Primary Business Contact other than Owner | | | Phone # | Email | |

F01-AW-0010194

EX 25
872

**MEMBER BANK INFORMATION**

**Deutsche Bank AG, c/o Deutsche Card Services GmbH · Kaltenbornweg 1-3 · 50679 Cologne, Germany · +49 221 99577 777 · support.deucs@db.com**

| **IMPORTANT MEMBER BANK RESPONSIBILITIES** | **IMPORTANT MERCHANT RESPONSIBILITIES** |
|---|---|
| 1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant. | 1. Merchant must ensure compliance with cardholder data security and storage requirements. |
| 2. A Visa Member must be a principal (signer) to the Merchant Agreement. | 2. Merchant must maintain fraud and chargebacks below thresholds. |
| 3. The Visa Member is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchants must comply. | 3. Merchant must review and understand the terms of the Merchant Agreement. |
| 4. The Visa Member is responsible for and must provide settlement funds to the Merchant. | 4. Merchant must comply with Visa Operating Regulations. |
| 5. The Visa Member is responsible for all funds held in reserve that are derived from the settlement. | 5. Merchant must comply with the American Express Merchant Operating Guide which can be found at www.americanexpress.com/merchantopguide. |
|  | The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the merchant understands these specific responsibilities. |



9/22/2016 7:49:23 PM    Mary Dee Owner

_____    _____    _____
Merchant Signature                          Date                  Merchant's Printed Name & Title

**CARDHOLDER DATA SECURITY, PAYMENT APPLICATIONS & SERVICE PROVIDERS**

Payment Card Industry Data Security Standards ("PCI DSS") and card association rules prohibit storage of track data under any circumstances. If you or your Point of Sale ("POS") system pass, transmit, store or receive full cardholder's data, then the POS software must be Payment Application Data Security Standard ("PA DSS") compliant or you (merchant) must validate PCI DSS compliance. If you use a payment gateway, they must be PCI DSS compliant.

**1.** **Have you ever experienced an Account Data Compromise (ADC)?**  ☐ Yes  ☑ No *(Please proceed to #2)*   If Yes, Date: _____

**2.** **Have you validated PCI DSS compliance?**   ☐ Yes  ☑ No *(Please proceed to #3)*   If Yes, Date: _____

   **a.** Which SAQ Validation Type was completed?   ☐ A   ☐ A-EP   ☐ B   ☐ B-IP   ☐ C   ☐ C-VT   ☐ D   ☐ P2PE-HW

   **b.** Qualified Security Assessor (QSA): _____ (As applicable)

   **c.** Approved Scanning Vendor (ASV): _____ (As applicable to SAQ A-EP, C or D merchants)  Last Scan Date: _____

**3.** **Do you or your Third-Party Provider(s) receive, transmit, or store Cardholder Data Electronically?**  ☑ Yes  ☐ No

   (If you are using a dial-only terminal with no internet connectivity or Touch Tone Capture (TTC) check No)

   **a.** Payment Application or Software: _____   Model or Version Number: _____

   **b.** Third-Party Provider: Network Merchants Inc _____   Is this provider PCI DSS Complaint? ☑ Yes  ☐ No

   **c.** Virtual Terminal or Payment Gateway: _____   Access to Cardholder Data?  ☐ Yes  ☐ No

   **d.** Web Hosting Vendor: _____   Access to Cardholder Data?  ☐ Yes  ☐ No

   **e.** Shopping Cart Vendor: _____   Access to Cardholder Data?  ☐ Yes  ☐ No

   **f.** Other Service Provider: _____   Access to Cardholder Data?  ☐ Yes  ☐ No

F01-AW-0010194

EX 25

874

**\*VISA/MC/DISCOVER**

Annual Volume: $20,000,000.00     Average Ticket: $2,000.00     High Ticket: $6,500.00

Describe high ticket in detail:

| | |
|---|---|
| Magnetic stripe/chip read transactions (Card & Cardholder present) | 0.0 % |
| Mail or Telephone order transactions | 0.0 % |
| Card & Cardholder present, "key punched" transactions w/ signature | 0.0 % |
| eCommerce/web based transactions | 100.0 % |

Describe products/services in detail:

# Digital Marketing Products

TOTAL MUST EQUAL 100%

**Do you currently accept Visa-MC or Discover at this or any other business?** ☑ Yes *(If yes, submit 3 merchant statements)*  ☐ No    **Name of Current Processor:** EMS

**MCC Code:** _____    **Do you own or operate more than one business?** ☐ Yes  ☐ No    **Refund Policy:** ☐ All sales final  ☐ _____ days  ☐ Exchange only

**Check the boxes that apply:**  ☐ Shopping Center/Mall   ☐ Website   ☐ Roving Merchant   ☐ Office Bldg   ☐ Commercial/Industrial   ☐ Storefront   ☐ Residence   ☐ Kiosk

**Processing Profile:**  ☐ Retail   ☐ Restaurant   ☐ Lodging   ☐ Service   ☐ Mail/Telephone Order   ☑ eCommerce    **Seasonal Business?** ☐ Yes  ☑ No

*\*Each person signing this form certifies that the volume, ticket, and products/services info above is accurate, complete and not misleading in any way and agrees that any transaction falling outside these parameters/descriptions can be cause for termination and can result in delayed and/or withheld settlement of funds. See paragraphs 4c, 9a, and 13b of the Merchant Processing Agreement regarding suspension, termination and Merchant changes.*

**MERCHANT SITE SURVEY REPORT *(TO BE COMPLETED BY SALES REPRESENTATIVE)***

**Merchant Location:**  ☐ Commercial   ☐ Industrial   ☐ Office Building   ☐ Online/Website   ☐ Residential   ☐ Retail Location With Store Front   ☐ Other _____

**Is inventory/merchandise amount consistent with type of business?**  ☐ Yes  ☑ No    If no, explain: Inventory Explanation

**The Merchant:**  ☐ Owns   ☐ Leases The Business Premises    **Landlord Name & Phone #:** _____

**Does the Merchant use a Fulfillment House?**  ☐ Yes  ☑ No    **If yes, was the Fulfillment House inspected?**  ☐ Yes   ☐ No

**Further comments by Inspector (required):** _____

**AMERICAN EXPRESS**

| | | | |
|---|---|---|---|
| American Express Tier 1 Rate: ▮▮▮ | Avg Amex Ticket Size: ▮▮▮ | Network Fees (Assessments): ▮▮▮ | Non Swiped Fee (Digital Wallet): ▮▮▮ |
| American Express Tier 2 Rate: ▮▮▮ | Highest Amex Ticket Size: ▮▮▮ | Network Fees (Cross Border): ▮▮▮ | CNP Fee: ▮▮▮ |
| American Express Tier 3 Rate: ▮▮▮ | Monthly Amex Volume: ▮▮▮ | | American Express Authorization Fee: ▮▮▮ |

**AMERICAN EXPRESS:** If Merchant has elected to accept American Express cards, Merchant acknowledges that in the event American Express determines that Merchant is or has become a High CV Merchant, then American Express may convert Merchant from EVO American Express Opt-Blue Program to a direct card acceptance relationship with American Express which has different servicing terms. Upon conversion Merchant acknowledges and agrees that (a) Merchant will be bound by American Express' then current Card Acceptance Agreement, and (b) American Express will set the pricing and establish the fees that Merchant will pay for acceptance of the American Express card.

American Express Fees: Up to 0.50% CNP fee will be charged for any transaction where the Card is not presented at the time of the transaction; a Network fee of up to 0.30% may be assessed on sales volume; and an Inbound Fee of up to 0.75% may be assessed where the country code of the card issuer differs from the Merchant.

☐ By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express. Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express.

☐ By checking this box I elect to not accept American Express.

**BANK INFORMATION *(ELECTRONIC FUNDS TRANSFER AUTHORIZATION)***

Merchant authorizes any party to the Agreement to present Automated Clearing House credits, Automated Clearing House debits, wire transfers, or depository transfer checks to and from the following account and to and from any other account for which any such parties are authorized to perform such functions under the Merchant Processing Agreement, for the purposes set forth in the Merchant Processing Agreement. This authorization extends to amounts due and owing under lease, rental or purchase agreements for POS terminals and/or accompanying equipment and/or check guarantee fees and amounts due for supplies and materials. This Automated Clearing House authorization cannot be revoked until all Merchant obligations under this Agreement are satisfied, and Merchant gives written notice of revocation as required by this Agreement.

Bank Name: Chase _____    DDA: •••••••••65 _____

Routing/ABA #: ▮▮▮▮▮▮ _____    **Account Type\*\*:** ☑ Checking   ☐ Savings *(Not Preferred)*
                                          **\*\*Account MUST have ACH debit and credit capability**

**A pre-printed voided check or letter from your bank will be required prior to final account approval.**

US 5/16 15s

F01-AW-0010194

EX 25

875

## BILLING INFORMATION (SCHEDULE A) VISA/MASTERCARD/DISCOVER

**1. CARD PRESENT MERCHANT**

**credit cards:** _____%   **exempt debit:** _____%   **non-exempt debit:** _____%

Fees apply to most US consumer card/cardholder present, mag-stripe/chip read transactions authorized and batched daily.

Manually key punched transactions batched daily with exact "AVS" match, or qualified key-entered lodging, emerging market or Corp/Purchase card transactions w/required Corp/Purchase data and some rewards-type cards shall be billed at the above credit card rate plus _____ unless otherwise indicated here. This does not apply to non-exempt debit.

Transactions involving non-U.S. credit/debit cards, some rewards-type cards, and all transactions with no "AVS" match, mag-stripe read, Corp/Purchase data, or other qualifiers including unclosed batches may be billed at the above credit card rate plus _____ unless otherwise indicated here. This does not apply to non-exempt debit.

**2. MAIL / TEL / ECOMMERCE MERCHANT**

**credit cards:** ____.___%   **non-exempt debit:** ____.___%

Fee applies to approved Mail/Tel/eCommerce merchants that submit US consumer transactions with an "AVS" request.

Transactions submitted without "AVS" request or Corp/Purchase card transactions submitted w/o required Corp/Purchase data, or unclosed batch transactions may be billed at the above rate plus _1.95_ unless otherwise indicated here. This does not apply to non-exempt debit.

Mail/Tel/eCommerce merchants may be required to submit a completed Mail-Tel-eCommerce profile. Merchants processing Mail/Tel/eCommerce transactions without    EVO Payments International    approval may be subject to deposit delays and/or account termination.

**PCI DSS VALIDATION FEES**

**PCI DSS Validation Fee:** (monthly)                                          $ ▮▮

All merchants are subject to enrollment into our Simple PCI DSS Validation Program unless proof of existing PCI DSS compliance is provided.

Merchants qualifying for exclusion from the PCI DSS validation fees are required to comply with Simple PCI DSS Validation Program requirements as they apply to the business, including provision of documents validating compliance with the PCI DSS upon request, and remain subject to the PCI DSS non-compliance fees.

**PCI DSS Non-Compliance Fee:** (monthly)                                    $ ▮▮

Applies in the event you fail to comply with the Simple PCI DSS Validation Program requirements within 60 days of the date of this agreement.

**GENERAL**

| | |
|---|---|
| **Bankcard:** (per authorization) | $ ▮▮ |
| **Voice-Auth/Touch Tone Transactions:** (per transaction) | $ ▮▮ |
| **Batch Header Fee:** (per batch closed) | $ ▮▮ |
| **Regulatory Fee:** | $ ▮▮ |
| **Annual Fee:** (billed in advance for the following year) | $ ▮▮ |
| **Basic Monthly Service Fee:** | $ ▮▮ |
| **Minimum Monthly Discount Fee:** | $ ▮▮ |
| **\*\*\*Monthly Discount Billing:** | ▮▮ |

**\*\*\****Merchants assessed their Discount Rate at the end of each month instead of daily may be charged a Monthly Discount Billing Fee in an amount based on their settled transaction volume.*

| | |
|---|---|
| **Chargeback Fee:** (per item) | $ ▮▮ |
| **NSF or ACH Reject - Fixed:** (per item) | $ ▮▮ |
| **Early Termination Fee:** | ▮▮ |

*(NOT applicable if proper notice provided - please read section 13 of the T's & C's carefully)*

---

**RETAIL** *(please check all that apply)*

| | | |
|---|---|---|
| **EBT Transactions:** *(Electronic Benefits Transfer – Quest Card)* | ☐ $ | ▮▮ |
| **PIN Based Debit Card Transactions:** | ☐ **cost plus** $ | ▮▮ |
| \*\*\*\***PIN Debit Participation Fee:** *(monthly)* | ☐ $ | ▮▮ |

\*\*\*\**Debit Participation Fee includes costs associated with, among other things, PIN Debit Networks (such as Star, Jeannie, Pulse, NYCE, and others), PIN Debit Sponsor, and PIN Debit Gateways.*

| | | |
|---|---|---|
| †**Mobile Wireless Monthly Terminal Access Fee:** *(per terminal)* | ☐ $ | ▮▮ |
| †**Mobile Wireless Transaction Fee:** *(per transaction)* | ☐ $ | ▮▮ |
| †**Magensa Per Active Device Monthly Fee:** | ☐ $ | ▮▮ |
| **Assurance Plan:** *(monthly)* | | |
| *Includes free supplies and equipment replacement (except wireless and Eclipse)* | $ | ▮▮ |

**Each additional terminal $5.00 month. Number of terminals:** _____
†*Fees subject to change if Merchant activates or deactivates this service.*

**ECOMMERCE/MOTO** *(please check all that apply)*

| | | |
|---|---|---|
| †**Monthly eCommerce Gateway Fee:** *(list gateway)* | ☑ $ | ▮▮ |
| †**eCommerce Transaction Fee:** *(additional)* | ☑ $ | ▮▮ |

**If the merchant will be using a gateway, please check one of the following:**

☐ **PP-MM541** - EVO Payments International creates the Gateway, and bills for the gateway fees

☐ **AG-MM541** - Agent creates the Gateway, EVO Payments International bills for the Gateway fees

☐ **PP-GW** - EVO Payments International creates the Gateway, Gateway bills the merchant directly

☑ **AG-GW** - Agent creates the Gateway, Gateway bills the merchant directly

†*Fees subject to change if Merchant activates or deactivates this service.*

**ASSESSMENTS**

*Pass-through fees from the Payment Brands charged as a percentage of the total sales volume for each brand.*

| | |
|---|---|
| **MasterCard Assessment** (transactions < $1,000) | ▮▮ |
| **MasterCard Assessment** (transactions ≥ $1,000) | ▮▮ |
| **Visa Assessment** | ▮▮ |
| **Discover Assessment** | ▮▮ |
| **MasterCard Acceptance Licensing Fee** | ▮▮ |

Merchants accepting International transactions may be charged cross border fees up to 1.50% as well as International Acquirer Fees and Acquirer Program fees up to 1.05%. These fees are in addition to the stated discount rates.

In addition to transaction fees and assessments, merchants may see the following (or similarly worded) pass-through fees from the Payment Brands charged either per transaction or as a percentage of the total sales volume. These will be displayed as separate line items on the Monthly Statement.

| | | |
|---|---|---|
| • Network Access Fees | • MasterCard Digital Enablement | • CVC2 Fee |
| • Misuse of Authorization Fees | • CVV Fee | • CID Fee |
| • Visa Debit and Prepaid Integrity Fees | • CVV2 Fee | |

Merchant will be assessed each month with the Visa Fixed Network Fee. This fee which may vary each month and is based on Merchant Category Codes, the number of merchant locations by taxpayer identification number, and/or merchants processing volume by taxpayer identification number.

**ADDITIONAL BILLING INSTRUCTIONS:**

---

F01-AW-0010194

EX 25
876

## ACKNOWLEDGEMENT OF AGREEMENT AND RESOLUTION

**IMPORTANT NOTICE:** All information contained in this application was completed or supplied by all contracting parties. EVO and BANK shall not be responsible for any change in printed terms unless specifically agreed to in writing by an officer of EVO and BANK. By signing below on either the original or a facsimile you are agreeing to the provisions stated within the Terms and Conditions of the Merchant Processing Agreement and the Merchant Application on the reverse side, and you are acknowledging that you have carefully read each of those provisions before signing. **INVESTIGATIVE CONSUMER REPORT:** An investigative or consumer report may be made in connection with application. MERCHANT authorizes ANY PARTY TO THE AGREEMENT or any of their agents to investigate the references provided or any other statements or data obtained from MERCHANT, and from any of the undersigned personal guarantor(s), or from any other person or entity with any financial obligations under this Agreement. You have a right, upon written request, to a complete and accurate disclosure of the nature and scope of the investigation requested. **FOR ALL CORPORATIONS** CORP. RESOLUTION — The indicated officer(s) identified below have the authorization to execute the MERCHANT Processing Agreement on behalf of the herewithin named corporation. MERCHANT UNDERSTANDS THAT THIS AGREEMENT SHALL NOT TAKE EFFECT UNTIL MERCHANT HAS BEEN APPROVED BY BANK AND A MERCHANT NUMBER IS ISSUED.

**By signing below and/or if Merchant submits a transaction hereunder, Merchant will be deemed to have accepted the Terms & Conditions of the Merchant Processing Agreement.**

| | Owner | 9/22/2016 7:49:23 PM | | | |
|---|---|---|---|---|---|
| Signature - Owner/Officer | Title | Date | Signature - Owner/Officer | Title | Date |

| | | |
|---|---|---|
| Accepted by EVO Merchant Services, LLC | Accepted by Deutsche Bank AG, New York | Accepted by Deutsche Bank AG, New York |

F01-AW-0010194

EX 25
877

**PERSONAL GUARANTEE**

As a primary inducement to EVO and Bank to enter into this Agreement, the undersigned Guarantor(s), by signing this Agreement, jointly and severally, unconditionally and irrevocably, personally guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to EVO and Bank under this Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and EVO and Bank, as such agreements now exist or are amended from time to time, with or without notice. Guarantor(s) understands further that EVO and Bank may proceed directly against Guarantor(s) without first exhausting their remedies against any other person or entity responsible to it or any security held by EVO and Bank or Merchant. Guarantor(s) waive trial by jury with respect to any litigation arising out of or relating to this personal guaranty. This guaranty will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of EVO and Bank. Guarantor(s) understand that the inducement to EVO and Bank to enter into this agreement is consideration for the guaranty, and that this guaranty remains in full force and effect even if the Guarantor(s) receive no additional benefit from the guaranty. Guarantors acknowledge the Investigative Consumer Report section in Acknowledgement above applies with full force and effect to each Guarantor(s) signing below.

**AGREED AND ACCEPTED**

9/22/2016 7:49:23 PM

| Signature - Owner/Officer | Date | Signature - Owner/Officer | Date | Witness |

EVO Payments International is a registered ISO/MSP for Deutsche Bank AG, New York, New York

F01-AW-0010194

EX 25

878

**AGENT CERTIFICATION**

I hereby verify that this application has been fully completed by the merchant applicant and that the information set forth in this Application is true, complete and not misleading in any way, and that product and services are consistent in type, quantity and quality with that described in this Application. Based upon my review of the merchant's website and/or physical inspection of their premises (whenever applicable and customary) the Merchant appears to be conducting business as described herein and I am not in possession of any knowledge to the contrary.

| EmpowerMerchant - Kevin Parlin | 09/22/2016 | 5097 | |
|---|---|---|---|
| Print Agent Name | Date | Agent ID # | Agent Signature (REQUIRED)                     Date |

F01-AW-0010194

EVO Payments International is a registered ISO/MSP for Deutsche Bank AG, New York, New York

EX 25

879

**MERCHANT PROCESSING AGREEMENT**

This document, "Merchant Processing Agreement" (the "Agreement"), accompanies the document "Merchant Application" ("Merchant Application") and includes the Terms and Conditions set forth below (the "Terms and Conditions") together with the terms and conditions of the Merchant Application. The bank ("Bank") identified in this Agreement is a member of Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"), and is Deutsche Bank AG, New York branch. EVO Merchant Services, LLC d/b/a EVO ("EVO") is a registered independent sales organization of Visa and a member service provider of MasterCard. This Agreement is between EVO, Bank, and the merchant (or "you") identified in the Merchant Application ("Merchant"). Merchant and EVO agree that the rights and obligations contained in this Agreement do not apply to Bank with respect to Discover and American Express transactions. To the extent Merchant accepts Discover cards, the provisions in this Agreement with respect to Discover apply if Merchant does not have a separate agreement with Discover. In such case, Merchant will also be enabled to accept JCB and Diner's Club cards under the Discover network and such transactions will be processed at the same fee rate as Merchant's Discover transactions are processed. Any references to the Debit Sponsor shall refer to the debit sponsors identified below.

**RECITALS**

Merchant desires to accept credit cards ("Cards") validly issued by members of Visa, MasterCard, Discover, and American Express. Bank and EVO desire to provide credit card processing services to Merchant. Therefore, Merchant, EVO and Bank agree as follows:

**TERMS AND CONDITIONS**

**1. Honoring Cards.**

**A. Without Discrimination.** You will honor, without discrimination, any Card properly tendered by a Cardholder. "Cardholder" (sometimes referred to as "Card Member" in some card association or network organization materials) means a person possessing a Card and purporting to be the person in whose name the Card is issued. You will not establish a minimum or maximum transaction amount as a condition for honoring a Card.

**B. Cardholder Identification.** You will identify the Cardholder and check the expiration date and signature on each Card. You will not honor any Card if: (i) the Card has expired, (ii) the signature on the sales draft does not correspond with the signature on the Card, or (iii) the account number embossed on the Card does not match the account number on the Card's magnetic strip (as printed in electronic form) or the account number listed on a current Electronic Warning Bulletin file.  You may not require a Cardholder to provide personal information, such as a home or business telephone number, a home or business address, or a driver's license number as a condition for honoring a Card unless permitted under the Laws and Rules (defined in Section 14, below).

**C. Card Recovery.** You will use your best efforts to retain any Card: (i) on Visa Cards if the printed four digits below the embossed account number do not match the first four digits of the embossed account number; (ii) if you are advised by EVO or Bank (or a designee) the issuer of the Card or the designated voice authorization center to retain it: (iii) if you have reasonable grounds to believe the Card is counterfeit, fraudulent or stolen, or not authorized by the Cardholder; or (iv) if, for MasterCard Cards, the embossed account number, indent printed account number and encoded account number do not match or the Card does not have a MasterCard hologram on the lower right corner of the Card face.

**D. Surcharges.** You will not add any amount to the posted price of goods or services you offer as a condition of paying with a Card, except as permitted by the Rules. This paragraph does not prohibit you from offering a discount from the standard price to induce a person to pay by cash, check or similar means rather than by using a Card.

**E. Return Policy.** You will properly disclose to the Cardholder, at the time of the Card transaction and in accordance with the Rules, any limitation you have on accepting returned merchandise.

**F. No Claim Against Cardholder.** You will not have any claim against or right to receive payment from a Cardholder unless EVO and Bank refuses to accept the Sales Draft (as defined in Section 3) or revokes a prior acceptance of the Sales Draft after receipt or a chargeback or otherwise. You will not accept any payments from a Cardholder relating to previous charges for merchandise or services included in a Sales Draft, and if you receive any such payments you promptly will remit them to EVO and Bank.

**G. Disputes With Cardholders.** All disputes between you and any Cardholder relating to any Card transaction will be settled between you and the Cardholder. Neither EVO nor Bank bear any responsibility for such transactions.

**H. Limited Acceptance.** You will elect to accept (full acceptance) or not accept (limited acceptance) certain credit and/or debit Cards for payment. You will accept all valid Cards unless you provide 30 days prior written notice to EVO and Bank requesting limited acceptance and specifying which Card types you elect to accept. Limited acceptance is not applicable to non US issued cards.

**2. Authorization.**

**A. Required on all Transactions.** You will obtain a prior authorization for the total amount of a transaction via electronic terminal or device before completing any transaction, and you will not process any transaction that has not been authorized. You will follow any instructions received during the authorization process. Upon receipt of authorization you may consummate only the transaction authorized and must note on the Sales Draft the authorization number. Where authorization is obtained, you will be deemed to warrant the true identity of the customer as the Cardholder.

**B. Effect.** Authorizations are not a guarantee of acceptance or payment of the Sales Draft. Authorizations do not waive any provisions of this Agreement or otherwise validate a fraudulent transaction or a transaction involving the use of an expired Card.

**C. Unreadable Magnetic Stripes.** When you present transactions for authorization electronically, and if your terminal is unable to read the magnetic stripe on the card, you will obtain an imprint of the card and the Cardholder's signature on the imprinted draft before presenting the Sales Draft to EVO and Bank for processing. Failure to do so may result in the assessment of a transaction surcharge on non-qualifying transactions.

**3. Presentment of Sales Drafts.**

**A. Forms.** You will use a Sales Draft ("Sales Draft") or other form approved by EVO and Bank to document each Card transaction.  Each Sales Draft will be legibly imprinted with: (i) Merchant's name, location and account number; (ii) the information embossed on the Card presented by the Cardholder (either electronically or manually); (iii) the date of the transaction; (iv) a brief description of the goods or services involved; (v) the transaction authorization number; (vi) the total amount of the sale including any applicable taxes, or credit transaction; and (vii) adjacent to the signature line, a notation that all sales are final, if applicable.

**B. Signatures.** Each Sales Draft must be signed by the Cardholder unless the Card transaction is a valid mail/telephone order Card transaction which fully complies with the requirements set forth in this Agreement. You may not require the Cardholder to sign the Sales Draft before you enter the final transaction amount in the Sales Draft.

**C. Reproduction of Information.** If the following information is not legibly imprinted on the Sales Draft, you will legibly inscribe on the Sales Draft before submitting it to EVO and Bank: (i) the Cardholder's name: (ii) account number (iii) expiration date of the Card and (iv) the Merchant's name and place of business. Additionally, for MasterCard transactions, you will legibly inscribe the name of the Bank issuing the Card as it appears on the Sales Draft.

**D. Delivery and Retention of Sales Drafts.** You will deliver a complete copy of the Sales Draft or credit voucher to the Cardholder at the time of the transaction. You will retain the "merchant copy" of the Sales Draft or credit memorandum for at least 3 years following the date of completion of the Card transaction (or such longer period as the Rules require).

**E. Electronic Transmission.** In using electronic authorization and/or data capture services, you will enter the data related to a sales or credit transaction into a computer terminal or magnetic stripe reading terminal no later than the close of business on the date the transaction is completed (unless otherwise permitted by the Rules). Failure to do so may result in the assessment of a transaction surcharge on non-qualifying transactions and, at EVO's sole discretion, the deposit of the funds received for such sales or credit transaction into the Reserve Account. If you provide your own electronic terminal or similar device, such terminal must meet EVO and Bank's requirements for processing transactions. Information regarding a sales or credit transaction transmitted with a computer or magnetic stripe reading terminal will be transmitted by you to EVO and Bank or their agent in the form EVO and Bank from time to time specify or as required under the Rules. If EVO or Bank requests a copy of a Sales Draft, credit voucher or other transaction evidence, you will provide it within 24 hours following the request.

**4. Deposit of Sales Drafts and Funds Due Merchant.**

**A. Deposit of Funds.** i. Deposits. You agree that this Agreement is a contract of financial accommodation within the meaning of the Bankruptcy Code, 11 U.S.C. § 365 as amended from time to time. Subject to this Section, Bank will deposit to the Designated Account (defined in section 6 below) funds evidenced by Sales Drafts (whether evidenced in writing or by electronic means) complying with the terms of this Agreement and the Rules and will provide you provisional credit to such funds (less recoupment of any credit(s), adjustments, fines, chargebacks, or fees). You shall not be entitled to credit for any indebtedness that arises out of a transaction not processed in accordance with the terms of this Agreement or the rules and regulations of a card association or network organization. You acknowledge that your obligation to EVO and Bank for all amounts owed under this Agreement arises out of the same transaction as EVO and Bank's obligation to deposit funds to the Designated Account. ii. Provisional Credit. Notwithstanding the previous sentences, under no circumstance will EVO or Bank be responsible for processing credits or adjustments related to Sales Drafts not originally processed by EVO and Bank. All Sales Drafts and deposits are subject to audit and final checking by EVO and Bank and may be adjusted for inaccuracies. You acknowledge that all credits provided to you are provisional and subject to chargebacks, recoupment, adjustments, fines and fees: (i) in accordance with the Rules; (ii) for any of your obligations to EVO and Bank; and (iii) in any other situation constituting suspected fraud or a breach of this Agreement, whether or not a transaction is charged back by the Card issuer. EVO and Bank may elect, but are not required, to grant conditional credit for individual or groups of any funds evidenced by Sales Drafts. Final credit for those conditional funds will be granted within EVO and Bank's sole discretion. iii. Processing Limits. EVO and Bank may impose a cap on the volume and ticket amount of Sales Drafts that they will process for you, as indicated to you by EVO or Bank. This limit may be changed by EVO or Bank upon written notice to you.

**B. Chargebacks.** You are fully liable for all transactions returned for whatever reason, otherwise known as "chargebacks". You may pay on demand the amount of all chargebacks. Authorization is granted to offset from incoming transactions and to debit the Designated Account, the Reserve Account (defined in Section 7, below) or any other account held at Bank or at any other financial institution the amount of all chargebacks. You will fully cooperate in complying with the Rules regarding chargebacks.

**C. Excessive Activity.** Your presentation to EVO and Bank of Excessive Activity will be a breach of this Agreement and cause for immediate termination of this agreement. "Excessive Activity" means, during any monthly period: (i) the dollar amount of chargebacks and/or retrieval requests in excess of 1% of the average monthly dollar amount of your Card transactions; (ii) sales activity that exceeds by 10% of the dollar volume indicated on the Application; or (iii) the dollar amount of returns equals 20% of the average monthly dollar amount of your Card transactions. You authorize, upon the occurrence of Excessive Activity, EVO and Bank to take any action they deem necessary including but not limited to, suspension of processing privileges and establishment or increase in the amount allocated to the Reserve Account and a reduction in the amount of provisional credit remitted to you in accordance with this Agreement.

**D. Credit.** i. Credit Memoranda. You will issue a credit memorandum in any approved form, instead of making a cash advance, a disbursement or a refund on any Card transaction. EVO or Bank will debit the Designated Account for the total face amount of each credit memorandum submitted to EVO and Bank. You will not submit a credit memorandum relating to any Sales Draft not originally submitted to EVO and Bank, nor will you submit a credit memorandum that exceeds the amount of the original Sales Draft. You will within the time period specified by the Rules, provide a credit memorandum or credit statement for every return of goods or forgiveness of debt for services which were the subject of a Card transaction. ii. Revocation of Credit. EVO or Bank may refuse to accept any Sales Draft, and EVO and Bank may revoke prior acceptance of a Sales Draft in the following circumstances: (a) the transaction giving rise to the Sales Draft was not made in compliance with this Agreement, the Laws or the Rules; (b) the Cardholder disputes his liability to EVO and Bank for any reason, including but not limited to a contention that the Cardholder did not receive the goods or services, that the goods or services provided were not as ordered, or those chargeback rights enumerated in the Rules; or (c) the transaction giving rise to the Sales Draft was not directly between you and the Cardholder. You will pay EVO and Bank any amount previously credited to you for a Sales Draft not accepted by EVO and Bank or where accepted, is revoked by EVO and Bank.

**E. Reprocessing.** Notwithstanding any authorization or request from a Cardholder, you will not re-enter or reprocess any transaction which has been charged back.

**F. Miscellaneous.** You will not present for processing or credit, directly or indirectly, any transaction not originated as a result of a Card transaction directly between you and a Cardholder or any transaction you know or should know to be fraudulent or not authorized by the Cardholder. You will not sell or disclose third party Card account information other than in the course of performing your obligations under this Agreement.

**5. Other Types of Transactions.**

**A. Debit Card Processing Services.** You may elect to accept debit cards, and said election should be made by you on the accompanying Merchant Application. If you elect to accept debit cards, the following terms and conditions apply to you.  Debit Sponsor shall act as your sponsor with respect to the participation of point-of-sale terminals owned, controlled, and/or operated by you (the "Covered Terminals") in each of the following debit card networks ("Networks"): Accel, AFFN, Alaska Option, Interlink, Maestro, NYCE, Pulse, Shazam, Star, CU24, and Tyme, which Networks may be changed from time-to-time by Debit Sponsor or EVO without notice. You may also have access to other debit networks that do not require a sponsor. EVO will provide you with the ability to access the Networks at the Covered Terminals for the purpose of authorizing debit card transactions from cards issued by the members of the respective Networks, and EVO will provide connection to such Networks, terminal applications, settlement, and reporting activities (collectively, the "Services"). You will comply with all federal, state, and local laws, rules, regulations and ordinances ("Applicable Laws") and with all by-laws, regulations, rules, and operating guidelines of the Networks ("Network Rules"). You will execute and deliver any application, participation, or membership agreement or other document necessary to enable Debit Sponsor to act as sponsor for you in each Network, and you shall obtain all consents, approvals, authorizations, or orders of any governmental agency or body required for the execution, delivery, and performance of this Agreement. You agree to utilize the debit card services in accordance with this Agreement, its exhibits or attachments, and EVO's instructions and specifications, and to provide EVO with the necessary data in the proper format to enable EVO to properly furnish the Services. Copies of the relevant agreements or operating regulations shall be made available to you upon request. You will provide prompt written notice to EVO in the event that you are subject to any of the following: i. Conviction for a felony offense or any other crime involving moral turpitude; ii. Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practice on your part; iii. Bankruptcy filing or petition; iv. Federal or state tax lien; v. Any material adverse change in your assets, operations, or condition, financial or otherwise; vi. The threat or filing of any litigation against you, the outcome of which reasonably could have a material adverse effect on your continuing operations; vii. Administrative or enforcement proceeding commenced by any state or federal regulatory agency, including any banking or securities agency or entity operating an EBT Network, that reasonably could have a material adverse effect on your continuing operations; or viii. Any disciplinary action taken by any Network against you or any of your principals. EVO may terminate or suspend in its discretion Debit Sponsor's sponsorship of you in any Network or modify the provision of Services to you: i. Immediately upon notice to you of the occurrence of any of the conditions set forth in items (i), (ii), (iii), (v), or (viii) in the immediately preceding paragraph or if Debit Sponsor's authority to participate in such Network or act as your sponsor in such Network is terminated by such Network; ii. Thirty (30) days after written notice by EVO to you of the occurrence of any of the conditions set forth in items (iv), (vi), or (vii) in the immediately preceding paragraph or if Debit Sponsor terminated its membership or participation in such Network; iii. Immediately upon notice to you in the event any financial statement, representation, warranty, statement or certificate furnished is materially false or misleading; or iv. Immediately upon notice to you of the occurrence of any other circumstance with respect to this Section that may reasonably be expected to have an adverse effect on EVO.

EX 25
880

The parties hereto acknowledge and agree that EVO shall pay Debit Sponsor any and all fees related to Debit Sponsor's sponsorship of you in the Networks; provided, however, that in the event EVO fails to pay such amounts, Debit Sponsor shall be entitled to recover all such amounts directly from you and you agree to pay all such amounts. You shall not in any way indicate that Debit Sponsor endorses your activities, products, or services. Debit Sponsor and you are and shall remain independent contractors of one another, and neither they, nor their respective individual employees, shall have or hold themselves out as having any power to bind the other to any third party. Nothing contained in this section shall be construed to create or constitute a partnership, joint venture, employer-employee, or agency relationship between Debit Sponsor and you. You shall indemnify and hold harmless EVO and its affiliates (including parents and subsidiaries), and their respective officers, directors, employees, successors and assigns, from and against any and all direct or contingent losses, costs, claims, demands, and causes of action (including, without limitation, the cost of investigating the claim, the cost of litigation, and reasonable attorney's fees including those of in-house counsel, whether or not legal proceedings are instituted) paid or incurred by or on behalf of EVO as a result of your violation of any of the terms of this Section, Network Rules, or applicable Laws, or otherwise arising from or related to Debit Sponsor's sponsorship of you in any Network. In the event that Debit Sponsor's sponsorship of you in any Network is terminated prior to the termination of this Agreement, EVO may assign Debit Sponsor's rights and obligations hereunder to a third party. All provisions in this section necessary to enforce the rights and obligations of the parties contained in this section shall survive the termination of Debit Sponsor's debit sponsorship of you under this Agreement.

**B. Mail/Telephone Order.** EVO and Bank caution against mail orders or telephone orders or any transaction in which the Cardholder and Card are not present ("mail/telephone orders") due to the high incidence of customer disputes. You will obtain the expiration date of the Card for a mail/telephone order and submit the expiration date when obtaining authorization of the Card transaction. For mail/telephone order transactions, you will type or print legibly on the signature line the following as applicable: telephone order or "TO" or mail order or "MO". You must promptly notify EVO and Bank if your retail/mail order/telephone order mix changes from the percentages represented by EVO and Bank in the Merchant Application. EVO and Bank may cease accepting mail/telephone order transactions, or limit their acceptance of such transactions, or increase their fees if this mix changes. Bank will release funds to Merchant five (5) business days after the transaction date for mail/telephone orders. Merchant agrees to use and retain proof of a traceable delivery system as means of shipment of product to the customer. Merchant agrees that transactions will not be processed until products are shipped to the Cardholder. Merchant agrees to pay a charge of $0.05 per AVS transaction, if applicable. This agreement may be immediately terminated by Bank if Merchant fails to comply with any of the terms of the agreement.

**C. Recurring Transactions.** For recurring transactions, you must obtain a written request from the Cardholder for the goods and services to be charged to the Cardholders account, the frequency of the recurring charge, and the duration of time during which such charges may be made. You will not complete any recurring transaction after receiving: (i) a cancellation notice from the Cardholder, (ii) notice from EVO or Bank, or (iii) a response that the Card is not to be honored. You must print legibly on the Sales Draft the words "Recurring Transaction".

**D. Multiple Sales Drafts.** You will include a description and total amount of goods and services purchased in a single transaction on a single Sales Draft or transaction record, unless (i) partial payment is entered on the Sales Draft or transaction record and the balance of the transaction amount is paid in cash or by check at the time of transaction, or (ii) a Sales Draft represents an advance deposit in a Card transaction completed in accordance with this Agreement and the Rules.

**E. Partial Completion.** i. Prior Consent. You will not accept for payment by Card any amount representing a deposit or partial payment for goods or services to be delivered in the future without the prior written consent of EVO or Bank. Such consent will be subject to Bank's final approval. The acceptance of a Card for payment or partial payment of goods or services to be delivered in the future without prior consent will be deemed a breach of this Agreement and cause for immediate termination, in addition to any other remedies available under the Laws or Rules. ii. Acceptance. If you have obtained prior written consent, then you will complete such Card transactions in accordance with the terms set forth in this Agreement, the Rules, and the Laws. Cardholders must execute one Sales Draft when making a deposit with a Card and a second Sales Draft when paying the balance. You will note upon the Sales Draft the words "deposit" or "balance" as appropriate. You will not deposit the Sales Draft labeled "balance" until the goods have been delivered to Cardholder or you have fully performed the services.

**F. Future Delivery.** You will not present any Sales Draft or other memorandum to Bank for processing "whether by electronic means" which relates to the sale of goods or services for future delivery without EVO or Bank's, prior written authorization. Such consent will be subject to Bank's final approval. If EVO or Bank have given such consent, you represent and warrant to EVO and Bank that you will not rely on any proceeds or credit resulting from such transactions to purchase or furnish goods or services. You will maintain sufficient working capital to provide for the delivery of goods or services at the agreed upon future date, independent of any credit or proceeds resulting from sales drafts or other memoranda taken in connection with future delivery transactions.

**G. Electronic Commerce Transactions.** You may process electronic commerce ("EC") transactions only if you have so indicated on the Application, and only if you have obtained EVO's consent. If you submit EC transactions without our consent, we may immediately terminate this Agreement. If you have indicated on the Application that you will be submitting EC transactions, you acknowledge that you have reviewed the Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program (CISP), MasterCard's Site Data Protection Program (SDP), and American Express' Merchant Data Security Requirements (MDSR) and to the extent that they apply to you, you agree to comply with, and ensure such transactions comply with, the terms of each. You understand that transactions processed via EC are high risk and subject to a higher incidence of chargebacks. You are liable for all chargebacks and losses related to EC transactions, whether or not: i) EC transactions have been encrypted; and ii) you have obtained consent to engage in such transactions. Encryption is not a guarantee of payment and will not waive any provision of this Agreement or otherwise validate a fraudulent transaction. All communication costs related to EC transactions are your responsibility. You understand that EVO will not manage the EC telecommunications link and that it is your responsibility to manage that link. All EC transactions will be settled by Bank into a depository institution of the United States in U.S. currency. i. Requirements. For goods to be shipped on EC transactions, you may obtain authorization up to 7 calendar days prior to the shipment date. You need not obtain a second authorization if the Sales Draft amount is within 15% of the authorized amount, provided that the additional amount represents shipping costs. Further, your web site must contain all of the following information: i) complete description of the goods or services offered, ii) returned merchandise and refund policy, iii) customer service contact, including electronic mail address and/or telephone number, iv) transaction currency (such as U.S. or Canadian dollars), v) export or legal restrictions, if known, and vi) delivery policy. If you store cardholder account numbers, expiration dates, and other personal cardholder data in the database, you must follow PCI DSS, CISP, SDP, and MDSR guidelines on securing such data. ii. If you accept EC transactions, you must: install and maintain a working network firewall to protect data accessible via the Internet; keep security patches up-to-date; encrypt stored data and data sent over networks; use and update anti-virus software; restrict access to data by business "need-to-know"; assign a unique ID to each person with computer access to data; not use vendor-supplied defaults for system passwords and other security parameters; track access to data by unique ID; regularly test security systems and processes; maintain a policy that addresses information security for employees and contractors; and restrict physical access to Cardholder information. When outsourcing administration of information assets, networks, or data you must retain legal control of proprietary information and use limited "need-to-know" access to such assets, networks or data. Further, you must reference the protection of cardholder information and compliance with the PCI DSS, CISP, SDP, and MDSR Rules in contracts with other service providers. You understand that failure to comply with this Section may result in fines and you agree to indemnify and reimburse EVO and Bank immediately for any fine imposed due to your breach of this Section.

**H. JCB and Diners Club Transactions.** Upon your request, EVO will provide authorization and/or data capture service, for JCB and Diners Club transactions. By signing this Merchant Agreement, Merchant agrees to abide by the terms and conditions of Diners Club and JCB. Merchant understands that the Diners Club Agreement will be sent to the business entity indicated on this application. By accepting the Diners Club Card for goods and/or services, Merchant agrees to be bound by the terms and conditions of the Agreement. Merchant also may be responsible for funding such transactions. Initial setup fees may apply.

**I. Cash Advances, Script, Money Service Businesses and Manual Cash Disbursements.** Merchant will not deposit any transaction for purpose of obtaining or providing a cash advance. You will not accept a Card to purchase travelers checks, script, Foreign Currency, Visa Travel/Money Cards, or other prepaid cards redeemable for cash or cash equivalent. You agree that any such deposit

or transaction shall be grounds for immediate termination. Money Service Businesses that charge a service fee or commission must include such fee or commission in the transaction amount and not collect it separately. Financial institutions performing manual cash disbursement services are subject to all membership requirements, core rules, and operating regulations applicable to manual cash disbursement services, including, but not limited to the Visa prohibition against accepting Visa Electron or Travel/Money Cards for manual cash disbursements issued.

**6. Designated Account.**
**A. Establishment and Authority.** Merchant will establish and maintain an account at an ACH receiving depository institution approved by Bank and EVO ("Designated Account"). Merchant will maintain sufficient funds in the Designated Account to satisfy all obligations, including fees, contemplated by this Agreement. Merchant irrevocably authorizes Bank and EVO to debit the Designated Account for chargebacks, recoupments, adjustments, fines, fees and any other penalties or amounts owed under this Agreement, and irrevocably authorizes Bank and EVO to debit the Designated Account for any amount owed to Bank and EVO under this Agreement other than the amounts directly attributable to the settlement of transactions. You also authorize EVO and Bank to debit the Merchant Account for any fees due such vendor or agent under this Agreement. This authority will remain in effect for at least 2 years after termination of this Agreement whether or not you have notified EVO and Bank of a change to the Designated Account. Merchant must obtain prior written consent from Bank or EVO to change the Designated Account. If Merchant does not get that consent, EVO or Bank may immediately terminate the Agreement and may take other action necessary, as determined by them within their sole discretion.

**B. Deposit.** Bank will deposit all Sales Drafts to the Designated Account subject to the other provisions of this Agreement. The funds represented by Sales Drafts will be deposited 3 business days following EVO's receipt of the Sales Draft, except for mail order/telephone order and electronic commerce transactions, which will be deposited 5 business days following receipt of the Sales Draft. "Business Day" means Monday through Friday, excluding holidays observed by the Federal Reserve Bank of New York. Merchant authorizes Bank and EVO to initiate reversal or adjustment entries and initiate or suspend such entries as may be necessary to grant Merchant provisional credit for any entry. You authorize and appoint Bank and EVO to act as your agent to collect Card transaction amounts from the Card issuing bank. As the collecting agent, Bank and EVO in their sole discretion, may grant you provisional credit for transaction amounts in the process of collection, subject to receipt of final payment by Bank and subject to all chargebacks.

**C. Asserted Errors.** You must promptly examine all statements relating to the Designated Account, and immediately notify EVO and Bank in writing of any errors. Your written notice must include: (i) Merchant name and account number, (ii) the dollar amount of the asserted error, (iii) a description of the asserted error, and (iv) an explanation of why you believe an error exists and the cause of it, if known. That written notice must be received by EVO and Bank within 30 calendar days after you received the periodic statement containing the asserted error. Your failure to notify EVO and Bank of any error within 30 days constitutes a waiver of any claim relating to that error. You may not make any claim against EVO or Bank for any loss or expense relating to any asserted error for 60 calendar days immediately following our receipt of your written notice. During that 60 day period, EVO and Bank will be entitled to investigate the asserted error.

**D. Indemnity.** You will indemnify and hold EVO and Bank harmless for any action they take against the Designated Account, the Reserve Account, or any other account pursuant to this Agreement.

**E. ACH Authorization.** You authorize EVO and Bank to initiate debit/credit entries to the Designated Account, the Reserve Account, or any other account maintained by you at any institution, all in accordance with this Agreement and the ACH Authorization on the attached Exhibit B, Merchant Authorizations . The ACH Authorization will remain in effect beyond termination of this Agreement. In the event you change the Designated Account, you will execute a new ACH Authorization.

**7. Security Interests, Reserve Account, Recoupment and Set-Off.**
**A. Security Interests.** i. Security Agreement. This Agreement is a security agreement under the Uniform Commercial Code. You grant to EVO and Bank a security interest in and lien upon: (i) all funds at any time in the Designated Account, regardless of the source of such funds; (ii) all funds at any time in the Reserve Account, regardless of the source of such funds; (iii) present and future Sales Drafts; and (iv) any and all amounts which may be due to you under this Agreement, including, without limitation, all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). You agree to provide either collateral or security to EVO and Bank to secure your obligations under this Agreement upon EVO or Bank's request. These security interests and liens will secure all of your obligations under this Agreement and any other agreements now existing or later entered into between you and EVO or Bank. This security interest may be exercised by EVO or Bank without notice or demand of any kind by making an immediate withdrawal or freezing the secured assets. ii. Perfection. Upon request of EVO or Bank, you will execute one or more financing statements or other documents to evidence this security interest. You represent and warrant that no other person or entity has a security interest in the Secured Assets. Further, with respect to such security interests and liens, EVO and Bank will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. You will obtain from EVO and Bank written consent prior to granting a security interest of any kind in the Secured Assets to a third party. You agree that this is a contract of recoupment and EVO and Bank are not required to file a motion for relief from the automatic stay in any bankruptcy proceeding in order for EVO or Bank to realize on any of its collateral (including any Reserve Account). Nevertheless you agree not to contest or object to any motion for relief from the automatic stay filed by EVO or Bank. You authorize EVO or Bank and appoint EVO or Bank your attorney in fact to sign your name to any financing statement used for the perfection of any security interest or lien granted hereunder.

**B. Reserve Account.** i. Establishment. A non-interest bearing deposit account ("Reserve Account") has been established and is maintained at Bank or one of its affiliates with sums sufficient to satisfy your current and future merchant obligations as determined by EVO and Bank. You authorize EVO and Bank to debit the Designated Account or any other account you have at Bank or any other financial institution to establish or maintain funds in the Reserve Account. Bank or EVO may deposit into the Reserve Account funds it would otherwise be obligated to pay you, for the purpose of establishing, maintaining or increasing the Reserve Account in accordance with this Section, if it determines such action is reasonably necessary to protect its interests. ii. Authorizations. EVO and Bank may, without notice to you, apply deposits in the Reserve Account against any outstanding amounts you owe under this Agreement or any other agreement between you and EVO or Bank. Also, EVO and Bank may exercise their rights under this Agreement against the Reserve Account to collect any amounts due to EVO or Bank including, without limitation, rights of set-off and recoupment. In the event you submit a merchant application to EVO through the use of Insta-App, and EVO does not receive a completed written merchant application within 2 business days, you authorize EVO or Bank to hold all of your funds in the Reserve Account until the completed written merchant application and other required documentation is received by EVO. iii. Funds. Funds in the Reserve Account will remain in the Reserve Account for 270 calendar days following the later of termination of this Agreement or the last activity in your account, provided, however, that you will remain liable to EVO and Bank for all liabilities occurring beyond such 270 day period. After the expiration of the 270 day period EVO will provide you with written notification via nationally recognized delivery service advising you that the 270 day period has expired, requesting that you provide EVO with an address where the funds you have remaining in the Reserve Account should be delivered, and stating that in the event you fail to respond to this notification within 30 days, EVO will begin deducting a flat fee of $95 each month from the funds you have remaining in the Reserve Account. In the event you fail to respond to the notification, the $95 fee will then be deducted each month from the funds you have remaining in the Reserve Account. This fee will offset the administrative, clerical, legal, and risk management costs incurred by EVO to monitor the funds you have remaining in the Reserve Account beyond the 270 day period, and includes all monthly minimums and any other contractual fees that would ordinarily be assessed against your account pursuant to the terms of this Agreement. You agree that prior to the expiration of the 270 days, you will not use any funds you have in the Reserve Account for any purpose, including but not limited to paying chargebacks, fees, fines, or other amounts you owe to EVO and/or Bank under this Agreement. EVO and Bank (and not Merchant) shall have control of the Reserve Account. iv. Assurance. In the event of a bankruptcy proceeding and the determination by the court that this Agreement is assumable under Bankruptcy Code § 365, as amended from time to time, you must maintain funds in the Reserve Account in an amount satisfactory to EVO and Bank.

**C. Recoupment and Set-Off.** EVO and Bank have the right of recoupment and set-off. This means that they may offset or recoup any outstanding/uncollected amounts owed by you from: (i) any amounts they would otherwise be obligated to deposit into the Designated Account; (ii) any other amounts Bank or EVO may owe you under this Agreement or any other agreement; and (iii) any funds in the Designated Account or the Reserve Account. You acknowledge that in the event of a bankruptcy proceeding, in order for

you to provide adequate protection under Bankruptcy Code § 362 to EVO and Bank, you must create or maintain the Reserve Account as required by EVO and Bank, and EVO and Bank must have the right to offset against the Reserve Account for any and all obligations which you may owe to EVO and Bank, without regard to whether the obligations relate to Sales Drafts initiated or created before or after the filing of the bankruptcy petition.

**D. Remedies Cumulative.** The rights and remedies conferred upon EVO and Bank in this Agreement, at law or in equity, are not intended to be exclusive of each other. Rather, each and every right of EVO and Bank under this Agreement, at law or in equity, will be cumulative and concurrent and in addition to every other right.

**8. Fees and Other Amounts Owed EVO and Bank.**
**A. Fees and Taxes.** You will pay EVO fees for services, forms and equipment in accordance with the rates set forth on the Application. In addition, you will pay EVO a fee for research it performs at your request in an amount equal to $200 per hour, or $5 per statement. Such fees will be calculated and debited from the Designated Account once each business day or month for the previous business day's or month's activity or will be netted out from the funds due you attributable to Sales Drafts presented to EVO and bank. EVO and Bank reserve the right to adjust the fees set forth on the Application and in this Section, in accordance with Section 16.H, below. If you do not have an active account at the time of the request, payment by certified check or money order must be received prior to the release of the requested document copies or research results. You are also obligated to pay all taxes, and other charges imposed by any governmental authority on the services provided under this Agreement. With respect to Visa, MasterCard, Discover, and American Express products, you may elect to accept credit cards or debit/prepaid cards or both. You shall so elect on the Merchant Application being completed contemporaneously herewith. You agree to pay and your account(s) will be charged pursuant to Section 6.A of this Agreement for any additional fees incurred as a result of your subsequent acceptance of transactions with any Visa, MasterCard, Discover, or American Express product that you have elected not to accept.

**B. Other Amounts Owed EVO and Bank.** You will immediately pay EVO and Bank any amount incurred by EVO and Bank attributable to this Agreement including but not limited to chargebacks, fines and penalties imposed by Visa, MasterCard, Discover, or American Express (including but not limited to fines and penalties related to PCI DSS), non-sufficient fund fees, and ACH debits that overdraw the Designated Account or Reserve Account, or are otherwise dishonored. You authorize EVO and Bank to debit via ACH the Designated Account or any other account you have at Bank or at any other financial institution for any amount you owe EVO or Bank under this Agreement or under any other contract, note, guaranty, instrument or dealing of any kind now existing or later entered into between you and EVO or Bank, whether your obligation is direct, indirect, primary, secondary, fixed, contingent, joint or several. In the event EVO or Bank demand sums due or such ACH does not fully reimburse EVO and Bank for the amount owed, you will immediately pay EVO and Bank such amount.

**C. Merchant Supply/Replacement Program.** Merchant is responsible for purchasing all supplies required to properly process credit card transactions (sales slips, printer rolls, etc.). If Merchant elects to participate in EVO's Supply/Replacement Program, Merchant understands that it is entitled to a maximum of 6 rolls of paper and 2 printer ribbons per month. It is Merchant's responsibility to contact EVO each month to order supplies. EVO will only provide Merchant with supplies for the current month, and Merchant's failure to place an order with EVO will constitute a waiver of its right to receive supplies for that month under the Supply/Replacement Program. Quantity of supplies provided is at the discretion of EVO. Enrollment in EVO's Supply/Replacement Program also entitles Merchant to free refurbished replacement equipment after EVO has collected 3 monthly payments from Merchant (merchant is responsible for all shipping costs). A separate program is required for each terminal Merchant may have. If Merchant's terminal type is unavailable, at EVO's discretion, a substitute may be provided. EVO's Supply/Replacement Program does not include labor, parts, or expenses necessary to replace or repair equipment damaged by fire, flood, accident, improper voltages, misuse of equipment, service performed by persons other than EVO representatives, and/or failure to continually maintain a suitable operating environment for the equipment.  EVO may choose to cancel Merchant's Supply/Replacement Program at any time without notice. This program is nontransferable without written consent. Maintenance is not available for any wireless terminals.

**9. Application, Indemnification, Limitation of Liability.**
**A. Application.** You represent and warrant to EVO and Bank that all information in the Application is correct and complete. You must notify EVO in writing of any changes to the information in the Application, including but not limited to: any additional location or new business, the identity of principals and/or owners, the form of business organization (e.g., sole proprietorship, partnership, etc.), type of goods and services provided and how sales are completed (i.e., by telephone, mail, or in person at your place of business). The notice must be received by EVO within 10 business days of the change. You will provide updated information to EVO within a reasonable time upon request. You are liable to EVO and Bank (as applicable) for all losses and expenses incurred by EVO and/or Bank arising out of your failure to report changes to it. Bank and EVO may immediately terminate this Agreement upon notification by you of a change to the information in the Application.

**B. Indemnification.** You will hold harmless and indemnify EVO and Bank, their employees and agents (i) against all claims by third parties arising out of this Agreement, and (ii) for all attorneys' fees and other costs and expenses paid or incurred by EVO or Bank in the enforcement of the Agreement, including but not limited to those resulting from any breach by you of this Agreement and those related to any bankruptcy proceeding.

**C. Limitation of Liability.** Any liability of EVO or Bank under this Agreement, whether to you or any other party, whatever the basis of the liability, shall not exceed in the aggregate the difference between (i) the amount of fees paid by you to EVO and Bank during the month in which the transaction out of which the liability arose occurred, and (ii) assessments, chargebacks, and offsets against such fees which arose during such month. In the event more than one month is involved, the aggregate amount of EVO and Bank's liability shall not exceed the lowest amount determined in accord with the foregoing calculation for anyone month involved. Neither EVO, Bank nor their agents, officers, directors, or employees shall be jointly liable to you under this Agreement or liable for indirect, special, or consequential damages. Neither EVO nor Bank will be responsible or liable for any damages you incur that arise from a terminal that has been downloaded by a third party.

**D. Performance.** EVO and Bank will perform all services in accordance with this Agreement. EVO and Bank make no warranty, express or implied, regarding the services, and nothing contained in the Agreement will constitute such a warranty. EVO and Bank disclaim all implied warranties, including those of merchantability and fitness for a particular purpose. No party will be liable to the others for any failure or delay in its performance of this Agreement if such failure or delay arises out of causes beyond the control and without the, fault or negligence of such party. Neither EVO nor Bank shall be liable for the acts or omissions of any third party.

**E. Representations By Salespersons.** All salespersons are independent contractors, and are not agents, employees, joint venturers, or partners of EVO or Bank. Any and all representations and/or statements made by a salesperson are made by them in their capacity as an independent contractor, and cannot be imputed to EVO or Bank. EVO and Bank have absolutely no liability or responsibility for any representations and/or statements made to you by any sales representative.

**10. Representations and Warranties.**
You represent and warrant to EVO and Bank at the time of execution and during the term of this Agreement the following:

**A. Information.** You are a corporation, limited liability company, partnership or sole proprietorship validly existing and organized in the United States. All information contained on the Application or any other document submitted to EVO or Bank is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant. You are not engaged or affiliated with any businesses, products or methods of selling other than those set forth on the Application, unless you obtain the prior written consent of EVO and Bank.

**B. Entity Power.** Merchant and the person signing this Agreement have the power to execute and perform this Agreement.  This Agreement and your performance hereunder will not violate any law, or conflict with any other agreement to which you are subject.

**C. No Litigation or Termination.** There is no action, suit or proceeding pending or to your knowledge threatened which if decided adversely would impair your ability to carry on your business substantially as now conducted or which would adversely affect your financial condition or operations. You have never entered into an agreement with a third party to perform credit or debit card processing which has been terminated by that third party.

**D. Transactions.** All transactions are bona fide. No transaction involves the use of a Card for any purpose other than the purchase of goods or services from you nor does it involve a Cardholder obtaining cash from you unless allowed by the Rules and agreed in writing with EVO and Bank. EVO may choose to cancel Merchant's Supply/Replacement Program at any time without notice. This program is non-transferable without written consent. Maintenance is not available for any wireless terminals.

**E. Rule Compliance.** You will comply with the Laws and Rules. Without limiting the generality of the foregoing, each sales transaction submitted hereunder and the handling, retention, and storage of information related thereto, will comply with the rules and regulations of Visa, MasterCard, Discover, American Express, and any other card association or network organization related to cardholder and transaction information security, including, without limitation Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program (CISP), MasterCard's Site Data Protection Program (SDP), American Express' Merchant Data Security Requirements (MDSR), and Payment Application Best Practices.

**11. Audit and financial information.**
**A. Audit.** You authorize EVO or Bank to audit your records to confirm compliance with this Agreement, as amended from time to time. You will obtain, and will submit a copy of, an audit of your business when requested by EVO or Bank.

**B. Financial Information.** i. Authorizations. You authorize EVO or Bank to make any business or personal credit inquiries they consider necessary to review the acceptance and continuation of this Agreement. You also authorize any person or credit reporting agency to compile information to answer, those credit inquiries and to furnish that information to EVO and Bank. ii. Documents. You will provide EVO or Bank personal and business financial statements and other financial information as requested from time to time. If requested, you will furnish within 120 calendar days after the end of each fiscal year to EVO and Bank a financial statement of profit and loss for the fiscal year and a balance sheet as of the end of the fiscal year.

**12. Third Parties.**
**A. Services.** You may be using special services or software provided by a third party to assist you in processing transactions, including authorizations and settlements, or accounting functions. You are responsible for ensuring compliance with the requirements of any third party in using their products. This includes making sure you have and comply with any software updates. EVO and Bank have no responsibility for any transaction until they receive it from EVO or Bank receive data about the transaction.

**B. Use of Terminals Provided by Others.** You will notify EVO and Bank immediately if you decide to use electronic authorization or data capture terminals or software provided by any entity other than EVO and Bank or its authorized designee ("Third Party Terminals") to process transactions. If you elect to use Third Party Terminals or payment software provided by others you agree (i) the third party providing the terminals will be your agent in the delivery of Card transactions to EVO and Bank; and (ii) to assume full responsibility and liability for any failure of that third party to comply with the Rules and this Agreement. Neither EVO nor Bank will be responsible for any losses or additional fees incurred by you as a result of any error by a third party agent, or a malfunction of your credit card terminal, including but not limited to Third Party Terminals.

**13. Term and Termination.**
**A. Term.** This Agreement shall become effective ("Effective Date") only upon acceptance by EVO and Bank, or upon the submission of a transaction by you to EVO, whichever event shall occur first. The Agreement will remain in effect for a period of 3 years ("Initial Term") and will renew for successive 1 year terms ("Renewal Term") unless terminated as set forth below.

**B. Termination.** The Agreement may be terminated by Merchant at any time during the initial or any renewal term of this Agreement provided Merchant does so in strict adherence to the Termination Procedure contained herein. Further, this Agreement may be terminated by EVO or Bank at any time with or without notice and with or without cause. Visa may limit or terminate this Agreement at any time.

**C. Termination Procedure.** Other than for cause, Merchant may only terminate this Agreement in writing 60 days in advance of accepting any competing service provider installation or system or effecting any changes what so ever to their card acceptance systems.

**D. Action upon Termination.** i. Terminated Merchant File. You acknowledge that Bank is required to report your business name and the name of Merchant's principals to Visa, MasterCard, Discover, and American Express when Merchant is terminated due to the reasons listed in the Rules. ii. Designated Account. All your obligations regarding accepted Sales Drafts will survive termination. You must maintain in the Designated Account and the Reserve Account enough funds to cover all chargebacks, deposit charges, refunds and fees incurred by you for a reasonable time, but in any event not less than the time specified in this agreement. You authorize EVO and Bank to charge those accounts, or any other account maintained under this Agreement, for all such amounts. If the amount in the Designated Account or Reserve Account is not adequate, you will pay EVO and Bank the amount you owe it upon demand, together with all costs and expenses incurred to collect that amount, including reasonable attorneys' fees. iii. Equipment. Within 14 business days of the date of termination, you must return all equipment owned by EVO and immediately pay EVO, any amounts you owe them for equipment costs. iv. Early Termination. If you choose to terminate this Agreement and do not do so in strict adherence with the Termination Procedure defined herein, or EVO terminates this Agreement based upon your failure to comply with the terms and conditions contained herein, you will immediately pay EVO, as liquidated damages, a closure fee of $250.  You agree that this fee is not a penalty, but rather is reasonable in light of the financial harm caused by the early termination of this Agreement.

**14. Compliance With Laws And Rules.**
You agree to comply with all rules and operating regulations issued from time to time by MasterCard, Visa, Discover, and American Express ("Rules"), and any policies and procedures provided by EVO or Bank. You further agree to comply with all applicable state, federal and local laws, rules and regulations ("Laws"), as amended from time to time. You will assist EVO and Bank in complying with all Laws and Rules now or hereafter applicable to any Card transaction or this Agreement. You will execute and deliver to EVO and Bank all instruments it may from time to time reasonably deem necessary. Without limiting the generality of the foregoing, you agree to comply with and be bound by the rules and regulations of Visa, MasterCard, Discover, American Express, and any other card association or network organization related to cardholder and transaction information security, including without limitation, Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program, MasterCard's Site Data Protection Program, and American Express' Merchant Data Security Requirements. You agree to cooperate at your sole expense with any request for an audit or investigation by EVO,  Bank, a card association or network organization in connection with cardholder and transaction information security. You may also be assessed a monthly or annual PCI fee, which will appear as a separate item on your monthly statement. This fee is assessed by EVO in connection with EVO's efforts to comply with the PCI DSS and does not ensure your compliance with the PCI DSS or any law, rule or regulation related to cardholder data security. The payment of such fee shall not relieve you of your responsibility to comply with all rules and regulations related to cardholder data security, including without limitation the PCI DSS. Without limiting the generality of the foregoing, you agree to use information obtained from a cardholder in connection with a card transaction solely for the purpose of processing a transaction with that cardholder or attempting to re-present a chargeback with respect to such transaction. You will indemnify and hold EVO and Bank harmless from any fines and penalties issued by Visa, MasterCard, Discover, American Express, or any card association or network organization and any other fines and costs arising out of or relating to the processing of transactions by EVO and Bank at your location(s) and will reimburse EVO and Bank for any losses incurred by EVO with respect to any such fines, penalties, fees and costs. You also agree that you will comply with all applicable laws, rules and regulations related to the truncation or masking of cardholder numbers and expiration dates on transaction receipts from transactions processed at your

US 5/16 15s
F01-AW-0010194
Page 11 of 12
EVO Payments International is a registered ISO/MSP for Deutsche Bank AG, New York, New York
EX 25
882

location(s), including without limitation the Fair and Accurate Credit Transactions Act and applicable state laws ("Truncation Laws"). As between you, on the one hand, and EVO and Bank, on the other hand, you shall be solely responsible for complying with all Truncation Laws and will indemnify and hold EVO and Bank harmless from any claim, loss or damage resulting from a violation of Truncation Laws as a result of transactions processed at your location(s).

**A. Prohibited Transactions.** You will not accept or deposit any fraudulent or illegal transaction and you may not, under any circumstances, present for deposit directly or indirectly, a transaction which originated with any other merchant or any other source. You will not accept a Card to collect a dishonored check, for the purchase of script, or to refinance an existing debt that has been deemed uncollectible. You will not, under any circumstances, deposit telemarketing transactions unless you obtain Bank and EVO's prior written consent. Such consent will be subject to Bank's final approval. If you process any such transactions, you may be immediately terminated and EVO or Bank may hold funds and/or increase the amount allocated to the Reserve Account and/or deduct from the amount of provisional credit that would otherwise be allocated to you. Further, you may be subject to Visa, MasterCard or Discover reporting requirements.

**B. Merchant Prohibitions.** You will not require the completion of any postal instrument on which the card account number, card expiry date, cardholder signature, or any other card account data is in plain view when mailed. You will not add sales or use tax to transactions unless permitted by applicable law. If added, it must be included in the transaction amount and not collected separately.

**15. Use of Trademarks and Confidentiality.**
**A. Use of Trademarks.** You use of Visa, MasterCard, Discover, and American Express trademarks must fully comply with the Rules. Your use of Visa, MasterCard, Discover, American Express, or other cards' promotional materials will not indicate directly or indirectly that Visa, MasterCard, Discover, American Express, or others endorse any goods or services other than their own and you may not refer to Visa, MasterCard, Discover, American Express, or others in stating eligibility for your products or services.

**B. Merchant is hereby granted a limited non-exclusive, non-transferable license to use Discover brands, emblems, trademarks, and/or logos that identify Discover cards ("Discover Program Marks").** You are prohibited from using the Discover Program Marks other than as expressly authorized in writing. You shall not use the Discover Program Marks other than to display decals, signage, advertising and other forms depicting the Discover Program Marks that are provided to you pursuant to this Agreement or otherwise approved in advance in writing. You may use the Discover Program marks only to promote the services covered by the Discover Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by you must be approved in advance in writing. You shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by you are sponsored or guaranteed by the owners of the Discover Program Marks. You recognize that you have no ownership rights in the Discover Program Marks and shall not assign to any third party any of the rights to use the Discover Program Marks.

**C. Confidentiality.** i. Cardholder Information. You will not disclose to any third party Cardholders' account information or other personal information except to an agent of yours assisting in completing a Card transaction, or as required by law. You must destroy all material containing Cardholders' account numbers, Card imprints, Sales Drafts, credit vouchers and (except for Sales Drafts maintained in accordance with this Agreement, Laws, and the Rules). Further, you must take all steps reasonably necessary to ensure Cardholder information is not disclosed or otherwise misused. ii. Prohibitions. You will not use for your own purposes, will not disclose to any third party, and will retain in strictest confidence all information and data belonging to or relating to the business of EVO and Bank (including without limitation the terms of this Agreement), and will safeguard such information and data by using the same degree of care that you use to protect your own confidential information. iii. Disclosure. You authorize EVO and Bank to disclose your name and address to any third party who requests such information or otherwise has a reason to know such information.

**D. Return to EVO.** All promotional materials, advertising displays, emblems, Sales Drafts, credit memoranda and other forms supplied to you and not purchased by you or consumed in use will remain the property of EVO and Bank and will be immediately returned to EVO upon termination of this Agreement. You will be fully liable for all loss, cost, and expense suffered or incurred by EVO and Bank arising out of the failure to return or destroy such materials following termination.

**16. General Provisions.**
**A. Entire Agreement.** This Agreement, as amended from time to time, including the Rules and the completed Merchant Application, all of which are incorporated into this Agreement, constitute the entire agreement among the four parties hereto (other than any prior agreements to which Merchant is not a party), and all prior or other agreements to which Merchant is a party or representations, written or oral, made to Merchant are superseded. This Agreement may be signed in one or more counterparts, all of which, taken together, will constitute one agreement.

**B. Exclusivity.** During the initial and any renewal term of this Agreement, you will not enter into an agreement with any other entity that provides credit card or debit card processing services similar to those provided by EVO and Bank as contemplated by this Agreement without EVO and Bank's written consent.

**C. Construction.** The headings used in this Agreement are inserted for convenience only and will not affect the interpretation of any provision. The language used will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party. Any alteration or strikeover in the text of this pre-printed Agreement will have no binding effect, and will not be deemed to amend this Agreement. This Agreement may be executed by facsimile, and facsimile copies of signatures to this Agreement shall be deemed to be originals and may be relied on to the same extent as the originals.

**D. Assignability.** This Agreement may be assigned by EVO or Bank but may not be assigned by Merchant directly or by operation of law, without the prior written consent of EVO and Bank. Any such assignment in breach of this provision shall be null and void, ab initio. If Merchant nevertheless assigns this Agreement without the consent of EVO and Bank, the Agreement shall be binding upon the assignee. Bank will be immediately informed in writing of any such assignment.

**E. Notices.** Any written notice under this Agreement will be deemed received upon the earlier of: (i) actual receipt or (ii) five calendar days after being deposited in the United States mail, and addressed to the last address shown on the records of the sender.

**F. Bankruptcy.** You will immediately notify EVO and Bank (i) of any bankruptcy, receivership, insolvency or similar action or proceeding initiated by or against Merchant or any of its principals and (ii) if it could reasonably be expected that any such action or proceeding will be initiated by or against Merchant or any of its principals. You will include EVO and Bank on the list and matrix of creditors as filed with the Bankruptcy Court whether or not a claim may exist at the time of filing. Failure to comply with either of these requirements will be cause for immediate termination or any other action available to EVO and Bank under applicable Rules or Law.

**G. Choice of Law/Attorney's Fees/Venue/Jury Trial Waiver.** Should it be necessary for EVO or Bank to defend or enforce any of its rights under this Agreement in any collection or legal action, you agree to reimburse EVO and/or Bank, or any agent acting on

their behalf, as applicable, for all costs and expenses including reasonable attorney's fees, as a result of such collection or legal action. Without limiting the generality of the foregoing, you agree to reimburse EVO and/or Bank, or any agent acting on their behalf, as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by EVO, Bank or their agent in any action arising out of, relating to, or in connection with this Agreement, without regard to whether there has been an adjudication on the merits in any such action. You waive trial by jury with respect to any litigation arising out of, relating to, or in connection with this Agreement. EVO, Bank, you, and Guarantor agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out of, relating to, or in connection with (i) this Agreement, (ii) the relationships which result from this Agreement, or (iii) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement, shall be governed by the laws of the State of New York, notwithstanding any conflicts of laws rules (other than NY General Obligations Law Section 5-1401), and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties. EVO, Bank, you, and Guarantor agree that all actions arising out of, relating to, or in connection with (a) this Agreement, (b) the relationships which result from this Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement shall only be brought in either the courts of the State of New York sitting in Suffolk County or in the United States District Court for the Eastern District of New York, and hereby irrevocably and unconditionally submit to the personal jurisdiction of those courts in any such action.

**H. Amendments.** EVO will notify you on your monthly statement of any new or increased fees. Except for any fee increases imposed by Visa, MasterCard, Discover, American Express, or the debit network, you may cancel the Agreement without charge if you object to the fee changes in writing within 30 days. If you do not object, and continue to process for 30 days after receiving notice of the fee change, you will be deemed to assent to the new fees.

**I. Severability and Waiver.** If any provision of this Agreement is illegal, the invalidity of that provision will not affect any of the remaining provisions and this Agreement will be construed as if the illegal provision is not contained in the Agreement. Neither the failure nor delay by EVO or Bank to exercise, or partial exercise of, any right under this Agreement will operate as a waiver or estoppel of such right, nor shall it amend this Agreement. All waivers must be signed by the waiving party.

**J. Independent Contractors.** EVO, Bank and Merchant will be deemed independent contractors and will not be considered agent, joint venture or partner of the other, except as provided in 6.C and 7.A(ii).

**K. Employee Actions.** You are responsible for your employees' actions while in your employment.

**L. Survival.** Sections 4.A, 4.B, 6, 7, 8, 9, 13.C, 15, and 16.G will survive termination of this Agreement.

**M. No Third Party Beneficiaries.** Except as set forth in Section 13 (B), nothing in this Agreement is intended or shall be construed to give any person, other than the parties hereto, their successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect of this Agreement or any provision contained herein.

**17. E-statements.**
**A. Merchant Account Statement.** Upon opening a merchant processing account you will automatically have access to your monthly merchant account statement electronically (an "E-statement") by viewing it on line. This Agreement governs the electronic availability of your E-statement. You agree to abide by the terms and conditions stated herein, and to access E-statements, as well as all notices and initial and future disclosures regarding your E-statement, online. You acknowledge that by the third business day of each month, your E-statement will be available online. You will be notified in writing of the website where you can access your E-statement. Your E-statement will be accessible only through a secure Log In screen which requires the use of a unique User ID and Password. You understand that you will not receive a monthly merchant account statement by U.S. postal mail, and that making your E-statement available online constitutes EVO's compliance with delivery of your monthly merchant account statement. You can print the E-statement or save the file to your computer's hard drive or other disk in order to retain a copy of the E-statement. Your E-statement can be accessed through the E-statement link for three consecutive months from the date the E-statement is first made available. You further agree to receive all initial and periodic account disclosure information in an electronic format. All such disclosures shall be provided in a clear, conspicuous manner that you can print and/or save using the hardware and software specified below. You are also entitled to obtain a paper copy of all disclosures or E-statements upon written request, however such a request does not constitute a withdrawal of consent to receive monthly E-statements. A fee may apply for providing such documentation. You understand that you may withdraw your consent to receive E-statements, or change your email address, upon 30 days written notice to EVO. Please note that a withdrawal of consent does not apply to an E-statement that was furnished before the date on which the withdrawal of consent becomes effective. PC Requirements: Viewing your E-statement on line requires a personal computer with Adobe Acrobat and internet access through a standard web browser. The product version levels must be supported by the respective vendors (i.e., Adobe, Apple, Mozilla, and Microsoft). EVO is not obligated to ensure that your E-statements are accessible through outdated vendor products. In the event you are unable to access any of the information that has been made available by EVO in electronic format, it is your obligation to notify EVO in writing immediately.

**B. Reporting Of Errors.** You must promptly view all E-statements, and immediately notify EVO in writing of any errors. Your written notice must include: (i) Merchant name and account number; (ii) the dollar amount of the asserted error; (iii) a description of the asserted error; and (iv) an explanation of why you believe an error exists and the cause of it, if known. That written notice must be received by EVO within 30 calendar days after the E-statement containing the asserted error is first made available. Your failure to notify EVO of any error within 30 days constitutes a waiver of any claim relating to that error. You may not make any claim against EVO for any loss or expense relating to any asserted error for 60 calendar days immediately following EVO's receipt of your written notice. During that 60 day period, EVO will be entitled to investigate the asserted error and to notify you with the results of our investigation.

**C. Miscellaneous.** EVO shall not be responsible for: (i) consequential or incidental damages caused by services performed by EVO, its agents, or your Internet Service Provider ("ISP"); (ii) damages arising from unauthorized access to E-statement services; or (iii) any costs associated with updating, modifying or terminating your software or hardware. EVO may change, suspend, or terminate all or any aspect of this service upon written notice to you.

**18. Electronic Signatures.**
Under the Electronic Signatures in Global and National Commerce Act ("E-Sign"), this Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when: (a) your electronic signature is associated with the Agreement and related documents, (b) your consent and intent to be bound by the Agreement and related documents, and (c) the Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i.e., print or otherwise store the electronic record). This Agreement and all related electronic documents shall be governed by the provisions of E-Sign. By pressing Submit, you agree: (i) that the Agreement and related documents shall be effective by electronic means, (ii) to be bound by the conditions of this Agreement and related documents, (iii) that you have the ability to print or otherwise store the Agreement and related documents, and (iv) to authorize EVO or Bank to conduct an investigation of your credit history with various credit reporting and credit bureau agencies for the sole purpose of determining the approval of the applicant for merchant status or equipment leasing. This information is kept strictly confidential and will not be released.

---

**MEMBER BANK INFORMATION**

Deutsche Bank AG, c/o Deutsche Card Services GmbH • Kaltenbornweg 1-3 • 50679 Cologne, Germany • +49 221 99577 777 • support.deucs@db.com • Debit sponsorship provided by Bay Bank MD

---

F01-AW-0010194

EX 25
883

## Deployment Information

### Terminal, Software, Gateway Programming

**Programming Type:** Moto/Internet Gateway

### Card Transaction Types

**Pin-based debit:** No
**EBT:** No
**Check service:** No
**Gift or loyalty:** No
**Wright Express:** No
**Voyager:** No

### Terminals, Software, and Gateways

| Description | Supplier | Refurb | IP | Wireless | Store and forward | Timed upload | Time |
|---|---|---|---|---|---|---|---|
| NMI Gateway | Agent | No | No | No | No | No | NA |

### Printers

| Description | Quantity | Supplier | Refurbished |
|---|---|---|---|
| No printers requested | | | |

### Pin Pads

| Description | Quantity | Supplier | Refurbished |
|---|---|---|---|
| No pin pads requested | | | |

*Every pin pad needs to be encrypted with our key, which means that every pin pad attached to a terminal needs to be provided by us. If we get back a **supported** pin pad to replenish our inventory we can provide a correctly encrypted pin pad to the merchant at no cost. The agent will be responsible for sending in the swapped pin pad within two weeks of deployment.*

### Check Readers

| Description | Quantity | Supplier | Refurbished |
|---|---|---|---|
| No check readers requested | | | |

### Shipping Info

**Shipping method:** No Kit Necessary              ,
**Ship to:**
**Phone:**

*We send welcome kits for each merchant, regardless of who supplies the equipment. We will normally not ship a kit for an ecommerce merchant, but we will send a welcome letter via email.*

### Billing Info

**Bill to:** No billing required
**Billing notes:** None

### Other Services and Notes

None

| Merchant ID | DBA | Date Inserted | Caption | Note | Windows User |
|---|---|---|---|---|---|
| ▉8662 | Digital Altitude | 10/12/2015 10:28:55 AM | | Digsig illegible; ip traces to CA; pid passed *email uw* | ▉ |
| ▉8662 | Digital Altitude | 10/13/2015 10:51:39 AM | | Application Similarity Check completed. | SYSTEM |
| ▉8662 | Digital Altitude | 10/13/2015 10:53:29 AM | | TMF Code is changed to NM - NO MATCH | ▉ |
| ▉8662 | Digital Altitude | 10/13/2015 11:27:20 AM | | Products & Services -  We sell online digital training courses and live event workshops<br>SIMILARITY CHECK -  sim to ▉0824, declined 4/2008 for busmech<br>TMF -  1 inq from May<br>CBR -  0 inq 2 deliq, 153 past due, 38% avail, 231 tot rev<br><br>VERIFICATION OF BUSINESS & SIGNER -  pid passed, can't verify llc<br>REVERSE SEARCH -  rev serach brings up business, no reviews found<br><br>WEBSITE REVIEW -  selling packages to help market your business, can't actually locate price points or checkout<br>WHOIS -  protected, created 3/2015<br>Additional Docs -  bs/vc/pps/web/mq/w9<br><br>ACTION -  sent ur email | ▉ |
| ▉8662 | Digital Altitude | 10/13/2015 11:27:20 AM | | Products & Services -  We sell online digital training courses and live event workshops<br>SIMILARITY CHECK -  sim to ▉0824, declined 4/2008 for busmech<br>TMF -  1 inq from May<br>CBR -  0 inq 2 deliq, 153 past due, 38% avail, 231 tot rev<br><br>VERIFICATION OF BUSINESS & SIGNER -  pid passed, reg with sos 3/2015<br>REVERSE SEARCH -  rev serach brings up business, no reviews found<br><br>WEBSITE REVIEW -  selling packages to help market your business, can't actually locate price points or checkout<br>WHOIS -  protected, created 3/2015<br>Additional Docs -  bs/vc/pps/web/mq/w9<br><br>ACTION -  sent ur email | ▉ |
| ▉8662 | Digital Altitude | 10/13/2015 1:38:01 PM | | mq<br><br>everything in house, no expected foreign sales percentage but would ask for alternate payment if there was | ▉ |
| ▉8662 | Digital Altitude | 10/15/2015 10:36:28 AM | | pps is just a stripe transaction history of 4 charges, two test sales in August and then 2 3k sales in september | ▉ |
| ▉8662 | Digital Altitude | 10/15/2015 10:39:13 AM | | June   Credits $30,229.00   Debits  $19,128.00   Avg Balance  $3,113.00<br>July   Credits $60,023.00   Debits  $51,781.00   Avg Balance $12,539.00<br>August   Credits $52,368.00   Debits  $62,088.00   Avg Balance  $13,059.00 | ▉ |
| ▉8662 | Digital Altitude | 10/16/2015 5:11:53 PM | | dropping annual volume from 1.5 million | ▉ |
| ▉8662 | Digital Altitude | 10/16/2015 5:12:08 PM | | Contingent Approval | ▉ |
| ▉8662 | Digital Altitude | 10/16/2015 5:12:50 PM | Application Approved | Application was approved. | ▉ |
| ▉8662 | Digital Altitude | 10/16/2015 5:12:51 PM | | Load Merchant Work Item Created | ▉ |
| ▉8662 | Digital Altitude | 10/18/2015 7:12:44 PM | | Mary Dee (coo) ci wanting to get transaction key to set up acct, apologized and adv we dont have that info and she would need to clbk tomorrow during regular buisness hours. | ▉ |
| ▉8662 | Digital Altitude | 10/19/2015 8:25:08 AM | Amex Application | Amex Application Generated. | ▉ |
| ▉8662 | Digital Altitude | 10/19/2015 8:41:05 AM | | Created Authorize.net Account<br><br>EDS Gateway Monthly Fee = $20.0000<br>EDS Credit Card Per-Transaction Fee = $0.1000 | ▉ |
| ▉8662 | Digital Altitude | 10/19/2015 8:41:05 AM | | Created Authorize.net Account / Global ID.<br><br>EDS Gateway Monthly Fee = $20.0000<br>EDS Credit Card Per-Transaction Fee = $0.1000 | ▉ |

| | 8662 | Digital Altitude | 10/19/2015 8:41 08 AM | | RATE/FEE Update - Work Item automatically created while boarding Authorize net | |
| | 8662 | Digital Altitude | 10/19/2015 9:22:40 AM | | Gateway Fees are Updated in EDS | |
| | 8662 | Digital Altitude | 10/19/2015 9:23 07 AM | | RATE/FEE Update COMPLETE - authnet $20 00 / $0 10 | |
| | 8662 | Digital Altitude | 10/19/2015 9:30:22 AM | | TPS Discover Request COMPLETE - Updated Discover number to ▇▇▇▇ 3282 | |
| | 8662 | Digital Altitude | 10/19/2015 12:09:42 PM | | Mary mgr, calling to get api trans k info , advised they need to activate their gateway | |
| | 8662 | Digital Altitude | 10/19/2015 4:15:38 PM | | 10% per underwriting | |
| | 8662 | Digital Altitude | 10/19/2015 4:15:38 PM | | 10% per underwriting | |
| | 8662 | Digital Altitude | 10/20/2015 10:50:29 AM | | MQ<br><br>3 day right of rescission<br>inhouse fulfillment<br>inhouse customer service, 2 reps | |
| | 8662 | Digital Altitude | 10/20/2015 10:50:57 AM | | sent mq/w9 to uwsr to upload<br>sent request to update to 10% | |
| | 8662 | Digital Altitude | 10/20/2015 12:22:19 PM | | Reserve Percentage changed to 10  EDS Updated | |
| | 8662 | Digital Altitude | 10/20/2015 1:14:32 PM | | Merchant attempted to authorize ▇▇▇▇ 20 times<br>Sending auth rule to the merchant | |
| | 8662 | Digital Altitude | 10/20/2015 1:14:32 PM | | Merchant attempted to authorize ▇▇▇▇ 20 times<br>Sending auth rule to the merchant | |
| | 8662 | Digital Altitude | 10/20/2015 2:46:22 PM | | UL W9, Agreement, MQ from uw file | |
| | 8662 | Digital Altitude | 10/22/2015 4:00:58 PM | | ACCOUNT APPROVED ON 10% RESERVE / DAILY DISCOUNTING | |
| | 8662 | Digital Altitude | 4/19/2016 4:08:00 PM | | Reserve Percentage changed to 100  EDS Updated | |
| | 8662 | Digital Altitude | 4/19/2016 4:15:33 PM | | Merch acct flagging for vol- processed less than $20k a month in first 3 months and now done $73 9k in Mar and $174k+ MTD<br><br>Capping vol and ▇▇▇ is reaching out to discuss since BS sent to him do not support the vol and need to see what is causing it and also if they have alt BS | |
| | 8662 | Digital Altitude | 4/19/2016 4:15:33 PM | | Merch acct flagging for vol- processed less than $20k a month in first 3 months and now done $73 9k in Mar and $174k+ MTD<br><br>Capping vol and ▇▇▇ is reaching out to discuss since BS sent to him do not support the vol and need to see what is causing it and also if they have alt BS<br><br>Current DDA bal: $89 3k<br><br>Current MSI: $ | |
| | 8662 | Digital Altitude | 4/19/2016 4:15:33 PM | | Merch acct flagging for vol- processed less than $20k a month in first 3 months and now done $73 9k in Mar and $174k+ MTD<br><br>Capping vol and ▇▇▇ is reaching out to discuss since BS sent to him do not support the vol and need to see what is causing it and also if they have alt BS<br><br>Already seen spike in CB activity as well with 7 CBs for $842<br><br>Current DDA bal: $89 3k<br><br>Current MSI: $27 5k | |
| | 8662 | Digital Altitude | 4/27/2016 10:29:18 AM | | Reserve Percentage changed to 10  EDS Updated | |
| | 8662 | Digital Altitude | 6/10/2016 9:18:28 AM | | Reserve change requested | |

| | 8662 | Digital Altitude | 6/14/2016 10:27:34 AM | | Approved for 480K/year, $6500 00 MT | |
|---|---|---|---|---|---|---|
| | | | | | We sell online digital training courses and live event workshops | |
| | | | | | Opened – 10/16/2015 | |
| | | | | | Established – 03/01/2015 | |
| | | | | | 100% Internet – LLC | |
| | | | | | CBR - 669 | |
| | | | | | | |
| | | | | | Funds Currently in MSI = $79,048 80 | |
| | | | | | Specified 6 Month Reserve 10% = $34,735 17 | |
| | | | | | ================================== | |
| | | | | | Total Release= $44,313 63 | |
| | | | | | | |
| | | | | | MTD | |
| | | | | | 3 Trans for $111 00 | |
| | | | | | 0 Returns for $0 00 – 0 0% by vol & 0 0% by trans | |
| | | | | | 2 CB's for $37 83 –  33 3% by vol & 66 6% by trans | |
| | | | | | | |
| | | | | | Last Month | |
| | | | | | 145 Trans for $7,587 84 | |
| | | | | | 60 Returns for $1,218 00 – 16 1% by vol & 41 4% by trans | |
| | | | | | 4 CBs for $2,343 00  -  30 1% by vol & 2 8% by trans | |
| | | | | | | |
| | | | | | YTD | |
| | | | | | 3280 Trans for $340,458 32 | |
| | | | | | 354 Returns for $12,338 70 – 3 6% by vol & 10 8% by trans | |
| | | | | | 21 CB's for $3,573 88  -  1 0% by vol & 0 6% by trans | |
| | | | | | | |
| | | | | | No ACH Rejects | |
| | | | | | No Linked Accounts | |
| | 8662 | Digital Altitude | 6/14/2016 12:35:29 PM | | Request to release funds to merchant has been initiated: Amount = $25000 00 | |
| | 8662 | Digital Altitude | 6/14/2016 12:35:29 PM | | Request to release funds to merchant has been initiated: Amount = $25000 00 per ▓▓▓▓ Will review to release remaining excess funds beyond specified 10% reserve in 2 weeks | |
| | 8662 | Digital Altitude | 6/28/2016 9:28:48 AM | | Request to release funds to merchant has been initiated: Amount = $10000 00 | |
| | 8662 | Digital Altitude | 8/4/2016 7:41:58 AM | | Another $111k batch coming through, requesting more information on the product (is airfare included?) also what are the $1 sales | |
| | 8662 | Digital Altitude | 8/4/2016 12:40:15 PM | | EMail: Blank Email | |
| | | | | |   Subj:  Digital Altitude - VAR:6016 MID▓▓▓▓6679 | |
| | | | | |   From: ▓▓▓▓ @bankcardhelp biz | |
| | | | | |   To:  mforce@digitalaltitude co | |
| | | | | |   BCC: ▓▓▓▓ @bankcardhelp biz | |
| | 8662 | Digital Altitude | 8/4/2016 12:41:18 PM | | merchant flagged by EVO for excessive declines emailed merchant today to let us know what they are doing to correct the issue | |
| | 8662 | Digital Altitude | 8/5/2016 10:38:30 AM | | Reserve Percentage changed to 100 | |
| | 8662 | Digital Altitude | 8/8/2016 9:29:41 AM | | Deactivate Front End - please deactivate | |

| | 8662 | Digital Altitude | 8/8/2016 9:30:51 AM | | 100% reserve $497,198 82<br><br>MTD<br>8545 sales $624,056 93<br>140 returns $11,973 00<br>1 CB $37<br><br>July<br>68 sales $98,842 15<br>1 return $1 00 – 1 47% trans<br>5 CBs $113 – 7 35% trans<br><br>Three Months<br>163 sales $107,753 98<br>63 returns $1,820 – 38 65% trans<br>15 CBs $2,607 88 – 9 20% trans<br><br>Bank Statements<br>April $602 93 + $209k - $196k = $12,750<br>May $12,750 + $1 05MM - $924k = $144,812 93<br>June $144,812 93 + $2 34MM - $2 39MM = $91,545 14<br><br>Balance Sheet<br>Debt Ratio: 0 03 Current Ratio: 31 69 Working Capital: $1,336,293 96<br>Current Assets $1,379,832 19, Total Assets $1,379,832 19, Current liabilities $43,538 23, Total liabilities $43,538 23<br><br>P&L Jan – July 2016<br>$4 98MM total income, $3 58MM expenses centered in commissions, $2 54MM (71%) leaving $1,410,015 33 net operating income | | |
| | 8662 | Digital Altitude | 8/8/2016 9:58 07 AM | Merchant Status Change | Merchant account status was changed from Open to Frozen | | |
| | 8662 | Digital Altitude | 8/8/2016 9:58:18 AM | | Deactivate Front End COMPLETE - Deactivated frontend | | |
| | 8662 | Digital Altitude | 8/23/2016 11:28:32 AM | | MTD<br>9192 sales $644,033 87<br>153 refunds $12,202 - 1 65% trans<br>46 CBs $5678 70 - 0 50% trans<br><br>Reserve $571,509 68<br>No rejects reporting in EMRS | | |
| | 8662 | Digital Altitude | 9/14/2016 8:36:27 AM | | Account Close by Risk - Please close | | |
| | 8662 | Digital Altitude | 9/14/2016 8:37:11 AM | | MTD<br>No processing<br>19 CBs $1,167 90<br><br>AUG<br>9192 sales $644,033 87<br>153 returns $12,202 – 1 67% trans<br>29 CBs $1,316 72 – 0 32% trans<br><br>Merchant is offering a $1 trials, decline issues have gone unanswered | | |
| | 8662 | Digital Altitude | 9/14/2016 9:36:55 AM | | Account Close by Risk COMPLETE - CLOSED PER RISK FE/BE<br><br>OPEN BATCH IN GAA | | |
| | 8662 | Digital Altitude | 9/14/2016 9:37:33 AM | Merchant Status Change | Merchant account status was changed from Frozen to Closed | | |
| | 8662 | Digital Altitude | 9/14/2016 9:37:34 AM | | Risk - ACH Rejects closed by Risk | | |
| | 8662 | Digital Altitude | 10/19/2016 8:16:30 AM | | removed Q status | | |
| | 8662 | Digital Altitude | 10/19/2016 10:54:40 AM | | Account Close by Risk - Please double check this account has been closed Merchant has a $2k refund coming through today | | |
| | 8662 | Digital Altitude | 10/19/2016 2:44:26 PM | | Account Close by Risk COMPLETE - closed front/back ends per risk | | |
| | 8662 | Digital Altitude | 10/20/2016 10:11:48 AM | | Reopened account in Onboard due to merchant showing up on the RPT09 report from 10/19   Requested Risk place the account on Q Status | | |
| | 8662 | Digital Altitude | 10/20/2016 10:19:33 AM | | Put on Q | | |
| | 8662 | Digital Altitude | 10/20/2016 12:52:45 PM | | Per RPT09 Reports, added adjustment for batch from 10/19/16, which will settle to the reserve   Account was  placed on Q Status per Risk to allow this to happen amount of $2057 00 | | |
| | 8662 | Digital Altitude | 10/21/2016 8:02:41 AM | | removed Q status | | |

EX 25

888

| | 8662 | Digital Altitude | 2/7/2017 12:57:41 PM | | Request to release funds to merchant has been initiated: Amount = $50000 00 - OK per ███ | ████████ |
| | 8662 | Digital Altitude | 2/7/2017 12:58:15 PM | | Reserve change requested | █████ |
| | 8662 | Digital Altitude | 3/2/2017 1:00:31 PM | | Request to release funds to merchant has been initiated: Amount = $50000 00 - OK per ███ | █████ |
| | 8662 | Digital Altitude | 4/3/2017 1:22:35 PM | | A Reserve Percentage change to 10% has been requested | ██ |
| | 8662 | Digital Altitude | 4/3/2017 1:22:35 PM | | Request to release funds to merchant has been initiated: Amount = $50000 00 | ██ |
| | 8662 | Digital Altitude | 5/9/2017 3:51:31 PM | | Request to release funds to merchant has been initiated: Amount = $50000 00 ok to release per ███████ | ██████ |
| | 8662 | Digital Altitude | 6/20/2017 4:23:34 PM | | Request to release funds to merchant has been initiated: Amount = $50000 00 ok to release per ████ | ████ |
| | 8662 | Digital Altitude | 7/31/2017 3:14:50 PM | | ok with $50k release | ██ |
| | 8662 | Digital Altitude | 7/31/2017 5:00:46 PM | | A Reserve Percentage change to 10% has been requested | ██ |
| | 8662 | Digital Altitude | 7/31/2017 5:00:46 PM | | Request to release funds to merchant has been initiated: Amount = $50000 | ██ |
| | 8662 | Digital Altitude | 7/31/2017 5:00:46 PM | | Request to release funds to merchant has been initiated: Amount = $50000 with ███ approval | ████ |

# PowerPay
## Merchant Application

Adam Johnson, Support Rep
320 Cumberland Avenue
Portland, ME 04101
Phone: 888-888-4009 x6
Fax: 888-204-4040
Email: underwritingsupport@powerpay.biz

## ONLINE MERCHANT APPLICATION

| | | |
|---|---|---|
| Date: 10/11/2015 7:38:25 PM | Merchant ID: ███ 8662 | Agent: Infusionsoft com (6016) |

| | |
|---|---|
| d/b/a Name | IRS Reporting/Legal Business Name |
| **Digital Altitude** | **Digital Altitude** |
| Location Address (no PO Boxes) | Mailing Address (if different) |
| **16192 Coastal Hwy** | **16192 Coastal Hwy** |
| City/State/Zip | City/State/Zip |
| **Lewes DE 199583608** | **Lewes DE 199583608** |
| Company Phone  /  Customer Service Phone | Legal Phone  /  Fax Number |
| **(800) 820-7589** | |
| Website | Email |
| **www.DigitalAltitude.co** | **mforce@digitalaltitude.co** |

## BUSINESS PROFILE

| | |
|---|---|
| Business Structure | Prior Business Name |
| **LLC** | **None** |
| Fed ID # (must match number reported to the IRS) | |
| **••–•••••54** | |
| Year Formed | Premises |
| **2015** | |
| Trade Reference | Contact Name                    Telephone |

## OWNERS/OFFICERS

| Name | Title | Owner % | Name | Title | Owner % |
|---|---|---|---|---|---|
| **Michael Force** | **Founder** | **100** | | | |
| SSN ███ | DOB ███ | Primary Tel # ███ | Mobile Tel # SSN | DOB | Primary Tel #      Mobile Tel # |
| Drivers License Number | State Issued | | Drivers License Number | | State Issued |
| Home Address (no PO Box) ███ | | | Home Address (no PO Box) | | |
| City/State/Zip | | | City/State/Zip | | |
| **Los Angeles CA** ███ | | | | | |

Primary business contact other than owner:                    Phone #:                    Email:

## MEMBER BANK INFORMATION

**Deutsche Bank AG**, c/o Deutsche Card Services GmbH, Kaltenbornweg 1-3, 50679 Cologne, Germany +49 221 99577 777, support deucs@db com

### IMPORTANT MEMBER BANK RESPONSIBILITIES

1  A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant
2  A Visa Member must be a principal (signer) to the Merchant Agreement
3  The Visa Member is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchants must comply
4  The Visa Member is responsible for and must provide settlement funds to the Merchant
5  The Visa Member is responsible for all funds held in reserve that are derived from the settlement

### IMPORTANT MERCHANT RESPONSIBILITIES

1  Merchant must ensure compliance with cardholder data security and storage requirements
2  Merchant must maintain fraud and chargebacks below thresholds
3  Merchant must review and understand the terms of the Merchant Agreement
4  Merchant must comply with Visa Operating Regulations
5  Merchant must comply with the American Express Merchant Operating Guide which can be found at www americanexpress com/merchantopguide

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure then merchant understands these specific responsibilities

## CARDHOLDER DATA SECURITY, PAYMENT APPLICATIONS, & SERVICE PROVIDERS

Payment Card Industry Data Security Standards (PCI DSS) and Payment Brand rules prohibit storage of track data under any circumstances  If you or your Point of Sale ("POS") system pass, transmit, store or receive full cardholder's data, then the POS software must be Payment Application Data Security Standard ("PA DSS") compliant and you (merchant) must validate PCI DSS compliance  A PA-DSS compliant payment application or terminal alone is not guarantee of your PCI DSS compliance  If you use a payment gateway, hosted shopping cart or e-commerce payment solution as an outsourced Third Party Provider they must also validate PCI DSS compliance  "

Has your company or any of the signatories to this merchant agreement ever had a data compromise that was reported to any of the Payment Brands?        **No**

Are you using only a dial-up" terminal with no internet connectivity or Touch Tone Capture (TTC)?"        **I don't know**

| | |
|---|---|
| Name of payment application or software | Model or version number |
| Name of primary third-party provider | Is primary provider PCI-DSS compliant? |
| Name of secondary third-party provider | Is secondary provider PCI-DSS compliant? |
| Are you PCI-DSS compliant? | **I don't know** |
| What was the date of your last scan? | What was the date of your last SAQ (Self Assessment Questionnaire)? | Which SAQ validation type was completed? |

Do you or your third-party provider(s) store cardholder data electronically?     **Yes   No**

If yes, where is data stored?     Merchant location     Merchant HQ     Co-location     Third-party provider     Other

**PCI COMPLIANCE VALIDATION**: I agree to provide proof of current PCI Compliance, including a yearly updated questionnaire and a minimum of quarterly scanning of all web accessible IP addresses as applies for the business, or I will complete the process to gain PCI Compliance through enrollment in the PCI Validation Program

Merchant Initials (required)

Michael Force (Signed: 11-Oct-2015 07:41 PM EDT (UTC-04:00))
Signature Information

## PRODUCTS/SERVICES PROFILE

| Annual Volume | $1,500,000.00 | Average Ticket | $2,400.00 | High Ticket | $6,500.00 |

Describe high ticket in detail

**No**

Seasonal Business?

### We sell online digital training courses and live event workshops

Describe products/services in detail

| | | |
|---|---|---|
| Magnetic stripe read transactions (Card & Card Holder present) | **0%** | Mail or Telephone order transactions | **0%** |
| Card & Cardholder present, "key punched" transactions w/signature | **0%** | e-commerce/web based transactions | **100%** |

Currently accept Visa/MC at this or any other business? (If yes, submit three merchant statements)   **Yes**

Refund Policy   **14 Days**

*Each person signing this form certifies that the volume, ticket, and products/services info above is accurate, complete and not misleading in any way and agrees that any transaction falling outside these parameters/descriptions can be cause for termination and can result in delayed and/or withheld settlement of funds  See paragraphs 4c, 9a, and 13b of the Merchant Processing Agreement regarding suspension, termination and Merchant changes

## MERCHANT SITE SURVEY

Merchant Location:

Is inventory amount consistent with type of business?   If no, explain   **Inventory Explanation**

Does the merchant own or lease the business premises?   If lease, provide landlord name and phone

## AMERICAN EXPRESS

American Express   **New Setup**

| | | |
|---|---|---|
| OptBlue Tier 1 Ticket Size | | OptBlue Additional Network Fee (Assessments) |
| OptBlue Tier 1 Rate | | OptBlue Additional Network Fee (Cross Border) |
| OptBlue Tier 2 Ticket Size | | OptBlue Additional CNP Fee |
| OptBlue Tier 2 Rate | | OptBlue Additional Authorization Fee |
| OptBlue Tier 3 Ticket Size | | ESA Additional Network Fee (Assessments) |
| OptBlue Tier 3 Rate | | ESA Additional Network Fee (Cross Border) |
| ESA Non Prepaid Rate | | ESA Additional CNP Fee |
| ESA Prepaid Rate | | ESA Additional Authorization Fee |

If Merchant has elected to accept American Express Cards, Merchant acknowledges that in the event American Express determines that Merchant is or has become a High CV Merchant (as defined in Section 10 5 of the Opt Blue Operating Regulations) , then American Express may convert Merchant from the EVO American Express Opt Blue Program to a direct Card acceptance relationship with American Express which has different servicing terms  Upon conversion Merchant acknowledges and agrees that (a) Merchant will be bound by American Express' then current Card Acceptance Agreement, and (b) American Express will set the pricing and establish the fees that Merchant will pay for acceptance of the American Express Card

**?** By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express  Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice  Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express

## BANK INFO - *Electronic Funds Transfer Authorization*

Merchant authorizes any party to the Agreement to present Automated Clearing House credits, Automated Clearing House debits, wire transfers, or depository transfer checks to and from the following account and to and from any other account for which any such parties are authorized to perform such functions under the Merchant Processing Agreement, for the purposes set forth in the Merchant Processing Agreement  This authorization extends to such entries in said account concerning lease, rental or purchase agreements for POS terminals and/or accompanying equipment and/or check guarantee fees and amounts due for supplies and materials  This Automated Clearing House authorization cannot be revoked until all Merchant obligations under this Agreement are satisfied, and Merchant gives written notice of revocation as required by this Agreement

| | |
|---|---|
| Bank Name   **Bank Of America** | Account Number   ●●●●●●●●●●92 |
| Account Type   **Checking** | Routing/ABA # |

**A pre-printed voided check or letter from your bank must accompany your application**

F01-AW-0010213

EX 25

892

## BILLING INFORMATION (schedule A)

**Mail/Tel/e-commerce Merchant**

credit cards ■

non-exempt debit ■

Fee applies to approved Mail/Tel/E-Commerce merchants that submit US consumer transactions with an AVS" request "

Transactions submitted without AVS" request or Corp/Purchase card transactions submitted w/o required Corp/Purchase data, or unclosed batch transactions may be billed at the above rate plus" ■ unless indicated here This does not apply to non-exempt debit

Mail/Tel/e-commerce merchants may be required to submit a completed Mail-Tel-e-commerce profile Merchants processing Mail/Tel/e-commerce transactions without PowerPay approval may be subject to deposit delays and/or account termination

**PCI DSS Validation Fees**

PCI DSS Validation Fee (monthly)

All merchants are subject to enrollment into our Simple PCI DSS Validation Program unless proof of existing PCI DSS compliance is provided

Merchants qualifying for exclusion from the PCI DSS validation fees are required to comply with Simple PCI DSS Validation Program requirements as they apply to the business, including provision of documents validating compliance with the PCI DSS upon request, and remain subject to the PCI DSS non-compliance fees

PCI DSS Non-Compliance Fee (Monthly)
Applies in the event you fail to comply with the Simple PCI DSS Validation Program requirements

**Additional Billing Instructions:**

**General Fees**

Bankcard (per authorization):
Amex ESA (per authorization)
Voice-Auth/Touch Tone Transactions
Batch Header Fee (per batch closed)
Annual Fee (billed in Dec for following year)
Basic Monthly Service Fee
Monthly Minimum Discount Fee
Chargeback Fee (per item)
NSF or ACH Reject - Fixed (per item)

**E-Commerce/MOTO**

Monthly E-commerce Gateway Fee (list gateway)
E-Commerce Transaction Fee (per transaction)
Gateway Setup      PowerPay creates the Gateway, PowerPay bills for the gateway fees
Details                                                                (PP-MM541)

**Assessments**

Pass-through fees from the Payment Brands charged as a percentage of the total sales volume for each brand

MasterCard Assessment (transactions < $1,000)
MasterCard Assessment (transactions ? $1,000)
Visa Assessment
Discover Assessment
MasterCard Acceptance Licensing Fee

In addition to transaction fees and assessments, merchants may see the following (or similary worded) pass-through fees from the Payment Brands charged either per transaction or as a percentage of the total sales volume These fees are published by the individual Payment Brands and displayed as separate line items on the Monthly Statement

International Assessments and Processing Fees
Network Access and Acquirer Program Support Fees
Misuse of Authorization Fees
Visa debit and PrePaid Integrity Fees
Fixed Acquirer Network Fees
CVV, CVV2, CVC2, CID fee
MasterCard Digital Enablement

## ACKNOWLEDGEMENT OF AGREEMENT AND RESOLUTION

IMPORTANT NOTICE: All information contained in this application was completed or supplied by all contracting parties  EVO MERCHANT SERVICES, LLC d/b/a EVO ("EVO"), and D EUTSCHE BANK AG, NEW YORK BRANCH and their agents and/or assigns thereof, (("Bank"), shall not be responsible for any change in printed terms unless specifically agreed to in writing by an officer of EVO MERCHANT SERVICES, LLC d/b/a EVO ("EVO"), and DEUTSCHE BANK AG, NEW YORK BRANCH  Investigative Consumer Report: An investigative or consumer report may be made in connection with application  Merchant authorizes ANY PARTY TO THE AGREEMENT or any of their agents to investigate the references provided or any other statements or data obtained from Merchant, from any of the undersigned personal guarantor(s), or from any other person or entity with any financial obligations under this Agreement  You have a right, upon written request, to a complete and accurate disclosure of the nature and scope of the investigation requested  **By signing below on either the original or a facsimile, you are agreeing to the provisions stated within the Terms and Conditions of the Merchant Processing Agreement attached as either pages 4, 5 and 6 of this Application & Merchant Agreement, or, as printed on the reverse pages of this Application, and you are acknowledging that you have carefully read each of the provisions before signing.** By signing below Merchant represents that the information provided in this Application is true, complete and not misleading in any way and expressly authorizes Bank to credit and debit Merchant's Bank Account in accordance with this Agreement  Corporate Resolution: The officer(s) identified below have the authorization to execute this Application and Merchant Processing Agreement on behalf of the here within named corporation

**By signing below and/or if Merchant submits a transaction hereunder, Merchant will be deemed to have accepted the Terms & Conditions of the Merchant Processing Agreement.**

Michael Force (Signed: 11-Oct-2015 07:41 PM EDT (UTC-04:00))
<u>Signature Information</u>

_____     _____
Accepted by EVO Merchant Services, LLC     Accepted by Deutsche Bank AG, New York

## PERSONAL GUARANTEE

As a primary inducement to EVO and Bank to enter into this Agreement, the undersigned Guarantor(s), by signing this Agreement, jointly and severally, unconditionally and irrevocably, personally guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to EVO and Bank under this Agreement or any other agreement currently in effect or in the future entered into between Merchant or its principals and EVO and Bank, as such agreements now exist or are amended from time to time, with or without notice  Guarantor(s) understands further that EVO and Bank may proceed directly against Guarantor(s) without first exhausting their remedies against any other person or entity responsible to it or any security held by EVO and Bank or Merchant  Guarantor(s) waive trial by jury with respect to any litigation arising out of or relating to this personal guaranty  This guaranty will not be discharged or affected by the death of the undersigned, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any successor of EVO and Bank  Guarantor(s) understand that the inducement to EVO and Bank to enter into this agreement is consideration for the guaranty, and that this guaranty remains in full force and effect even if the Guarantor(s) receive no add'l benefit from the guaranty  Guarantors acknowledge the Investigative Consumer Report section in Acknowledgement above

AGREED AND ACCEPTED                               AGREED AND ACCEPTED

Michael Force (Signed: 11-Oct-2015 07:41 PM EDT (UTC-04:00))
Signature Information

## AGENT CERTIFICATION

By clicking Certify" I hereby verify that this application has been fully completed by the merchant applicant and that the information set forth in this Application is true, complete and not misleading in any way, and that product and services are consistent in type, quantity and quality with that described in this Application  Based upon my review of the merchant's website and/or physical inspection of their premises (whenever applicable and customary) the Merchant appears to be conducting business as described herein and I am not in possession of any knowledge to the contrary "

- - -
Agent Name  Agent Number  Date and Time

## MERCHANT PROCESSING AGREEMENT

This document, Merchant Processing Agreement" (the "Agreement"), accompanies the document "Merchant Application" ("Merchant Application") and includes the Terms and Conditions set forth below (the "Terms and Conditions") together with the terms and conditions of the Merchant Application  The bank ("Bank") identified in this Agreement is a member of Visa USA, Inc ("Visa") and MasterCard International, Inc ("MasterCard"), and is Deutsche Bank AG, New York branch  EVO Merchant Services, LLC d/b/a EVO ("EVO") is a registered independent sales organization of Visa and a member service provider of MasterCard  This Agreement is between EVO, Bank, and the merchant (or "you") identified in the Merchant Application ("Merchant")  Merchant and EVO agree that the rights and obligations contained in this Agreement do not apply to Bank with respect to Discover and American Express transactions  To the extent Merchant accepts Discover cards, the provisions in this Agreement with respect to Discover apply if Merchant does not have a separate agreement with Discover  In such case, Merchant will also be enabled to accept JCB and Diner's Club cards under the Discover network and such transactions will be processed at the same fee rate as Merchant's Discover transactions are processed  Any references to the Debit Sponsor shall refer to the debit sponsors identified below "

## RECITALS

Merchant desires to accept credit cards (Cards) validly issued by members of Visa, MasterCard, Discover, and American Express  Bank and EVO desire to provide credit card processing services to Merchant  Therefore, Merchant, EVO and Bank agree as follows:"

## TERMS AND CONDITIONS

**1. Honoring Cards.** A  Without Discrimination  You will honor, without discrimination, any Card properly tendered by a Cardholder  "Cardholder" (sometimes referred to as "Card Member" in some card association or network organization materials) means a person possessing a Card and purporting to be the person in whose name the Card is issued  You will not establish a minimum or maximum transaction amount as a condition for honoring a Card  B  Cardholder Identification  You will identify the Cardholder and check the expiration date signature on each Card  You will not honor any Card if: (i) the Card has expired, (ii) the signature on the sales draft does not correspond with the signature on the Card, or (iii) the account number embossed on the Card does not match the account number on the Card's magnetic strip (as printed in electronic form) or the account number listed on a current Electronic Warning Bulletin file  You may not require a Cardholder to provide personal information, such as a home or business telephone number, a home or business address, or a driver's license number as a condition for honoring a Card unless permitted under the Laws and Rules (defined in Section 14, below)  C  Card Recovery  You will use your best efforts to retain any Card: (i) on Visa Cards if the printed four digits below the embossed account number do not match the first four digits of the embossed account number; (ii) if you are advised by EVO or Bank (or a designee) the issuer of the Card or the designated voice authorization center to retain it; (iii) if you have reasonable grounds to believe the Card is counterfeit, fraudulent or stolen, or not authorized by the Cardholder; or (iv) if, for MasterCard Cards, the embossed account number, indent printed account number and encoded account number do not match or the Card does not have a MasterCard hologram on the lower right corner of the Card face  D  Surcharges  You will not add any amount to the posted price of goods or services you offer as a condition of paying with a Card, except as permitted by the Rules  This paragraph does not prohibit you from offering a discount from the standard price to induce a person to pay by cash, check or similar means rather than by using a Card  E  Return Policy  You will properly disclose to the Cardholder, at the time of the Card transaction and in accordance with the Rules, any limitation you have on accepting returned merchandise  F  No Claim Against Cardholder  You will not have any claim against or right to receive payment from a Cardholder unless EVO and Bank refuses to accept the Sales Draft (as defined in Section 3) or refuses a prior acceptance of the Sales Draft after receipt or a chargeback or otherwise  You will not accept any payments from a Cardholder relating to previous charges for merchandise or services included in a Sales Draft, and if you receive any such payments you promptly will remit them to EVO and Bank  G  Disputes With Cardholders  All disputes between you and any Cardholder relating to any Card transaction will be settled between you and the Cardholder  Neither EVO nor Bank bear any responsibility for such transactions "

**2. Authorization.** A  Required on all Transactions  You will obtain a prior authorization for the total amount of a transaction via electronic terminal or device before completing any transaction, and you will not process any transaction that has not been authorized  You will follow any instructions received during the authorization process  Upon receipt of authorization you may consummate only the transaction authorized and must note on the Sales Draft the authorization number  Where authorization is obtained, you will be deemed to warrant the true identity of the customer as the Cardholder  B  Effect  Authorizations are not a guarantee of acceptance or payment of the Sales Draft  Authorizations do not waive any provisions of this Agreement or otherwise validate a fraudulent transaction or a transaction involving the use of an expired Card  C  Unreadable Magnetic Stripes  When you present Card transactions for authorization electronically, and if your terminal is unable to read the magnetic stripe on the card, you will obtain an imprint of the card and the Cardholder's signature on the imprinted draft before presenting the Sales Draft to EVO and Bank for processing  Failure to do so may result in the assessment of a transaction surcharge on non-qualifying transactions

**3. Presentment of Sales Drafts.** A  Forms  You will use a Sales Draft (Sales Draft") or other form approved by EVO and Bank to document each Card transaction  Each Sales Draft will be legibly imprinted with: (i) Merchant's name, location and account number; (ii) the information embossed on the Card presented by the Cardholder (either electronically or manually); (iii) the date of the transaction; (iv) a brief description of the goods or services involved; (v) the transaction authorization number; (vi) the total amount of the sale including any applicable taxes, or credit transaction; and (vii) adjacent to the signature line, a notation that all sales are final, if applicable  B  Signatures  Each Sales Draft must be signed by the Cardholder unless the Card transaction is a valid mail/telephone order Card transaction which fully complies with the requirements set forth in this Agreement  You may not require the Cardholder to sign the Sales Draft before you enter the final transaction amount in the Sales Draft  C  Reproduction of Information  If the following information is not legibly imprinted on the Sales Draft, you will legibly inscribe on the Sales Draft before submitting it to EVO and Bank: (i) the Cardholder's name: (ii) account number (iii) expiration date of the Card and (iv) the Merchant's name and place of business  Additionally, for MasterCard transactions you will legibly inscribe the name of the bank issuing the Card if it appears on the face of the Card  D  Delivery and Retention of Sales Drafts  You will deliver a complete copy of the Sales Draft or credit voucher to the Cardholder at the time of the transaction  You will retain the "merchant copy" of the Sales Draft or credit memorandum for at least 3 years following the date of completion of the Card transaction (or such longer period as the Rules require)  E  Electronic Transmission  In using electronic authorization and/or data capture services, you will enter the data related to a sales or credit transaction into a computer terminal or magnetic stripe reading terminal no later than the close of business on the date the transaction is completed (unless otherwise permitted by the Rules)  Failure to do so may result in the assessment of a transaction surcharge on non-qualifying transactions and, at EVO's sole discretion, the deposit of the funds received for such sales or credit transaction into the Reserve Account  If you provide your own electronic terminal or similar device, such terminal must meet EVO and Bank's requirements for processing transactions  Information regarding a sales or credit transaction transmitted with a computer or magnetic stripe reading terminal will be transmitted by you to EVO and Bank or their agent in the form EVO and Bank from time to time specify or as required under the Rules  If EVO or Bank requests a copy of a Sales Draft, credit voucher or other transaction evidence, you will provide it within 24 hours following the request "

**4. Deposit of Sales Drafts and Funds Due Merchant.** A  Deposit of Funds  i  Deposits  You agree that this Agreement is a contract of financial accommodation within the meaning of the Bankruptcy Code, 11 U S C  365 as amended from time to time  Subject to this Section, Bank will deposit to the Designated Account (defined in section 6 below) funds evidenced by Sales Drafts (whether evidenced in writing or by electronic means) complying with the terms of this Agreement and the Rules and will provide you provisional credit for such funds (less recoupment of any credit(s), adjustments, fines, chargebacks, or fees)  You shall not be entitled to credit for any indebtedness that arises out of a transaction not processed in accordance with the terms of this Agreement or the rules and regulations of a card association or network organization  You acknowledge that your obligation to EVO and Bank for all amounts owed under this Agreement arises out of the same transaction as EVO and Bank's obligation to deposit funds to the Designated Account  ii  Provisional Credit  Notwithstanding the previous sentences, under no circumstance will EVO or Bank be responsible for processing credits or adjustments related to Sales Drafts not originally processed by EVO and Bank  All Sales Drafts and deposits are subject to audit and final checking by EVO and Bank and may be adjusted for inaccuracies  You acknowledge that all credits provided to you are provisional and subject to chargebacks, recoupment, adjustments, fines and fees: (i) in accordance with the Rules; (ii) for any of your obligations to EVO and Bank; and (iii) in any other situation constituting suspected fraud or a breach of this Agreement, whether or not a transaction is charged back by the Card issuer  EVO and Bank may elect, but are not required, to grant conditional credit for individual or groups of any funds evidenced by Sales Drafts  Final credit for those conditional funds will be granted within EVO and Bank's sole discretion  iii  Processing Limits  EVO and Bank may impose a cap on the volume and ticket amount of Sales Drafts that they will process for you, as indicated to you by EVO or Bank  This limit may be changed by EVO or Bank upon written notice to you  B  Chargebacks  You are fully liable for all transactions returned for whatever reason, otherwise known as chargebacks"  You will pay on demand the amount of all chargebacks  Authorization is granted to offset from incoming transactions and to debit the Designated Account, the Reserve Account (defined in Section 7, below) or any other account held at Bank or at any other financial institution the amount of all chargebacks  You will fully cooperate in complying with the Rules regarding chargebacks  C  Excessive Activity  Your presentation to EVO and Bank of Excessive Activity will be a breach of this Agreement and cause for immediate termination of this agreement  "Excessive Activity" means, during any monthly period: (i) the dollar amount of chargebacks and/or retrieval requests in excess of 1% of the average monthly dollar amount of your Card transactions; (ii) sales activity that exceeds by 10% of the dollar volume indicated on the Application; or (iii) the dollar amount of returns equals 20% of the average monthly dollar amount of your Card transactions  You authorize, upon the occurrence of Excessive Activity, EVO and Bank to take any action they deem necessary including but not limited to, suspension of processing privileges and establishment or increase in the amount allocated to the Reserve Account and a reduction in the amount of provisional credit remitted to you in accordance with this Agreement  D  Credit  i  Credit Memoranda  You will issue a credit memorandum in any approved form, instead of making a cash advance, a disbursement or a refund on any Card transaction  EVO or Bank will debit the Designated Account for the total face amount of each credit memorandum submitted to EVO and Bank  You will not submit a credit memorandum relating to any Sales Draft not originally submitted to EVO and Bank, nor will you submit a credit memorandum that exceeds the amount of the original Sales Draft  You will within the time period specified by the Rules, provide a credit memorandum or credit statement for every return of goods or forgiveness of debt for services which were the subject of a Card transaction  ii  Revocation of Credit  EVO or Bank may refuse to accept any Sales Draft, and EVO and Bank may revoke prior acceptance of a Sales Draft in the following circumstances: (a) the transaction giving rise to the Sales Draft was not made in compliance with this Agreement, the Laws or the Rules; (b) the Cardholder disputes his liability to EVO and Bank for any reason, including but not limited to a contention that the Cardholder did not receive the goods or services, that the goods or services provided were not as ordered, or those chargeback rights enumerated in the Rules; or (c) the transaction giving rise to the Sales Draft was not directly between you and the Cardholder  You will pay EVO and Bank any amount previously credited to you for a Sales Draft not accepted by EVO and Bank or where accepted, is revoked by EVO and Bank  E  Reprocessing  Notwithstanding any authorization or request from a Cardholder, you will not re-enter or reprocess any transaction which has been charged back  F  Miscellaneous  You will not present for processing or credit, directly or indirectly, any transaction not originated as a result of a Card transaction directly between you and a Cardholder or any transaction you know or should know to be fraudulent or not authorized by the Cardholder  You will not sell or disclose to third parties Card account information other than in the course of performing your obligations under this Agreement "

**5. Other Types of Transactions.** A  Debit Card Processing Services  You may elect to accept debit cards, and said election should be made by you on the accompanying Merchant Application  If you elect to accept debit cards, the following terms and conditions apply to you  Debit Sponsor shall act as your sponsor with respect to the participation of point-of-sale terminals owned, controlled, and/or operated by you (the Covered Terminals") in each of the following debit card networks ("Networks"): Accel, AFFN, Alaska Option, Interlink, Maestro, NYCE, Pulse, Shazam, Star, CU24, and Tyme, which Networks may be changed from time-to-time by Debit Sponsor or EVO without notice  You may also have access to other debit networks that do not require a sponsor  EVO will provide you with the ability to access the Networks at the Covered Terminals for the purpose of authorizing debit card transactions from cards issued by the members of the respective Networks, and EVO will provide connection to such Networks, terminal applications, settlement, and reporting activities (collectively, the "Services")  You will comply with all federal, state, and local laws, rules, regulations and ordinances ("Applicable Laws") and with all by-laws, regulations, rules, and operating guidelines of the Networks ("Network Rules")  You will execute and deliver any application, participation, or membership agreement or other document necessary to enable Debit Sponsor to act as sponsor for you in each Network, and you shall obtain all consents, approvals, authorizations, or orders of any governmental agency or body required for the execution, delivery, and performance of this Agreement  You agree to utilize the debit card services in accordance with this Agreement, its exhibits or attachments, and EVO's instructions and specifications, and to provide EVO with the necessary data in the proper format to enable EVO to properly furnish the Services  Copies of the relevant agreements or operating regulations shall be made available to you upon request  You will provide prompt written notice to EVO in the event that you are subject to any of the following: i  Conviction for a felony offense or any other crime involving moral turpitude; ii  Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practice on your part; iii  Bankruptcy filing or petition; iv  Federal or state tax lien; v  Any material adverse change in your assets,

operations; or condition, financial or otherwise; vi  The threat or filing of any litigation against you, the outcome of which reasonably could have a material adverse effect on your continuing operations; vii  Administrative or enforcement proceeding commenced by any state or federal regulatory agency, including any banking or securities agency or entity operating an EBT Network, that reasonably could have a material adverse effect on your continuing operations; or viii  Any disciplinary action taken by any Network against you or any of your principals  EVO may terminate or suspend in its discretion Debit Sponsor's sponsorship of you in any Network or modify the provision of Services to you  I  Immediately upon notice to you of the occurrence of any of the conditions set forth in items (i), (ii), (iii), (v), or (viii) in the immediately preceding paragraph or if Debit Sponsor's authority to participate in such Network or act as your sponsor in such Network is terminated by such Network; ii  Thirty (30) days after written notice by EVO to you of the occurrence of any of the conditions set forth in items (iv), (vi), or (vii) in the immediately preceding paragraph or if Debit Sponsor terminated its membership or participation in such Network; iii  Immediately upon notice to you in the event any financial statement, representation, warranty, statement or certificate furnished is materially false or misleading; or iv  Immediately upon notice to you of the occurrence of any other circumstance with respect to this Section that may reasonably be expected to have an effect on EVO  The parties herein acknowledge and agree that EVO shall pay Debit Sponsor any and all fees related to Debit Sponsor's sponsorship of you in the Networks; provided, however, that in the event EVO fails to pay such amounts, Debit Sponsor shall be entitled to recover all such amounts directly from you and you agree to pay all such amounts  You shall not in any way indicate that Debit Sponsor endorses your activities, products, or services  Debit Sponsor and you are and shall remain independent contractors of one another, and neither they, nor their respective individual employees, shall have or hold themselves out as having any power to bind the other to any third party  Nothing contained in this section shall be construed to create or constitute a partnership, joint venture, employer-employee, or agency relationship between Debit Sponsor and you  You shall indemnify and hold harmless EVO and its affiliates (including parents and subsidiaries), and their respective officers, directors, employees, successors and assigns, from and against any and all direct or contingent losses, costs, claims, demands, and causes of action (including, without limitation, the cost of investigating the claim, the cost of litigation, and reasonable attorney's fees including those of in-house counsel, whether or not legal proceedings are instituted) paid or incurred by or on behalf of EVO as a result of your violation of any of the terms of this Section, Network Rules, or Applicable Laws, or otherwise arising from or related to Debit Sponsor's sponsorship of you in any Network  In the event that Debit Sponsor's sponsorship of you in any Network is terminated prior to the termination of this Agreement, EVO may assign Debit Sponsor's rights and obligations hereunder to a third party  All provisions in this section necessary to enforce the rights and obligations of the parties contained in this section shall survive the termination of this Agreement  In the event you and Bank enter into this Agreement  B  Mail/Telephone Order  EVO and Bank caution against mail orders or telephone orders or any transaction in which the Cardholder and Card are not present ("mail/telephone orders") due to the high incidence of customer disputes  You will obtain the expiration date of the Card for a mail/telephone order and submit the expiration date when obtaining authorization of the Card transaction  For mail/telephone order transactions, you will type or print legibly on the signature line the following as applicable: telephone order or "TO" or mail order or "MO"  You must promptly notify EVO and Bank if your retail/mail order/telephone order mix changes from the percentages represented to EVO and Bank and may cause acceptance of your mail/telephone order transactions, or limit their acceptance of such transactions, or increase their fees if this mix changes  Bank will release funds to Merchant five (5) business days after the transaction date for mail/telephone orders  Merchant agrees to use and retain proof of a traceable delivery system as means of shipment of product to the customer  Merchant agrees that transactions will not be processed until products are shipped to the Cardholder  Merchant agrees to pay a charge of $0 05 per AVS transaction, if applicable  This agreement may be immediately terminated by Bank if Merchant fails to comply with any of the terms of the agreement  C  Recurring Transactions  For recurring transactions, you must obtain a written request from the Cardholder for the goods and services to be charged to the Cardholders account, the frequency of the recurring charge, and the duration of time during which such charges may be made  You will not complete any recurring transaction after receiving: (i) a cancellation notice from the Cardholder, (ii) notice from EVO or Bank, or (iii) a response that the Card is not to be honored  You must print legibly on the Sales Draft the words "Recurring Transaction"  D  Multiple Sales Drafts  You will include a description and total amount of goods and services purchased in a single transaction on a single Sales Draft or transaction record, unless (i) partial payment is entered on the Sales Draft or transaction record and the balance of the transaction amount is paid in cash or by check at the time of transaction, or (ii) a Sales Draft represents an advance deposit in a Card transaction completed in accordance with this Agreement and the Rules  E  Partial Completion  i  Prior Consent  You will not accept for payment by Card any amount representing a deposit or partial payment for goods or services to be delivered in the future without the prior written consent of EVO or Bank  Such consent will be subject to Bank's final approval  The acceptance of a Card for payment or partial payment for goods or services to be delivered in the future without the prior consent will be deemed a breach of this Agreement and cause for immediate termination, in addition to any other remedies available under the Laws or Rules  ii  Acceptance  If you have obtained prior written consent, then you will complete such Card transactions in accordance with the terms set forth in this Agreement, the Rules, and the Laws  Cardholders must execute one Sales Draft when making a deposit with a Card and a second Sales Draft when paying the balance  You will note upon the Sales Draft the words "deposit" or "balance" as appropriate  You will not deposit the Sales Draft labeled "balance" until the goods have been delivered to Cardholder or you have fully performed the services  F  Future Delivery  You will not accept any Sales Draft or other memorandum to Bank for processing "whether by electronic means" which relates to the sale of goods or services for future delivery without EVO or Bank's, prior written authorization  Such consent will be subject to Bank's final approval  If EVO or Bank have given such consent, you represent and warrant to EVO and Bank that you will not rely on any proceeds or credit resulting from such transactions to purchase or furnish goods or services  You will maintain sufficient working capital to provide for the delivery of goods or services at the agreed upon future date, independent of any credit or proceeds resulting from sales drafts or other memoranda taken in connection with future delivery transactions  G  Electronic Commerce Transactions  You may process electronic commerce ("EC") transactions only if you have so indicated on the Application, and only if you have obtained EVO's consent  If you submit EC transactions without our consent, we may immediately terminate this Agreement  If you have indicated on the Application that you will be submitting EC transactions, you acknowledge that you have reviewed the Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program (CISP), MasterCard's Site Data Protection Program (SDP), and American Express' Merchant Data Security Requirements (MDSR) and to the extent that they apply to you, you agree to comply with, and ensure such transactions comply with, the terms of each  You understand that transactions processed via EC are high risk and subject to a higher incidence of chargebacks  You are liable for all chargebacks and losses related to EC transactions, whether or not: i) EC transactions have been encrypted; and ii) you have obtained consent to engage in such transactions  Encryption is not a guarantee of payment and will not waive any provision of this Agreement or otherwise validate a fraudulent transaction  All communication costs related to EC transactions are your responsibility  You understand that EVO will not manage the EC telecommunications link and that it is your responsibility to manage that link  All EC transactions will be settled by Bank into a depository institution of the United States in U S  currency  i  Requirements  For goods to be shipped on EC transactions, you may obtain authorization up to 7 calendar days prior to the shipment date  You need not obtain a second authorization if the Sales Draft amount is within 15% of the authorized amount, provided that the additional amount represents shipping costs  Further, your web site must contain all of the following information: i) complete description of the goods or services offered, ii) returned merchandise and refund policy, iii) customer service contact, including electronic mail address and/or telephone number, iv) transaction currency (such as U S  or Canadian dollars), v) export or legal restrictions, if known, and vi) delivery policy  If you store cardholder account numbers, expiration dates, and other personal cardholder data in the database, you must follow PCI DSS, CISP, SDP, and MDSR guidelines on securing such data  ii  If you accept EC transactions, you must: install and maintain a working network firewall to protect data accessible via the Internet; keep security patches up-to-date; encrypt stored data and data sent over open networks; use and update anti-virus software; restrict access to data by business "need-to-know"; assign a unique ID to each person with computer access to data; not use vendor-supplied defaults for system passwords and other security parameters; track access to data by unique ID; regularly test security systems and processes; maintain a policy that addresses information security for employees and contractors; and restrict physical access to Cardholder information  When outsourcing administration of information assets, networks, or data you must retain legal control of proprietary information and use limited "need-to-know" access to such assets, networks or data  Further, you must reference the protection of cardholder information and compliance with the PCI DSS, CISP, SDP, and MDSP Rules in contracts with other service providers  You understand that failure to comply with this Section may result in fines and you agree to indemnify and reimburse EVO and Bank immediately for any fine imposed due to your breach of this Section  H  JCB and Diners Club Transactions  Upon your request, EVO will provide authorization and/or data capture service, for JCB and Diners Club transactions  By signing this Merchant Agreement, Merchant agrees to abide by the terms and conditions of Diners Club and JCB  Merchant understands that the Diners Club Agreement will be sent to the business entity indicated on this application  By accepting the Diners Club Card for goods and/or services, Merchant agrees to be bound by the terms and conditions of the Agreement  EVO and Bank are not responsible for funding such transactions  Initial setup fees may apply  I  Cash Advances  You will not deposit any transaction for purposes of obtaining or providing a cash advance  You agree that any such deposit shall be grounds for immediate termination  J  Prohibited Transactions  You will not accept or deposit any fraudulent or illegal transaction and you may not, under any circumstances, present for deposit directly or indirectly, a transaction which originated with any other merchant or any other source  You will not, under any circumstance, deposit telemarketing transactions unless you obtain Bank, EVO prior written consent  Such consent will be subject to Bank's final approval  If you process any such transactions, you may be immediately terminated and EVO or Bank may hold funds and/or increase the amount allocated to the Reserve Account and/or deduct from the amount of provisional credit that would otherwise be allocated to you Further, you may be subject to Visa, MasterCard, Discover, or American Express reporting requirements  "

**6. Designated Account.** A  Establishment and Authority  Merchant will establish and maintain an account at an ACH receiving depository institution approved by Bank and EVO (Designated Account)  Merchant will maintain sufficient funds in the Designated Account to satisfy all obligations, including fees, contemplated by this Agreement  Merchant irrevocably authorizes Bank and EVO to debit the Designated Account for chargebacks, recoupments, adjustments, fines, fees and any other penalties or amounts owed under this Agreement, and irrevocably authorizes Bank and EVO to debit the Designated Account for any amount owed to Bank and EVO under this Agreement other than the amounts directly attributable to the settlement of transactions  You also authorize EVO and Bank to debit the Merchant Account for any fees due such vendor or agent under this Agreement  This authority will remain in effect for at least 2 years after termination of this Agreement whether or not you have notified EVO and Bank of a change to the Designated Account  Merchant must obtain prior written consent from Bank or EVO to change the Designated Account  If Merchant does not get that consent, EVO or Bank may immediately terminate the Agreement and may take other action necessary, as determined by them within their sole discretion  B  Deposit  Bank will deposit all Sales Drafts to the Designated Account subject to the other provisions of this Agreement  The funds represented by Sales Drafts will be deposited 3 business days following receipt of the Sales Draft, except for mail order/telephone order and electronic commerce transactions, which will be deposited 5 business days following receipt of the Sales Draft  "Business Day" means Monday through Friday, excluding holidays observed by the Federal Reserve Bank of New York  Merchant authorizes Bank and EVO to initiate reversal or adjustment entries and initiate or suspend such entries as may be necessary to grant Merchant provisional credit for any entry  You authorize and appoint Bank and EVO to act as your agent to collect Card transaction amounts from the Card issuing bank  As the collecting agent, Bank and EVO in their sole discretion, may grant you provisional credit for transaction amounts in the process of collection, subject to receipt of final payment by Bank and subject to all chargebacks  C  Asserted Errors  You must promptly examine all statements relating to the Designated Account, and immediately notify EVO and Bank in writing of any errors  Your written notice must include: (i) merchant name and number  (ii) the dollar amount of the asserted error, (iii) a description of the asserted error, and (iv) an explanation of why EVO or Bank believe an error exists and the cause of it, if known  That written notice must be received by EVO and Bank within 30 calendar days after you received the periodic statement containing the asserted error  Your failure to notify EVO and Bank of any error within 30 days constitutes a waiver of any claim relating to that error  You may not make any claim against EVO or Bank for any loss or expense relating to any asserted error for 60 calendar days immediately following our receipt of your written notice  During that 60 day period, EVO and Bank will be entitled to investigate the asserted error  D  Indemnity  You will indemnify and hold EVO and Bank harmless for any action they take against the Designated Account, the Reserve Account, or any other account pursuant to this Agreement  E  ACH Authorization  You authorize EVO and Bank to initiate debit/credit entries to the Designated Account, the Reserve Account, or any other account maintained by you at any institution, all in accordance with this Agreement and the ACH Authorization on the attached Exhibit B, Merchant Authorizations  The ACH Authorization will remain in effect beyond termination of this Agreement  In the event you change the Designated Account, you will execute a new ACH Authorization  "

**7. Security Interests, Reserve Account, Recoupment and Set-Off.** A  Security Interests  i  Security Agreement  This Agreement is a security agreement under the Uniform Commercial Code  You grant to EVO and Bank a security interest in and lien upon: (i) all funds at any time in the Designated Account, regardless of the source of such funds; (ii) all funds at any time in the Reserve Account, regardless of the source of such funds; (iii) present and future Sales Drafts; and (iv) any and all amounts which may be due to you under this Agreement including, without limitation, all rights to receive any payments or credits under this Agreement (collectively, the Secured Assets)  You agree to provide other collateral or security to EVO and Bank to secure your obligations under this Agreement upon EVO or Bank's request  These security interests and liens will secure all of your obligations under this Agreement and any other agreements now existing or later entered into between you and EVO or Bank  This security interest may be exercised by EVO or Bank without notice or demand of any kind by making an immediate withdrawal or freezing the secured assets  i  Perfection  Upon request of EVO or Bank, you will execute one or more financing statements or other documents to evidence this security interest  You represent and warrant that no other person or entity has a security interest in the Secured Assets  Further, with respect to such security interests and liens, EVO and Bank will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity  You will obtain from EVO and Bank written consent prior to granting a security interest of any kind in the Secured Assets to a third party  You agree that this is a contract of recoupment and EVO and Bank are not required to file a motion for relief from the automatic stay in any bankruptcy proceeding in order for EVO or Bank to realize on any of its collateral (including any Reserve Account)  Nevertheless you agree not to contest or object to any motion for relief from the automatic stay filed by EVO or Bank  You authorize EVO or Bank and appoint EVO or Bank your attorney in fact to sign your name to any financing statement used for the perfection of any security interest or lien granted hereunder  B  Reserve Account  i  Establishment  A non-interest bearing deposit account ("Reserve Account") has been established and is maintained at Bank or one of its affiliates with sums sufficient to satisfy your current and future merchant obligations as determined by EVO and Bank  You authorize EVO and Bank to debit the Designated Account or any other account you have at Bank or any

other financial institution to establish or maintain funds in the Reserve Account  Bank or EVO may deposit into the Reserve Account funds it would otherwise be obligated to pay you, for the purpose of establishing, maintaining or increasing the Reserve Account in accordance with this Section, if it determines such action is reasonably necessary to protect its interests  ii  Authorizations  EVO and Bank may, without notice to you, apply deposits in the Reserve Account against any outstanding amounts you owe under this Agreement or any other agreement between you and EVO or Bank  Also, EVO and Bank may exercise their rights under this Agreement against the Reserve Account to collect any amounts due to EVO or Bank including, without limitation, rights of set-off and recoupment  In the event you submit a merchant application to EVO through the use of Insta-App, and EVO does not receive a completed written merchant application within 2 business days, you authorize EVO or Bank to hold all of your funds in the Reserve Account until the completed written merchant application and other required documentation is received by EVO  iii  Funds  Funds in the Reserve Account will remain in the Reserve Account for 270 calendar days following the later of termination of this Agreement or the last activity in your account, provided, however, that you will remain liable to EVO and Bank for all liabilities occurring beyond such 270 day period  After the expiration of the 270 day period EVO will provide you with written notification via nationally recognized delivery service advising you that the 270 day period has expired, requesting that you provide EVO with an address where the funds you have remaining in the Reserve Account should be delivered, and stating that in the event you fail to respond to this notification within 30 days, EVO will begin deducting a flat fee of $95 each month from the funds you have remaining in the Reserve Account  In the event you fail to respond to the notification, the $95 fee will then be deducted each month from the funds you have remaining in the Reserve Account  This fee will offset the administrative, clerical, legal, and risk management costs incurred by EVO to monitor the funds you have remaining in the Reserve Account beyond the 270 day period, and includes all monthly minimums and any other contractual fees that would ordinarily be assessed against your account pursuant to the terms of this Agreement  You agree that prior to the expiration of the 270 days, you will not use funds you have in the Reserve Account for any purpose, including but not limited to paying chargebacks, fees, fines, or other amounts you owe to EVO and/or Bank under this Agreement  EVO and Bank (and not Merchant) shall have control of the Reserve Account  iv  Assurance  In the event of a bankruptcy proceeding and the determination by the court that this Agreement is assumable under Bankruptcy Code 365, as amended from time to time, you must maintain funds in the Reserve Account in an amount satisfactory to EVO and Bank  C  Recoupment and Set Off  EVO and Bank have the right of recoupment and set-off  This means that they may offset or recoup any outstanding/uncollected amounts owed by you from: (i) any amounts they would otherwise be obligated to deposit into the Designated Account; (ii) any other amounts Bank or EVO may owe you under this Agreement or any other agreement; and (iii) any funds in the Designated Account or the Reserve Account  You acknowledge that in the event of a bankruptcy proceeding, in order for you to provide adequate protection under Bankruptcy Code 362 to EVO and Bank, you must create or maintain the Reserve Account as required by EVO and Bank, and EVO and Bank must have the right to offset against the Reserve Account for any and all obligations which you may owe to EVO and Bank, without regard to whether the obligations relate to Sales Drafts initiated or created before or after the filing of the bankruptcy petition  D  Remedies Cumulative  The rights and remedies conferred upon EVO and Bank in this Agreement, at law or in equity, are not intended to be exclusive of each other  Rather, each and every right of EVO and Bank under this Agreement, at law or in equity, will be cumulative and concurrent and in addition to every other right ''

**8. Fees and Other Amounts Owed EVO and Bank.**  A  Fees and Taxes  You will pay EVO fees for services, forms and equipment in accordance with the rates set forth on the Application  In addition, you will pay EVO a fee for research it performs at your request in an amount equal to $200 per hour, or $5 per statement  Such fees will be calculated and debited from the Designated Account each business day or month for the previous business day's or month's activity or will be netted out from the funds due you attributable to Sales Drafts presented to EVO and Bank  EVO and Bank reserve the right to adjust the fees set forth on the Application and in this Section, in accordance with Section 16 H, below  If you do not have an active account at the time of the request, payment by certified check or money order must be received prior to the release of the requested document copies or research results  You are also obligated to pay all taxes, and other charges imposed by any governmental authority on the services provided under this Agreement  With respect to Visa, MasterCard, Discover, and American Express products, you may elect to accept credit cards or debit/prepaid cards or both  You shall so elect on the Merchant Application being completed contemporaneously herewith  You agree to pay and your account(s) will be charged pursuant to Section 6  A of this Agreement for any additional fees incurred as a result of your subsequent acceptance of transactions with any Visa, MasterCard, Discover, or American Express product that you have elected not to accept  B  Other Amounts Owed EVO and Bank  You will immediately pay EVO and Bank any amount incurred by EVO and Bank attributable to this Agreement including but not limited to chargebacks, fines and penalties imposed by Visa, MasterCard, Discover or American Express (including but not limited to fines and penalties related to PCI DSS), non-sufficient fund fees, and ACH debits that overdraw the Designated Account or Reserve Account, or are otherwise dishonored  You authorize EVO and Bank to debit via ACH the Designated Account or any other account you have at Bank or at any other financial institution for any amount you owe EVO or Bank under this Agreement or under any other contract, note, guaranty, instrument or dealing of any kind now existing or later entered into between you and EVO or Bank, whether your obligation is direct, indirect, primary, secondary, fixed, contingent, joint or several  In the event EVO or Bank demand sums due or such ACH does not fully reimburse EVO and Bank for the amount owed, you will immediately pay EVO and Bank such amount  C  Merchant Supply/Replacement Program  Merchant is responsible for purchasing all supplies required to properly process credit card transactions (sales slips, printer rolls, etc )  If Merchant elects to participate in EVO's Supply/Replacement Program, Merchant understands that it is entitled to a maximum of 6 rolls of paper and 2 printer ribbons per month  It is Merchant's responsibility to contact EVO each month to order supplies  EVO will only provide Merchant with supplies for the current month, and Merchant's failure to place an order with EVO will constitute a waiver of its right to receive supplies for that month under the Supply/Replacement Program  Quantity of supplies provided is at the discretion of EVO  Enrollment in EVO's Supply/Replacement Program also entitles Merchant to free refurbished replacement equipment after EVO has collected 3 monthly payments from Merchant (merchant is responsible for all shipping costs)  A separate program is required for each terminal Merchant may have  If Merchant's terminal type is unavailable, at EVO's discretion, a substitute may be provided  EVO's Supply/Replacement Program does not include labor, parts, or expenses necessary to replace or repair equipment damaged by fire, flood, accident, improper voltages, misuse of equipment, service performed by persons other than EVO representatives, and/or failure to continually maintain a suitable operating environment for the equipment  EVO may choose to cancel Merchant's Supply/Replacement Program at any time without notice  This program is nontransferable without written consent  Maintenance is not available for any wireless terminals

**9. Application, Indemnification, Limitation of Liability.**  A  Application  You represent and warrant to EVO and Bank that all information in the Application is correct and complete  You must notify EVO in writing of any changes to the information in the Application, including but not limited to: any additional location or new business, the identity of principals and/or owners, the form of business organization (e.g , sole proprietorship, partnership, etc ), type of goods and services provided and how sales are completed (i e , by telephone, mail, or in person at your place of business)  The notice must be received by EVO within 10 business days of the change  You will provide updated information to EVO within a reasonable time upon request  You are liable to EVO and Bank (as applicable) for all losses and expenses incurred by EVO and/or Bank arising out of your failure to report changes to it  Bank and EVO may immediately terminate this Agreement upon notification by you of a change to the information in the Application  B  Indemnification  You will hold harmless and indemnify EVO and Bank, their employees and agents (i) against all claims by third parties arising out of this Agreement, and (ii) for all attorneys' fees and other costs and expenses paid or incurred by EVO or Bank in the enforcement of the Agreement, including but not limited to those resulting from any breach by you of this Agreement and those related to any bankruptcy proceeding  C  Limitation of Liability  Any liability of EVO or Bank under this Agreement, whether to you or any other party, whatever the basis of the liability, shall not exceed in the aggregate the difference between (i) the amount of fees paid by you to EVO and Bank during the month in which the transaction out of which the liability arose occurred, and (ii) assessments, chargebacks, and offsets against such fees which arose during such month  In the event more than one month is involved, the aggregate amount of EVO and Bank's liability shall not exceed the lowest amount determined in accord with the foregoing calculation for anyone month involved  Neither EVO, Bank nor their agents, officers, directors, or employees shall be jointly liable to you under this Agreement or liable for indirect, special, or consequential damages  Neither EVO nor Bank will be responsible or liable for any damages you incur that arise from a terminal that has been downloaded by a third party  D  Performance  EVO and Bank will perform all services in accordance with this Agreement  EVO and Bank make no warranty, express or implied, regarding the services, and nothing contained in the Agreement will constitute such a warranty  EVO and Bank disclaim all implied warranties, including those of merchantability and fitness for a particular purpose  No party will be liable to the others for any failure or delay in its performance of this Agreement if such failure or delay arises out of causes beyond the control and without the, fault or negligence of such party  Neither EVO nor Bank shall be liable for the acts or omissions of any third party  E  Representations By Salespersons  All salespersons are independent contractors, and are not agents, employees, joint venturers, or partners of EVO or Bank  Any and all representations and/or statements made by a salesperson are made by them in their capacity as an independent contractor, and cannot be imputed to EVO or Bank  EVO and Bank absolutely no liability or responsibility for any representations and/or statements made to you by any sales representative

**10. Representations and Warranties. You represent and warrant to EVO and Bank at the time of execution and during the term of this Agreement the following.**  A  Information  You are a corporation, limited liability company, partnership or sole proprietorship validly existing and organized in the United States  All information contained on the Application or any other document submitted to EVO or Bank is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant  You are not engaged or affiliated with any businesses, products or methods of selling other than those set forth on the Application, unless you obtain the prior written consent of EVO and Bank  B  Entity Power  Merchant and the person signing this Agreement have the power to execute and perform this Agreement  This Agreement and your performance hereunder will not violate any law, or conflict with any other agreement to which you are subject  C  No Litigation or Termination  There is no action, suit or proceeding pending or to your knowledge threatened which if decided adversely would impair your ability to carry on your business substantially as now conducted or which would adversely affect your financial condition or operations  You have never entered into an agreement with a third party to perform credit or debit card processing which has been terminated by that third party  D  Transactions  All transactions are bona fide  No transaction involves the use of a Card for any purpose other than the purchase of goods or services from you nor does it involve a Cardholder obtaining cash from you unless allowed by the Rules and agreed in writing with EVO and Bank  EVO may choose to cancel Merchant's Supply/Replacement Program at any time without notice  This program is non-transferable without written consent  Maintenance is not available for any wireless terminals  E  Rule Compliance  You will comply with the Laws and Rules  Without limiting the generality of the foregoing, each sales transaction submitted hereunder and the handling, retention, and storage of information related thereto, will comply with the rules and regulations of Visa, MasterCard, Discover, American Express, and any other card association or network organization related to cardholder and transaction information security, including, without limitation Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program (CISP), MasterCard's Site Data Protection Program (SDP), American Express' Merchant Data Security Requirements (MDSR), and Payment Application Best Practices

**11. Audit and financial information.**  A  Audit  You authorize EVO or Bank to audit your records to confirm compliance with this Agreement, as amended from time to time  You will obtain, and will submit a copy of, an audit of your business when requested by EVO or Bank  B  Financial Information  i  Authorizations  You authorize EVO or Bank to make any business or personal credit inquiries they consider necessary to review the acceptance and continuation of this Agreement  You also authorize any person or credit reporting agency to compile information to answer, those credit inquiries and to furnish that information to EVO and Bank  ii  Documents  You will provide EVO or Bank personal and business financial statements and other financial information as requested from time to time  If requested, you will furnish within 120 calendar days after the end of each fiscal year to EVO and Bank a financial statement of profit and loss for the fiscal year and a balance sheet as of the end of the fiscal year

**12. Third Parties.**  A  Services  You may be using special services or software provided by a third party to assist you in processing transactions, including authorizations and settlements, or accounting functions  You are responsible for ensuring compliance with the requirements of any third party in using their products  This includes making sure you have and comply with any software updates  EVO and Bank have no responsibility for any transaction until that point in time EVO or Bank receive data about the transaction  B  Use of Terminals Provided by Others  You will notify EVO and Bank immediately if you decide to use electronic authorization or data capture terminals or software provided by any entity other than EVO and Bank or its authorized designee (Third Party Terminals") to process transactions  If you elect to use Third Party Terminals or payment software provided by others you agree (i) the third party providing the terminals will be your agent in the delivery of Card transactions to EVO and Bank; and (ii) to assume full responsibility and liability for any failure of that third party to comply with the Rules and this Agreement  Neither EVO nor Bank will be responsible for any losses or additional fees incurred by you as result of any error by a third party agent, or a malfunction of your credit card terminal, including but not limited to Third Party Terminals ^

**13. Term and Termination.**  A  Term  This Agreement shall become effective ("Effective Date") only upon acceptance by EVO and Bank, or upon the submission of a transaction by you to EVO, whichever event shall occur first  The Agreement will remain in effect for a period of 3 years ("Initial Term") and will renew for successive 1 year terms ("Renewal Term") unless terminated as set forth below  B  Termination  The Agreement may be terminated by Merchant at any time during the initial or any renewal term of this agreement provided Merchant does so in strict adherence to the Termination Procedure contained herein  Further, this Agreement may be terminated by EVO or Bank at any time with or without notice and with or without cause  C  Termination Procedure  Other than for cause, Merchant may only terminate this Agreement in writing 60 days in advance of accepting any competing service provider installation or system or effecting any changes that so ever to their card acceptance systems  D  Action upon Termination  i  Terminated Merchant File  You acknowledge that Bank is required to report your business name and the name of Merchant's principals to Visa, MasterCard, Discover and American Express when Merchant is terminated due to the reasons listed in the Rules  ii  Designated Account  All your obligations regarding accepted Sales Drafts will survive termination  You must maintain in the Designated Account and the Reserve Account enough funds to cover all chargebacks, deposit charges, refunds and fees incurred by you for a reasonable time, but in any event not less than the time specified in this agreement  You authorize EVO and Bank to charge those accounts, or any other account maintained under this Agreement, for all such amounts  If the amount in the Designated Account or Reserve Account is not adequate, you will pay EVO and Bank the amount you owe it upon demand, together with all costs and expenses incurred to collect that amount, including reasonable attorneys' fees  iii  Equipment  Within 14 business days of the date of termination, you must return all equipment owned by EVO and immediately pay EVO, any amounts you owe them for equipment costs  iv  Early Termination  If you choose to terminate this

Agreement and do not do so in strict adherence with the Termination Procedure defined herein, or EVO terminates this Agreement based upon your failure to comply with the terms and conditions contained herein, you will immediately pay EVO, as liquidated damages, a closure fee of $50  You agree that this fee is not a penalty, but rather is reasonable in light of the financial harm caused by the early termination of this Agreement

**14. Compliance With Laws And Rules.** You agree to comply with all rules and operating regulations issued from time to time by MasterCard, Visa, Discover and American Express (Rules"), and any policies and procedures provided by EVO or Bank  You further agree to comply with all applicable state, federal and local laws, rules and regulations ("Laws"), as amended from time to time  You will assist EVO and Bank in complying with all Laws and Rules now or hereafter applicable to any Card transaction or this Agreement  You will execute and deliver to EVO and Bank all instruments it may from time to time reasonably deem necessary  Without limiting the generality of the foregoing, you agree to comply with and be bound by the rules and regulations of Visa, MasterCard, Discover, American Express, and any other card association or network organization related to cardholder and transaction information security, including without limitation, Payment Card Industry Data Security Standards (PCI DSS), Visa's Cardholder Information Security Program, MasterCard's Site Data Protection Program, and American Express' Merchant Data Security Requirements  You agree to cooperate at your sole expense with any request for an audit or investigation by EVO, Bank, a card association or network organization in connection with cardholder and transaction information security  You may also be assessed a monthly or annual PCI fee, which will appear as a separate item on your monthly statement  This fee is assessed by EVO in connection with EVO's efforts to comply with the PCI DSS and does not ensure your compliance with the PCI DSS or any law, rule or regulation related to cardholder data security  The payment of such fee shall not relieve you of your responsibility to comply with all rules and regulations related to cardholder data security, including without limitation the PCI DSS  Without limiting the generality of the foregoing, you agree to use information obtained from a cardholder in connection with a card transaction solely for the purpose of processing a transaction with that cardholder or attempting to re-present a chargeback with respect to such transaction  You will indemnify and hold EVO and Bank harmless from any fines and penalties imposed by Visa, MasterCard, Discover or any card association or network organization and any other fees and costs arising out of or relating to the processing of transactions by EVO and Bank at your location(s) and will reimburse EVO and Bank for any losses incurred by EVO with respect to any such fines, penalties, fees and costs  You also agree that you will comply with all applicable laws, rules and regulations related to the truncation or masking of cardholder numbers and expiration dates on transaction receipts from transactions processed at your location(s), including without limitation the Fair and Accurate Credit Transactions Act and applicable state laws ("Truncation Laws")  As between you, on the one hand, and EVO and Bank, on the other hand, you shall be solely responsible for complying with all Truncation Laws and will indemnify and hold EVO and Bank harmless from any claim, loss or damage resulting from a violation of Truncation Laws as a result of transactions processed at your location(s) "

**15. Use of Trademarks and Confidentiality** A Use of Trademarks  Your use of Visa, MasterCard, Discover, and American Express trademarks must fully comply with the Rules  Your use of Visa, MasterCard, Discover, American Express, or other cards' promotional materials will not indicate directly or indirectly that Visa, MasterCard, Discover, American Express, or others endorse any goods or services other than their own and you may not refer to Visa, MasterCard, Discover, American Express or others in stating eligibility for your products or services  B Merchant is hereby granted a limited non-exclusive, non-transferable license to use Discover brands, emblems, trademarks, and/or logos that identify Discover cards (Discover Program Marks")  You are prohibited from using the Discover Program Marks other than as expressly authorized in writing  You shall not use the Discover Program Marks other than to display decals, signage, advertising and other forms depicting the Discover Program Marks that are provided to you pursuant to this Agreement or otherwise approved in advance in writing  You may use the Discover Program marks only to promote the services covered by this Agreement by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by you must be approved in advance in writing  You shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by you are sponsored or guaranteed by the owners of the Discover Program Marks  You recognize that you have no ownership rights in the Discover Program Marks and shall not assign to any third party any of the rights to use the Discover Program Marks  C Confidentiality  i Cardholder Information  You will not disclose to any third party Cardholders' account information or other personal information except to an agent of yours assisting in completing a Card transaction, or as required by law  You must destroy all material containing Cardholders' account numbers, Card imprints, Sales Drafts, credit vouchers and (except for Sales Drafts maintained in accordance with this Agreement, Laws and the Rules)  Further, you must take all steps reasonably necessary to ensure Cardholder information is not disclosed or otherwise misused  ii Prohibitions  You will not use for your own purposes, will not disclose to any third party, and will retain in strictest confidence all information and data belonging to or relating to the business of EVO and Bank (including without limitation the terms of this Agreement), and will safeguard such information and data by using the same degree of care that you use to protect your own confidential information  iii Disclosure  You authorize EVO and Bank to disclose your name and address to any third party who requests such information or otherwise has a reason to know such information  D Return to EVO  All promotional materials, advertising displays, emblems, Sales Drafts, credit memoranda and other forms supplied to you and not purchased by you or consumed in use will remain the property of EVO and Bank and will be immediately returned to EVO upon termination of this Agreement  You will be fully liable for all loss, cost, and expense suffered or incurred by EVO and Bank arising out of the failure to return or destroy such materials following termination "

**16. General Provisions** A Entire Agreement  This Agreement, as amended from time to time, including the Rules and the completed Merchant Application, all of which are incorporated into this Agreement, constitute the entire agreement among the four parties hereto (other than any prior agreements to which Merchant is not a party), and all prior or other agreements to which Merchant is a party or representations, written or oral, made to Merchant are superseded  This Agreement may be signed in one or more counterparts, all of which, taken together, will constitute one agreement  B Exclusivity  During the initial and any renewal term of this Agreement, you will not enter into an agreement with any other entity that provides credit card or debit card processing services similar to those provided by EVO and Bank as contemplated by this Agreement without EVO and Bank's written consent  C Construction  The headings used in this Agreement are inserted for convenience only and will not affect the interpretation of any provision  The language used will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party  Any alteration or strikeover in the text of this pre-printed Agreement will have no binding effect, and will not be deemed to amend this Agreement  This Agreement may be executed by facsimile, and facsimile copies of signatures to this Agreement shall be deemed to be originals and may be relied on to the same extent as the originals  D Assignability  This Agreement may be assigned by EVO or Bank but may not be assigned by Merchant directly or by operation of law, without the prior written consent of EVO and Bank  Any such assignment in breach of this provision shall be null and void, ab initio  If Merchant nevertheless assigns this Agreement without the consent of EVO and Bank, the Agreement shall be binding upon the assignee  Bank will be immediately informed in writing of any such assignment  E Notices  Any written notice under this Agreement will be deemed received upon the earlier of: (i) actual receipt or (ii) five calendar days after being deposited in the United States mail, and addressed to the last address shown on the records of the sender

MEMBER BANK INFORMATION

Deutsche Bank AG, c/o Deutsche Card Services GmbH
Kaltenbornweg 1-3
50679 Cologne, Germany

+49 221 99577 777 Support deucs@db com

**Debit sponsorship** provided by either Wells Fargo Bank N A  or JP Morgan Chase N A , as applicable

F Bankruptcy  You will immediately notify EVO and Bank (i) of any bankruptcy, receivership, insolvency or similar action or proceeding initiated by or against Merchant or any of its principals and (ii) if it could reasonably be expected that any such action or proceeding will be initiated by or against Merchant or any of its principals  You will include EVO and Bank on the list and matrix of creditors as filed with the Bankruptcy Court whether or not a claim may exist at the time of filing  Failure to comply with either of these requirements will be cause for immediate termination or any other action available to EVO and Bank under applicable Rules or Law  G Choice of Law/Attorney's Fees/Venue/Jury Trial Waiver  Should it be necessary for EVO or Bank to defend or enforce any of its rights under this Agreement in any collection or legal action, you agree to reimburse EVO and/or Bank, or any agent acting on their behalf, as applicable, for all costs and expenses including reasonable attorney's fees, as a result of such collection or legal action  Without limiting the generality of the foregoing, you agree to reimburse EVO and/or Bank, or any agent acting on their behalf, as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by EVO, Bank or their agent in any action arising out of, relating to, or in connection with this Agreement, without regard to whether there has been an adjudication on the merits in any such action  You waive trial by jury with respect to any litigation arising out of, relating to, or in connection with this Agreement  EVO, Bank, you, and Guarantor agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out of, relating to, or in connection with this Agreement, (i) the relationships which result from this Agreement, or (iii) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement, shall be governed by the laws of the State of New York, notwithstanding any conflicts of laws rules (other than NY General Obligations Law Section 5-1401), and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties  EVO, Bank, you, and Guarantor agree that all actions arising out of, relating to, or in connection with (a) this Agreement, (b) the relationships which result from this Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement shall only be brought in either the courts of the State of New York sitting in Suffolk County or in the United States District Court for the Eastern District of New York, and hereby irrevocably and unconditionally submit to the personal jurisdiction of those courts in any such action  H Amendments  EVO will notify you on your monthly statement of any new or increased fees  Except for any fee increases imposed by Visa, MasterCard, Discover, American Express or the debit network, you may cancel the Agreement without charge if you object to fee changes in writing within 30 days  If you do not object, and continue to process for 30 days after receiving notice of the fee change, you will be deemed to assent to the new fees  I Severability and Waiver  If any provision of this Agreement is illegal, the invalidity of that provision will not affect any of the remaining provisions and this Agreement will be construed as if the illegal provision is not contained in the Agreement  Neither the failure nor delay by EVO or Bank to exercise, or partial exercise of, any right under this Agreement will operate as a waiver or estoppel of such right, nor shall it amend this Agreement  All waivers must be signed by the waiving party  J Independent Contractors  EVO, Bank and Merchant will be deemed independent contractors and will not be considered agent, joint venture or partner of the other, except as provided in 6 C and 7 A(ii)  K Employee Actions  You are responsible for your employees' actions while in your employment  L Survival  Sections 4 A, 4 B, 6, 7, 8, 9, 13 C, 15, and 16 G will survive termination of this Agreement

**17. E-statements** A Merchant Account Statement  Upon opening a merchant processing account you will automatically have access to your monthly merchant account statement electronically (an E-statement") by viewing it on line  This Agreement governs the electronic availability of your E-statement  You agree to abide by the terms and conditions stated herein, and to access E-statements, as well as all notices and initial and future disclosures regarding your E-statement, online  You acknowledge that by the third business day of each month, your E-statement will be available online  You will be notified in writing of the website where you can access your E-statement  Your E-statement will be accessible only through a secure Log In screen which requires the use of a unique User ID and Password  You understand that you will not receive a monthly merchant account statement by U S  postal mail, and that making your E-statement available online constitutes EVO's compliance with delivery of your monthly merchant account statement  You can print the E-statement or save the file to your computer's hard drive or other disk in order to retain a copy of the E-statement  Your E-statement can be accessed through the E-statement link for three consecutive months from the date the E-statement is first made available  You further agree to receive all initial and periodic account disclosure information in an electronic format  All such disclosures shall be provided in a clear, conspicuous manner that you can print and/or save using the hardware and software specified below  You are also entitled to obtain a paper copy of all disclosures or E-statements upon written request, however such a request does not constitute a withdrawal of consent to receive monthly E-statements  A fee may apply for providing such documentation  You understand that you may withdraw your consent to receive E-statements, or change your email address, upon 30 days written notice to EVO  Please note that a withdrawal of consent does not apply to an E-statement that was furnished before the date on which the withdrawal of consent becomes effective  PC Requirements: Viewing your E-statement on line requires a personal computer with Adobe Acrobat and internet access  Retrieving E-statements through a standard web browser  The product version levels must be supported by the respective vendors (i e , Adobe, Apple, Mozilla, and Microsoft)  EVO is not obligated to ensure that your E-statements are accessible through outdated vendor products  In the event you are unable to access any of the information that has been made available by EVO in electronic format, it is your obligation to notify EVO in writing immediately  B Reporting Of Errors  You must promptly view all E-statements, and immediately notify EVO in writing of any errors  Your written notice must include: (i) Merchant name and account number; (ii) the dollar amount of the asserted error; (iii) a description of the asserted error; and (iv) an explanation of why you believe an error exists and the cause of it, if known  That written notice must be received by EVO within 30 calendar days after the E-statement containing the asserted error is first made available  Your failure to notify EVO of any error within 30 days constitutes a waiver of any claim relating to that error  You may not make any claim against EVO for any loss or expense relating to any asserted error for 60 calendar days immediately following EVO's receipt of your written notice  During that 60 day period, EVO will be entitled to investigate the asserted error and we will notify you of the results of our investigation  C Miscellaneous  EVO shall not be responsible for: (i) consequential or incidental damages caused

by services performed by EVO, its agents, or your Internet Service Provider ("ISP"); (ii) damages arising from unauthorized access to E-statement services; or (iii) any costs associated with updating, modifying or terminating your software or hardware  EVO may change, suspend, or terminate all or any aspect of this service upon written notice to you  "

**18. Electronic Signatures** Under the Electronic Signatures in Global and National Commerce Act (E-Sign"), this Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when: (a) your electronic signature is associated with the Agreement and related documents, (b) you consent and intend to be bound by the Agreement and related documents, and (c) the Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i e , print or otherwise store the electronic record)  This Agreement and all related electronic documents shall be governed by the provisions of E-Sign  By pressing Submit, you agree: (i) that the Agreement and related documents shall be effective by electronic means, (ii) to be bound by the terms and conditions of this Agreement and related documents, (iii) that you have the ability to print or otherwise store the Agreement and related documents, and (iv) to authorize EVO or Bank to conduct an investigation of your credit history with various credit reporting and credit bureau agencies for the sole purpose of determining the approval of the applicant for merchant status or equipment leasing  This information is kept strictly confidential and will not be released  "

| MEMBER BANK INFORMATION |
|---|
| **Deutsche Bank AG**, c/o Deutsche Card Services GmbH, Kaltenbornweg 1-3, 50679 Cologne, Germany +49 221 99577 777, support.deucs@db.com<br>**Debit Sponsorship provided by either Wells Fargo Bank N.A. or JP Morgan Chase N.A.** |

| Deployment Information |
|---|

| Terminal, Software, Gateway Programming |
|---|
| Programming Type: |

| Card Transaction Types |
|---|
| Pin-based debit:<br>EBT:<br>Check service:<br>Gift or loyalty:<br>Wright Express:<br>Voyager: |

| Terminals, Software, and Gateways | | | | | | | |
|---|---|---|---|---|---|---|---|
| Description | Supplier | Refurb | IP | Wireless | Store and forward | Timed upload | Time |

| Printers | | | |
|---|---|---|---|
| Description | Quantity | Supplier | Refurbished |

| Pin Pads | | | |
|---|---|---|---|
| Description | Quantity | Supplier | Refurbished |
| *Every pin pad needs to be encrypted with our key, which means that every pin pad attached to a terminal needs to be provided by us. If we get back a **supported** pin pad to replenish our inventory we can provide a correctly encrypted pin pad to the merchant at no cost. The agent will be responsible for sending in the swapped pin pad within two weeks of deployment.* | | | |

| Check Readers | | | |
|---|---|---|---|
| Description | Quantity | Supplier | Refurbished |

| Shipping Info |
|---|
| Shipping method:          ,<br>Ship to:<br>Phone: |
| *We send welcome kits for each merchant, regardless of who supplies the equipment. We will normally not ship a kit for an ecommerce merchant, but we will send a welcome letter via email.* |

| Billing Info |
|---|
| Bill to:<br>Billing notes: |

| Other Services and Notes |
|---|

Document ID: Default-1000564448

## FTC/CID: Aspire, et al.
### Updated 11/14/17

| MID | A360MID | DBA | Open Date | Date Closed | Closure Reason |
|---|---|---|---|---|---|
| 8662 | 6679 | DIGITAL ALTITUDE | 10/17/2015 | 09/14/2016 | Excessive declines and processing $1 trials. On or about 8/4/16 the account flagged EVO's risk system for excessive declines. Excessive declines are noted when the declines to sales ratio is over 5%. Some of the possible reasons a merchant would experience excessive declines include: bad affiliate traffic source; the merchant is testing stolen cards; the merchant is attempting sales on previously declined cards; or there is another inexplicable reason for the decline ratio. In addition, $1 trials pose the following concerns:<br>(a) customers may think it is a one-time rather than a recurring $1 transaction;<br>(b) the merchant may do this as a way to lower their CB ratio to avoid triggering card scheme programs; and<br>(c) chargebacks resulting from $1 transactions would trigger a $25 CB fee which pose a significant financial burden on the merchant in a short period of time.<br>The existence of these two concerns - excessive declines and $1 trials - caused EVO to terminate the account. |
| 0333 | N/A | www.swingbounce.com | 10/30/2014 | 01/29/2015 | Risk - ACH Reject closed by Merchant |
| 7682 | N/A | DIGITAL ALTITUDE | 7/29/2016 Cancelled | 08/01/2016 Cancelled | Duplicate Application |
| 1109 | N/A | Digital Altitude | 9/22/2016 Cancelled | 09/23/2016 Cancelled | Duplicate Application |
| 4670 | N/A | Partnerwithmos | 1/11/2014 Cancelled | 01/13/2014 Cancelled | Duplicate Application |

EX 25
900

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
Pursuant to 28 U.S.C. § 1746

1.  I, _Ben Knoll_, have personal knowledge of the facts set forth below

and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by **Bright Market,**

**LLC, also d/b/a FastSpring**, and attached hereto.

The documents produced and attached hereto by **Bright Market, LLC, also d/b/a**

**FastSpring** are originals or true copies of records of regularly conducted activity

that:

a)  Were made at or near the time of the occurrence of the matters set forth by, or

from information transmitted by, a person with knowledge of those matters;

b)  Were kept in the course of the regularly conducted activity of **Bright Market,**

**LLC, also d/b/a FastSpring**; and

c)  Were made by the regularly conducted activity as a regular practice of **Bright**

**Market, LLC, also d/b/a FastSpring**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on _April 12_, 2017.

_Ben Knoll_
Signature

EX 26
901



FSSales    Home    Tasks ▾    Calendar    Dashboards ▾    Leads ▾    Accounts ▾    Opportunities ▾    Forecasts    Quotes

DETAILS    RELATED

⌄ Task Information

Assigned To                                          Related To
👤 Kevin Galanis                              ✎    Digital Altitude                              ✎

Subject                                              Name
Email: Re: FastSpring                         ✎    Mary Dee                                      ✎

Due Date                                             Type
12/29/2016                                    ✎    Email                                         ✎

Sales Engineer
                                              ✎

Comments ⓘ
From: kgalanis@fastspring.com (mailto:kgalanis@fastspring.com)
To: billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)
Cc:
Bcc:
Subject: Re: FastSpring
Body:
I will begin the account set up process immediately and get back to you shortly with the next steps.
On Thu, Dec 29, 2016 at 2:55 PM, Morgan Johnson < billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)
<mailto:billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)>> wrote:
Ok so just the BASE and RISE programs. How do we proceed?
Thanks,Morgan
On Thu, Dec 29, 2016 at 4:53 PM, Kevin Galanis < kgalanis@fastspring.com (mailto:kgalanis@fastspring.com) <mailto:kgalanis@fastspring.com
(mailto:kgalanis@fastspring.com)>> wrote:
Gotchya, so yeah we could process transactions for the classes but not the extra, more custom, add on's to your service.
On Thu, Dec 29, 2016 at 2:39 PM, Morgan Johnson < billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)
<mailto:billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)>> wrote:
Our program in pre-recorded but, we do offer additional additional training calls etc.
On Thu, Dec 29, 2016 at 4:37 PM, Kevin Galanis < kgalanis@fastspring.com (mailto:kgalanis@fastspring.com) <mailto:kgalanis@fastspring.com
(mailto:kgalanis@fastspring.com)>> wrote:
Hi Morgan,
Thank you for the information. FastSpring is geared towards processing transactions for digital goods and services that are available immediately
upon purchase. So the custom coaching and training calls are not something we would be able to process transactions for through our platform. If
the classes are pre-recorded and available on demand, we would be able to help with that. Please let me know if you would like to move forward,
happy to help.
Best regards,
Kevin Galanis
On Thu, Dec 29, 2016 at 12:37 PM, Morgan Johnson < billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)
<mailto:billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)>> wrote:
Hello Kevin,Here is our product listing. Please let me know if you have any questions.

F01-AW-0007638                                                                              EX 26
                                                                                           902

ASPIRE- Monthly $37, $67 or $127 ($67/$127 package comes with additional training calls, live Q&A and a personal coach)

BASE: Digital Business Mastery Course (597)

BASE helps you "come out swinging" in those crucial early days, with shortcuts, tools and resources to fast track your digital business' success.

RISE: Digital Business Mastery Course (1997)

RISE provides you with the key mindsets and concepts developed by top marketers for success, along with traffic, tools and resources to fast track your digital business' growth.

Thanks,

Morgan

On Thu, Dec 29, 2016 at 2:31 PM, Kevin Galanis < kgalanis@fastspring.com (mailto:kgalanis@fastspring.com) <mailto:kgalanis@fastspring.com (mailto:kgalanis@fastspring.com)>> wrote:

Hey Mary -

Thanks for signing up with FastSpring!

Let's setup a quick call to discuss or, if you prefer to start with email, tell me a bit more about your product(s).

FastSpring helps companies sell digital goods and subscriptions globally without having to worry about billing, local compliance / taxes, and the other headaches left to figure out with a simple payments only-platform. Check out this e-book http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=http%3A%2F%2Finfo.fastspring.com%2Fhidden_costs_ecommerce&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=http%3A%2F%2Finfo.fastspring.com%2Fhidden_costs_ecommerce&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e)> for a cost comparison.

Looking forward to hearing from you,

--

Kevin Galanis • Business Development Representative

FastSpring • www.fastspring.com (http://www.fastspring.com) <http://www.fastspring.com/ (http://www.fastspring.com/)>

o. +1 (805) 880-1953 <> • c. +1 (805) 409-9008 <>

2min intro <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e)> • LinkedIn <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e)> • Facebook <https://www.facebook.com/fastspring (https://www.facebook.com/fastspring)> • Twitter <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=35e49e8b-d925-4c65-de8a-f4b78127604e)>

--

Kevin Galanis • Business Development Representative

FastSpring • www.fastspring.com (http://www.fastspring.com) <http://www.fastspring.com/ (http://www.fastspring.com/)>

o. +1 (805) 880-1953 <> • c. +1 (805) 409-9008 <>

2min intro <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=718d66ab-e34b-482f-ed89-50580f025494 (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=718d66ab-e34b-482f-ed89-50580f025494)> • LinkedIn <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=718d66ab-e34b-482f-ed89-50580f025494 (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=718d66ab-e34b-482f-ed89-50580f025494)> • Facebook <https://www.facebook.com/fastspring (https://www.facebook.com/fastspring)> • Twitter <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=718d66ab-e34b-482f-ed89-50580f025494 (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=718d66ab-e34b-482f-ed89-50580f025494)>

--

Kevin Galanis • Business Development Representative

F01-AW-0007638

EX 26
903

Email: Re: FastSpring | Salesforce                                                                                   4/18/17, 8:36 AM

FastSpring • www.fastspring.com (http://www.fastspring.com) <http://www.fastspring.com/ (http://www.fastspring.com/)>

o. +1 (805) 880-1953 <> • c. +1 (805) 409-9008 <>

2min intro
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=1913b248-0256-4132-faaf-5c85ece5c862 (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=1913b248-0256-4132-faaf-5c85ece5c862)> • LinkedIn
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=1913b248-0256-4132-faaf-5c85ece5c862 (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=1913b248-0256-4132-faaf-5c85ece5c862)> •
Facebook <https://www.facebook.com/fastspring (https://www.facebook.com/fastspring)> • Twitter
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=1913b248-0256-4132-faaf-5c85ece5c862 (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=1913b248-0256-4132-faaf-5c85ece5c862)>

--

Kevin Galanis • Business Development Representative

FastSpring • www.fastspring.com (http://www.fastspring.com) <http://www.fastspring.com/ (http://www.fastspring.com/)>

o. +1 (805) 880-1953 <> • c. +1 (805) 409-9008 <>

2min intro
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=1c6e6f32-5eaa-43eb-fc4e-beabf91ceb5c (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=1c6e6f32-5eaa-43eb-fc4e-beabf91ceb5c)> • LinkedIn
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=1c6e6f32-5eaa-43eb-fc4e-beabf91ceb5c (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=1c6e6f32-5eaa-43eb-fc4e-beabf91ceb5c)> •
Facebook <https://www.facebook.com/fastspring (https://www.facebook.com/fastspring)> • Twitter
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=1c6e6f32-5eaa-43eb-fc4e-beabf91ceb5c (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=1c6e6f32-5eaa-43eb-fc4e-beabf91ceb5c)>

## ⌄ Additional Information

Status
Completed                                                                              ✏️

Priority
Normal                                                                                 ✏️

## ⌄ System Information

Created By                                              Last Modified By
Kevin Galanis, 12/29/2016 3:30 PM                       Kevin Galanis, 12/29/2016 4:14 PM

                                                        Category
                                                        Engaged

F01-AW-0007638

EX 26
904



Email: Welcome To FastSpring! Mary - Digital Altitude | Salesforce                                                                                                          4/18/17, 8:38 AM

DETAILS          RELATED

⌄ Task Information

Assigned To                                                          Related To
👤 Kevin Galanis                                          ✏️        Digital Altitude                                            ✏️

Subject                                                              Name
Email: Welcome To FastSpring! Mary - Digital Altitude     ✏️        Mary Dee                                                    ✏️

Due Date                                                             Type
12/30/2016                                                ✏️        Email                                                       ✏️

Sales Engineer
                                                          ✏️

Comments ⓘ
From: kgalanis@fastspring.com (mailto:kgalanis@fastspring.com)
To: billing@digitalaltitude.co (mailto:billing@digitalaltitude.co)
Cc: smcintosh@fastspring.com (mailto:smcintosh@fastspring.com)
Bcc:
Subject: Welcome To FastSpring! Mary - Digital Altitude
Body:
Welcome to FastSpring!
You have made the right choice! FastSpring is the full stack global e-commerce engine, flexible and fully loaded with everything you need both
now and in the future. We look forward to powering your growth and success!
Login URL: https://dashboard.fastspring.com (https://dashboard.fastspring.com) <https://dashboard.fastspring.com
(https://dashboard.fastspring.com)>Login Email: billing@digitalaltitude.co (mailto:billing@digitalaltitude.co) <mailto:billing@digitalaltitude.co
(mailto:billing@digitalaltitude.co)>Password: 9O83E5ECtiveCompany ID: digitalaltitude
Jumpstart your setup with FastSpring's Knowledge Base
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02
?t=https%3A%2F%2Fdocs.fastspring.com%2Fgetting-started-with-fastspring&si=5396018456428544&pi=e66634fe-3741-4e04-e134-
16275c16ad3c
(http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?
t=https%3A%2F%2Fdocs.fastspring.com%2Fgetting-started-with-fastspring&si=5396018456428544&pi=e66634fe-3741-4e04-e134-
16275c16ad3c)>. You can learn about storefront options, watch short help videos
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02
?t=https%3A%2F%2Fdocs.fastspring.com%2Fvideo-tutorials&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c
(http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?
t=https%3A%2F%2Fdocs.fastspring.com%2Fvideo-tutorials&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c)>, and if
you are a </> dev type check out FastSpring's API
<http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02
?t=https%3A%2F%2Fdocs.fastspring.com%2Fintegrating-with-fastspring%2Ffastspring-api&si=5396018456428544&pi=e66634fe-3741-4e04-
e134-16275c16ad3c
(http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?
t=https%3A%2F%2Fdocs.fastspring.com%2Fintegrating-with-fastspring%2Ffastspring-api&si=5396018456428544&pi=e66634fe-3741-4e04-                                    ✏️

F01-AW-0007640                                                                              EX 26
                                                                                                905

e134-16275c16ad3c)> details.

Steve McIntosh will reach out to you shortly to help you determine the best package/options for your business, and then guide you through a step by step process to get you up and running. In the meantime, if you have any specific questions don't hesitate to email your account contact directly.

We're excited to help you take your e-commerce business to the next level.

Primary account contact: Steve McIntoshEmail: smcintosh@fastspring.com (mailto:smcintosh@fastspring.com) <mailto:smcintosh@fastspring.com (mailto:smcintosh@fastspring.com)>

--

Kevin Galanis • Business Development Representative

FastSpring • www.fastspring.com (http://www.fastspring.com) <http://www.fastspring.com/ (http://www.fastspring.com/)>

o. +1 (805) 880-1953 <> • c. +1 (805) 409-9008 <>

2min intro http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fvimeo.com%2F106828015&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c)> • LinkedIn <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Fwww.linkedin.com%2Fcompany%2Ffastspring&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c)> • Facebook <https://www.facebook.com/fastspring (https://www.facebook.com/fastspring)> • Twitter <http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c (http://t.sidekickopen06.com/e1t/c/5/f18dQhb0S7lC8dDMPbW2n0x6l2B9nMJW7t5XZs7fRNRPW4WzrhW3LyGy4W63RzZn56dw4Rf72XMgn02?t=https%3A%2F%2Ftwitter.com%2FFastSpring&si=5396018456428544&pi=e66634fe-3741-4e04-e134-16275c16ad3c)>

## ⌄ Additional Information

Status
Completed ✏

Priority
Normal ✏

## ⌄ System Information

Created By
Kevin Galanis, 12/30/2016 10:14 AM

Last Modified By
Kevin Galanis, 12/30/2016 10:14 AM

Category
Contacted

F01-AW-0007640

EX 26
906

From: **Steven Miller** <smiller@fastspring.com>
Date: Thu, Jan 12, 2017 at 9:13 AM
Subject: Digital Altitude notice
To: mjohnson@digitalaltitude.co

Dear Morgan,

I regret to inform you that our risk assessment team has reviewed your account and firmly decided that we cannot support your business model for the below reason.

**FastSpring does not process MLM-related transactions. As such, we cannot continue our business relationship with Digital Altitude.**

We will be terminating your account on our platform at 5:00pm Pacific on Friday. After that point, no additional transactions will be processed through your FastSpring store.

For transactions that have been processed to-date, Digital Altitude has two options. 1) We can refund all transactions processed to date by FastSpring; or 2) We will hold 100% of the funds thus far processed for 60 days to cover any chargeback and fraud liabilities FastSpring incurs from these transactions, at which point the balance of funds net of our fees will be remitted to Digital Altitude.

I apologize for the unfortunate news,

Steven

Steven Miller | Operations & Risk Manager
Tel: 1-877-327-8914
smiller@FastSpring.com
www.fastspring.com

F01 -AW-0007908

EX 26
907

**BRIGHT MARKET, LLC, D/B/A FASTSPRING'S
RESPONSE TO WRITTEN INTERROGATORIES IN CID ISSUED MARCH 29, 2017**

**C.     WRITTEN INTERROGATORIES**: For each Corporate Account, provide the following information:

1 . The date the account was opened and, for any account that was closed, the date and reason the account was closed;

**ANSWER:        First sale 1/4/2017;
                Last sale 1/13/2017;
                Terminated when we learned the MLM nature of their business, which
                wasn't obvious initially.**

2. The amount or percent of each transaction held by the Company in reserve, if any, and the current balance of any such reserve fund or account;

**Answer:        Reserve held
                Currently holding $87,157.48 in reserve.**

3. For each month, the total number and dollar amount of all transactions the Company processed through the account, including any transactions indirectly processed through another third party service provider;

**ANSWER:        January, 2017
                146 transactions totaling $202,192.00**

                **Included file DigitalAltitudeOrders.xlsx with details of each order and
                refund.**

4. For each month, the total number and dollar amount of Refunds, and the percentage of Refunds (compared against total transactions);

**ANSWER:        January, 2017
                4 refunds totaling $5,929.00**

5. For each month, the total number and dollar amount of Charge backs, and percentage of Chargebacks (compared against total transactions);

**ANSWER:        January, 2017
                2 chargebacks totaling $2,675.00**

6. For each month, the total number of Chargebacks organized by Chargeback Reason (include the Chargeback Reason Code);

**ANSWER:    Only 2 Chargebacks**

███████████ - **Code: 0083 - Fraudulent Transaction-Card Absent Environment**

███████████ **Code: 4853 - Cardholder Dispute-Defective/Not as Described**

7. For each month, the total number and dollar amount of Declined Transactions, and the percentage of Declined Transactions (compared against total attempted transactions);

**ANSWER:**      **January, 2017**
  **99 declined transactions for $154,726.00, details included in attachment dadeclines.xlsx**

8. For each month, the total number of Declined Transactions organized by the Declined Transaction Reason (include the Declined Transaction Reason Code);

**ANSWER:**      **Dump of ALL declines included in file dadeclines.xlsx**

9. The bank routing and account numbers, as well as the name, address, telephone number, and contact person at each financial institution, ISO, or other third party to or from which the Company transmitted, forwarded, or received funds or information about the Corporate Account;

**ANSWER:**      **Received subscription payment from Digital Altitude, referenced in receipt DAreceipt.pdf**

  **This was paid via Mastercard ending 1442 on Jan 11, 2017.  It was refunded on Jan 16 due to account termination.**

  **Proceeds of sales (minus FastSpring fees and reserve) were paid to Digital Altitude in a payment of $87,157.48 on March 6, via ACH to bank referenced in the file DAdestinationbank.pdf**

10. Whether the Company has provided processing, authorization, clearing, settlement, or transmission of payments other than credit or debit card transactions, including but not limited to Automated Clearinghouse ("ACH") payments, Remotely Created Checks ("RCCs"), or Remotely Created Payment Orders ("RCPOs").

**ANSWER:**      **5 Paypal transactions, all others were Credit Card.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 19 , 2017

*Ben Knoll*
Ben Knoll

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
### Pursuant to 28 U.S.C. § 1746

1.  I, Elizabeth Thompson _____, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by ProPay, Inc. (the "Company") and attached hereto.

3.  The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

    a)  Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    b)  Were kept in the course of the regularly conducted activity of the Company; and

    c)  Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.

Date: September 25, 2017                          _Elizabeth Thompson_

                                                 Signature

## Account Holder Information

Account Holder:  Mary Dee
Social Security Number:  ███████
Date of Birth: ███████
Address:  16192 Coastal Highway Lewes DE 19958
Phone Number:  ███████
E-mail Address:  Aspireprocessingllc@gmail.com
Application Date:  09/13/2016
Doing Business As:  Aspire Processing LLC

## Transaction Information

*no transactions processed*

## Account Notes

| Date | Note |
| --- | --- |
| 9/15/16 12:57 PM | Proactive Verifications - Sale of software against PSA. Closed. CL |
| 9/14/16 2:05 PM | Proactive Verifications - Requesting verification and biz docs. Sent email. MLF |
| 9/14/16 2:04 PM | See Fraud |
| 9/14/16 5:34 PM | Confirmed we recieved docs. gave timeframe for processing. |
| 9/15/16 12:57 PM | See Fraud |



**emailtopia** Response Manager Utilities

**Find Messages**          RE: Documents for Aspire Processing LLC (Thread:3432699)          Index

[ Search Again ] [ Back To List ]

| | | | |
|---|---|---|---|
| **Sent:** | Thu, 15 Sep 2016 12:56:06 -0600 (MDT) | **Thread:** | 3432699 |
| **From:** | verify <verify@propay.com> | **Mailbox:** | verify |
| **To:** | 'ASPIRE Processing' <aspireprocessingllc@gmail.com> | **Owner:** | Chris Leon |
| **Cc:** | | **Categories:** | |
| **Message ID:** 4553980 | | **Status:** | Sent |

✉ **Message:**                                                                                    Reply

Mary,

Thank you for your interest in ProPay.

Unfortunately, the business for which you would like to use ProPay's services has been deemed High Risk and so we cannot approve this account for you. If you would like to review this information, you will find it under the High Risk Transactions/Acceptable Use Policy on our website (https://epay.propay.com/legal/AcceptableUse.aspx).

We have canceled your account request but do encourage you look for another merchant for your business needs.
Good luck in all your processing endeavors.
Sincerely,

Chris| Verification Analyst| ProPay®, A TSYS® Company
P: 866.573.0951 | F: 801.341.5308
verify@propay.com | www.propay.com

Remember, never email your password, complete credit card numbers, or checking account information to anyone. If such information is required call us at 866-573-0951 Monday through Friday 6:30 AM to 7:00 PM MST.
If you require additional assistance, please respond to this email and include the text from all previous messages so that we may access the complete message history.
Please view our FAQ for answers to the most Frequently Asked Questions! www.propay.com/propay-support/frequently-asked-questions/

✉ Copy to Search Results folder

CONFIDENTIAL ProPay production to FTC September 8, 2017

[ Search Again ] [ Back To List ]

**PRO**PAY.

A TSYS® Company

CONFIDENTIAL

September 13, 2017

*Sent via Secure Email*

Carol Jones
c/o Laura Basford
Federal Trade Commission
600 Pennsylvania Avenue NW, Mailstop CC-8528
Washington, D.C. 20580
lbasford@ftc.gov

Re: Sworn Statement concerning Interrogatories in response to FTC Matter No. 1723060

Ms. Jones:

The undersigned is in receipt of your Civil Investigative Demand ("**CID**") dated August 18, 2017, and hereby re-submits ProPay's response to the Interrogatories[1] but this time with a sworn statement:

**B. Interrogatories**

1. **Identify the merchant associated with the Subject Account[2].**
   See Account Holder Information section at the top of exhibits B-E, respectively. This is the information provided at the time of sign-up. In particular, the line "Account Holder" shows the legal name and the dba is shown on the "Doing Business As" line.
   a.   Mary Dee – Mary Dee dba Aspire Processing LLC
   b.   RISE International – Lynn Cole dba RISE International
   c.   RISE Counseling – Jillian Morrison dba RISE Counseling & Consulting LLC
   d.   ASPIRE Center – Shana Nichols dba ASPIRE Center

2. **The date the subject account was opened.**
   See Account Holder Information section, "Application Date" line at the top of exhibits B-E.
   a.   Mary Dee – 9/13/16
   b.   RISE International – 8/29/13
   c.   RISE Counseling – 7/7/17
   d.   ASPIRE Center – 7/13/17

3. **Date account was closed, the date and reason the account was closed.**
   a.   Mary Dee – The account was closed as a result of the sign-up screening on 9/15/2016.
   b.   RISE International – this account remains open.
   c.   RISE Counseling – this account remains open.
   d.   ASPIRE Center – this account remains open.

4. **The amount ProPay held in reserve on each account, if any, and the current balance of such reserve account**
   a.   Mary Dee – no reserve was ever taken on this account.
   b.   RISE International – no reserve has been taken to date.
   c.   RISE Counseling – no reserve has been taken to date.

---

[1] This response to Interrogatories are subject to the same objections and conditions listed in ProPay's original response to the CID dated September 8, 2017.
[2] Note that "Mary Dee", "RISE International", "RISE Counseling" and "ASPIRE Center" reference the Subject Accounts more fully described in ProPay's Response to the CID dated September 8, 2017.

    d.   ASPIRE Center – no reserve has been taken to date.

5. **All banks and FIs associated with the merchant's account, including the BIN and time period such FI was associated with the account.**
   a. Mary Dee – there was no bank or FI information associated with this account.
   b. RISE International – A JPMorgan Chase Bank, NA Business Checking Account with Routing Number ███████ and an Account Number ending in ████ 0193. See exhibit B for dates this account was used (see "Routing # and Checking # columns). Note that our system does not store this information for transactions over two years old, so where the Routing # and Checking # show "NULL" on a withdrawal our system no longer stores this information.
   c. RISE Counseling – A Westerra Credit Union Business Checking Account with Routing Number ███████ and an Account Number ending in ████ 3740. See exhibit D for the information surrounding the only withdrawal to this account on August 24, 2017.
   d. ASPIRE Center – A Chase Business Checking Account with Routing Number ███████ and an Account Number ████ 9356. See exhibit E for dates this account was used (see "Routing # and Checking # columns). Note that our system does not store this information for transactions over two years old, so where the Routing # and Checking # show "NULL" on a withdrawal our system no longer stores this information.

6. **All banks, FIS, payment processors, ISOs, or third parties to or from which ProPay transmitted, forwarded, or received funds relating to the merchant's account, and provide bank routing and account numbers to or from which the funds were transmitted, forwarded, or sent.**
   a. Mary Dee – there was no processing or transfers out on this account.
   b. RISE International – All transfers out are itemized in exhibit B, including routing and account numbers with each transaction.
   c. RISE Counseling – See the second transaction listed in exhibit D which included the routing and account numbers.
   d. ASPIRE Center – See 5(d) above, and exhibit E has transfers out as transactions, including routing and account numbers.

7. **State whether the merchant account was used for ACH or similar.**
   a. Mary Dee – there were no ACH transactions (or any transactions) on this account.
   b. RISE International – there have been no ACH transactions to date.
   c. RISE Counseling – there have been no ACH transactions to date.
   d. ASPIRE Center – there have been no ACH transactions to date.

I swear that the information I have provided on behalf of ProPay, Inc. in response to the CID is true and complete as of the date it was first submitted – September 8, 2017.

Sincerely,

*Elizabeth Thompson*

Elizabeth Thompson
Senior Staff Attorney
801-341-5625
elizabeth.thompson@propay.com

EX 27
914

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
### Pursuant to 28 U.S.C. § 1746

1.  I, _Caroline Leduc_, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by Pivotal Payments, Inc. (the "Company") and attached hereto.

3.  The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

    a)  Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    b)  Were kept in the course of the regularly conducted activity of the Company; and

    c)  Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _September 14, 2017_

Signature

EX 28
915



# Application Submission Form

☒**Strategic Account Program (SAP** High Priority Workflow**)**
☐**Non-SAP Account (**Normal workflow**)**

| For Internal Use: | |
|---|---|
| ☐   If on TSYS (Merrick or Wells) – Set up with Association, Agent & Chain Number **500145** | |

| | |
|---|---|
| **Partner Name :** | Vantage Payments LLC |
| **Agent ID in PL :** | A00010020 |
| **Referral Agent** (if applicable) **:** | |
| **Application Date :** | January 5, 2017 |
| **Merchant DBA :** | Digital Altitude |
| **Reason for SAP Submission :** | Restricted Merchant Type |

**Business Summary :**

Digital Altitude provides entrepreneurs with tools, systems, training and products to open their own online store.
Please see Executive Summary for product details.

**NOTES**:
Michael Force owns remaining 49%, DL is included in file.
Sales profile is 100% ecomm.
MOTO Questions: #8 – up to 30 days; #9 – Yes, monthly; #10 – Consumer;  #11 – Yes, Yes

Login Credentials:
www.my.aspiresystem.com
username: demo   password: demome

This merchant has statements on EMS, but have switched to MLS and on the MLS MID they are NOT running a trial offer like they were on EMS, which caused a spike in some CB's. On their MLS statements, you will see they are using a straight sale (which they will continue to do) and have had almost no chargebacks. Any large transactions over $1000 are always ran through ACH and not cards. They also use all fraud tools available and that has helped lower the CB's as well. We can also lower the volume to 1.5 million if that will help in anyway.



Here is the current MTD Sales showing it's still performing.

December MTD:

| MID | MTD Sales | MTD Trans qty | Avg Tick | MTD CB qty |
|---|---|---|---|---|
| ▇0739 | $1,741,770.54 | 7588 | $229.54 | 52 |

Business started in 2015, does not have taxes for 2014, and only 5 months of processing for EMS as they switched to MLS solely.

Is there also "remote coaching"?

The remote coaching would be coaches that are paired up with each customer. They have regular sessions via phone or skype.

**BBB**- the rating is not based on a consumer star rating as we have none of those. It's based solely on the BBB rating scale. They make up their own rules. All we can do is respond to their inquiries. I have asked my compliance team to go find those 2 unanswered complaints and make sure the BBB has our response

**Ripoff Report** - Report seems to be from someone angry that he couldn't promote before he finished his steps. We have a very strict policy around NOT allowing people to become an Affiliate until all their steps are completed. We also make no income guarantees. People are buying our training products. They can also partake in our Affiliate program. Neither of those factors means they are guaranteed income and we have our own procedures to follow to ensure that newbies aren't out there making income claims or "breaking the rules" before they can be an affiliate.

DO NOT SEND WELCOME KIT TO MERCHANT

**Email applications to:** merchantapp@merchant-support.com

**G globalonepay**
5000 Legacy Dr. Suite 320 Plano, TX 75024, 844 864-9590

MERCHANT APPLICATION AND AGREEMENT

**WESTAMERICA BANK**
3750 Westwind Blvd, Suite 201, Santa Rosa, CA  95403, 800 939-9942

| MERCHANT BUSINESS INFORMATION | DBA INFORMATION |
|---|---|
| | ☑ Check if DBA data same as Legal Information. If not indicate DBA name and complete section below |
| Name of Ownership Entity (Legal Name): **DIGITAL ALtitude, LLC** | DBA Name: **DIGITAL ALTITUDE LLC** |
| Corporate / Billing Address: **16192 Coastal Hwy** | Address: **16192 Coastal Hwy** |
| City: **Lewes** State: **DE** Zip: **19458** + Four (Zip + 4): | City: **Lewes** State: **DE** Zip: **19958** + Four (Zip + 4): |
| Telephone # (Landline): **800 820 7589**   Federal Tax ID: | Telephone # **800 820 7589** Fax #: |
| | Business Email: **Mdee@digitalaltitude.com** |
| IRS Tax Filing Name: (This is the business name you have used / will use to file taxes with IRS for your business.) **DIGITAL ALTitude LLC**   **7 0 5 4** | Merchant Customer Service # (If MOTO/Ecomm): ( **800** ) **820** - **7589** |
| How long in present business?   Years **1**   Months **6** | Product or Service Sold (explain in full): **Online business courses** |
| | Business Website: **digitalaltitude.com** |

| OWNERS OR OFFICERS (Ownership must be equal to or greater than 50%) - No P.O. Box # | | | | | |
|---|---|---|---|---|---|
| Title: **COO** | Email Address: **mdee@digital altitude.com** | | | Percent Ownership: **51** % |
| First Name: **MARU** | Last Name: **Dee** | | | Date of Birth: (mm/dd/yyyy) |
| Home Address: ███ Address 1 | | City: **Fort Worth** | State: **TX** | + Four (Zip + 4): |
| Home Tel. # | SSN: ███ | | Driver's Lic. #: ███ | State: **TX** |
| Title: | Email Address: | | | Percent Ownership: % |
| First Name: | Last Name: | | | Date of Birth: (mm/dd/yyyy): / |
| Home Address: | | City: | State: | Zip: | + Four (Zip + 4): |
| Home Tel. #:( ) - | SSN: | | Driver's Lic. #: | State: |

| BUSINESS PROFILE | VISA / DISCOVER® / MASTERCARD / AMEX SALES PROFILE (be as accurate as possible) | | |
|---|---|---|---|
| Type of Ownership:<br>☐ Sole Proprietorship  ☐ Partnership<br>☒ Limited Liability  ☐ Government<br>☐ Corporation  ☐ Non-Profit | Swipe: %   Ecomm: **100**%<br>MOTO/Keyed: **XXX** ks %<br>Total = 100% | VISA / DISCOVER / MASTERCARD<br>Monthly Volume: $ **2 Mil**<br>Average Ticket: $ **200** | AMEX<br>Monthly Volume: $ **1 mil**   High Ticket **$2500**<br>Average Ticket: $ **150** |

How many days until the cardholder receives the product or service from when the card is charged?  ☒ Same Day  ☐ 1-5  ☐ 6-15  ☐ 16-30  ☐ Over 30

### BANK DISCLOSURE

**DEFINITIONS:** "**Merchant Application**" means this Merchant Application between Westamerica Bank, "Bank", GlobalOnePay and Merchant.
"**Merchant Agreement**" means this Merchant Application once approved and accepted by Westamerica Bank together with the Terms and Conditions of the Merchant Agreement found at www.GlobalOnePay.com/WABM2M012016.

**Member Bank Information:** Westamerica Bank, 3750 Westwind Blvd, Suite 201, Santa Rosa, CA  95403, (800) 939-9942

**Important Member Bank Responsibilities:**
1. The Bank is the only entity approved to extend acceptance of Card Association products directly to a Merchant.
2. The Bank must be a principal (signer) to the Merchant Agreement.
3. The Bank is responsible for and must provide settlement funds to the Merchant.

4. The Bank is responsible for educating Merchants on pertinent Visa and MasterCard Rules with which Merchants must comply; but this information may be provided to you by Processor.
5. The Bank is responsible for all funds held in reserve.

**Important Merchant Responsibilities:**
1. Ensure compliance with cardholder data security and storage requirements.
2. Maintain fraud and chargebacks below Card Organization thresholds.

3. Review and understand the terms of the Merchant Agreement.
4. Comply with Card Organization rules.
5. Retain a signed copy of this Disclosure Page.

**Merchant Resources:**
Download "Visa Regulations" at: http://usa.visa.com/merchants/operations/op_regulations.html
www.GlobalOnePay.com/WABM2M012016.

Download "MasterCard Rules" at: http://www.mastercard.com/us/merchant/support/rules.html

The responsibilities listed above do not supersede terms of the entire Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the Visa Member - Westamerica Bank - is the ultimate authority should the Merchant have any problems.

Merchant Signature **X** _____   Title: **COO**   Date: **12/29/2016**

### PCI* AND PAYMENTS APPLICATION COMPLIANCE

1. Do you store credit card numbers?  ☐ Yes  ☒ No

2. If you use third party payment application that stores/transmits/processes cardholder data, provide name and version #: _____

*PCI Monthly Fee: $5 per LP, per month (Ecomm and MOTO if applicable); $9 per MID for Retail and MOTO if applicable per month. Additional PCI terms set out in the online Merchant Agreement.

**NOTE: ONLY APPLICATIONS THAT COMPLY WITH CARD BRAND SECURITY STANDARDS WILL BE PERMITTED.**

A list of valid applications is available at: www.pcisecuritystandards.org

### AMERICAN EXPRESS COMMUNICATION

☐ By checking this box, Merchant opts out of receiving future commercial marketing communications from American Express.

Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express.

Agent8002-WAB-M2M-27/05/16   GlobalOnePay is a registered ISO/SP of Westamerica Bank, Santa Rosa, CA   1/3

F01-AW-0010382

## CONTINUING PERSONAL GUARANTY PROVISION – PERSONAL GUARANTOR

By signing below, each individual or entity ("Guarantor") jointly and severally (if there is more than one Guarantor) and unconditionally guarantees to GlobalOnePay and BANK the prompt payment and full and complete performance of all obligations of the Merchant identified above under the Merchant Agreement, as amended from time to time, including, without limitation, all promises and covenants of the Merchant, and all amounts payable by the Merchant under the Merchant Agreement, including, without limitation, charges, interest, costs and other expenses such as attorney's fees and court costs. This means, among other things, that GlobalOnePay or BANK can demand performance or payment from any Guarantor if the Merchant fails to perform any obligation or pay what the Merchant owes under the Agreement. Each Guarantor agrees that his or her liability under this guaranty will not be limited or canceled because: (1) the Merchant Agreement cannot be enforced against the Merchant for any reason, including, without limitation, bankruptcy proceedings; (2) either GlobalOnePay or BANK agrees to changes or modifications to the Merchant Agreement, with or without notice to Guarantor; (3) GlobalOnePay or BANK releases any other Guarantor of the Merchant from any obligation under the Merchant Agreement; (4) any law, regulation, or order of any public authority affects the rights of either GlobalOnePay, the Merchant, or BANK under the Merchant Agreement; and/or (5) anything else happens that may affect the rights of either GlobalOnePay or BANK against the Merchant or any other Guarantor. Each Guarantor further agrees that: (a) GlobalOnePay and BANK each may delay enforcing any of its rights under this guaranty without losing such rights and hereby waives any applicable Statute of Limitations; (b) GlobalOnePay and BANK each can demand payment from such Guarantor without first seeking payment from the Merchant or any other Guarantor or from any security held by GlobalOnePay and/or the BANK; and (c) such Guarantor will pay all court costs, attorney's fees and collection costs incurred by either GlobalOnePay or the BANK in connection with the enforcement of the Merchant Agreement or this Guaranty, whether or not there is a lawsuit, and such additional fees and costs as may be directed by a court. If the Merchant is a corporation or limited liability company, this Guaranty must be executed by a principal or affiliate of Merchant. Guarantor agrees and acknowledges having read the Merchant Agreement found at www.GlobalOnePay.com/WABM2M012016.

Principal #1 Signature X: _____    Principal #2 Signature X: _____

Print Name: Mary Dee    Date: 12/26/2016 Print Name: _____   Date: _____

### ELECTRONIC DEBIT/CREDIT AUTHORIZATION

TR Code* _____    Account Number** _____    3 3 2 5

Name on Account Matches: ☑ DBA ☑ Legal

Please provide a pre-printed void business check or bank letter confirming your business account Transit # (ABA Routing) and Account # (DDA). By providing this information, you are authorizing the Bank to initiate ACH debit and credit transactions to said account.

### SCHEDULE A

Billing Options Requested: ☐ Daily ☑ Monthly    ☐ Next Day Funding Requested

| Card Type Accepted | Discount Rate | | | | Transaction Fee | | | Authorization Fee |
|---|---|---|---|---|---|---|---|---|
| | Qualified | Surcharge | | | Qualified | Mid-Qualified | Non-Qualified | |
| | | +Mid-Qualified | +Non-Qualified | | | | | |
| Visa, M/C, Discover Check Card | % | % | % | $ | $ | $ | $ | .25 |
| Visa, M/C, Discover Credit Card | % | % | % | $ | $ | $ | | |
| AMEX Credit Card | | % | % | $ | | N/A | $ | .25 |
| Visa, M/C, Discover Cost Plus | 5.99 % | EBT Per Item | $ | Existing EBT # | | | | |
| AMEX Cost Plus | 5.99 % | | | Visa, M/C, Discover Non-Qualified Surcharge | | % | | |
| PIN-Based (Online) Debit | $ | ☐ Debit Network Fees | | Existing Amex Acct # | | | | |

AMEX Network Fee: 0.15 %.
AMEX Non-Swiped Rate: 0.30 %.

### SERVICE FEES (Other fees may apply)

| | | | | | |
|---|---|---|---|---|---|
| Set-Up Fee | $ | Batch Fee | $ .25 | Address Verification | $ |
| Account on File Fee – Monthly | $ 15.00 | Wireless Activation Fee | $ | Gateway Setup Fee | $ |
| Annual Fee | $ 99 | Wireless Monthly Fee | $ | Gateway Transaction Fee | $ |
| Retrieval Fee | $ 10.00 | Auto Account Updater Monthly Fee | $ | Gateway Monthly Fee | $ |
| Chargeback Fee | $ 40 | Auto Account Updater Per Transaction | $ | Monthly Tokenization Per Card | $ |

### EQUIPMENT LEASE (Westamerica Bank is not a party to the Lease Agreement between First Data Global Leasing ("FDGL") and Merchant.)

| Quantity | POS Description | Lease Term | Total Monthly Lease Charge | |
|---|---|---|---|---|
| | | Months | $ | ☐ Terminal Insurance Program – Late fees or other charges may apply. Non-cancelable lease for full term indicated in Part Four of the online Merchant Agreement. FDGL Relationship Code: _____ |
| | | Months | $ | |
| | | Months | $ | |

### MERCHANT APPLICATION AND AGREEMENT ACCEPTANCE

By executing this Merchant Application and Agreement on behalf of the merchant described above ("Merchant"), the undersigned individual(s) represent(s), warrant(s), and acknowledge(s) that: (i) All information contained in this Merchant Application ("Application") is true, correct and complete as of the date of this Application; (ii) If the Merchant is a corporation, limited liability company, or partnership, the individual(s) executing this Application have the requisite legal power and authority to complete and submit this Application on behalf of the Merchant and to make and provide the acknowledgements, authorizations and agreements set forth herein on behalf of the Merchant and individually; (iii) The information contained in this Application is provided for the purpose of obtaining, or maintaining, a merchant account for the Merchant with the Bank and GlobalOnePay (collectively "Service Provider"); and Service Provider will rely on the information provided herein in its approval process and in settling the applicable Discount Rate, Approved Average Ticket, and Approved Monthly Payment Card Volume; (iv) Service Provider is authorized to investigate, other through its own agents or through credit bureaus/agencies, the credit of the Merchant and each person listed on this Application; (v) Service Provider will determine all rates, fees and charges and notify Merchant of the approved fees and by Merchant's submission and acceptance of Merchant's first settled transaction Merchant agrees to pay such approved fees, including those fees listed at section of fLO7 the attached Merchant Agreement; (vi) The Merchant Agreement will not take affect until Merchant has been approved by Service Provider and a merchant number has been issued to Merchant; and (vii) The undersigned has read and understood the Merchant Agreement, which is incorporated herein by reference and agrees on behalf of the Merchant to be bound by the terms of such Merchant Agreement. The merchant on whose behalf this Application is being submitted acknowledges that if this Application is being submitted to Westamerica Bank as the Member Bank, GlobalOnePay is also a party to this Merchant Agreement. In such case, Merchant acknowledges that GlobalOnePay will rely on the representations and warranties set forth in this Application for Merchant Agreement and unless otherwise specified or prohibited by Association or applicable law, GlobalOnePay will have all the rights of Westamerica Bank under this Merchant Application and Agreement.

You have the option of accepting MasterCard credit cards, Visa credit cards, American Express credit cards, Discover credit cards, MasterCard signature debit cards (MasterMoney Cards) or Visa signature debit cards (Check Cards), or debit cards issued by Discover. You may elect to accept any or all of these card types for payment. If you do not specifically indicate otherwise, your application will be processed to accept ALL MasterCard, Discover, American Express and Visa card types. Elected Visa, Discover, or MC card types NOT to accept: _____

**Merchant acknowledges having read and agreed to the terms and conditions of the online Merchant Agreement found at www.GlobalOnePay.com/WABM2M012016. If Merchant was unable to access such online agreement, Merchant acknowledges having been provided a copy by GlobalOnePay, and having read and agreed to same.**

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT: To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: when you open an account, we may ask you for information that will allow us to identify you, including a

| MERCHANT: | | BANK: | |
|---|---|---|---|
| Principal #1 Signature X: _____ | | By: _____ | Date: _____ |
| Print Name: Mary Dee | Date: 12/29/2016 | Name and Title: _____ | |
| Principal #2 Signature X: _____ | | GLOBALONEPAY: | |
| Print Name: _____ | Date: _____ | By: _____ | Date: _____ |
| | | Name and Title: _____ | |

Agent8002-WAB-M2M-27/05/16    GlobalOnePay is a registered ISO/SP of Westamerica Bank, Santa Rosa, CA    2/3

## ADDITIONAL CREDIT/SITE SURVEY INFORMATION – ALL MERCHANTS

| 1. Zone: ☒ Business District ☐ Industrial ☐ Residential | | 3. Approximate Square Footage: ☐ 0-250 ☐ 251-500 ☒ 501-2,000 ☐ 2,001 plus |
|---|---|---|
| 2. Location: ☐ Mall ☒ Office ☐ Home ☐ Shopping Area ☐ Mixed ☐ Apartment ☐ Isolated | | 4. Are all your products / services delivered immediately? ☒ Yes ☐ No<br><br>Agent Signature: |

### EQUIPMENT AND CODING

| ☐ Ship to DBA | | | | | | SHIPPING METHOD |
|---|---|---|---|---|---|---|
| ☐ Ship to Other Address | Address: | | | | | ☐ Regular (3 Day)   ☐ 2 Day |
| | City: | | State: | Zip: | + Four (Zip + 4): | ☐ Next Day   ☐ Overnight<br>Cost of shipping will vary depending on location and delivery options selected. |

| Multi-Merchant File Build:  ☐ Yes  ☐ No | | If yes, provide parent/child MIDs: | | Charge Equipment Cost to: ☐ Partner ☐ Merchant* |
|---|---|---|---|---|

| Terminal 1: PayCenter gateway | | | ☐ Free Terminal | ☐ Purchase from GlobalOnePay | ☐ Reprogram |
|---|---|---|---|---|---|
| Terminal 2: | | Quantity: | ☐ Free Terminal | ☐ Purchase from GlobalOnePay | ☐ Reprogram |
| Software/Gateway: NMI | | Version #: | ☐ GlobalOnePay Setup | ☒ Data Sheet Only | ☐ Purchase from GlobalOnePay |
| PIN Pad: | | Quantity: | ☐ Existing | ☐ Purchase from GlobalOnePay | |
| PivotalMOBILE Device: | | Quantity: | (1 Free Swiper per MID) | | |

| Default Terminal Settings:   ☐ RETAIL Setup    ☐ RETAIL with Tip Setup    ☐ MOTO/Ecomm Setup    ☐ Lodging Setup | | | | | |
|---|---|---|---|---|---|
| Prompt: | Disable: | | Prompt: | | Prompt: |
| PIN Based Debit | ☐ | | Auto Close Time: | | ☐  CVV On |
| Fraud Control Last Four Prompt | ☐ | | Tip at Time of Sale ☐ | | ☐  Small Ticket |
| Password Protect Refund | ☐ | | Capture Method:  Term / ☐ Host | | |

Communication Method:   ☐ Dial   ☐ IP   ☐ Wireless

For Wireless:   ☐ New Synapse SIM Card Required

Special Instructions:

### INTERNET, MOTO, FUTURE SERVICES QUESTIONNAIRE  (Required for Internet accounts, accounts with greater than 30% keyed transactions, and/or future delivery greater than 30 days)

1. What percentage of sales are: _____ % Businesses    100 % Individuals

2. Method of Marketing (check all that apply):   ☐ Direct Mail/Brochure/Catalog   ☐ Newspaper/Magazine   ☒ Social Media
☐ Television/Radio   ☒ Internet   ☐ Outbound Telemarketing   ☐ Phone Book/Yellow Pages   ☐ Trade Shows

3. Ecommerce Merchants - % of customer base:  100 % US    _____ % Canada    _____ % Other: _____ (Must Equal 100%)

4. Cards are charged on the:  ☒ Day of Order   ☐ Day of Shipment   ☐ Other: _____

5. If you have future delivery, do you require a deposit?   n/a     ☐ Yes  ☒ No
If yes, percent of sale required _____ % or flat fee $ _____
Is final payment due before fulfillment? Number of days: _____     ☐ Yes  ☒ No

6. Does your billing strategy involve automatic, negative option billing?     ☐ Yes  ☒ No

7. Does your business offer a product guarantee or warrantee?     ☒ Yes  ☐ No
If yes, is it a:  ☐ Replacement  ☒ Refund  ☐ Partial Refund

8. Refund Policy: Within # of Days:  ☒ Up to 30 days  ☐ 31-90 Days  ☐ Greater than 90 days  ☐ No Refunds

9. Does your business offer recurring billing?     ☒ Yes  ☒xxxx
If yes, what is the frequency?   ☐ Weekly  ☒ Monthly  ☐ Quarterly  ☐ Annually  ☐ Other: _____

10. How is the card payment information entered into the payment system? ☒xxxxent ☒ Consumer ☐ Other: _____

11. Is card payment information entered via the Internet?     ☒ Yes  ☒xxxxx
If yes, is the payment channel encrypted by SSL or better?     ☒ Yes  ☐ No

### INVENTORY/SHIPPING          ☒ Not applicable for services, virtual or downloadable products

12. Do you own the product/inventory?     ☒ Yes  ☐ No
If you do not own the product, who does? _____

13. Where is the product stored/shipped from? ☒ Business location  ☐ Own Warehouse  ☐ Fulfillment Center (If Fulfillment Center, provide company and contact information below)
Company Name: Digital Items          Contact Name: _____
Address: _____          Contact Phone: _____
City: _____ State: _____ Zip: _____          Contact Fax: _____

14. Method of delivery:  ☐ US Postal  ☐ Fedex  ☐ UPS  ☐ Courier  ☒ Other: _____

### TRADE REFERENCE (If Required)

15.  Company Name: _____          Contact Name: _____
Address: _____          Contact Title: _____
City: _____ State: _____ Zip: _____          Phone: _____

ks

F01-AW-0010382

EX 28
920



## Certificate Of Completion

Envelope Id: 366079FCE317437DA2675A6956DF7896

Subject: Please DocuSign: Digital Altitude West_America_Bank.pdf

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 3 | Signatures: 3 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Lyle Holland |
| AutoNav: Enabled | | Lyle@Thestewardgrp.com |
| EnvelopeId Stamping: Enabled | | IP Address: 10.102.101.11 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | |

Status: Completed

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Lyle Holland | Location: DocuSign |
| 12/29/2016 1:56:27 PM | Lyle@Thestewardgrp.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mary Dee | | Sent: 12/29/2016 1:57:37 PM |
| mdee@digitalaltitude.co | | Viewed: 12/29/2016 5:28:33 PM |
| Security Level: Email, Account Authentication (None) | | Signed: 12/29/2016 5:28:54 PM |
| | Using IP Address: 58.10.17.154 | |
| Electronic Record and Signature Disclosure: Accepted: 12/29/2016 5:28:33 PM ID: 882566dc-caff-4703-a623-4c713f171b15 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/29/2016 1:57:37 PM |
| Certified Delivered | Security Checked | 12/29/2016 5:28:33 PM |
| Signing Complete | Security Checked | 12/29/2016 5:28:54 PM |
| Completed | Security Checked | 12/29/2016 5:28:54 PM |

## Electronic Record and Signature Disclosure



2015   DELAWARE   2015
S CORPORATION RECONCILIATION
AND SHAREHOLDERS INFORMATION RETURN
FORM 1100S
FOR CALENDAR YEAR 2015

DO NOT WRITE OR STAPLE IN THIS AREA - REVENUE CODE 0093

for Fiscal year beginning   08 15 15   and ending   12 31 16

EMPLOYER IDENTIFICATION NUMBER

Name of Corporation
**Digital Altitude**

███ 7 0 5 4

Street Address
**16192 Coastal Hwy**

| City | State | Zip Code |
|---|---|---|
| **Lewes** | **DE** | **19958** |

CHECK APPLICABLE BOX:          AMENDED RETURN

Delaware Address if Different than Above
**16192 Coastal Hwy**

X   INITIAL RETURN       CHANGE OF ADDRESS       EXTENSION ATTACHED

| City | State | Zip Code |
|---|---|---|
| **Lewes** | **DE** | **19958** |

IF OUT OF BUSINESS, ENTER DATE HERE:

| State of Incorporation: | Nature of Business: |
|---|---|
| **DE** | **Education** |

DATE OF INCORPORATION:   03 10 15

ATTACH COMPLETE COPY OF FEDERAL FORM 1120S

1. Total Net Income from Delaware Form 1100S, Schedule A, Column B, Line 19 . . . . . . . . . . . . . . . . . . . .   1   107672

2. Subtractions:
   (a)  Net interest from U.S. securities to the extent included in Line 1 . . . . . . . . .   2a
   (b)  Wage deduction - Federal Jobs Credit . . . . . . . . . . . . . . . . . . . .   2b
   (c)  Total. Add Lines 2(a) and 2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2c
3. Line 1 minus Line 2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3   107672

4. Additions:
   (a)  Interest on obligations from any state except Delaware
        to the extent excluded from Line 1 . . . . . . . . . . . . . . . . . . . . . .   4a
   (b)  Depletion expense . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4b
   (c)  Charitable contributions included in Line 1 for which the Delaware Land & Historic
        Resource Conservation credit was granted . . . . . . . . . . . . . . . . . .   4c
   (d)  Total. Add Lines 4(a) through 4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4d
5. Distributive income.  Add Lines 3 and 4(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5   107672
6. Percentage of stock owned by non-residents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6   0.000000
7. Distributive income attributable to non-resident shareholders. (Multiply Line 5 by the percentage on Line 6) . . . . . . . . .   7
8. Tax due on behalf of non-resident shareholders (Line 7 x 6.60%) . . . . . . . . . . . . . . . . . . . . . . . . .   8
9. Estimated tax paid on behalf of non-resident shareholders from
   Delaware Form 1100P . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
10. Other payments (Attach schedule) . . . . . . . . . . . . . . . . . . . . . .   10
11. Approved income tax credits . . . . . . . . . . . . . . . . . . . . . . . . .   11
12. Total payments and credits. Add Lines 9 through 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
13. If Line 8 is greater than Line 12, enter BALANCE DUE AND PAY IN FULL. If Line 12 is greater than
    Line 8, the amount on Line 12 will be the amount of estimated tax proportionally claimed by the non-
    resident shareholder(s) upon the filing of their Delaware non-resident personal income tax return.  A
    refund will not be issued directly to the S Corporation for any overpayment of estimated tax paid on
    behalf of the non-resident shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief it is true, correct and complete.  If prepared by a person other than the taxpayer, the declaration is based on all information of which the preparer has any knowledge.

09-16-2016
Date                           Signature of Officer

09-16-2016           **Chris Knoth**
Date               Signature of individual or firm preparing the return

944 John Kennedy dr
Fort Worth TX       76179
                    Address

Email Address

MAKE CHECK PAYABLE AND MAIL TO:   Delaware Division of Revenue,
                                  P.O. Box 2044, Wilmington, DE  19899-2044

DF11215011024

F01-AW-0010417

EX 28
923

FORM 1100S
SCHEDULE A

**2015**
**DELAWARE S CORPORATION RECONCILIATION OF**
**ORDINARY INCOME TO TOTAL NET INCOME**

For Calendar Year 2015

for Fiscal year beginning   08  15   2015   and ending   12  31   2016

Name of S Corporation

Digital Altitude

EMPLOYER IDENTIFICATION NUMBER

███ 7 0 5 4

| | | | |
|---|---|---|---|
| 1. | Ordinary income (loss) from Federal Form 1120S, Schedule K, Line 1  . . . . . . . . . . . . . . . . . . | 107672 | 1. |
| 2. | Apportionment percentage from Delaware Form 1100S, Schedule 1-D, Line 8  . . . . . . . . . . . . . . | 100.000000 | 2. |
| 3. | Ordinary income apportioned to Delaware.  Multiply Line 1 times Line 2  . . . . . . . . . . . . . . . . | 107672 | 3. |

| | Column A<br>Total | Column B<br>Within Delaware | |
|---|---|---|---|
| 3(a).  Enter in Column A the amount from Line 1. | | | |
| Enter in Column B the amount from Line 3. | 107672 | 107672 | 3(a) |

ADDITIONS:

| | | | | |
|---|---|---|---|---|
| 4. | Net income (loss) from rental real estate activities, Federal Form 1120S, Schedule K, Line 2  . . | | | 4. |
| 5. | Net income (loss) from other rental activities, Federal Form 1120S, Schedule K, Line 3c  . . . . | | | 5. |
| 6. | Interest income from Federal Form 1120S, Schedule K, Line 4  . . . . . . . . . . . . . . | | | 6. |
| 7. | Dividend income from Federal Form 1120S, Schedule K, Line 5a  . . . . . . . . . . . . . | | | 7. |
| 8. | Royalty income from Federal Form 1120S, Schedule K, Line 6  . . . . . . . . . . . . . . | | | 8. |
| 9. | Net short term capital gain (loss) from Federal Form 1120S, Schedule K, Line 7  . . . . . . . . | | | 9. |
| 10. | Net long term capital gain (loss) from Federal Form 1120S, Schedule K, Line 8a  . . . . . . . . | | | 10. |
| 11. | Net gain (loss) under Section 1231 from Federal Form 1120S, Schedule K, Line 9  . . . . . . . | | | 11. |
| 12. | Other income (loss) (Attach schedule) from Federal Form 1120S, Schedule K, Line 10  . . . . | | | 12. |
| 13. | Total. Add Lines 3(a) through 12  . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107672 | 107672 | 13. |

SUBTRACTIONS:

| | | | | |
|---|---|---|---|---|
| 14. | Section 179 expense deduction from Federal Form 1120S, Schedule K, Line 11  . . . . . . . . | | | 14. |
| 15. | Charitable contributions from Federal Form 1120S, Schedule K, Line 12a  . . . . . . . . . | | | 15. |
| 16. | Other deductions from Federal Form 1120S, Schedule K, Line 12d  . . . . . . . . . . . . | | | 16. |
| 17. | Depletion expense included on Federal Form 1120S, Schedule K, Line 15e  . . . . . . . . . | | | 17. |
| 18. | Total.  Add Lines 14 through 17  . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 18. |
| 19. | Total Net Income (Loss). Line 13 minus Line 18  . . . . . . . . . . . . . . . . . . . . . | 107672 | 107672 | 19. |
| | Enter the amount from Column B on Delaware Form 1100S, Line 1 | | | |

(Revised 02/10/16)



DF11315011024

EX 28
924

**2015**                    **FORM 1100S**                    **PAGE 2**

SCHEDULE 1 - APPORTIONMENT PERCENTAGE

### Schedule 1-A - Gross Real and Tangible Personal Property

| Description | Within Delaware | | Within and Without Delaware | |
|---|---|---|---|---|
| | Beginning of Year | End of Year | Beginning of Year | End of Year |
| 1 Real and tangible property owned .. | | | | |
| 2 Real and tangible property rented (Eight times annual rental paid) .. | | | | |
| 3 Total .............. | | | | |
| 4 Less: Value at original cost of real and tangible property, the income from which is separately allocated (See Instructions) | | | | |
| 5 Total .............. | | | | |
| 6 Average value (See instructions) .. | | | | |

### Schedule 1-B - Wages, Salaries, and Other Compensation Paid or Accrued to Employees

| Description | Within Delaware | Within and Without Delaware |
|---|---|---|
| 1 Wages, salaries, and other compensation of all employees ................ | | |
| 2 Less: Wages, salaries, and other compensation of general executive officers ........ | | |
| 3 Total ........................................ | | |

### Schedule 1-C - Gross Receipts Subject to Apportionment

| Description | | |
|---|---|---|
| 1 Gross receipts from sales of tangible personal property ................. | | |
| 2 Gross income from other sources (Attach statement) ................. | | |
| 3 Total ........................................ | | |

### Schedule 1-D - Determination of Apportionment Percentage

1 Average value of real and tangible property within Delaware ...............
2 Average value of real and tangible property within and without Delaware ..........    =

3 Wages, salaries and other compensation paid to employees within Delaware ........
4 Wages, salaries and other compensation paid to employees within and without Delaware ...    =

5 Gross receipts and gross income from within Delaware .................
6 Gross receipts and gross income from within and without Delaware ...........    =

7 Total ...............................................

8 Apportionment percentage (See instructions) ........................................    100.000000

(Revised 12/19/15)



DF11215021024

EX 28
925



| FORM 1100S SCHEDULE A-1 | 2015 | S CORPORATION | 2015 |
| --- | --- | --- | --- |

**SHAREHOLDERS INFORMATION RETURN**

SHAREHOLDER'S SHARE OF INCOME, DEDUCTIONS & CREDITS
For Calendar Year 2015



for Fiscal year beginning    08 15 2015    and ending    12 31 2016

Shareholder's Identifying Number ▶ ████8966    S Corporation's Identifying Number ▶ ████7054

Shareholder's Name
Michael Force

S Corporation's Name
Digital Altitude

Street Address
340 S Lemon Ave 1994

Street Address
16192 Coastal Hwy

City          State  Zip Code
Walnut        CA 91789

City          State  Zip Code
Lewes         DE 19958

Percentage of Stock Owned 100.000000   %

| | Column A Resident | Column B Non-Resident | |
| --- | --- | --- | --- |
| 1.  Shareholder's portion of ordinary income (loss) from Delaware Form 1100S, Schedule A, Line 3(a) | 107672 | | 1. |

ADDITIONS:

| | | | |
| --- | --- | --- | --- |
| 2.  Net income (loss) from rental real estate activities, from Delaware Form 1100S, Schedule A, Line 4 . . | | | 2. |
| 3.  Net income (loss) from other rental activities, from Delaware Form 1100S, Schedule A, Line 5   . . . | | | 3. |
| 4.  Interest income from Delaware Form 1100S, Schedule A, Line 6   . . . . . . . . . . . . . . . | | | 4. |
| 5.  Dividend income from Delaware Form 1100S, Schedule A, Line 7   . . . . . . . . . . . . . . . | | | 5. |
| 6.  Royalty income from Delaware Form 1100S, Schedule A, Line 8   . . . . . . . . . . . . . . | | | 6. |
| 7.  Net short term capital gain (loss) from Delaware Form 1100S, Schedule A, Line 9   . . . . . . . . | | | 7. |
| 8.  Net long term capital gain (loss) from Delaware Form 1100S, Schedule A, Line 10   . . . . . . . . | | | 8. |
| 9.  Net gain (loss) under Section 1231 from Delaware Form 1100S, Schedule A, Line 11   . . . . . . . | | | 9. |
| 10.  Other income (loss) (Attach schedule) from Delaware Form 1100S, Schedule A, Line 12   . . . . . | | | 10. |
| 11.  Total. Add Lines 1 through 10   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107672 | | 11. |

SUBTRACTIONS:

| | | | |
| --- | --- | --- | --- |
| 12.  Section 179 expense deduction from Delaware Form 1100S, Schedule A, Line 14   . . . . . . . . | | | 12. |
| 13.  Charitable contributions from Delaware Form 1100S, Schedule A, Line 15   . . . . . . . . . . . . | | | 13. |
| 14.  Other deductions from Delaware Form 1100S, Schedule A, Line 16   . . . . . . . . . . . . | | | 14. |
| 15.  Depletion expense from Delaware Form 1100S, Schedule A, Line 17   . . . . . . . . . . . . | | | 15. |
| 16.  Total. Add Lines 12 through 15   . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 16. |
| 17.  Total Net Income (Loss). Line 11 minus Line 16   . . . . . . . . . . . . . . . . . . . . | 107672 | | 17. |

STATE MODIFICATIONS
SUBTRACTIONS:

| | | | |
| --- | --- | --- | --- |
| 18.  Net interest from U.S. Securities from Delaware Form 1100S, Line 2(a)   . . . . . . . . . . . | | | 18. |
| 19.  Wage deduction - Federal Jobs Credit from Delaware Form 1100S, Line 2(b)   . . . . . . . . . | | | 19. |



DF11415011024



EX 28
926



FORM 1100S
SCHEDULE A-1

2015        S CORPORATION        2015
SHAREHOLDERS INFORMATION RETURN

SHAREHOLDER'S SHARE OF INCOME, DEDUCTIONS & CREDITS
For Calendar Year 2015



for Fiscal year beginning        08 15  2015        and ending        12 31  2016

Shareholder's Identifying Number ▶ ██ 8309        S Corporation's Identifying Number ▶ ██ 7054

Shareholder's Name
Dalila Force

Street Address
████████████

City
Walnut

State  Zip Code
CA  ██

S Corporation's Name
Digital Altitude

Street Address
16192 Coastal Hwy

City
Lewes

State  Zip Code
DE  19958

Percentage of Stock Owned                %

|  | Column A Resident | Column B Non-Resident |  |
|---|---|---|---|
| 1.  Shareholder's portion of ordinary income (loss) from Delaware Form 1100S, Schedule A, Line 3(a) |  |  | 1. |
| **ADDITIONS:** |  |  |  |
| 2.  Net income (loss) from rental real estate activities, from Delaware Form 1100S, Schedule A, Line 4 . . |  |  | 2. |
| 3.  Net income (loss) from other rental activities, from Delaware Form 1100S, Schedule A, Line 5  . . . |  |  | 3. |
| 4.  Interest income from Delaware Form 1100S, Schedule A, Line 6 . . . . . . . . . . . . . . |  |  | 4. |
| 5.  Dividend income from Delaware Form 1100S, Schedule A, Line 7 . . . . . . . . . . . . . . |  |  | 5. |
| 6.  Royalty income from Delaware Form 1100S, Schedule A, Line 8 . . . . . . . . . . . . . . |  |  | 6. |
| 7.  Net short term capital gain (loss) from Delaware Form 1100S, Schedule A, Line 9 . . . . . . . . |  |  | 7. |
| 8.  Net long term capital gain (loss) from Delaware Form 1100S, Schedule A, Line 10 . . . . . . . . |  |  | 8. |
| 9.  Net gain (loss) under Section 1231 from Delaware Form 1100S, Schedule A, Line 11 . . . . . . . |  |  | 9. |
| 10.  Other income (loss) (Attach schedule) from Delaware Form 1100S, Schedule A, Line 12 . . . . . |  |  | 10. |
| 11.  Total. Add Lines 1 through 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  |  | 11. |
| **SUBTRACTIONS:** |  |  |  |
| 12.  Section 179 expense deduction from Delaware Form 1100S, Schedule A, Line 14 . . . . . . . . |  |  | 12. |
| 13.  Charitable contributions from Delaware Form 1100S, Schedule A, Line 15 . . . . . . . . . . . |  |  | 13. |
| 14.  Other deductions from Delaware Form 1100S, Schedule A, Line 16 . . . . . . . . . . . . |  |  | 14. |
| 15.  Depletion expense from Delaware Form 1100S, Schedule A, Line 17 . . . . . . . . . . . . . |  |  | 15. |
| 16.  Total. Add Lines 12 through 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  |  | 16. |
| 17.  Total Net Income (Loss). Line 11 minus Line 16 . . . . . . . . . . . . . . . . . . . . |  |  | 17. |
| **STATE MODIFICATIONS** |  |  |  |
| **SUBTRACTIONS:** |  |  |  |
| 18.  Net interest from U.S. Securities from Delaware Form 1100S, Line 2(a) . . . . . . . . . . . |  |  | 18. |
| 19.  Wage deduction - Federal Jobs Credit from Delaware Form 1100S, Line 2(b) . . . . . . . . . |  |  | 19. |



DF11415011024



Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is
attaching Form 2553 to elect to be an S corporation.

▶ Information about Form 1120S and its separate instructions is at www.irs.gov/form1120s.

OMB No. 1545-0123

**2015**

For calendar year 2015 or tax year beginning ____08-15____, 2015, ending ____12-31,2015____

| | |
|---|---|
| **A** S election effective date  08-15-2015 | |
| **B** Business activity code number (see instructions)  1000 | |
| **C** Check if Sch. M-3 attached ☐ | |

**TYPE OR PRINT**

Name  Digital Altitude

Number, street, and room or suite no. If a P.O. box, see instructions.  16192 Coastal Hwy

City or town, state or province, country, and ZIP or foreign postal code  Lewes      DE   19958

**D** Employer identification number  ▓▓▓7054

**E** Date incorporated  03-10-2015

**F** Total assets (see instructions)  $

**G** Is the corporation electing to be an S corporation beginning with this tax year?  ☒ Yes  ☐ No   If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☒ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . . . . . . . . . ▶   2

**Caution.** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | | |
|---|---|---|---|---|---:|
| **Income** | **1a** | Gross receipts or sales . . . . . . . . . . . . . | **1a** | 307,470 | |
| | **b** | Returns and allowances . . . . . . . . . . . . . | **1b** | | |
| | **c** | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . | | **1c** | 307,470 |
| | **2** | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . | | **2** | |
| | **3** | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . | | **3** | 307,470 |
| | **4** | Net gain (loss) from Form 4797, line 17 (attach Form 4797) . . . . . . . . | | **4** | |
| | **5** | Other income (loss) (see instructions - attach statement) . . . . . . . . | | **5** | |
| | **6** | **Total income (loss).** Add lines 3 through 5 . . . . . . . . . . . ▶ | | **6** | 307,470 |

| | | | | |
|---|---|---|---|---:|
| **Deductions** (see instructions for limitations) | **7** | Compensation of officers (see instructions - attach Form 1125-E) . . . . . | **7** | |
| | **8** | Salaries and wages (less employment credits) . . . . . . . . . . . . . | **8** | |
| | **9** | Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . | **9** | 712 |
| | **10** | Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | |
| | **11** | Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | 26,450 |
| | **12** | Taxes and licenses . . . . . . . . . . . . . . . . . . . . . . | **12** | |
| | **13** | Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | |
| | **14** | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **14** | |
| | **15** | Depletion **(Do not deduct oil and gas depletion.)**. . . . . . . . . . . | **15** | |
| | **16** | Advertising . . . . . . . . . . . . . . . . . . . . . . . . . | **16** | 5,287 |
| | **17** | Pension, profit-sharing, etc., plans . . . . . . . . . . . . . . . . | **17** | |
| | **18** | Employee benefit programs . . . . . . . . . . . . . . . . . . . | **18** | |
| | **19** | Other deductions (attach statement) . . . . . . . . . **Statement #2.** | **19** | 167,349 |
| | **20** | **Total deductions.** Add lines 7 through 19 . . . . . . . . . . . . ▶ | **20** | 199,798 |
| | **21** | **Ordinary business income (loss).** Subtract line 20 from line 6 . . . . . | **21** | 107,672 |

| | | | | |
|---|---|---|---|---:|
| **Tax and Payments** | **22 a** | Excess net passive income or LIFO recapture tax (see instructions) . . . | **22a** | |
| | **b** | Tax from Schedule D (Form 1120S) . . . . . . . . . . . . . . . | **22b** | |
| | **c** | Add lines 22a and 22b (see instructions for additional taxes) . . . . . | **22c** | |
| | **23 a** | 2015 estimated tax payments and 2014 overpayment credited to 2015 . . | **23a** | |
| | **b** | Tax deposited with Form 7004 . . . . . . . . . . . . . . . . | **23b** | |
| | **c** | Credit for federal tax paid on fuels (attach Form 4136) . . . . . . . | **23c** | |
| | **d** | Add lines 23a through 23c . . . . . . . . . . . . . . . . . . | **23d** | |
| | **24** | Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . ▶ ☐ | **24** | |
| | **25** | **Amount owed.** If line 23d is smaller than the total of lines 22c and 24, enter amount owed . . . . . | **25** | |
| | **26** | **Overpayment.** If line 23d is larger than the total of lines 22c and 24, enter amount overpaid . . . . | **26** | |
| | **27** | Enter amount from line 26 Credited to 2016 estimated tax ▶ _____ Refunded ▶ | **27** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

May the IRS discuss this return with the preparer shown below (see instructions)?  ☒ Yes  ☐ No

| | | |
|---|---|---|
| ▶ Signature of officer | Date | ▶ Title |

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name  Christopher J Knoth | Preparer's signature | Date  09-16-2016 | Check ☒ if self-employed   PTIN  p01426676 |
| Firm's name ▶ Indy Tax Prep | | | Firm's EIN ▶ |
| Firm's address ▶ 944 John Kennedy Dr  Saginaw TX 76179 | | | Phone no.  (817)718-1367 |

For Paperwork Reduction Act Notice, see separate instructions.

EEA

Form **1120S** (2015)

EX 28
928

**TASK 1**

05/01/17 11:39 **dlaframboise (private) :** From: Rebecca Reitzel
Sent: January-05-17 11:20 AM
To: Agent Applications
Subject: SAP Submission Digital Altitude

Hi Team,

Attached is the SAP Submission for Digital Altitude

NOTE an updated Fee page for the application is attached; Docusign Cert also included

Partner is Vantage

Thank you,
Rebecca Reitzel

05/01/17 11:44 **validate4 :** [TASK Validate Application CLOSED] - resolved

**TASK 2**

05/01/17 11:44 **System :**
Start gathering Owner Credit Report
06/01/17 14:09 **agibbon :** Application is declined due to chargeback levels & prohibited products (business opportunity).
06/01/17 14:17 **dhorikawa :** [TASK Underwrite Re-Opened] - Unresolving Underwrite
06/01/17 14:18 **agibbon :** [TASK Underwrite Re-Opened] - Unresolving Underwrite
06/01/17 14:18 **dhorikawa :** Account is declined due to chargeback levels and prohibited product/service type
06/01/17 14:18 **agibbon :** Application is declined due to chargeback levels & prohibited products (business opportunity).
06/01/17 14:19 **agibbon :** [TASK Underwrite Re-Opened] - Unresolving Underwrite
06/01/17 14:19 **agibbon :** Application is declined due to chargeback levels & prohibited products (business opportunity).
06/01/17 14:19 **agibbon :** [TASK Underwrite CLOSED] - Application is declined due to chargeback levels & prohibited products (business opportunity).

**TASK 3**

06/01/17 14:17 **dhorikawa :** [TASK Data Entry CLOSED] - Unresolving Underwrite
06/01/17 14:19 **vchornousko (private) :** Assoc code: 500145

**TASK 4**

06/01/17 14:31 **System :** No response has been received from the boarding system
06/01/17 14:32 **gcordova :** [TASK Review Processor Submission CLOSED] - Resolved - NO IMPACT

## ANSWER TO INTERROGATORIES

I, the undersigned, Ms. Rachael Sholes, employee for Pivotal Payments, provide the following answers to the Interrogatories requests received under a Civil Investigative Demand of the United States of America Federal Trade Commission (FTC Matter No. 1723060) (the "**CID**") under oath:

1. Amongst the list of merchant billing descriptors listed on page 2 of the CID, only Digital Altitude LLC and San Martin Specialty Shop ever had a merchant account with Pivotal Payments;

2. Regarding Digital Altitude LLC Account:

   a. The Account was open on January 5, 2017;
   b. The Account was closed on January 6, 2017;
   c. There is no transaction in the Account for Pivotal Payments to hold any amount in reserve;
   d. Pivotal Payments does not hold any amount in reserve for that Account;
   e. Digital Altitude LLC's application was denied due to chargeback levels & prohibited products and this Account was never boarded on any platform;
   f. No payments were processed by Pivotal Payments for this merchant.

3. Regarding San Martin Specialty Shop:

   a. The Account was open on December 7, 2011;
   b. The Account was closed on April 14, 2016;
   c. There is no transaction in the Account for Pivotal Payments to hold any amount in reserve;
   d. Pivotal Payments does not hold any amount in reserve for that Account;
   e. The sub-ISO on this Account was Pivotal Payments Inc., dba CPN, the ISO on this Account was First Data;
   f. No payments were processed by Pivotal Payments for this merchant.

4. I declare that the foregoing and all facts alleged therein are true.

AND I HAVE SIGNED:

*Rachael Sholes*

**Rachael Sholes**

Solemnly declared before me at
Montreal, this 11 day of September 2017

**Commissioner of Oaths, District of Montreal**

Commissaire à l'assermentation pour la Québec
Commissioner for Oaths for Québec
Caroline
Leduc
212179
and for outside of Québec
et pour l'extérieur du Québec



Fifth Third Bank
5050 Kingsley Dr.
MD 1MOC2Q
Cincinnati, Ohio 45263

LAURA BASFORD
FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE NW
MAILSTOP CC-8528
WASHINGTON          DC   20580-

**Fifth Third ID**          144922
**RE**          DIGITAL ALTITUDE LLC,  ASPIRE,  ASPIRE SYSTEMS,  ASPIRE SYSTEMS LLC,
          ASPIRE PROCESSING LLC,  RISE SYSTEMS & ENTERPRISES LLC,  THE
          UPSIDE LLC,  MARTIN MERRIMENT COMPANIES INC,  MICHAEL FORCE,
          MARY DEE,  MORGAN JOHNSON,  DIGITAL ALTITUDE CO,  DIGITAL ALTI

Tuesday, April 04, 2017

To Whom It May Concern:

The requested subpoena seeks information about accounts that are owned by Vantive LLC and
cannot be provided by Fifth Third Bank.  Please submit a subpoena to:

Vantiv, LLC
Attn: Legal Department
8500 Govenor's Hill Drive.
Symmes Township, OH 45249

Should you have any questions with regards to the response that you received in this
letter, please call Legal Operations at (513) 358-9355

Thank you,

Amy Kroll
Records Custodian
**Fax:**  (513) 358-1279

F01-AW-0007657

EX 29
931

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
Pursuant to 28 U.S.C. § 1746

1.   I, _____ Susan A. Dunn _____ , have personal knowledge of the facts set forth below

and am competent to testify as follows:

2.   I have authority to certify the authenticity of the records produced by **WePay, Inc.**, and

attached hereto.

The documents produced and attached hereto by **WePay, Inc.** are originals or true copies

of records of regularly conducted activity that:

a)   Were made at or near the time of the occurrence of the matters set forth by, or

from information transmitted by, a person with knowledge of those matters;

b)   Were kept in the course of the regularly conducted activity of **WePay, Inc.**; and

c)   Were made by the regularly conducted activity as a regular practice of **WePay,**

**Inc.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on _____ January 11, 2018 _____ , 20XX.

_____
Signature





**Nghi Cao <nghi@wepay.com>**

## Fwd: Digital Altitude, LLC - High Chargeback Rate
1 message

**Vinodh Poyyapakkam** <vinodhp@wepay.com>                           Tue, Jul 19, 2016 at 3:39 PM
To: Eric Saylor <erics@wepay.com>, Nghi Cao <nghi@wepay.com>, Ricky A <richard.anderson@wepay.com>

FYI

**Vinodh Poyyapakkam**
Director, Head of Risk Policy and Consulting



350 Convention Way, Suite 200
Redwood City, CA 94063

Payments partner to the platform economy

---------- Forwarded message ----------
From: **Daniel Schiffman** <daniels@wepay.com>
Date: Tue, Jul 19, 2016 at 3:35 PM
Subject: Digital Altitude, LLC - High Chargeback Rate
To: Carlos Wilson <carlos.wilson@infusionsoft.com>, Michael Jaramillo <michael.jaramillo@infusionsoft.com>, Jordan
Walker <jordan.walker@infusionsoft.com>, Brendan Mallon <brendan.mallon@infusionsoft.com>, Dina Bunting
<dinab@wepay.com>

Hi guys,

Risk just brought to my attention that Digital Altitude has experienced a consistent month over month increase in
chargeback percentage. So far this month, they have crossed over 1% month to date.

As of now, risk has informed me that we will need to terminate their processing on August 1st, and we will hold
approximately $300k for 120 days to cover future potential risk exposure.

Please let me know if you have any questions on this.

Thanks,



Daniel Schiffman
Technical Account Manager
350 Convention Way , Suite 200
Redwood City, CA 94063
Mobile:  **(510) 371-0718**

---

Senders Card  ?

**DANIEL SCHIFFMAN**
Technical Account Manager @ WePay



 **@WePay | 11K followers | 7K tweets** · 21 hours ago

The opportunities Silicon Valley doesn't see buff.ly/29DINFz pic.twitter.com/3rX1eNaLsl

F01-AW-0008353

EX 30
934

Vinodh is using Senders. View / edit your own Card

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
Pursuant to 28 U.S.C. § 1746

1. I, _____J. Brandon Simpson_____, have personal knowledge of the facts set forth

   below and am competent to testify as follows:

2. I have authority to certify the authenticity of the records produced by TSYS Merchant

   Solutions, LLC ("TMS") and attached hereto.

3. The documents produced and attached hereto by TMS are originals or true copies of

   records of regularly conducted activity that:

   a. Were made at or near the time of the occurrence of the matters set forth by, or

      from information transmitted by, a person with knowledge of those matters;

   b. Were kept in the course of the regularly conducted activity of TMS; and

   c. Were made by the regularly conducted activity as a regular practice of TMS.

4. I produced these records to First National Bank of Omaha pursuant to a legal request of

   the Federal Trade Commission.

I certify under penalty of perjury that the foregoing is true and correct.

   Executed on this _12th_ day of _January_, 2018.

   _____
   Signature

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION

)
)                    **FILE NO. 9923259**
)
)
)
)                    **DECLARATION OF PATRICK J. ICKES ON**
)                    **BEHALF OF  FIRST NATIONAL BANK OF**
)                    **OMAHA**
)

I, Patrick J. Ickes, state and declare as follows:

1.  I am over the age of 18 and submit this Declaration based on my own personal
    knowledge and in connection with the above-referenced matter.

2.  I am one of in-house counsel in the Legal Department for First National Bank of
    Omaha ("First National").  Among my duties, I am responsible for coordinating
    compliance with valid legal process.

3.  Pursuant to a Federal Trade Commission ("FTC") Civil Investigative Demand  issued
    to First National in connection with the above matter (the "FTC CID"), I conducted
    an investigation for the purpose of obtaining documents responsive to the FTC CID.
    This included requesting TSYS Merchant Solutions, LLC ("TMS") to provide me
    responsive materials from its systems and records.

4.  The materials I submitted to the FTC in response to the FTC CID were produced to
    me by TMS from its systems and records.  These materials are those attached to the
    Certification of Records of Regularly Conducted Activity executed by J. Brandon
    Simpson on January 12, 2018.

[Remainder of Page Intentionally Blank]

1

I certify under penalty of perjury that the foregoing is true and correct.

Dated this 12th day of January 2018.

By _____

Patrick J. Ickes,

Counsel for First National Bank of Omaha

2

MLS DIRECT NETWORK

**Merchant Application and Agreement**

111 Congress Ave, Ste 400 ♦ Austin, TX 78701
Tel: 1(877) 972-0700 ♦ Fax: 1(205) 278-8520

MLS Office: _____     Tel: _____
Sales Representative: _____     Fax: _____

## 1. Merchant Business (Federal Regulations require us to collect and retain information verifying a merchant's identity.)

### "Doing Business As" (DBA) Information

| | |
|---|---|
| Merchant DBA Name | Digital Altitude LLC |
| DBA Street Address (No PO Box or Paid Mail Box) | 16192 Coastal HWY |

| City | State | Zip Code |
|---|---|---|
| Lewes | DE | 19958 |

| Telephone | Fax | Start Date (MM/YYYY) |
|---|---|---|
| (800) 820-7589 | | 06/2015 |

| Primary DBA Contact Name | Merchant DBA Email Address |
|---|---|
| Mary Dee | mdee@digitalaltitude.co |

List DBA Related Websites
http://www.digitalaltitude.co/

### Legal Information (Sole Proprietor, use your personal information)

| | |
|---|---|
| Merchant Legal Name | Digital Altitude LLC |

| Federal Tax ID (EIN). Sole Proprietorship may use SSN | State of Formation |
|---|---|
| 7 0 5 4 | DE |

Legal Street Address (Fill in address if different than DBA)
16192 Coastal HWY

| City | State | Zip Code |
|---|---|---|
| Lewes | DE | 19958 |

| Telephone | Fax | Legal Email Address |
|---|---|---|
| (800) 820-7589 | | mdee@digitalaltitude.co |

| Ownership Type | Entity Taxed As |
|---|---|
| LLC | |

## 2. Merchant Profile

| Merchant Type | MCC Code | If Merchant Type is "Other" then Specify Below. If "Internet" Key in Websites |
|---|---|---|
| Internet - ECommerce | | |

Describe the Merchant's Products and / or Services
Online business courses

Have you ever been in bankruptcy?  ☐ Yes  ☒ No  If yes: Details: _____

## 3. Delivery of Statements, Chargeback Requests, and Retrieval Requests

**Statements:** ☐ Email  ☑ Mail  ☑ DBA  ☐ Legal

**Chargebacks:** Mail to: ☑ DBA  ☐ Legal

**Retrievals:** ☑ Mail to: ☑ DBA  ☐ Legal  ☐ Fax to:

## 4. Ownership Information (The Patriot Act requires that we obtain, verify and record information that identifies each signatory)

### Owner 1 (Individual or Legal Entity)

| Name (First, MI, Last) | % Ownership |
|---|---|
| Michael Force | 49 % |

| Social Security Number | Date of Birth | Title |
|---|---|---|
| | | CEO |

| Driver's License Number | DL State | Telephone |
|---|---|---|
| | FL | |

Home Address (No PO Box or Paid Mail Box)

| City | State | Zip Code |
|---|---|---|
| Miami | FL | |

### Owner 2 (Individual or Legal Entity)

| Name (First, MI, Last) | % Ownership |
|---|---|
| Mary DEE | 51 % |

| Social Security Number | Date of Birth | Title |
|---|---|---|
| | | COO |

| Driver's License Number | DL State | Telephone |
|---|---|---|
| | TX | |

Home Address (No PO Box or Paid Mail Box)
Address 1

| City | State | Zip Code |
|---|---|---|
| Fort Worth | TX | |

### Authorized Signer Name & Title (IF Non-Profit Organization, Publicly Owned Corporation, or Governmental Entity)

| Name of Authorized Representative | Title | Gov't Issued ID # | ID Type | Date of Birth |
|---|---|---|---|---|
| | | | | |

## 5. Funding and Account Information

| Bank Name | Account Type | Routing Number (ABA) | Account Number (DDA) |
|---|---|---|---|
| Bank of America | ☑ Checking  ☐ Savings | | 2263 |

Please provide a printed-voided check or bank letter that has the entity name, routing number (ABA) and Account Number (DDA), in accordance with the terms set out in the Terms and Conditions, transfer funds will be made to/from the account set forth in the enclosed voided check or bank letter.

## 6. Card and Payment Processing Information

Have you ever accepted credit cards? ☑ Yes ☐ No
(If Yes, please provide last 2 months processing statements)

Previous Processor
Powerpay, EMS,Stripe,Paypal

Reason for Leaving: ☐ Service ☐ Rate
☐ Terminated ☐ Other: still processing

### Average Annual Processing Volume

| Visa / MC | Discover | AMEX |
|---|---|---|
| 4,000,000 | 500,000 | 500,000 |

### Average Ticket

| Visa/MC/Discover | AMEX |
|---|---|
| 150 | 150 |

### High Ticket

| |
|---|
| 2,500 |

### High Month's Volume

| |
|---|
| 500,000 |

### Estimated Annual Card Transactions in Percentage (%)

| Swiped (Card Present) | Keyed (Card Present) | Mail or Phone | E-Commerce | Total | Business-to-Business | Business-to-Consumer | Total |
|---|---|---|---|---|---|---|---|
| % | % | 100 % | % | 100 % | % | 100 % | 100 % |

MLS Direct Network, Inc. is a registered ISO/MSP of First National Bank of Omaha, Omaha, NE

MLSDN 1601     Page 1 of 3

EX 31
939