

LODGED
CLERK, U.S. DISTRICT COURT

1/29/2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

January 29, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____AK_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

**Federal Trade Commission**,

Plaintiff,

vs.

**Digital Altitude LLC, et al.**,

Defendants.

No. LACV18-00729-JAK(MRWx)

FEDERAL TRADE COMMISSION'S EXHIBITS IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

**VOLUME V**

# Table of Contents

EX 35    Documents filed in *MOBE Ltd. v. Digital Altitude, LLC and Michael Force*, No. 2:16-CV-5708 (C.D. Cal.)............. 1032

EX 36    Documents filed in *Digital Altitude, LLC v. NetCents Technology, Inc.*, No. 2:17-CV-3345 (D. Ariz.) ................... 1128

EX 37    Documents filed in *Wealth Masters International, Ltd v. Jason "Jay" Kubassek, et al.*, No. 4:12-CV-3421 (S.D. Tex.) ........................................................................... 1143

# Exhibit 35

Tyson K. Hottinger (CA State Bar No. 253221; E-Mail: thottinger@mabr.com)
Kirk R. Harris (*pro hac vice* forthcoming; E-Mail: kharris@mabr.com)
Mark W. Ford (*pro hac vice* forthcoming; E-Mail: mford@mabr.com)
Quincy J. Chuck (CA State Bar No. 307857; E-Mail: qchuck@mabr.com)
MASCHOFF BRENNAN LAYCOCK GILMORE ISRAELSEN & WRIGHT PLLC
20 Pacifica, Suite 1130
Irvine, California 92618
Telephone:  (949) 202-1900
Facsimile:  (949) 453-1104

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| MOBE, LTD., a Malaysian company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Digital Altitude LLC, a Delaware limited liability company, Michael Force, an individual,<br><br>                    Defendants. | Civil Action No. 2:16-cv-05708<br><br>**COMPLAINT FOR:**<br><br>(1) Copyright Infringement<br>(2) Federal Theft of Trade Secrets<br>(3) Intentional Interference with Contractual Relations<br>(4) Intentional Interference with Prospective Economic Advantage<br>(5) Unfair Competition, California Bus. & Prof. Code §17200 *et seq.*<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiff MOBE, Ltd. (hereinafter "Plaintiff" or "MOBE") hereby complains

2    against defendants Digital Altitude LLC and Michael Force ("hereinafter, as "Digital

3    Altitude" and "Force," respectively, or collectively as "Defendants") and alleges as

4    follows:

5                          **THE PARTIES**

6    1.    Plaintiff MOBE, Ltd. is a Malaysian company having a principal place of

7    business located at Soho Suites at KLCC B1-28-8 NO.20, Jalan Perak, Kuala Lumpur,

8    50450, Malaysia.

9    2.    Defendant Digital Altitude is a Delaware limited liability company and, on

10   information and belief, has a principal place of business at 520 Broadway, Santa Monica,

11   California 90401.

12   3.    Defendant Force is an individual and, on information and belief, resides in

13   California.

14                   **JURISDICTION AND VENUE**

15   4.    By this civil action, MOBE seeks injunctive relief and damages for (a)

16   copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*, (b) theft of

17   trade secrets under 18 U.S.C. § 1836, *et seq.*, (c) intentional interference with contractual

18   relations, (d) intentional interference with prospective economic advantage, and (e) unfair

19   competition under California Business & Professions Code § 17200 *et seq.*

20   5.    This Court has original, "federal question" jurisdiction over MOBE's

21   copyright infringement and Federal theft of trade secrets claims pursuant to 28 U.S.C. §

22   1331 and 28 U.S.C. § 1338.

23   6.    This Court has pendent jurisdiction over MOBE's state law claims pursuant

24   to 28 U.S.C. § 1367.

25   7.    Digital Altitude has recreated and displayed copyrighted materials belonging

26   to MOBE, utilized misappropriated MOBE's trade secrets, and engaged in unfair

27   business practices within this judicial district and this Court's exercise of personal

28

1

1   jurisdiction over it is consistent with provisions of the Constitutions of the United States

2   and the State of California.

3        8.    Force is resident in and transacts business within this judicial district, and

4   has sold infringing materials, utilized misappropriated trade secrets, and engaged in

5   unfair business practices within this judicial district and this Court's exercise of personal

6   jurisdiction over him is consistent with provisions of the Constitutions of the United

7   States and the State of California.

8        9.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and

9   1400.

10   **GENERAL ALLEGATIONS**

11   **MOBE and its MTTB System**

12        10.    MOBE provides online business training courses, products, tools, and

13   services, to give customers the training, knowledge, and support needed to build

14   successful businesses online.

15        11.    One of MOBE's signature products is the "My Top Tier Business system"

16   ("MTTB System"), which is an industry leading online business training program and

17   business system.  The MTTB System consists of a 21-Step program containing

18   proprietary written materials, PowerPoint presentations, and videos for each of 21

19   separate steps.

20        12.    The MTTB System includes unique upselling opportunities to MOBE for

21   higher value training products.  These upselling opportunities result in significant source

22   of revenue for MOBE.

23        13.    In addition to the MTTB System, MOBE offers additional services and

24   products for sale, including additional training programs, seminars, and materials.

25        14.    The MTTB System was created by Matt Lloyd ("Lloyd"), the founder and

26   CEO of MOBE. He created the MTTB System in 2013, after many years of experience in

27   the field of Top Tier marketing.

28

2

15.　The MTTB System provides a step by step method for new business owners to rapidly build up a successful online business, utilizing traffic acquired by various methods, including traffic driven by sales of associated business training tools and courses, business mindset and how to promote the MOBE core products and events.

16.　The MTTB System provides valuable training on how to get high ticket commissions through a proven system, with MOBE providing training and services for a precise business system that would otherwise require a new business owner years to develop.

17.　Lloyd spend a significant amount of time and effort developing his MTTB System material, eventually drafting written documents that provide an outline for entrepreneurs and other business owners to follow.

18.　In April, 2013, Lloyd finalized these written materials in the form of twenty-one documents, ("21 Step Documents") each of which correspond to one of twenty-one steps that form the basis of the MTTB System.

19.　On or about July 12, 2016, MOBE submitted to the Register of Copyrights a completed application for registration, deposit copies, and the applicable fee in order to register the copyright to each of the 21 Step Documents.  Plaintiff will seek leave of court to amend its complaint to attach and incorporate by reference a copy of the certificate of copyright registration when it receives it.

20.　Lloyd wrote these steps in a script format. Lloyd created these documents knowing that they would eventually be used to create presentation-style slides and videos for each of the 21 steps in the MTTB System.

21.　The 21 Step Documents were published to MOBE's website on or around June 21, 2013, and were used as textual versions of the MTTB System until video presentations could be completed.

22.　In September of 2013, Force, who was then a sales representative for MOBE, was looking for expanded opportunities at MOBE and discussed his suitability for additional positions within MOBE.

EX 35
1035

23.   After meeting Force in person in September 2013, Lloyd agreed to expand Force's duties and responsibilities at MOBE.

24.   Specifically, Lloyd instructed Force to assist with several MOBE projects, including (1) completing the commercialization of the MTTB System, (2) updating the design of the website, and (3) redesigning MOBE's back office.

25.   With regard to completing the commercialization of the MTTB System, Lloyd instructed Force to create 21 separate videos ("2013 21 Step Videos") that covered the material contained in each of the 21 Step Documents. To that end, Lloyd gave Force two discrete tasks: first, create presentation-type slides for each of the 21 Step Documents; and second, make a video showing each of the presentation-type slides accompanied by audio corresponding to the information contained in the 21 Step Documents. In many cases, the audio is a verbatim recitation of language contained in the 21 Step Documents.

26.   Lloyd exercised full creative control over the creation of the 2013 21 Step Videos, having provided Force with the completed 21 Step Documents and giving Force specific instructions to follow.

27.   In recording the narration for the 2013 21 Step Videos, Force followed the script style 21 Step Documents and additional information given to him by Lloyd almost verbatim. Force did not make any significant additions or modifications to the material, and used diagrams that Lloyd provided and in the positions that Lloyd indicated.

28.   The only contributions to the 2013 21 Step Videos that Force provided— which were subject to artistic control and ultimate approval by Lloyd—were introductory slides and commentary summarizing what each step would cover, and a modified sales pitch during the final step.

29.   Throughout the 2013 21 Step Videos, Force acknowledges on several occasions that Lloyd is the owner and creator of MOBE and the MTTB System. For example, during the Step 1 video, Force states that Lloyd "slaved away for four years of his life in creating a system called MOBE."

EX 35
1036

1        30.    In October of 2013, Lloyd reviewed the finalized 2013 21 Step Videos and,

2  being satisfied with their quality and confirming that Force had followed his instructions,

3  Lloyd approved the 2013 21 Step Videos to be uploaded to MOBE's website.

4        31.    On or about July 19, 2016, MOBE submitted to the Register of Copyrights a

5  completed application for registration, deposit copies, and the applicable fee in order to

6  register the copyright to each of the 2013 21 Step Videos. Plaintiff will seek leave of

7  court to amend its complaint to attach and incorporate by reference a copy of the

8  certificate of copyright registration when it receives it.

9        32.    In March of 2014, MOBE stopped using Force's design services.

10        33.    Shortly thereafter, Lloyd began revising and editing the 2013 21 Step

11  Videos, creating a completely new set of presentation-style slides ("2014 21 Step Slides")

12  and videos ("2014 21 Step Videos") that added significant amounts new material to the

13  MTTB System.

14        34.    In addition to the new material, Lloyd used a different color scheme and

15  layout than was used in the 2013 21 Step Videos, and created new slides even for

16  material that was covered in the 2013 21 Step Videos.

17        35.    On or about July 21, 2016, MOBE submitted to the Register of Copyrights a

18  completed application for registration, deposit copies, and the applicable fee in order to

19  register the copyright to each of the 2014 21 Step Slides Plaintiff will seek leave of court

20  to amend its complaint to attach and incorporate by reference a copy of the certificate of

21  copyright registration when it receives it.

22        36.    Subsequent to the creation of the 2014 21 Step Slides and 2014 21 Step

23  Videos, Lloyd continued to revise, edit, and add new material to the MTTB System,

24  which required further updates the 2014 21 Step Slides and 2014 21 Step Videos to

25  reflect these changes.

26        37.    The current version of the MTTB System videos ("Current 21 Step

27  Videos"), which are presently active and being used on MOBE's website, contain all

28  revisions, edits, and new material added to the MTTB System.

EX 35
1037

38.     On or about July 26, 2016, MOBE submitted to the Register of Copyrights a completed application for registration, deposit copies, and the applicable fee in order to register the copyright to each of the Current 21 Step Videos.  Plaintiff will seek leave of court to amend its complaint to attach and incorporate by reference a copy of the certificate of copyright registration when it receives it.

39.     On information and belief, Force has had access to all versions of MOBE's MTTB System, including: each of the 21 Step Documents; each of the 2013 21 Step Videos; each of the 2014 21 Step Slides; each of the 2013 21 Step Videos; and each of the Current 21 Step Videos.

40.     MOBE has not provided permission to nor consented to Force or Digital Altitude to use any of MOBE's proprietary information, including the aforementioned copyright pending materials.

**Digital Altitude and its Aspire Program**

41.     Subsequent to Force's departure from MOBE, Force started a competing business called Digital Altitude.

42.     Upon information and belief, Force is the sole owner and member of Digital Altitude and has direct control over all Digital Altitude operations and actions, including supervising all Digital Altitude activities.

43.     Digital Altitude, like MOBE, provides online business training courses, products, tools, and services.

44.     Digital Altitude's "Aspire Program" is a product that includes eighteen business training videos, consisting primarily of a set of slides with accompanying audio ("Aspire Videos"). Digital Altitude's use of the Aspire Videos is commercial, as it requires customers to pay a fee in order to obtain access to and view the Aspire Videos.

45.     Upon information and belief, Force is responsible for creating all of the Aspire Videos.

/ / /

/ / /

EX 35
1038

46.     The Aspire Videos copy extensively from MOBE's 21 Step Documents, MOBE's 2013 21 Step Videos, MOBE's 2014 21 Step Slides, and MOBE's Current 21 Step Videos.

47.     A quick examination of the titles of each step of Digital Altitude's Aspire Videos and the titles of the first 18 steps of MOBE's current MTTB system reveals more than coincidental similarities, as illustrated in the following table:

| Step | MOBE Title | Digital Altitude Title |
|---|---|---|
| 1 | How to make 6-figures in your first year with a top tier direct sales business model | How to build a digital 6-figure business in 90-days or less with top tier |
| 2 | Discover the missing ingredient 99% miss in business success | Discover the #1 missing ingredient 99% missing with online business success |
| 3 | How to unlock your millionaire mind | Millionaire mind how to rewire your brain to guarantee your success |
| 4 | Why 85% of franchises succeed while most other businesses fail | Discover why 85% of franchises succeed while 95% businesses fail |
| 5 | What is even more lucrative than a franchise model? | Discover what the #1 business model to make 6-7 figures online |
| 6 | How to license a proven and profitable online business | How to license the most profitable products and proven systems online |
| 7 | How to get the expert support you need to succeed | Finally get the expert support you need to succeed |
| 8 | How to get paid quickly and easily with MOBE | How you can get paid quickly and easily with Aspire |
| 9 | How to get $3,300 commissions with no extra work | How to get $4,500 commissions with no extra work |

7

| 10 | How to get $5,500 commissions with no extra work | How to get $7500 commissions with no extra work |
| 11 | How to get new Mercedes Benz paid for every month and other perks | How to get your dream car paid for every month |
| 12 | How the phone sales team makes you money 24/7 | How the phone sales team makes you money 24/7 |
| 13 | How the MOBE team helps you build your business everyday | Your digital altitude family: climbing to the top together |
| 14 | How to make 5x more money without any additional work | The power of positioning: how to live the real 4-hour work week |
| 15 | How goals are the GPS to your success | Goals: the GPS to your success |
| 16 | How to create success faster with helping hands | How to: create success faster |
| 17 | How to finance your new business venture | How to finance your new business venture |
| 18 | How to get steady streams of traffic, 24/7 | How to get steady streams of visitors to your D.A. site (traffic 24/7) |

48.     A more thorough comparison of Digital Altitude's Aspire Videos and MOBE's various MTTB System materials clearly reveals that MOBE's materials were copied by Force and Digital Altitude.

49.     The material that Force and Digital Altitude has copied represents a large portion of MOBE's proprietary content and includes the core substantive material of MOBE's MTTB System.

### MOBE's Confidential Customer, Affiliate, and Staff Lists

50.     The success of MOBE's MTTB System relies heavily on the number of MOBE affiliates (currently at over 12,000), who provide a marketing and promoting platform for MOBE products, and its extensive list of clients.

EX 35
1040

51.     Over the years, MOBE has gathered and collected confidential lists of MOBE's affiliates and customers, as well as its staff (Confidential Lists").  These Confidential Lists contain highly sensitive information, including but not limited to identification of and contact information for the limited market of customers who would potentially purchase online business training services, and the limited market of high-achieving affiliates who form the basis of any successful affiliate marketing system.

52.     Due to the incredibly valuable nature of affiliates and customers to MOBE's business model, MOBE has spent years and valuable resources creating these Confidential Lists.

53.     The information contained on these Confidential Lists could not be independently recreated by a third party without a significant investment of time and money.

54.     These Confidential Lists are used for in interstate and foreign commerce for MOBE to solicit, recruit, and maintain relationships with customers and affiliates across different states and in different countries.

55.     MOBE's Confidential Lists are and have always been kept confidential on a customer relations management ("CRM") database, with access restricted on a need-to-know basis, and requiring specialized software to access the database containing these lists.

56.     MOBE further protects its Confidential Lists by requiring its independent contractors, employees, and affiliates to sign a confidentiality agreement and a non-solicitation agreement.

57.     A true and correct copy of MOBE's confidentiality agreement is attached hereto as Exhibit A.

58.     A true and correct copy of MOBE's non-solicitation agreement for affiliates is attached hereto as Exhibit B.

59.     A true and correct copy of MOBE's non-solicitation agreement for independent contractors is attached hereto as Exhibit C.

EX 35
1041

60.    The confidentiality agreement defines "confidential information" as "confidential and proprietary information and various trade secrets including scientific, engineering and technical knowhow, processes, computer software and related documentation owned or marketed by MOBE or its clients, marketing strategies, customer requirements, ***customer lists***, employees' compensation, methods of doing business, the financial affairs of MOBE and other confidential business information which belongs to MOBE or its clients." Ex. E, § 1 (emphasis added).

61.    Under the confidentiality agreement, MOBE staff agree to "not disclose any Confidential Information to any person other than for purposes of MOBE," and to "not use for my own purposes or for purposes other than those of MOBE." Ex. E, § 2 (a).

62.    The confidentiality agreement includes a survival clause and an agreement that, upon termination of employment with MOBE, to "immediately return to MOBE all of the materials, including all copies in whatever form, containing Confidential Information." Ex. E, § 2 (a)-(c).

63.    Under the non-solicitation agreement, all MOBE staff agree that they "will not directly recruit other MOBE Affiliates or Customers for any other network marketing business." Ex. B.  Independent contractors agree that they "will not directly or indirectly recruit any MOBE Affiliates or Customers for any non-MOBE business opportunity, coaching program, or product."  Ex. C.

64.    "Recruit" is defined for affiliates as "the actual or attempted solicitation, enrollment, encouragement, or attempt to influence in any other way an Affiliate or Customer to enroll or participate in another multilevel marketing, network marketing or direct sales opportunity. The term "recruit" also includes merely mentioning you're participating in another Network Marketing business to another Affiliate or Customer." Ex. B.  For independent contractors, "Recruit" is defined as "the actual or attempted solicitation, enrollment, encouragement, or attempt to influence in any other way an Affiliate or Customer to enroll or participate in any non-MOBE product or service, including coaching programs, training classes, another multilevel marketing, network

EX 35
1042

1   marketing or direct sales opportunity.  The term also includes general solicitation on your

2   social networking site where your "friends" or "contacts" include individuals not

3   personally enrolled by you and who are MOBE Affiliates.  It also includes merely

4   mentioning your participating in any non-MOBE business when there may be MOBE

5   Affiliates or Customers you did not introduce to the MOBE opportunity."  Ex. C.

6          65.     Both non-solicitation agreements have a survival clause and is "enforceable

7   during the term of this Agreement and for twelve (12) months following termination,

8   regardless if termination was voluntary or involuntary."  Exs. B and C.

9                          **Defendant's Misappropriation And Recruitment Of**

10                          **MOBE's Customers, Affiliates, And Staff**

11          66.     On information and belief, Digital Altitude has contacted a large number of

12   MOBE's customers, affiliates, and staff, whose names and contact information are

13   included in MOBE's Confidential Lists.

14          67.     On information and belief, many of the individuals contacted would not

15   have been available to Digital Altitude unless Digital Altitude had misappropriated

16   MOBE's Confidential Lists.

17          68.     For example, one of MOBE's customers, Patrick White, received an email

18   from Force on May 27, 2016, informing him that he had been proactively registered and

19   signed up for a Digital Altitude account.  Mr. White contacted MOBE regarding this

20   email and informed MOBE that he had never opted into Digital Altitude's list before

21   receiving this email.  Numerous other customers on MOBE's Confidential Lists have also

22   contacted MOBE to complain about receiving unsolicited emails from Digital Altitude.

23          69.     Further, one of MOBE's affiliates operated a number of test email addresses

24   that were used only for testing MOBE landing pages.  As a result, these email addresses

25   appear only in MOBE's confidential CRM databases, and would not appear anywhere

26   else and would never have been used for anything other than testing purposes.  Customer

27   solicitation emails were sent to these test email addresses from Michael Force, clearly

28

EX 35
1043

1  illustrating Digital Altitude's misappropriation of MOBE's Confidential Lists, and use of
2  the same.

3      70.    Upon information and belief, Digital Altitude received the Confidential Lists
4  from former MOBE employees that Digital Altitude has recruited away from MOBE.

5      71.    By providing Confidential Lists to Digital Altitude, the former MOBE
6  employees who are responsible for disclosing this information have breached at least § 2
7  of the confidentiality agreements, which requires maintaining these lists confidential, not
8  to use them for any purpose other than for MOBE, and to immediately return all customer
9  lists to MOBE upon terminating the employment relationship.

10     72.    In addition to copying proprietary components of MOBE's MTTB System
11  and misappropriating MOBE's Confidential Lists, Digital Altitude and Force have
12  actively recruited MOBE customers, staff, and affiliates to join Digital Altitude
13  ("Recruited Individuals").

14     73.    On information and belief, many of the Recruited Individuals have actively
15  sought to recruit other individuals away from MOBE in violation of the non-solicitation
16  agreements.

17     74.    MOBE has lost significant numbers of important affiliates, customers, and
18  staff as a result of these breaches of MOBE's confidentiality and non-solicitation
19  agreements, resulting in significant loss of income.

20     75.    In addition to irreparably damaging MOBE's business through the
21  compounding effect of lost affiliates, customers, staff, and referrals, Digital Altitude's
22  actions using misappropriated confidential information to contact customers threatens to
23  permanently damage the goodwill and reputation that has taken MOBE years to build up.

24     76.    By repeatedly contacting customers and affiliates, sometimes using
25  specialized test emails customers used in their marketing campaigns and known only to
26  MOBE, Digital Altitude damages MOBE's goodwill by suggesting to customers that
27  confidential information that was specially entrusted to MOBE is being shared with
28  companies like Digital Altitude to bombard them with advertising.

12

77.     In the online world, with rampant identity theft and customer information being sold to advertisers, Digital Altitude's actions contacting MOBE's customers threatens to permanently damage MOBE's goodwill, making customers believe that MOBE's security has been compromised, or that personal information was released.

78.     Digital Altitude directly targets all of aspects of MOBE's business model through this combination of directly copying all of MOBE's materials and directly targeting MOBE's customers and affiliates.  Digital Altitude is also directly soliciting and raiding MOBE's staff members.

79.     Not only does each sale by Digital Altitude of infringing material take away a sale from MOBE, that sale takes away uncountable numbers of further sales of supporting services, and further uncountable numbers of further sales generated by the affiliate system.  As if this is not enough, directly targeting MOBE's affiliates and customers by misappropriating confidential information takes away uncountable numbers of future sales from MOBE, impossible to calculate due to the compounding nature of the affiliate marketing system, the positive externalities that having a large affiliate network brings for marketing and advertising capabilities, and the negative effects on MOBE's reputation and good will.

## **CLAIM 1: COPYRIGHT INFRINGEMENT**

(**Against Digital Altitude and Michael Force For Actions Relating To**

**The Creation And Dissemination Of The Step 1 Aspire Video)**

80.     MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

81.     MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 1 of the 21 Step Documents, step 1 of the 2013 21 Step Videos, step 1 of the 2014 21 Step Slides, and step 1 of the Current 21 Step Videos, all of which are original works of authorship.

82.     Upon information and belief, Force and Digital Altitude had access to step 1 of MOBE's 21 Step Documents and, without the permission or consent of MOBE, Force

EX 35
1045

1  and Digital Altitude copied original expression contained in step 1 of MOBE's 21 Step

2  Documents to create step 1 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106

3  and 501.

4       83.    Upon information and belief, Force and Digital Altitude had access to step 1

5  of MOBE's 2013 21 Step Videos and, without the permission or consent of MOBE,

6  Force and Digital Altitude copied original expression contained in step 1 of MOBE's

7  2013 21 Step Videos to create step 1 of the Aspire Videos, in violation of at least 17

8  U.S.C. §§ 106 and 501.

9       84.    Upon information and belief, Force and Digital Altitude had access to step 1

10  of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force

11  and Digital Altitude copied original expression contained in step 1 of MOBE's 2014 21

12  Step Slides to create step 1 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106

13  and 501.

14       85.    Upon information and belief, Force and Digital Altitude had access to step 1

15  of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,

16  Force and Digital Altitude copied original expression contained in step 1 of MOBE's

17  Current 21 Step Videos to create step 1 of the Aspire Videos, in violation of at least 17

18  U.S.C. §§ 106 and 501.

19       86.    Upon information and belief, Force—as the founder and owner of Digital

20  Altitude and having a significant financial interest in the success of Digital Altitude—

21  personally, willfully, and knowingly participated in the aforementioned acts of copyright

22  infringement. As such, Force is personally liable for the aforementioned acts of copyright

23  infringement.

24       87.    Force's and Digital Altitude's infringement of MOBE's rights in each of the

25  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

26       88.    Force's and Digital Altitude's acts of infringement are willful, intentional,

27  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

28

14

EX 35
1046

89.     As a result of Force's and Digital Altitude's willful copyright infringement, MOBE has been, and will continue to be, irreparably harmed.

90.     Unless enjoined by this Court, Force and Digital Altitude will continue to willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents, the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the Current 21 Step Videos.

91.     By reason of their infringement of MOBE's copyrights as alleged herein, Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE as a result of the infringement, and for any profits of Force and Digital Altitude directly or indirectly attributable to such infringement.

## CLAIM 2: COPYRIGHT INFRINGEMENT

### (**Against Digital Altitude and Michael Force For Actions Relating To The Creation And Dissemination Of The Step 2 Aspire Video)**

92.     MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

93.     MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 2 of the 21 Step Documents, step 2 of the 2013 21 Step Videos, step 2 of the 2014 21 Step Slides, and step 2 of the Current 21 Step Videos, all of which are original works of authorship.

94.     Upon information and belief, Force and Digital Altitude had access to step 2 of MOBE's 21 Step Documents and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 2 of MOBE's 21 Step Documents to create step 2 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

95.     Upon information and belief, Force and Digital Altitude had access to step 2 of MOBE's 2013 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 2 of MOBE's

15

EX 35
1047

1   2013 21 Step Videos to create step 2 of the Aspire Videos, in violation of at least 17

2   U.S.C. §§ 106 and 501.

3        96.   Upon information and belief, Force and Digital Altitude had access to step 2

4   of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force

5   and Digital Altitude copied original expression contained in step 2 of MOBE's 2014 21

6   Step Slides to create step 2 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106

7   and 501.

8        97.   Upon information and belief, Force and Digital Altitude had access to step 2

9   of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,

10   Force and Digital Altitude copied original expression contained in step 2 of MOBE's

11   Current 21 Step Videos to create step 2 of the Aspire Videos, in violation of at least 17

12   U.S.C. §§ 106 and 501.

13        98.   Upon information and belief, Force—as the founder and owner of Digital

14   Altitude and having a significant financial interest in the success of Digital Altitude—

15   personally, willfully, and knowingly participated in the aforementioned acts of copyright

16   infringement. As such, Force is personally liable for the aforementioned acts of copyright

17   infringement.

18        99.   Force's and Digital Altitude's infringement of MOBE's rights in each of the

19   aforementioned copyrighted works constitutes a separate and distinct act of infringement.

20        100.   Force's and Digital Altitude's acts of infringement are willful, intentional,

21   and purposeful, and in disregard of, and with indifference to, MOBE's rights.

22        101.   As a result of Force's and Digital Altitude's willful copyright infringement,

23   MOBE has been, and will continue to be, irreparably harmed.

24        102.   Unless enjoined by this Court, Force and Digital Altitude will continue to

25   willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,

26   the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the

27   Current 21 Step Videos.

28

103.   By reason of their infringement of MOBE's copyrights as alleged herein, Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE as a result of the infringement, and for any profits of Force and Digital Altitude directly or indirectly attributable to such infringement.

## CLAIM 3: COPYRIGHT INFRINGEMENT

**(Against Digital Altitude and Michael Force For Actions Relating To The Creation And Dissemination Of The Step 3 Aspire Video)**

104.   MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

105.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 3 of the 21 Step Documents, step 3 of the 2013 21 Step Videos, step 3 of the 2014 21 Step Slides, and step 3 of the Current 21 Step Videos, all of which are original works of authorship.

106.   Upon information and belief, Force and Digital Altitude had access to step 3 of MOBE's 21 Step Documents and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 3 of MOBE's 21 Step Documents to create step 3 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

107.   Upon information and belief, Force and Digital Altitude had access to step 3 of MOBE's 2013 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 3 of MOBE's 2013 21 Step Videos to create step 3 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

108.   Upon information and belief, Force and Digital Altitude had access to step 3 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 3 of MOBE's 2014 21 Step Slides to create step 3 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

EX 35
1049

1    109.    Upon information and belief, Force and Digital Altitude had access to step 3

2   of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,

3   Force and Digital Altitude copied original expression contained in step 3 of MOBE's

4   Current 21 Step Videos to create step 3 of the Aspire Videos, in violation of at least 17

5   U.S.C. §§ 106 and 501.

6    110.    Upon information and belief, Force—as the founder and owner of Digital

7   Altitude and having a significant financial interest in the success of Digital Altitude—

8   personally, willfully, and knowingly participated in the aforementioned acts of copyright

9   infringement. As such, Force is personally liable for the aforementioned acts of copyright

10  infringement.

11    111.    Force's and Digital Altitude's infringement of MOBE's rights in each of the

12  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

13    112.    Force's and Digital Altitude's acts of infringement are willful, intentional,

14  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

15    113.    As a result of Force's and Digital Altitude's willful copyright infringement,

16  MOBE has been, and will continue to be, irreparably harmed.

17    114.    Unless enjoined by this Court, Force and Digital Altitude will continue to

18  willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,

19  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the

20  Current 21 Step Videos.

21    115.    By reason of their infringement of MOBE's copyrights as alleged herein,

22  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE

23  as a result of the infringement, and for any profits of Force and Digital Altitude directly

24  or indirectly attributable to such infringement.

25  / / /

26  / / /

27  / / /

28  / / /

EX 35
1050

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 23 of 157   Page ID
#:1207
Case 2:16-cv-05708   Document 1   Filed 08/01/16   Page 20 of 41   Page ID #:20

## CLAIM 4: COPYRIGHT INFRINGEMENT

**(Against Digital Altitude and Michael Force For Actions Relating To**

**The Creation And Dissemination Of The Step 4 Aspire Video)**

116.   MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

117.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 4 of the 21 Step Documents, step 4 of the 2013 21 Step Videos, step 4 of the 2014 21 Step Slides, and step 4 of the Current 21 Step Videos, all of which are original works of authorship.

118.   Upon information and belief, Force and Digital Altitude had access to step 4 of MOBE's 21 Step Documents and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 4 of MOBE's 21 Step Documents to create step 4 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

119.   Upon information and belief, Force and Digital Altitude had access to step 4 of MOBE's 2013 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 4 of MOBE's 2013 21 Step Videos to create step 4 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

120.   Upon information and belief, Force and Digital Altitude had access to step 4 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 4 of MOBE's 2014 21 Step Slides to create step 4 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

121.   Upon information and belief, Force and Digital Altitude had access to step 4 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 4 of MOBE's

EX 35
1051

1  Current 21 Step Videos to create step 4 of the Aspire Videos, in violation of at least 17
2  U.S.C. §§ 106 and 501.

3       122.   Upon information and belief, Force—as the founder and owner of Digital
4  Altitude and having a significant financial interest in the success of Digital Altitude—
5  personally, willfully, and knowingly participated in the aforementioned acts of copyright
6  infringement. As such, Force is personally liable for the aforementioned acts of copyright
7  infringement.

8       123.   Force's and Digital Altitude's infringement of MOBE's rights in each of the
9  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

10      124.   Force's and Digital Altitude's acts of infringement are willful, intentional,
11  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

12      125.   As a result of Force's and Digital Altitude's willful copyright infringement,
13  MOBE has been, and will continue to be, irreparably harmed.

14      126.   Unless enjoined by this Court, Force and Digital Altitude will continue to
15  willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,
16  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the
17  Current 21 Step Videos.

18      127.   By reason of their infringement of MOBE's copyrights as alleged herein,
19  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE
20  as a result of the infringement, and for any profits of Force and Digital Altitude directly
21  or indirectly attributable to such infringement.

## CLAIM 5: COPYRIGHT INFRINGEMENT

### (Against Digital Altitude and Michael Force For Actions Relating To
### The Creation And Dissemination Of The Step 5 Aspire Video)

25      128.     MOBE hereby realleges and incorporates the foregoing paragraphs as
26  though fully set forth herein.

27      129.     MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to
28  step 5 of the 21 Step Documents, step 5 of the 2013 21 Step Videos, step 5 of the 2014 21

EX 35
1052

1  Step Slides, and step 5 of the Current 21 Step Videos, all of which are original works of
2  authorship.

3      130.    Upon information and belief, Force and Digital Altitude had access to step 5
4  of MOBE's 21 Step Documents and, without the permission or consent of MOBE, Force
5  and Digital Altitude copied original expression contained in step 5 of MOBE's 21 Step
6  Documents to create step 5 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106
7  and 501.

8      131.    Upon information and belief, Force and Digital Altitude had access to step 5
9  of MOBE's 2013 21 Step Videos and, without the permission or consent of MOBE,
10 Force and Digital Altitude copied original expression contained in step 5 of MOBE's
11 2013 21 Step Videos to create step 5 of the Aspire Videos, in violation of at least 17
12 U.S.C. §§ 106 and 501.

13     132.    Upon information and belief, Force and Digital Altitude had access to step 5
14 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force
15 and Digital Altitude copied original expression contained in step 5 of MOBE's 2014 21
16 Step Slides to create step 5 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106
17 and 501.

18     133.    Upon information and belief, Force and Digital Altitude had access to step 5
19 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,
20 Force and Digital Altitude copied original expression contained in step 5 of MOBE's
21 Current 21 Step Videos to create step 5 of the Aspire Videos, in violation of at least 17
22 U.S.C. §§ 106 and 501.

23     134.    Upon information and belief, Force—as the founder and owner of Digital
24 Altitude and having a significant financial interest in the success of Digital Altitude—
25 personally, willfully, and knowingly participated in the aforementioned acts of copyright
26 infringement. As such, Force is personally liable for the aforementioned acts of copyright
27 infringement.

28

21

135.     Force's and Digital Altitude's infringement of MOBE's rights in each of the aforementioned copyrighted works constitutes a separate and distinct act of infringement.

136.     Force's and Digital Altitude's acts of infringement are willful, intentional, and purposeful, and in disregard of, and with indifference to, MOBE's rights.

137.     As a result of Force's and Digital Altitude's willful copyright infringement, MOBE has been, and will continue to be, irreparably harmed.

138.     Unless enjoined by this Court, Force and Digital Altitude will continue to willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents, the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the Current 21 Step Videos.

139.     By reason of their infringement of MOBE's copyrights as alleged herein, Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE as a result of the infringement, and for any profits of Force and Digital Altitude directly or indirectly attributable to such infringement.

## CLAIM 6: COPYRIGHT INFRINGEMENT

### (Against Digital Altitude and Michael Force For Actions Relating To The Creation And Dissemination Of The Step 6 Aspire Video)

140.     MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

141.     MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 6 of the 21 Step Documents, step 6 of the 2013 21 Step Videos, step 6 of the 2014 21 Step Slides, and step 6 of the Current 21 Step Videos, all of which are original works of authorship.

142.     Upon information and belief, Force and Digital Altitude had access to step 6 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 6 of MOBE's 2014 21 Step Slides to create step 6 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

EX 35
1054

143.    Upon information and belief, Force and Digital Altitude had access to step 6 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 6 of MOBE's Current 21 Step Videos to create step 6 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

144.    Upon information and belief, Force—as the founder and owner of Digital Altitude and having a significant financial interest in the success of Digital Altitude— personally, willfully, and knowingly participated in the aforementioned acts of copyright infringement. As such, Force is personally liable for the aforementioned acts of copyright infringement.

145.    Force's and Digital Altitude's infringement of MOBE's rights in each of the aforementioned copyrighted works constitutes a separate and distinct act of infringement.

146.    Force's and Digital Altitude's acts of infringement are willful, intentional, and purposeful, and in disregard of, and with indifference to, MOBE's rights.

147.    As a result of Force's and Digital Altitude's willful copyright infringement, MOBE has been, and will continue to be, irreparably harmed.

148.    Unless enjoined by this Court, Force and Digital Altitude will continue to willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents, the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the Current 21 Step Videos.

149.    By reason of their infringement of MOBE's copyrights as alleged herein, Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE as a result of the infringement, and for any profits of Force and Digital Altitude directly or indirectly attributable to such infringement.

/ / /

/ / /

/ / /

/ / /

EX 35
1055

## CLAIM 7: COPYRIGHT INFRINGEMENT

**(Against Digital Altitude and Michael Force For Actions Relating To**

**The Creation And Dissemination Of The Step 9 Aspire Video)**

150.    MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

151.    MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 9 of the 21 Step Documents, step 9 of the 2013 21 Step Videos, step 9 of the 2014 21 Step Slides, and step 9 of the Current 21 Step Videos, all of which are original works of authorship.

152.    Upon information and belief, Force and Digital Altitude had access to step 9 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 9 of MOBE's Current 21 Step Videos to create step 9 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

153.    Upon information and belief, Force—as the founder and owner of Digital Altitude and having a significant financial interest in the success of Digital Altitude— personally, willfully, and knowingly participated in the aforementioned acts of copyright infringement. As such, Force is personally liable for the aforementioned acts of copyright infringement.

154.    Force's and Digital Altitude's infringement of MOBE's rights in each of the aforementioned copyrighted works constitutes a separate and distinct act of infringement.

155.    Force's and Digital Altitude's acts of infringement are willful, intentional, and purposeful, and in disregard of, and with indifference to, MOBE's rights.

156.    As a result of Force's and Digital Altitude's willful copyright infringement, MOBE has been, and will continue to be, irreparably harmed.

157.    Unless enjoined by this Court, Force and Digital Altitude will continue to willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,

EX 35
1056

1  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the

2  Current 21 Step Videos.

3      158.   By reason of their infringement of MOBE's copyrights as alleged herein,

4  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE

5  as a result of the infringement, and for any profits of Force and Digital Altitude directly

6  or indirectly attributable to such infringement.

7              **CLAIM 8: COPYRIGHT INFRINGEMENT**

8          **(Against Digital Altitude and Michael Force For Actions Relating To**

9            **The Creation And Dissemination Of The Step 10 Aspire Video)**

10     159.   MOBE hereby realleges and incorporates the foregoing paragraphs as

11  though fully set forth herein.

12     160.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to

13  step 10 of the 21 Step Documents, step 10 of the 2013 21 Step Videos, step 10 of the

14  2014 21 Step Slides, and step 10 of the Current 21 Step Videos, all of which are original

15  works of authorship.

16     161.   Upon information and belief, Force and Digital Altitude had access to step

17  10 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,

18  Force and Digital Altitude copied original expression contained in step 10 of MOBE's

19  Current 21 Step Videos to create step 10 of the Aspire Videos, in violation of at least 17

20  U.S.C. §§ 106 and 501.

21     162.   Upon information and belief, Force—as the founder and owner of Digital

22  Altitude and having a significant financial interest in the success of Digital Altitude—

23  personally, willfully, and knowingly participated in the aforementioned acts of copyright

24  infringement. As such, Force is personally liable for the aforementioned acts of copyright

25  infringement.

26     163.   Force's and Digital Altitude's infringement of MOBE's rights in each of the

27  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

28

EX 35
1057

164.    Force's and Digital Altitude's acts of infringement are willful, intentional, and purposeful, and in disregard of, and with indifference to, MOBE's rights.

165.    As a result of Force's and Digital Altitude's willful copyright infringement, MOBE has been, and will continue to be, irreparably harmed.

166.    Unless enjoined by this Court, Force and Digital Altitude will continue to willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents, the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the Current 21 Step Videos.

167.    By reason of their infringement of MOBE's copyrights as alleged herein, Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE as a result of the infringement, and for any profits of Force and Digital Altitude directly or indirectly attributable to such infringement.

## CLAIM 9: COPYRIGHT INFRINGEMENT

### (Against Digital Altitude and Michael Force For Actions Relating To The Creation And Dissemination Of The Step 11 Aspire Video)

168.   MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

169.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 11 of the 21 Step Documents, step 11 of the 2013 21 Step Videos, step 11 of the 2014 21 Step Slides, and step 11 of the Current 21 Step Videos, all of which are original works of authorship.

170.   Upon information and belief, Force and Digital Altitude had access to step 11 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 11 of MOBE's Current 21 Step Videos to create step 11 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

171.   Upon information and belief, Force—as the founder and owner of Digital Altitude and having a significant financial interest in the success of Digital Altitude—

EX 35
1058

1  personally, willfully, and knowingly participated in the aforementioned acts of copyright
2  infringement. As such, Force is personally liable for the aforementioned acts of copyright
3  infringement.

4      172.   Force's and Digital Altitude's infringement of MOBE's rights in each of the
5  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

6      173.   Force's and Digital Altitude's acts of infringement are willful, intentional,
7  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

8      174.   As a result of Force's and Digital Altitude's willful copyright infringement,
9  MOBE has been, and will continue to be, irreparably harmed.

10      175.   Unless enjoined by this Court, Force and Digital Altitude will continue to
11  willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,
12  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the
13  Current 21 Step Videos.

14      176.   By reason of their infringement of MOBE's copyrights as alleged herein,
15  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE
16  as a result of the infringement, and for any profits of Force and Digital Altitude directly
17  or indirectly attributable to such infringement.

18                    **CLAIM 10: COPYRIGHT INFRINGEMENT**
19           **(Against Digital Altitude and Michael Force For Actions Relating To**
20              **The Creation And Dissemination Of The Step 12 Aspire Video)**

21      177.   MOBE hereby realleges and incorporates the foregoing paragraphs as
22  though fully set forth herein.

23      178.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to
24  step 12 of the 21 Step Documents, step 12 of the 2013 21 Step Videos, step 12 of the
25  2014 21 Step Slides, and step 12 of the Current 21 Step Videos, all of which are original
26  works of authorship.

27      179.   Upon information and belief, Force and Digital Altitude had access to step
28  12 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,

EX 35
1059

1  Force and Digital Altitude copied original expression contained in step 12 of MOBE's
2  Current 21 Step Videos to create step 12 of the Aspire Videos, in violation of at least 17
3  U.S.C. §§ 106 and 501.

4       180.   Upon information and belief, Force—as the founder and owner of Digital
5  Altitude and having a significant financial interest in the success of Digital Altitude—
6  personally, willfully, and knowingly participated in the aforementioned acts of copyright
7  infringement. As such, Force is personally liable for the aforementioned acts of copyright
8  infringement.

9       181.   Force's and Digital Altitude's infringement of MOBE's rights in each of the
10  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

11       182.   Force's and Digital Altitude's acts of infringement are willful, intentional,
12  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

13       183.   As a result of Force's and Digital Altitude's willful copyright infringement,
14  MOBE has been, and will continue to be, irreparably harmed.

15       184.   Unless enjoined by this Court, Force and Digital Altitude will continue to
16  willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,
17  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the
18  Current 21 Step Videos.

19       185.   By reason of their infringement of MOBE's copyrights as alleged herein,
20  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE
21  as a result of the infringement, and for any profits of Force and Digital Altitude directly
22  or indirectly attributable to such infringement.

23                    **CLAIM 11: COPYRIGHT INFRINGEMENT**
24            **(Against Digital Altitude and Michael Force For Actions Relating To**
25              **The Creation And Dissemination Of The Step 14 Aspire Video)**

26       186.   MOBE hereby realleges and incorporates the foregoing paragraphs as
27  though fully set forth herein.

28

EX 35
1060

187.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 14 of the 21 Step Documents, step 14 of the 2013 21 Step Videos, step 14 of the 2014 21 Step Slides, and step 14 of the Current 21 Step Videos, all of which are original works of authorship.

188.   Upon information and belief, Force and Digital Altitude had access to step 14 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 14 of MOBE's 2014 21 Step Slides to create step 14 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

189.   Upon information and belief, Force and Digital Altitude had access to step 14 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 14 of MOBE's Current 21 Step Videos to create step 14 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

190.   Upon information and belief, Force—as the founder and owner of Digital Altitude and having a significant financial interest in the success of Digital Altitude—personally, willfully, and knowingly participated in the aforementioned acts of copyright infringement. As such, Force is personally liable for the aforementioned acts of copyright infringement.

191.   Force's and Digital Altitude's infringement of MOBE's rights in each of the aforementioned copyrighted works constitutes a separate and distinct act of infringement.

192.   Force's and Digital Altitude's acts of infringement are willful, intentional, and purposeful, and in disregard of, and with indifference to, MOBE's rights.

193.   As a result of Force's and Digital Altitude's willful copyright infringement, MOBE has been, and will continue to be, irreparably harmed.

194.   Unless enjoined by this Court, Force and Digital Altitude will continue to willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,

EX 35
1061

1  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the

2  Current 21 Step Videos.

3       195.   By reason of their infringement of MOBE's copyrights as alleged herein,

4  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE

5  as a result of the infringement, and for any profits of Force and Digital Altitude directly

6  or indirectly attributable to such infringement.

7                    **CLAIM 12: COPYRIGHT INFRINGEMENT**

8              **(Against Digital Altitude and Michael Force For Actions Relating To**

9                **The Creation And Dissemination Of The Step 15 Aspire Video)**

10      196.   MOBE hereby realleges and incorporates the foregoing paragraphs as

11  though fully set forth herein.

12      197.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to

13  step 15 of the 21 Step Documents, step 15 of the 2013 21 Step Videos, step 15 of the

14  2014 21 Step Slides, and step 15 of the Current 21 Step Videos, all of which are original

15  works of authorship.

16      198.   Upon information and belief, Force and Digital Altitude had access to step

17  15 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE,

18  Force and Digital Altitude copied original expression contained in step 15 of MOBE's

19  2014 21 Step Slides to create step 15 of the Aspire Videos, in violation of at least 17

20  U.S.C. §§ 106 and 501.

21      199.   Upon information and belief, Force and Digital Altitude had access to step

22  15 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,

23  Force and Digital Altitude copied original expression contained in step 15 of MOBE's

24  Current 21 Step Videos to create step 15 of the Aspire Videos, in violation of at least 17

25  U.S.C. §§ 106 and 501.

26      200.   Upon information and belief, Force—as the founder and owner of Digital

27  Altitude and having a significant financial interest in the success of Digital Altitude—

28  personally, willfully, and knowingly participated in the aforementioned acts of copyright

EX 35
1062

1  infringement. As such, Force is personally liable for the aforementioned acts of copyright

2  infringement.

3       201.   Force's and Digital Altitude's infringement of MOBE's rights in each of the

4  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

5       202.   Force's and Digital Altitude's acts of infringement are willful, intentional,

6  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

7       203.   As a result of Force's and Digital Altitude's willful copyright infringement,

8  MOBE has been, and will continue to be, irreparably harmed.

9       204.   Unless enjoined by this Court, Force and Digital Altitude will continue to

10  willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,

11  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the

12  Current 21 Step Videos.

13       205.   By reason of their infringement of MOBE's copyrights as alleged herein,

14  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE

15  as a result of the infringement, and for any profits of Force and Digital Altitude directly

16  or indirectly attributable to such infringement.

17                  **CLAIM 13: COPYRIGHT INFRINGEMENT**

18      **(Against Digital Altitude and Michael Force For Actions Relating To**

19        **The Creation And Dissemination Of The Step 16 Aspire Video)**

20       206.   MOBE hereby realleges and incorporates the foregoing paragraphs as

21  though fully set forth herein.

22       207.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to

23  step 16 of the 21 Step Documents, step 16 of the 2013 21 Step Videos, step 16 of the

24  2014 21 Step Slides, and step 16 of the Current 21 Step Videos, all of which are original

25  works of authorship.

26       208.   Upon information and belief, Force and Digital Altitude had access to step

27  16 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE,

28  Force and Digital Altitude copied original expression contained in step 16 of MOBE's

EX 35
1063

1  2014 21 Step Slides to create step 16 of the Aspire Videos, in violation of at least 17

2  U.S.C. §§ 106 and 501.

3       209.  Upon information and belief, Force and Digital Altitude had access to step

4  16 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE,

5  Force and Digital Altitude copied original expression contained in step 16 of MOBE's

6  Current 21 Step Videos to create step 16 of the Aspire Videos, in violation of at least 17

7  U.S.C. §§ 106 and 501.

8       210.  Upon information and belief, Force—as the founder and owner of Digital

9  Altitude and having a significant financial interest in the success of Digital Altitude—

10  personally, willfully, and knowingly participated in the aforementioned acts of copyright

11  infringement. As such, Force is personally liable for the aforementioned acts of copyright

12  infringement.

13       211.  Force's and Digital Altitude's infringement of MOBE's rights in each of the

14  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

15       212.  Force's and Digital Altitude's acts of infringement are willful, intentional,

16  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

17       213.  As a result of Force's and Digital Altitude's willful copyright infringement,

18  MOBE has been, and will continue to be, irreparably harmed.

19       214.  Unless enjoined by this Court, Force and Digital Altitude will continue to

20  willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,

21  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the

22  Current 21 Step Videos.

23       215.  By reason of their infringement of MOBE's copyrights as alleged herein,

24  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE

25  as a result of the infringement, and for any profits of Force and Digital Altitude directly

26  or indirectly attributable to such infringement.

27  / / /

28  / / /

EX 35
1064

## CLAIM 14: COPYRIGHT INFRINGEMENT

### (Against Digital Altitude and Michael Force For Actions Relating To
### The Creation And Dissemination Of The Step 18 Aspire Video)

216.   MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

217.   MOBE owns valid copyrights and exclusive rights under 17 U.S.C. § 106 to step 18 of the 21 Step Documents, step 18 of the 2013 21 Step Videos, step 18 of the 2014 21 Step Slides, and step 18 of the Current 21 Step Videos, all of which are original works of authorship.

218.   Upon information and belief, Force and Digital Altitude had access to step 18 of MOBE's 21 Step Documents and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 18 of MOBE's 21 Step Documents to create step 18 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

219.   Upon information and belief, Force and Digital Altitude had access to step 18 of MOBE's 2013 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 18 of MOBE's 2013 21 Step Videos to create step 18 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

220.   Upon information and belief, Force and Digital Altitude had access to step 18 of MOBE's 2014 21 Step Slides and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 18 of MOBE's 2014 21 Step Slides to create step 18 of the Aspire Videos, in violation of at least 17 U.S.C. §§ 106 and 501.

221.   Upon information and belief, Force and Digital Altitude had access to step 18 of MOBE's Current 21 Step Videos and, without the permission or consent of MOBE, Force and Digital Altitude copied original expression contained in step 18 of MOBE's

EX 35
1065

1  Current 21 Step Videos to create step 18 of the Aspire Videos, in violation of at least 17

2  U.S.C. §§ 106 and 501.

3       222.   Upon information and belief, Force—as the founder and owner of Digital

4  Altitude and having a significant financial interest in the success of Digital Altitude—

5  personally, willfully, and knowingly participated in the aforementioned acts of copyright

6  infringement. As such, Force is personally liable for the aforementioned acts of copyright

7  infringement.

8       223.   Force's and Digital Altitude's infringement of MOBE's rights in each of the

9  aforementioned copyrighted works constitutes a separate and distinct act of infringement.

10      224.   Force's and Digital Altitude's acts of infringement are willful, intentional,

11  and purposeful, and in disregard of, and with indifference to, MOBE's rights.

12      225.   As a result of Force's and Digital Altitude's willful copyright infringement,

13  MOBE has been, and will continue to be, irreparably harmed.

14      226.   Unless enjoined by this Court, Force and Digital Altitude will continue to

15  willfully and intentionally infringe MOBE's proprietary rights in the 21 Step Documents,

16  the 2013 21 Step Videos, the 2014 21 Step Slides, the 2013 21 Step Videos, and the

17  Current 21 Step Videos.

18      227.   By reason of their infringement of MOBE's copyrights as alleged herein,

19  Force and Digital Altitude are liable to MOBE for the actual damages incurred by MOBE

20  as a result of the infringement, and for any profits of Force and Digital Altitude directly

21  or indirectly attributable to such infringement.

22                  **CLAIM 15: FEDERAL THEFT OF TRADE SECRETS**

23                     **(Against Digital Altitude and Michael Force)**

24      228.   MOBE hereby realleges and incorporates the foregoing paragraphs as

25  though fully set forth herein.

26      229.   MOBE has developed Confidential Lists, containing names and contact

27  details for MOBE affiliates, customers, and staff.

28

EX 35
1066

230.   These Confidential Lists have significant economic value to MOBE, and this value is derived from not being generally known to the public or users other than MOBE.

231.   These Confidential Lists are kept secure and secret by having access restricted only to employees who need to know, and who are required to agree to a comprehensive confidentiality agreement preventing the disclosure or unauthorized use of the Confidential Lists.

232.   MOBE uses these Confidential Lists in interstate and foreign commerce to solicit, recruit, and maintain relationships with customers across different states and different countries.

233.   Force knew or should have known that MOBE's Confidential Lists were trade secrets and kept strictly confidential.

234.   On information and belief, Force, without any authorization from MOBE, took MOBE's Confidential Lists for the economic benefit of another knowing that taking the Confidential Lists for the economic benefit of another would cause injury to MOBE and intending the same in violation of at least 18 U.S.C. § 1832.

235.   On information and belief, Digital Altitude received MOBE's Confidential Lists, using these lists for its own economic benefit knowing that the Customer Lists had been obtained without authorization from MOBE and knowing that receiving and using the Confidential Lists would cause injury to MOBE and intending the same in violation of at least 18 U.S.C. § 1832.

236.   Unless enjoined by this Court, Digital Altitude will continue to willfully and intentionally use MOBE's Confidential Lists for its own economic gain.

237.   By reason of their theft of MOBE's trade secrets, Defendants are liable to MOBE for the actual damages incurred by MOBE as a result of the theft, and for any profits directly or indirectly attributable to such theft.

/ / /

/ / /

/ / /

EX 35
1067

## CLAIM 16: INTENTIONAL INTERFERENCE
## WITH CONTRACTUAL RELATIONS
### (Against Digital Altitude and Michael Force)

238.   MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

239.   On information and belief, Defendants knew of MOBE's confidentiality agreement and non-solicitation agreements and that MOBE independent contractors, affiliates and employees are required to sign these agreements.

240.   On information and belief, Digital Altitude and Force knew of the contractual relationship contained in the confidentiality and non-solicitation agreements.

241.   On information and belief, Digital Altitude and Force committed intentional acts designed to induce a breach or disruption of these contractual relationships.

242.   On information and belief, Defendants' acts have resulted in actual breaches by individuals that previously worked for MOBE and that have been recruited to Digital Altitude.

243.   Indeed, over the past several months, Digital Altitude has recruited at least 30 of MOBE's top affiliates, which represent a significant amount of MOBE's new customers. Defendants' interference with MOBE's contractual relations has resulted in damage to MOBE in the form of at least lost income and loss of good will.

244.   Unless enjoined by this Court, Defendants will continue to intentionally interfere with MOBE's contractual relations.

245.   By reason of their interference, Defendants are liable to MOBE for the actual damages incurred by MOBE as a result of the intentional interference, and for any profits directly or indirectly attributable to such breach.

/ / /

/ / /

/ / /

/ / /

EX 35
1068

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 41 of 157   Page ID
#:1225
Case 2:16-cv-05708   Document 1   Filed 08/01/16   Page 38 of 41   Page ID #:38

## CLAIM 17: INTENTIONAL INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Digital Altitude and Michael Force)

246.   MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

247.   Over the past several months, Digital Altitude has recruited at least 30 of MOBE's top affiliates, which represent a significant amount of MOBE's new customers.

248.   MOBE had an economic relationship with these recruited affiliates that probably would have resulted in an economic benefit to MOBE.

249.   On information and belief, Defendants knew or should have known of the relationship that MOBE had with the recruited affiliates.

250.   On information and belief, Defendants intended to disrupt MOBE's economic relationship with the recruited affiliates.

251.   On information and belief, Defendants have engaged in wrongful conduct in their attempt to disrupt MOBE's economic relationship with the recruited affiliates. Further, on information and belief, Defendants have induced other MOBE customers and staff to breach their contractual obligations contained in their confidentiality and non-solicitation agreements with MOBE as provided in Claim 21.

252.   Defendants' actions have caused MOBE's relationship with these recruited individuals to be disrupted and MOBE has been harmed due to this disruption.

253.   On information and belief, Defendants' wrongful conduct was a substantial factor in causing MOBE's harm.

254.   Unless enjoined by this Court, Defendants will continue to intentionally interfere with MOBE's prospective economic advantage.

255.   By reason of their interference, Defendants are liable to MOBE for the actual damages incurred by MOBE as a result of the intentional interference, and for any profits directly or indirectly attributable to such breach.

EX 35
1069

### CLAIM 18: UNFAIR COMPETITION

#### (Against Digital Altitude and Michael Force)

256.   MOBE hereby realleges and incorporates the foregoing paragraphs as though fully set forth herein.

257.   Defendants actions constitute unfair, unlawful, deceptive, or misleading practices in violation of California Business and Professions Code § 17200 et seq.

258.   MOBE has suffered injury in fact and has lost money or property as a result of Defendants unfair and unlawful business practices in the form of damage to its good will, lost sales, and other actual damages.

259.   Defendants' acts and conduct have caused, and continue to cause, MOBE to suffer irreparable harm.

260.   Unless enjoined by this Court, Defendants will continue to willfully and intentionally violate California Business and Professions Code §17200 *et seq.* and continue to cause consumer confusion.

### PRAYER FOR RELIEF

WHEREFORE, MOBE prays for judgment against Digital Altitude and Michael Force as follows:

A.   For an order preliminarily and permanently enjoining and restraining Digital Altitude and Michael Force and their officers, agents, servants, employees, successors, and all those in active concert or participation with them, from:

      i.   Distributing the Digital Altitude Aspire program steps identified within the above claims; and

      ii.   Contacting any affiliate or customer of MOBE.

B.   For a judgment that Digital Altitude and Michael Force have committed acts of copyright infringement in violation of 17 U.S.C. § 101 *et seq.*;

C.   For a judgment finding Digital Altitude and Michael Force are in violation of 18 U.S.C. § 1832 *et seq.*;

EX 35
1070

D.    For a judgment finding Digital Altitude and Michael Force have intentionally interfered with MOBE's contractual relations;

E.    For a judgment finding Digital Altitude and Michael Force have intentionally interfered with MOBE's prospective economic advantage;

F.    For a judgment finding Digital Altitude and Michael Force have committed acts of unfair competition;

G.    For an award of compensatory and statutory damages, unjust enrichment damages, costs, and reasonable attorneys' fees in accordance with 17 U.S.C. §§ 504 and 505, 18 U.S.C. §§ 1836, Cal. Civ. Code § 3426 and other applicable law;

H.    For an award of disgorgement of profits by Digital Altitude and Michael Force that are attributable to their copyright infringement, misappropriation of trade secrets, intentional interference with contract; intentional interference with perspective economic advantage, and unfair competition;

I.    For an award of exemplary damages, pursuant to 18 U.S.C. § 1836 and other applicable law;

J.    For damages in an amount to be determined at trial for unfair competition in violation of California Business and Professions Code § 17200 *et seq.*;

K.    For an award of punitive damages, pursuant to all applicable state statutory and common law;

L.    For damages in an amount to be determined at trial for breach of contract and intentional interference with contract;

M.    For an award of MOBE's costs in bringing this action, pursuant to all applicable statutory and common law, including at least 15 U.S.C. § 1117(a);

N.    For a judgment declaring this case exceptional and awarding MOBE its attorneys' fees pursuant to 15 U.S.C. § 1117(a);

O.    For prejudgment interest, pursuant to at least California Civil Code § 3287;

P.    For post-judgment interest, pursuant to at least 28 U.S.C. § 1961(a); and

Q.    For such other and further relief as the Court may deem just and proper.

EX 35
1071

## DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, MOBE demands TRIAL BY JURY of all issues so triable.

DATED:  August 1, 2016

Tyson K. Hottinger
Kirk R. Harris
Mark W. Ford
Quincy J. Chuck
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT PLLC

By: _____/s/ Tyson K. Hottinger_____
        Tyson K. Hottinger
Attorneys for MOBE, Ltd.

40

EX 35
1072

Tyson K. Hottinger (CA State Bar No. 253221; E-Mail: thottinger@mabr.com)
Kirk R. Harris (*pro hac vice* forthcoming; E-Mail: kharris@mabr.com)
Mark W. Ford (*pro hac vice* forthcoming; E-Mail: mford@mabr.com)
Quincy J. Chuck (CA State Bar No. 307857; E-Mail: qchuck@mabr.com)
MASCHOFF BRENNAN LAYCOCK GILMORE ISRAELSEN & WRIGHT PLLC
20 Pacifica, Suite 1130
Irvine, California 92618
Telephone:  (949) 202-1900
Facsimile:   (949) 453-1104

Attorneys for Plaintiff MOBE, LTD.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| MOBE, LTD., a Malaysian company, <br><br> Plaintiff, <br><br> vs. <br><br> Digital Altitude LLC, a Delaware limited liability company, Michael Force, an individual, <br><br> Defendants. | Case No. 2:16-cv-05708-FFM <br><br> **DECLARATION OF MATT LLOYD IN SUPPORT OF MOBE'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> HON. FREDERICK F. MUMM <br> UNITED STATES MAGISTRATE JUDGE <br> ROYBAL COURT, COURTROOM 580 <br><br> Date:   September 6, 2016 <br> Time:   10:00 a.m. <br> Place:  Courtroom 580 |

## DECLARATION OF MATT LLOYD

I, Matt Lloyd, declare:

1.      I am the CEO and founder of MOBE.  MOBE stands for My Own Business Education.

EX 35
1073

1    added significant amounts of new material to the MTTB System using newly recorded

2    audio with his own voiceovers.

3       18.    Subsequent to the creation of the 2014 21 Step Slides and 2014 21 Step

4    Videos, I continued to revise, edit, and add new material to the MTTB System, which

5    required further updates the 2014 21 Step Slides and 2014 21 Step Videos to reflect these

6    changes. The current version of the MTTB System videos ("Current 21 Step Videos"),

7    which are presently active and being used on MOBE's website, contain all revisions,

8    edits, and new material added to the MTTB System.

9       19.    After Force and MOBE parted ways, Force started a competing business

10    called Digital Altitude LLC ("Digital Altitude"). Digital Altitude first launched its

11    website on in or about May 2016, long after Lloyd's creation of the new 2014 21 Step

12    Slides and Videos. Indeed, the first historical capture of Digital Altitude's website is

13    June 1, 2016.

14       20.    Force has stated to me that he has "insiders" at MOBE that are feeding him

15    MOBE's information. For example, below is an excerpt from an email that I received

16    from Force:

17
18    I find it odd you think your the only one who has fans and or spy's on the inside... I get alerted every time you do anything. And your NOT the only one has compiled hundreds of hours boiler room recordings, chats, emails, IM's, screenshots from disgruntled members, and compiled entire company processes from google docs.
19

20       21.    Force has stated to me that he is judgment proof. For example, below is an

21    excerpt from an email that I received from Force:

22    I'd be happy to be done with you and this conversation. Fwd to your shady lawyer... could care less as they are the biggest liars on earth. Waste of time as there is nothing you can get from me. Have multiple citizenships, have no registered companies in the U.S. and hold no assets in the U.S. Good luck.

23

24       I declare under penalty of perjury under the laws of the United States that the

25    foregoing is true and correct.

26       Executed this 4th day of August 2016.

27

28                       Matthew Lloyd McPhee

1  Stephen M. Lobbin (SBN 181195)
   slobbin@onellp.com
2  Joanna Ardalan (SBN 285384)
   jardalan@onellp.com
3  **ONE LLP**
   4000 MacArthur Boulevard
4  East Tower, Suite 500
   Newport Beach, California  92660
5  Tel:   949.502.2870
   Fax:   949.258.5081
6
   Attorneys for Defendants
7

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                    **WESTERN DIVISION**

12

13  **MOBE, Ltd.**, a Malaysian company,      Case No. 2:16-cv-05708-PA-KS

14                Plaintiff,                   **DECLARATION OF MICHAEL**
                                               **FORCE IN OPPOSITION TO**
15           v.                                **PLAINTIFF'S MOTION TO**
                                               **ENFORCE SETTLEMENT**
16  **Digital Altitude LLC**, a Delaware       **AGREEMENT**
    limited liability company, and **Michael**
17  **Force**, an individual,                  Date:  January 23, 2016
                                               Time:  1:30 p.m.
18                Defendants.                  Ctrm:  15

19                                             Honorable Percy Anderson

20

21

22

23        I, Michael Force, declare and state as follows:

24        1.      I am Founder and CEO of Defendant Digital Altitude, LLC, a digital

25  marketing training company which provides our customers with marketing tools

26  including automation, sales funnels, community, tools, and many other resources.  I

27  have personal knowledge of the facts stated herein, and if called to testify as a

28  witness, I could and would testify competently thereto.

Force Decl. Re Mot. Re Settlement Agreement
Case No. 2:16-cv-05708-PA-KS

EX 35
1075

2.      I have worked in the digital marketing industry for nearly 20 years, for organizations including Wealth Masters International, Carbon Copy Pro, Liberty League, Life Path, and Reverse Funnel Systems.  During this time, I became familiar with many different "sales funnels;" a sales funnel is a process for leading customers through when purchasing products.  A sales funnel is typically divided into several steps, which differ depending on the particular sales model.  The idea of a sales funnel is not new at all.  The only difference between different sales funnels is the particular words used in the expression of the steps, and the particular examples and anecdotes provided.  One sales funnel I became familiar with, and which has been used for many years and long before Mobe existed, is the MOS sales funnel which has been used by an organization known as Redshift.  Redshift does business including lead generation with both Digital Altitude and Mobe.

3.      In 2010, I created a presentation using the same franchise comparison example at issue here, found on pages 5-7 of Mobe's motion.  Mobe did not even exist in 2010.

4.      During 2013-2014, I worked as an independent contractor (not an employee) with Plaintiff Mobe's organization.  In that capacity, I had the primary responsibility of developing the content for Mobe's sales funnel, which includes the particular content at issue in this action.  Most of the content was derived directly from the prior Redshift/MOS sales funnel.  Nonetheless, as an independent contractor, I understand that I am the author of any new, original content I included in the Mobe sales funnel, and as such, I own any copyrights to that content.  Mobe never requested that I assign any copyrights, nor did I ever assign any copyrights to Mobe.

5.      Upon founding Digital Altitude, we used the same prior Redshift/MOS sales funnel for our initial Digital Altitude sales funnel.  In fact, Redshift specifically authorized and encouraged us to use their sales funnel, the same one upon which Mobe's sales funnel is derived.

Force Decl. Re Mot. Re Settlement Agreement
Case No. 2:16-cv-05708-PA-KS

EX 35
1076

6.    As Digital Altitude's business has progressed, we have revised and improved the specific content of our sales funnel on an ongoing basis, to make it more customized to our business and to improve its effectiveness.  Mobe's filing of this lawsuit provided another incentive to further customize the specific content of our sales funnel, which continues to this day and will continue.

7.    Digital Altitude proposed the parties' Confidential Content Agreement because we already were revising the specific content of our sales funnel to be distinct from Mobe's sales funnel, which in our view made it unnecessary to litigate the issues raised in Mobe's motion requesting a preliminary injunction.  Moreover, as expressed in the Agreement, our continued use of "content created independently or by third parties or in the public domain" is permitted.  This provision permits us to continue using all content I authored while working for Mobe, and all content derived from the Redshift/MOS sales funnel.

8.    In Mobe's motion at page 4, it shows "thumbnail images of an audio transcript . . . highlighted to show the Proprietary Content still being used by Digital Altitude."  But all of this content was created independently by me as the independent author, and also it is content licensed to Digital Altitude by Redshift/MOS.

9.    In Mobe's motion at pages 5-8, Mobe claims that "the changes [Digital Altitude] actually made are minimal."  But rather than "minimal" revisions, since the Agreement was signed, Digital Altitude has expended many hours of effort directed to revising the content of its sales funnel, and also we have enlisted the expertise of King's Offer, LLC, a company in Utah tasked with the total transformation of our content to make it consistent with Digital Altitude's unique value proposition for our customers.  In addition, we have an agreement to get our courses accredited very soon.

-3-

Force Decl. Re Mot. Re Settlement Agreement
Case No. 2:16-cv-05708-PA-KS

EX 35
1077

1     I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct and if called to testify, I could and

3  would competently do so.

4     Executed on this 2nd day of January 2017, at San Francisco, California.

Michael Force

Force Decl. Re Mot. Re Settlement Agreement
Case No. 2:16-cv-05708-PA-KS

EX 35
1078

Stephen M. Lobbin (SBN 181195)
slobbin@onellp.com
Joanna Ardalan (SBN 285384)
jardalan@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, California  92660
Tel:   949.502.2870
Fax:   949.258.5081

Attorneys for Defendants

```
                                    FILED
                           CLERK, U.S. DISTRICT COURT

                           January 3, 2017

                           CENTRAL DISTRICT OF CALIFORNIA
                           BY: ____MM____ DEPUTY
```

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| **MOBE, Ltd.**, a Malaysian company, <br><br> Plaintiff, <br><br> v. <br><br> **Digital Altitude LLC**, a Delaware limited liability company, and **Michael Force**, an individual, <br><br> Defendants. | Case No. 2:16-cv-05708-PA-KS <br><br> **ANSWER TO COMPLAINT AND COUNTERCLAIMS** <br><br> **DEMAND FOR JURY TRIAL** |

Pursuant to consent under Fed. R. Civ. P. 15(a)(2), Digital Altitude LLC and Michael Force (herein collectively "Defendants"), answer the Complaint filed by Plaintiff MOBE, Ltd. as follows:

## THE PARTIES

1. Answering paragraph 1 of the Complaint, Defendants lack sufficient information or belief to admit or deny the allegations contained therein, and on that basis, deny each and every allegation contained therein.

2. Answering paragraph 2 of the Complaint, Defendants admit the allegations contained therein.

EX 35
1079

3.      Answering paragraph 3 of the Complaint, Defendants admit the allegations contained therein.

4.      Answering paragraph 4 of the Complaint, Defendants admit that Plaintiff seeks injunctive relief and damages for the causes of action stated therein, but denies that Defendants are entitled to such relief or have stated a claim as to each cause of action stated therein.

5.      Answering paragraph 5 of the Complaint, Defendants admit that the Court has federal question jurisdiction over MOBE's copyright infringement and Federal theft of trade secrets claim, but denies that Defendants are entitled to such relief or have stated a claim as to each cause of actions stated therein.

6.      Answering paragraph 6 of the Complaint, Defendants admit that the Court has pendent jurisdiction over MOBE's state law claims, but denies that Defendants are entitled to such relief or have stated a claim as to each cause of actions stated therein.

7.      Answering paragraph 7 of the Complaint, Defendants deny each and every allegation contained therein.

8.      Answering paragraph 8 of the Complaint, Defendants admit that Force is a resident in and transacts business within this judicial district.  Except as expressly admitted herein, Defendants deny the remaining allegations.

9.      The statement made in paragraph 9 requires no response.

## GENERAL ALLEGATIONS

### MOBE and its MTTB System

10.      Answering paragraph 10 of the Complaint, Defendants lack sufficient information or belief to admit or deny the allegations contained therein, and on that basis, deny each and every allegation contained therein.

EX 35
1080

Stephen M. Lobbin (SBN 181195)
slobbin@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, California  92660
Tel:   949.502.2870
Fax:   949.258.5081

Joanna Ardalan (SBN 285384)
jardalan@onellp.com
Oscar Orozco-Botello (SBN 313104)
oobotello@onellp.com
**ONE LLP**
9301 Wilshire Blvd., Penthouse
Beverly Hills, CA 90210
Tel: 310.437.8665

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| **MOBE, Ltd.**, a Malaysian company,<br><br>Plaintiff,<br><br>v.<br><br>**Digital Altitude LLC**, a Delaware limited liability company, and **Michael Force**, an individual,<br><br>Defendants. | Case No. 2:16-cv-05708-PA-KS<br><br>**DECLARATION OF SEAN K. BROWN IN OPPOSITION TO MOTION TO DISQUALIFY** |

1    I, Sean K. Brown, declare and state as follows:

2        1.    I am an attorney and counsel to Defendants in the above-captioned

3    action.  I have personal knowledge of the facts stated herein, and if called to

4    testify as a witness, I could and would testify competently thereto.

5        2.    I previously represented Plaintiff Mobe—as an independent

6    contractor and part-time outside counsel—with respect to certain of its consumer

7    disputes.  When a customer would complain to Mobe about its service, I would

8    attempt to resolve the dispute.  My representation never involved or required any

9    sort of knowledge about Mobe's consumer or customer lists or other databases, or

10   its development of software or products.  I did not advise Mobe about protecting

11   any intellectual property or other rights.  While I represented Mobe in resolving

12   some of its consumer disputes, I did not know who represented Mobe, or even

13   whether Mobe was represented, with respect to any intellectual property matters.

14   Prior to preparing this declaration, I did not know that Maschoff Brennan

15   prosecuted a trademark for Mobe in August 2015, during the time I worked with

16   Mobe.

17       3.    My representation of Mobe also involved some incidental matters,

18   such as facilitating Mobe's engagement of another law firm for representation in

19   connection with the Maryland Attorney General's investigation of Mobe.  I was

20   not involved in representing Mobe with respect to the substance of this

21   investigation, and I do not possess confidential information relating to this

22   investigation.  My understanding is that this investigation is in the public record.

23       4.    Mobe claims that I, on behalf of Mobe, sent a demand letter to

24   Michael Force.  It claims that the letter included many of the same claims as this

25   lawsuit.  I recall sending a letter to Mr. Force, but I do not recall the contents of

26   the letter.  Mobe has not produced a copy of the letter, and I do not otherwise have

27   access to a copy of the letter.  I do not believe the letter was related to intellectual

28   property at all.  Even if it was, I would not have received any confidential

1    information about Mobe's alleged intellectual property.  Unfortunately, without

2    the letter, I am not in the position to explain its contents with more specificity.

3         5.     I was never a Mobe employee, only an independent contractor.  I

4    stopped representing Mobe on or around August 2015.

5         6.     Mobe has been aware that I now represent Digital Altitude since at

6    least September, 2016.  In September 2016, I reached out to Mobe's general

7    counsel Ross Weber to discuss mediation for this case.  I represented to him that I

8    am counsel for Digital Altitude and that we would like to discuss early settlement

9    of this case.  I told him prior to the mediation that I would be present.  The parties

10    agreed to the mediation and I attended the mediation in plain view of Mobe's

11    representative and counsel.  Moreover, Mobe had notice that I was a member of

12    the Board of Directors for Digital Altitude starting in July 2016 because, at least, I

13    updated my LinkedIn profile with this information.  I never received any objection

14    to my Board position from Mobe.

15         7.     Digital Altitude has invested substantial time and money in involving

16    me in this litigation.  I was the point person for Digital Altitude at mediation,

17    meaning I was the main contact between Founder and CEO Michael Force and the

18    mediator during settlement discussions and negotiation.  I oversaw Digital

19    Altitude's efforts in complying with the stipulated preliminary injunction.  I have

20    been an integral part in assisting Digital Altitude in responding to discovery and

21    coordinating efforts to collect documents from every employee.  With the March 6

22    deadline to serve the initial expert report and the March 29 deadline to serve

23    discovery requests rapidly approaching, it would be highly prejudicial to Digital

24    Altitude if I were to be disqualified, because someone else would have to take the

25    lead on these matters and that person likely would not have the history and rapport

26    with Digital Altitude that I do.

27

28

I declare under penalty of perjury of the laws of the United States of America that the information contained herein is true and correct.

Executed on this _17_ day of February, 2017.

1   Stephen M. Lobbin (SBN 181195)
    slobbin@onellp.com
2   Joanna Ardalan (SBN 285384)
    jardalan@onellp.com
3   **ONE LLP**
    4000 MacArthur Boulevard
4   East Tower, Suite 500
    Newport Beach, California  92660
5   Tel:   949.502.2870
    Fax:   949.258.5081
6
7   Attorneys for Defendants

8               **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **WESTERN DIVISION**

11

12   **MOBE, Ltd.**, a Malaysian company,      Case No. 2:16-cv-05708-PA-KS

13              Plaintiff,                      **DECLARATION OF MICHAEL**
                                                **FORCE IN SUPPORT OF**
14        v.                                    **DEFENDANTS' MOTION FOR**
                                                **SUMMARY JUDGMENT**
15   **Digital Altitude LLC**, a Delaware
     limited liability company, and **Michael**
16   **Force**, an individual,

17              Defendants.

18

19

20

21

22

23

24

25

26

27

28

                    **DECLARATION OF MICHAEL FORCE**
                                -1-

EX 35
1085

## DECLARATION OF MICHAEL FORCE

1.     I, Michael Force, am the founder and principal of Digital Altitude LLC, am competent to testify and have personal knowledge of the facts stated herein. If called to testify I could and would testify as follows:

2.     I am a former U.S. Marine who has been working in the online marketing and the "step-by-step onboarding" model of customer acquisition and retention for at least 20 years. I trained tens of thousands of people in entrepreneurship, sales, and marketing.

3.     "Step-by-step onboarding" is a marketing technique that delivers incremental information or education to its users through achieving milestones.

4.     As a step-by-step onboarding expert, I became well known in the industry and earned the title of *the* top affiliate for Wealth Masters, a now-defunct company that would have competed with Mobe.

5.     In 2013, Mobe, that I understand was founded by Matt Lloyd, needed content for its step-by-step onboarding company. Lloyd asked that I help it with creating the same.  It was clear to me that he didn't have a lot of experience and needed substantial guidance regarding content and optimizing traffic and customer conversion.

6.     I agreed to help out Mobe and, in doing so, urged Lloyd to create videos and slides. As an experienced online marketer, I knew that, as compared with text, videos create more traffic, keep viewers engaged for a longer amount of time, and ultimately convert more customers.  I offered to produce and even appear in the Original Videos to support Lloyd, who was reluctant to appear on camera.

7.     After much urging, Lloyd appeared in the Original Videos with me. I produced the Original Videos using my personal video camera and directed Lloyd and myself on screen, including making decisions as to where to sit and what to say with respect to how to break down and present and ad-lib material. I also authored

and narrated the substance of the presentation in the Original Videos. After I captured the footage from my personal camera, I, alone, edited and finalized the Original Videos, which also implemented the Slides that I created.

7.   The Mobe Videos, which are the asserted works in this lawsuit, were based on my Original Videos and Slides, which Lloyd knew used preexisting Redshift MOS material. I received a video from Darren Salkeld, who I understand to be the founder of Redshift. The video, which represents it was captured on July 18, 2016, shows Lloyd conferencing Salkeld to probe him on whether Redshift would object to Mobe's use of its MOS. A true and correct copy of this video is lodged under seal and attached to a separate declaration.

8.   Shortly after I created the Original Videos and the Slides contained in the Videos, Lloyd and I had a falling out. Not wanting to be upstaged by me, Lloyd re-shot all the videos using a substantial amount of material from my Original Videos, which I own.  He did so without permission or consent.

9.   I have no knowledge that Digital Altitude ever possessed, used, or even accessed a Mobe Staff, Customer, and Affiliate List.

10.   I understand that Mobe frequently did not pay its staff on time or in full, so some of its staff pursued other opportunities, some with Digital Altitude.

11.   The "affiliates" who purportedly used Mobe's Customer and Affiliate Lists were formerly associated with Mobe and later became affiliates for Digital Altitude.

12.   I learned only *after* the fact that two affiliates, Michael Oliver and Russell Armstrong, sent out an email to the asserted list.  I understand that the email was sent through their personal email addresses. Neither I nor anyone at Digital Altitude had prior notice they would send this email nor were they given approval to do so.

**DECLARATION OF MICHAEL FORCE**

EX 35
1087

13.     Both Michael Oliver and Russell Armstrong had to sign agreements that expressly prohibited the use of third party's' intellectual property. True and correct copies of those agreements are attached as Exhibit A.

14.     Mobe claims Patrick White never opted into our list. However, Mr. White opted into the list and even provided credit card information and payment of $1, which is the only way to get on this particular Digital Altitude list. Digital Altitude tracks its users' Internet Protocol address (IP), a unique identifier attached to each computer or device, including Mr. White's IP. A true and correct copy of screenshots showing the same is attached as Exhibit B. The log shows that he signed up by logging into Digital Altitude and that he logged in again multiple times to access the content.

15.     I understand Ashraf Ali, Mike Lee, Cathy Flynn, Jennifer Gligoric, Brian Price, Nate Rio, Scott Smith, Scott Hess, Ryan Jaten, and Damien Martin currently work with Digital Altitude.

16.     Lodged under seal and attached to a separate declaration is a true and correct copy of the Original Videos I own. The Videos also contain the slides I created and own.

17.     Lodged under seal and attached to a separate declaration is a true and correct copy of the Mobe Videos.

18.     Lodged under seal and attached to a separate declaration are true and correct transcripts that were filed by Mobe in support of its preliminary injunction, except for the fact that we excluded the highlighting from the filed copies. The copies attached in support of this motion include new highlighting which shows when Mobe copied expression from the Original Videos verbatim (in pink) and very closely (in green).

**DECLARATION OF MICHAEL FORCE**

-4-

1        I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct and if called to testify, I could and

3    would competently do so.

4        Executed on this _10_ day of April, 2017, at _Miami_, Florida.

5

6

7

8                        Michael Force

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EX 35
1089

```
 1                 UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4

 5    MOBE, LTD., a Malaysian      )
      company,                     )
 6                                 )
                      Plaintiff,   )
 7                                 ) Case No.
           vs.                     ) 2:16-cv-05708-PA(KSx)
 8                                 )
      DIGITAL ALTITUDE LLC, a      )
 9    Delaware limited liability   )
      company; et al.,             )
10                                 )
                     Defendants.   )
11    _____)
                                   )
12    AND RELATED COUNTERCLAIMS.   )
      _____)
13

14

15         DEPOSITION OF MICHAEL FORCE, a witness herein,

16         taken on behalf of the plaintiff and

17         counterdefendant at 9301 Wilshire Boulevard,

18         Beverly Hills, California, at 10:14 a.m., on

19         Thursday, April 6, 2017, before Lori S.

20         Turner, CSR 9102.

21

22

23

24

25
```

Exhibit 3 Page 94

EX 35

1090

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 63 of 157   Page ID
#:1247
Case 2:16-cv-05708-PA-KS   Document 93-1   Filed 04/17/17   Page 111 of 174   Page ID
#:4409

```
 1    They -- They come into the garage with you and say,

 2    "Hey, man, let's" -- "let's" -- "let's do something.

 3         Q.  Are you the only member of Digital Altitude

 4    LLC?

 5         A.  On the entity docs, it's my wife and I, if

 6    I recall.

 7             Mary?  Yeah.

 8         Q.  Does your wife play a role in the

 9    management of the company?

10         A.  No role whatsoever.

11             She goes to events and hugs -- hugs and

12    kisses the babies.  But beyond that, there's no

13    management role or decision-making role or anything

14    like that.

15         Q.  Who has ownership in Digital Altitude?

16         A.  Me and my wife.

17         Q.  Anyone else?

18         A.  No one else.

19         Q.  How is that ownership held?

20         A.  I believe it's a 50/50 thing, but maybe --

21    maybe I'm 51.  I -- I don't -- I don't know.  I'd

22    have to --

23         Q.  When you say you, you mean personally

24    Michael Force, you hold that ownership interest in

25    your own name, as opposed to, for example, like
```

Exhibit 3 Page 116

EX 35
1091

```
1    another entity or a trust or something like that?

2         A.   Yeah.  No.  I didn't build a shell company,

3    no.  I don't know the three flag rule.

4         Q.   So you're the only owner/shareholder --

5         A.   That's correct.  And that's all on record

6    in Delaware, I believe.

7         Q.   So you have the ultimate say at the

8    company; correct?

9         A.   Yes.

10        Q.   And it's always been that way; correct?

11        A.   It's always been that way.  On purpose.

12   You know, partnerships are tough.

13             Not to take anything away from lawyers, but

14   you guys are all partners.

15        Q.   Does Digital Altitude have a board?

16        A.   A board?  Like a formal board where --

17        Q.   Like a -- yeah, a board of directors --

18        A.   No.

19        Q.   -- or a board --

20        A.   No, no.

21             I mean, I have my management team, but

22   they're all paid.

23             It's not like I bring in a CEO Snapchat to

24   advise me or something.

25             Is that what you mean?  Something like
```

Exhibit 3 Page 117

EX 35
1092

```
 1    e-mail you, you put in a real one.

 2           I would be shocked -- And we'll do our own

 3    research.  Mary is probably doing it right now,

 4    but -- to find out if -- how Jesse would do

 5    something like that, 'cause it just doesn't -- I can

 6    understand Russell because he's MOBE-trained, but

 7    I -- I can't understand Jesse.  Yeah.  If that's all

 8    what it looks like it is.

 9           But I guarantee if you go look at

10    hotmlmcompanies.com, is it a review site?  Did you

11    guys go do that?

12           It's probably a review site, but I'm

13    speculating.

14       Q.  Have you ever heard of an e-mail address,

15    support@aspir.link?

16       A.  Aspir.link, that sounds like a -- I'd have

17    to look at our URLs, but it sounds like one of our

18    redirected links to one of our -- to the Aspire

19    system.

20       Q.  I'll introduce as Exhibit 31.

21           (Exhibit 31 was marked for identification

22    by the reporter.)

23       THE WITNESS:  The trials and tribulations of

24    having 200,000 members and lots of affiliates who

25    are very aggressive.
```

Exhibit 3 Page 160

EX 35

1093

```
 1              Tiji Thomas, I know Tiji.  He's a coach for

 2   MOBE.

 3              But he's never been a coach at DA.

 4       MR. HOTTINGER:

 5       Q.  So are you aware that MOBE is making a

 6   contention in this case that Patrick White, who is

 7   listed on this e-mail --

 8       A.  I don't know who that is.

 9       Q.  Well, you'll see in the forwarded message.

10   It says, "From:  'Patrick White.'"

11              "To:  'Tiji Mobe.'"

12       A.  Oh, I got it, yeah.  Okay.

13       Q.  That Patrick White is making the contention

14   that he never signed up for the Aspire program and

15   that he received this e-mail unsolicited from

16   Aspire?

17       A.  Well, Mary can verify that, and so can

18   Alan.  Because we capture IPs.

19              We dig in -- because there's just a lot of

20   unscrupulous affiliate sites, and they try to play a

21   lot of games and try to do a lot of stuff that we

22   don't -- it's not -- we don't want them to be doing.

23              But irregardless, you know, you have to

24   police your affiliates, just like you have to police

25   your employees.
```

Exhibit 3 Page 161

EX 35

1094

```
 1              So this looks like an aggressive -- This

 2    isn't us.  This is -- I mean, this is -- I've never

 3    even heard of Patrick White.

 4              She's going to do some research to find out

 5    what IP it's coming from.  She'll go down the rabbit

 6    hole and dig into it.  But this is not us on

 7    purpose.

 8              And then it says the "From,"

 9    support@aspir.link, that's our typical autoresponder

10    e-mail.  That's our usual autoresponder e-mail

11    that's -- everybody gets.  You belong to the Aspire

12    system, you get it from support@aspir.link.

13              Because I, Michael Force, can't possibly

14    respond to 10,000 e-mails a day, can he?

15        Q.  Well, I understand that.

16              But you're -- you're -- I get the sense

17    that you're trying to defer some of this -- this

18    conduct that we've looked at based on an

19    autoresponder.

20              And you -- you control the autoresponder.

21    You tell it what to do.  You draft the e-mails --

22        A.  Sure.

23        Q.  -- that are going to be in the

24    autoresponder; correct?

25        A.  Sure.  Sure.
```

Exhibit 3 Page 162

EX 35
1095

```
 1        A.  Yes, I do.

 2        Q.  And you actually created the content and

 3   the improvements to his content slides, et cetera?

 4        A.  Well, I -- there weren't slides.  I created

 5   slides.

 6            And I also recorded the videos with him and

 7   the -- and the precursor to the slides.

 8        Q.  Okay.

 9        A.  And then I also reformatted the structure

10   of some of the text below it and added some

11   additional things to it.  Images, text.

12        Q.  And then, you know, at some time later -- I

13   know it was some time later, you started Digital

14   Altitude; right?

15        A.  Yes.

16        Q.  And you started with a -- some content

17   related to your 18 steps; correct?

18        MR. HOTTINGER:  Objection.  Leading.

19        MR. LOBBIN:

20        Q.  Is that correct?

21        A.  Yes.

22        MR. HOTTINGER:  Objection.  Leading.

23        MR. LOBBIN:

24        Q.  And was there something from RedShift or

25   MOS that your content was based on, at least in
```

Exhibit 3 Page 163

EX 35
1096

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-5708 PA (KSx) | Date | May 4, 2017 |
|---|---|---|---|

| Title | MOBE, Ltd. v. Digital Altitude LLC, et al. |
|---|---|

Present: The Honorable   PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| V.R. Vallery | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**        IN CHAMBERS—COURT ORDER

Before the Court is a Motion for Summary Judgment filed by defendants Digital Altitude LLC ("Digital Altitude") and Michael Force ("Force") (collectively "Defendants") (Docket No. 82). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for May 8, 2017, is vacated, and the matter taken off calendar.

Plaintiff MOBE, Ltd. ("MOBE") filed this action on August 1, 2016. MOBE's Complaint alleges that Force is a former sales representative for MOBE. According to the Complaint, after Force helped prepare some of the materials for MOBE's introductory course, he started Digital Altitude. Both MOBE and Digital Altitude provide business training programs. Both businesses apparently recruit customers by providing introductory training courses at reduced rates and then solicit those customers to purchase far more expensive additional training materials. MOBE, for instance, describes its business model as relying on the introductory course as the "precursor to all of the revenue MOBE generates," and uses its initial course to sell "additional products" that include "memberships that provide customers extensive coaching, systems, and support in building their online businesses, multiple networking and mentorship opportunities, and the opportunities to earn commissions for referring other customers to MOBE."

MOBE alleges that Force copied "extensively" from MOBE's materials to create the introductory course offered by Digital Altitude. Force claims instead that he had primary responsibility for developing the content of MOBE's introductory program and that most of that content was derived from other entities. The Complaint alleges that Digital Altitude also used MOBE's confidential client lists to solicit customers. The Complaint claims for: (1) copyright infringement; (2) theft of trade secrets under federal law; (3) intentional interference with contractual relations; (3) intentional interference with prospective economic advantage; and (4) unfair competition pursuant to California Business and Professions Code section 17200.

EX 35
1097

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 16-5708 PA (KSx) | Date | May 4, 2017 |
|---|---|---|---|
| Title | MOBE, Ltd. v. Digital Altitude LLC, et al. | | |

In their Motion for Summary Judgment, Defendants contend that MOBE's copyright infringement claim fails as a matter of law because Force, not MOBE, authored the original videos released by MOBE that MOBE alleges were later copied by Force and Digital Altitude when Digital Altitude released its own videos. Defendants additionally contend that much of the material in the original MOBE videos is based on pre-existing content from a third-party, Redshift, and that MOBE cannot maintain a copyright infringement claim for content it did not create. Defendants further assert that MOBE's copyright registrations should be deemed invalid because MOBE did not disclose in those registrations that Redshift was the source of the material. In its Opposition, MOBE asserts that the videos that Force was involved in creating for MOBE were based on scripts created by MOBE's founder Matt Lloyd ("Lloyd"). The Court concludes that triable issues of fact concerning the authorship, protectability, source, and similarity of the materials at issue preclude summary judgment on MOBE's copyright infringement claim.

MOBE's trade secret claim alleges that Digital Altitude and those affiliated with it, used MOBE's confidential lists of its customers, "affiliates,"[1/] and staff, to solicit business for Digital Altitude. In their Motion for Summary Judgment, Defendants admit that two of their affiliates, both of whom had previously been affiliated with MOBE, solicited clients using information those individuals had obtained while affiliated with MOBE. According to Defendants, these solicitations were done without Digital Altitude's knowledge or approval, and that this information does not qualify as "trade secrets" because MOBE did not have adequate safeguards to keep such information confidential. Defendants additionally seek summary judgment on MOBE's trade secret claim to the extent that claim relies on the improper use of the "staff" list because MOBE's public website identified those staff members. MOBE's Opposition and supporting factual materials do not respond to Defendants' arguments concerning the lack of confidentiality of its staff list, but do succeed in creating triable issues of fact concerning the confidentiality and improper use of the customer and affiliate lists. The Court therefore grants the Motion for Summary Judgment concerning the staff list, and denies the Motion with respect to the customer and affiliate lists.

The Court additionally concludes that Defendants have failed to establish that they are entitled to summary judgment on the claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair competition. Finally, triable issues of fact exist concerning Force's personal involvement and vicarious liability for the actions of Digital Altitude.

---

[1/]     Although both sides use the term "affiliates," neither side defines what qualifies one as an "affiliate," and how that differs from being either a customer or an employee or independent contractor.

EX 35
1098

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-5708 PA (KSx) | Date | May 4, 2017 |
|---|---|---|---|

| Title | MOBE, Ltd. v. Digital Altitude LLC, et al. |
|---|---|

For all of the foregoing reasons, the Court denies Defendants' Motion for Summary Judgment with the exception of the trade secret claim concerning MOBE's staff list.  Because the Court has denied Defendants' Motion for Summary Judgment, MOBE's application to continue the hearing on the summary judgment motion pursuant to Federal Rule of Civil Procedure 56(d) (Docket 95) is denied as moot.

IT IS SO ORDERED.

EX 35
1099

1  Stephen M. Lobbin (SBN 181195)
   slobbin@onellp.com
2  **ONE LLP**
   4000 MacArthur Boulevard
3  East Tower, Suite 500
   Newport Beach, California 92660
4  Tel:   949.502.2870
5
6  Joanna Ardalan (SBN 285384)
   jardalan@onellp.com
7  Oscar M. Orozco-Botello (SBN 313104)
   oobotello@onellp.com
8  **ONE LLP**
   9301 Wilshire Blvd., Penthouse
9  Beverly Hills, CA 90210
   Tel: 310.866.5157
10
11  Attorneys for Defendants and Counterclaimants

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                    **WESTERN DIVISION**

15  **MOBE, Ltd.**, a Malaysian company,        Case No. 2:16-cv-05708-PA-KS
                                                 Hon. Percy Anderson
16              Plaintiff,
17        v.                                     **DEFENDANTS' EXPERT
                                                 WITNESS SUBMISSIONS
18  **Digital Altitude LLC**, a Delaware         PURSUANT TO THE COURT'S
    limited liability company, and **Michael    ORDER ON JUNE 16, 2017**
19  Force**, an individual,
20              Defendants.                      [Documents related to the Expert
                                                 Opinion Proffer of David S. Hanson]
21
22                                               **Final Pretrial Conference: 6/23/2017,
23                                               at 1:30 pm**
24  AND RELATED COUNTERCLAIMS.                   **Jury Trial: 7/11/2017, at 9:00 a.m.**
25
26
27
28

1      Pursuant to this Court's Order dated June 16, 2017, ECF No. 138, Defendants Digital

2   Altitude, LLC and Michael Force respectfully submit the following documents:

3

4    1.  Exhibit A: Curriculum Vitae of David S. Hanson;

5    2.  Exhibit B: David S. Hanson's Rebuttal Report to Preliminary Expert Opinion of

6        Clarke B. Nelson (May 9, 2017); and

7    3.  Exhibit C: Disclosure of David Hanson as Expert via report attached as Exhibit B.

8

9   Dated:  June 20, 2017              **ONE LLP**

10

11                        By: __/s/ Stephen M. Lobbin_____
                              Attorneys for Defendants and Counterclaimants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# LIT.ECON LLP

ECONOMIC ANALYSIS ▪ DAMAGES ▪ FORENSIC ACCOUNTING ▪ VALUATIONS

**David S. Hanson, CPA**
**Rebuttal Report to Preliminary Expert Opinion**
**Of Clarke B. Nelson**
**Regarding Damages**

*MOBE, Ltd.*
*v.*
*Digital Altitude LLC and Michael Force*

**United States District Court**
**For the Central District of California**
**Western Division**

**Case No. 2:16-CV-05708-PA-KS**

***Confidential – Attorneys' Eyes Only***

courses competing directly with similar to MOBE and Digital Altitude. These include Digital
Marketer, Etison LLC, B-School, Fascinate, Inc., Tecademics, The Transformation Network, 7
Figure Sales Training, and many others.

Initial access to the MOBE MTTB System is sold for $49.00 after which customers are presented
with offers to purchase further MOBE products and training materials.[59]   Other additional
products offered by MOBE include memberships that are sold at different levels and at different
prices.[60]  These memberships include the Silver, Gold, Titanium, platinum and Diamond.[61]  The
prices for these memberships range from $2,497 for the Silver to $29,997 for the Diamond.[62]

Digital Altitude's core products include Aspire, Base, Rise, Ascend, Peak and Apex.[63]   The
Aspire product includes eighteen training videos consisting of slides with accompanying audio.[64]
The Aspire membership program sells for between $37.00 and $127.00 per month.[65]  The prices
for the Base, Rise, Ascend, Peak and Apex membership programs sell for prices ranging from
$597 for the Base to $27,997 for the Apex.[66]  I understand that Digital Altitude does offer a
limited 14-day trial membership to the Aspire program for $1.00.[67]

### IV. Copyright Infringement Damages – Digital Altitude's Profits

  A.  Total Revenues Earned by Digital Altitude

In **Schedule 3** I have prepared a summary of the revenues realized and corresponding profits
earned by Digital Altitude from inception of its business operations in 2015 through December
31, 2016.  This schedule was prepared based on financial statements produced by Digital
Altitude during the course of this litigation.  This schedule reveals that during this period; Digital
Altitude realized product related revenues of 13,919,221 and other revenues of 12,702,963 for a

---

[59] *Id.*, Page 5.
[60] *Id.*, Page 6
[61] *Id.*, Page 7
[62] *Id.*
[63] https://s3.amazonaws.com/public.digitalaltitude.co/DIGITAL%20ALTITUDE%OVERVIEW%20(LONG).pdf
[64] Complaint, page 6.
[65] https://s3.amazonaws.com/public.digitalaltitude.co/DIGITAL%20ALTITUDE%OVERVIEW%20(LONG).pdf.
[66] *Id.*
[67] April 6, 2017 Preliminary Expert Report of Clarke B. Nelson, page 11.

**\*\*\*Confidential – Attorneys' Eyes Only\*\*\***

total income of $26,622,184. I understand that included in the other revenue amounts are funds received by Digital Altitude for product related revenues.[68]   However, as of the date of my report a reconciliation has not yet been completed by Digital Altitude in order to reclassify those revenues into the appropriate product revenue general ledger codes.[69]

In addition to the 2015 and 2016 financial statements, Digital Altitude has also produced transactional data in electronic form regarding revenues realized from the sale of its products. In **Schedule 2** I have summarized the revenues included in the transactional data documents as sorted and reflected by Mr. Nelson in his report. This schedule reveals that Digital Altitude realized total revenues for the years 2015 and 2016 of $27,965,191 and realized an additional $4,446,455 in revenues through March 22 of calendar 2017. **Schedule 2** summarizes Digital Altitude revenues by the product offerings of Aspire, Base, Rise, Ascend, Peak and Apex.

I have noted that total revenues as reflected in the transaction data for the years 2015 and 2016 is $1,343,007 greater than total revenues reflected in the financial statements of Digital Altitude for that same period as summarized in **Schedule 3**. I have asked Digital Altitude to reconcile that difference. Once that reconciliation is completed I will review it and evaluate its impact, if any, on my determination of Digital Altitude revenues and related profits/profit rate. If necessary, my evaluation of its impact will be addressed in a supplemental report.

**B.** Costs and Expenses

As set forth in the Ninth Circuit Model Civil Jury Instructions for Copyright Damages – Defendant's Profits, profit is determined by deducting all expenses from gross revenues.[70] Expenses include all operating costs, overhead costs and production costs incurred in producing those gross revenues.

As previously mentioned, In **Schedule 3** I have prepared a summary of the profits earned by

---

[68] Discussion with Chris Webb, financial and accounting consultant to Digital Altitude.
[69] *Id.*
[70] See Ninth Circuit Model Civil Jury Instructions 17.24 Copyright-Damages-Defendant's Profits.

***Confidential – Attorneys' Eyes Only***

Digital Altitude from inception of its business operations in 2015 through December 31, 2016. This schedule was prepared based on monthly financial statements produced by Digital Altitude during the course of this litigation (see **Schedule 4** for 2015 and **Schedule 5** for 2016). The financial statements produced by Digital Altitude include its operating costs, its overhead costs and its production costs. Digital Altitude's only line of business is the sale of online business training courses and programs, products, tools and services. One of those training courses is the Aspire program, which is the Digital Altitude training program that MOBE asserts has infringed its alleged copyrighted material.

In order to evaluate costs and expenses incurred by Digital Altitude to produce and sell its products and programs, I had discussions with Digital Altitude management personnel.[71] From those discussions I learned that the monthly financial statements produced for 2015 and 2016 reflect the accrual basis of accounting. In 2016, one of the accrual adjustments recorded by Digital Altitude was to record "unearned revenue" as of December 31, 2016 related to revenues received on products and programs for which the training courses and seminars would not be conducted by Digital Altitude until 2017. Because the purpose of this damages report is to assess the profits earned on the alleged infringement of MOBE's copyrighted material, it is my opinion that these unearned revenues should be included in the assessment of Digital Altitude's profits, and accordingly I have reversed Digital Altitude's accrual of unearned revenue in my summary set forth in **Schedule 3**. In order to accurately determine Digital Altitude's profits earned through 2016 for the purposes of assessing copyright infringement damages, expenses actually incurred thus far in calendar 2017, as well as those costs expected to be incurred in 2017 related to the unearned revenues must be captured. Accordingly, in **Schedule 3** I have added actual costs incurred in 2017 as well as Digital Altitude's estimates for remaining costs that will be incurred in 2017 related to its unearned revenues collected through December 31, 2016.

---

[71] Discussions held with Morgan Johnson and Chris Web.

16
**\*\*\*Confidential – Attorneys' Eyes Only\*\*\***

EX 35
1105

After accounting for all of its costs and expenses, for the period 2015 through 2016 Digital Altitude earned a profit of $381,317 for a profit rate on sales of approximately 1.4 percent. See further discussions regarding the apportionment of profits in Section IV C. below.

### C. Revenues and Profits Earned by Digital Altitude Due to Infringement – Apportionment

As explained in the Ninth Circuit Model Jury Instructions, in addition to actual damages, the copyright holder is entitled to any profits of the defendant that is attributable to the infringement.[72] Any profits earned by Digital Altitude should be based only on the portion of the accused product sales that are attributable to the alleged copyrighted material. The Litigation Services Handbook states that the plaintiff's recovery of the defendant's profits in these actions (non patent intellectual property cases) should not exceed the portion of profits attributable to the alleged wrongful act.[73]

MOBE has specifically accused Digital Altitude's Aspire product as infringing its copyrighted material (direct sales). In addition, it appears that MOBE asserts that the Aspire program was the gateway through which customers eventually stepped up to other products offered by Digital Altitude such as the Base, Rise, Ascend, Peak and Apex programs (indirect sales).

The profits earned by Digital Altitude on both direct sales as well as indirect sales represent the contribution of many factors and assets beyond merely the alleged copyrighted materials itself. Such factors and assets would include other features of the product and business such as its customized landing page and $1.00 free trial offer, its personal one-on-one coaching each coach does with a customer, its 24-hour customer service and live chat, its experienced management team, the personalized texts, e-mails and voice drops that goes to each member, the quality, value and content of its live events, its flexible payment options, its accredited course that is offered, the Digital Altitude name, the owners' previous business success and relationships, the Digital Altitude affiliate network, its marketing, its know-how, its goodwill, etc. All of these

---

[72] See Ninth Circuit Model Civil Jury Instructions 17.24 Copyright-Damages-Defendant's Profits.
[73] Litigation Services Handbook the Role of the Financial Expert; Third Edition; Weil, Wagner and Frank P21.5. Also see Ninth Circuit Model Civil Jury Instructions 17.24 Copyright-Damages-Defendant's Profits.

***Confidential – Attorneys' Eyes Only***

EX 35
1106

MOBE, Ltd.
v.

**Digital Altitude LLC & Michael Force**
*Summary of Damages*

Schedule 1

**Damages Copyright Infringement**

| | |
|---|---|
| Digital Altitude Profit - Direct Sales | $0 to $5,506 |
| Digital Altitude Profit - Indirect Sales | None |
| **Total Copyright Infringement Damages** **Digital Altitude Profit** | **$0 to $5,506** |

**Damages Misappropriation of Trade Secrets**

| | |
|---|---|
| **Digital Altitude Profit - Misappropriation of Trade Secrets** | **None** |

**Confidential - Attorneys' Eyes Only**

EX 35
1107

Schedule 2

**Digital Altitude LLC and Michael Force**
**v.**
**MOBE, Ltd.**
**(#621)**

*Transactional Sales Data (1)*

| | 2015 $ | 2015 % | 2016 $ | 2016 % | Total 2015/2016 $ | % | 2017 $ | % | Total All Periods $ | % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Product Revenue** | | | | | | | | | | |
| **Aspire** | | | | | | | | | | |
| Walker | $938 | | $1,936,724 | 6.99% | $1,936,724 | 6.93% | 238,403 | 5.36% | $2,175,127 | 6.71% |
| Hiker | | 0.38% | 75,848 | 0.27% | 76,786 | 0.27% | 18,894 | 0.42% | 95,680 | 0.30% |
| Climber | 10,287 | 4.22% | 1,244,397 | 4.49% | 1,254,684 | 4.49% | 407,183 | 9.16% | 1,661,867 | 5.13% |
| **Total Aspire** | 11,225 | 4.60% | 3,256,969 | 11.75% | 3,268,194 | 11.69% | 664,480 | 14.94% | 3,932,674 | 12.13% |
| Base | 7,882 | 3.23% | 15,339 | 0.06% | 23,221 | 0.08% | 3,109 | 0.07% | 26,330 | 0.08% |
| Rise | 30,585 | 12.54% | 9,323,004 | 33.63% | 9,353,589 | 33.45% | 1,357,627 | 30.53% | 10,711,216 | 33.05% |
| Ascend | 18,972 | 7.78% | 7,552,542 | 27.24% | 7,571,514 | 27.07% | 1,289,707 | 29.01% | 8,861,221 | 27.34% |
| Peak | | | 4,883,658 | 17.62% | 4,883,658 | 17.46% | 700,586 | 15.76% | 5,584,244 | 17.23% |
| Apex | 175,306 | 71.86% | 2,689,709 | 9.70% | 2,865,015 | 10.24% | 430,946 | 9.69% | 3,295,961 | 10.17% |
| **Total Revenues** | $243,970 | 100.00% | $27,721,221 | 100.00% | $27,965,191 | 100.00% | 4,446,455 | 100.00% | $32,411,646 | 100.00% |

**Footnotes**
(1) Source of Data: Schedule 4 to the April 6, 2017 Preliminary Expert Report of Clarke B. Nelson

EX 35
1108

Schedule  3

**Digital Altitude LLC & Michael Force**
*Summary of Digital Altitude LLC P&L's 2015 and 2016 - Accrual Basis*

| | | 2015 (1) | % | 2016 (2) | % | Combined | % |
|---|---|---:|---:|---:|---:|---:|---:|
| **Income** | | | | | | | |
| Sources of Income | | | | | | | |
| 4100 | Aspire | $11,098 | 3.61% | $857,776 | 3.26% | $868,874 | 3.26% |
| 4200 | Base | | 0.00% | 36,117 | 0.14% | 36,117 | 0.14% |
| 4300 | Rise | 9,387 | 3.05% | 3,240,771 | 12.32% | 3,250,158 | 12.21% |
| 4400 | Ascend | 50,327 | 16.37% | 5,148,079 | 19.56% | 5,198,406 | 19.53% |
| 4500 | Peak | 44,685 | 14.53% | 2,940,121 | 11.17% | 2,984,806 | 11.21% |
| 4600 | Apex | 181,812 | 59.13% | 1,369,848 | 5.21% | 1,551,660 | 5.83% |
| 4700 | Gear | | 0.00% | 2,735 | 0.01% | 2,735 | 0.01% |
| 4800 | Trek | 1,480 | 0.48% | 24,985 | 0.09% | 26,465 | 0.10% |
| | Total Sources of Income | $298,789 | 97.18% | $13,620,432 | 51.76% | $13,919,221 | 52.28% |
| | | | | | | | |
| Other Income | | | | | | | |
| 4910 | Payments | | 0.00% | 3,821,293 | 14.52% | 3,821,293 | 14.35% |
| 4924 | Stripes - Deposit Income | | 0.00% | 948,182 | 3.60% | 948,182 | 3.56% |
| 4926 | American Express Merchant - Income | | 0.00% | 280,826 | 1.07% | 280,826 | 1.05% |
| 4928 | BMO Harris Bank Merchant - Revenue | | 0.00% | 300,000 | 1.14% | 300,000 | 1.13% |
| 4930 | Remarketing Income | | 0.00% | 21,269 | 0.08% | 21,269 | 0.08% |
| 4940 | EventBrite Revenue | | 0.00% | 120,103 | 0.46% | 120,103 | 0.45% |
| 4950 | Fee Revenue | 595 | 0.19% | 100,726 | 0.38% | 101,321 | 0.38% |
| 4980 | Sales Income - Divide Into Products | 8,087 | 2.63% | 461,826 | 1.76% | 469,913 | 1.77% |
| 4990 | Traffic Packages | | 0.00% | 200,509 | 0.76% | 200,509 | 0.75% |
| 4999 | Reimbursement Expenses | | 0.00% | 500 | 0.00% | 500 | 0.00% |
| 4998 | Merchant Account Income in Reserves | | 0.00% | 6,439,047 | 24.47% | 6,439,047 | 24.19% |
| | Total Other Income | $8,682 | 2.82% | $12,694,281 | 48.24% | $12,702,963 | 47.72% |
| | Total Income | $307,471 | 100.00% | $26,314,713 | 100.00% | $26,622,184 | 100.00% |
| | | | | | | | |
| **Cost of Goods Sold** | | | | | | | |
| 5200 | Events Expense | | 0.00% | 558,152 | 2.12% | 558,152 | 2.10% |
| 5500 | Direct Labor | 1,465 | 0.48% | 16,470,504 | 62.59% | 16,471,969 | 61.87% |
| 5600 | Traffic Costs | | 0.00% | 376,895 | 1.43% | 376,895 | 1.42% |
| 5700 | Returns, Refunds, and Chargebacks | | 0.00% | 235,228 | 0.89% | 235,228 | 0.88% |
| 5800 | Merchant Service Fees | 2,518 | 0.82% | 979,761 | 3.72% | 982,279 | 3.69% |
| | Total Cost of Goods Sold | $3,983 | 1.30% | $18,620,540 | 70.76% | $18,624,523 | 69.96% |
| | Gross Profit | $303,488 | 98.70% | $7,694,173 | 29.24% | $7,997,661 | 30.04% |
| | | | | | | | |
| **Expenses** | | | | | | | |
| Administrative | | | | | | | |
| 6010 | Business Gifts | 734 | 0.24% | 12,444 | 0.05% | 13,178 | 0.05% |
| 6020 | Business Management Services | 2,153 | 0.70% | 16,571 | 0.06% | 18,724 | 0.07% |
| 6030 | Dues & Subscriptions | 528 | 0.17% | 3,781 | 0.01% | 4,309 | 0.02% |
| 6040 | Meals & Entertainment | 4,045 | 1.32% | 5,128 | 0.02% | 9,173 | 0.03% |
| 6042 | Recreational Activities | | 0.00% | 1,209 | 0.00% | 1,209 | 0.00% |
| 6044 | Business Meals | 8,893 | 2.89% | 24,289 | 0.09% | 33,182 | 0.12% |
| 6060 | Insurance | | 0.00% | 1,259 | 0.00% | 1,259 | 0.00% |
| 6070 | Legal & Professional Fees | 225 | 0.07% | 165,949 | 0.63% | 166,174 | 0.62% |
| 6080 | Outsourced Service Providers | 286 | 0.09% | 12,497 | 0.05% | 12,783 | 0.05% |
| 6090 | Technology | 8,077 | 2.63% | 69,275 | 0.26% | 77,352 | 0.29% |
| 6100 | Office Expense & Supplies | 13,068 | 4.25% | 20,369 | 0.08% | 33,437 | 0.13% |
| 6160 | Postage & Shipping | 217 | 0.07% | 2,766 | 0.01% | 2,983 | 0.01% |
| 6170 | Phone Expense | 490 | 0.16% | 49,842 | 0.19% | 50,332 | 0.19% |
| 6180 | Website Expense | 5,545 | 1.80% | 71,554 | 0.27% | 77,099 | 0.29% |
| 6190 | Travel Expense | 7,857 | 2.56% | 107,262 | 0.41% | 115,119 | 0.43% |
| | Total Administrative | $52,118 | 16.95% | $564,195 | 2.14% | $616,313 | 2.32% |
| | | | | | | | |
| Financing | | | | | | | |
| 6210 | Bank Charges | 2,683 | 0.87% | 36,060 | 0.14% | 38,743 | 0.15% |
| 6220 | Finance Costs | 0 | 0.00% | 81,486 | 0.31% | 81,486 | 0.31% |
| | Total Financing | $2,683 | 0.87% | $117,546 | 0.45% | $120,229 | 0.45% |

Confidential - Attorneys' Eyes Only

EX 35
1109

Schedule 3

**Digital Altitude LLC & Michael Force**
*Summary of Digital Altitude LLC P&L's 2015 and 2016 - Accrual Basis*

| | | 2015 (1) | % | 2016 (2) | % | Combined | % |
|---|---|---|---|---|---|---|---|
| Indirect Labor | | | | | | | |
| 6310 | Support Services | | 0.00% | 85,899 | 0.33% | 85,899 | 0.32% |
| 6315 | Programming | | 0.00% | 200,659 | 0.76% | 200,659 | 0.75% |
| 6320 | Staff wages | | 0.00% | 59,577 | 0.23% | 59,577 | 0.22% |
| 6325 | Copy Writers | | 0.00% | 62,475 | 0.24% | 62,475 | 0.23% |
| 6330 | Executive Wages | 76,850 | 24.99% | 2,257,618 | 8.58% | 2,334,468 | 8.77% |
| 6350 | Finance Division | 7,350 | 2.39% | 93,335 | 0.35% | 100,685 | 0.38% |
| 6360 | Marketing Division | 49,250 | 16.02% | 197,586 | 0.75% | 246,836 | 0.93% |
| 6370 | Subcontractor Work | 16,706 | 5.43% | 354,504 | 1.35% | 371,210 | 1.39% |
| 6380 | Payroll Expense | | 0.00% | | 0.00% | | 0.00% |
| | Total Indirect Labor | $150,156 | 48.84% | $3,311,653 | 12.58% | $3,461,809 | 13.00% |
| Facilities & Equipment | | | | | | | |
| 6420 | Computer & Internet Expenses | 9,970 | 3.24% | 37,965 | 0.14% | 47,935 | 0.18% |
| 6450 | Rent or Lease | 26,450 | 8.60% | 42,339 | 0.16% | 68,789 | 0.26% |
| 6460 | Software | 1,058 | 0.34% | 26,497 | 0.10% | 27,555 | 0.10% |
| 6490 | Utilities | 420 | 0.14% | 3,934 | 0.01% | 4,354 | 0.02% |
| | Total Facilities & Equipment | $37,898 | 12.33% | $110,735 | 0.42% | $148,633 | 0.56% |
| Marketing | | | | | | | |
| 6610 | Advertising | 5,287 | 1.72% | 3,736 | 0.01% | 9,023 | 0.03% |
| 6620 | Advertising/Promotional | | 0.00% | 1,707 | 0.01% | 1,707 | 0.01% |
| 6630 | Facebook AD | 1,408 | 0.46% | 16,122 | 0.06% | 17,530 | 0.07% |
| 6640 | Formidable Forms | 117 | 0.04% | | 0.00% | 117 | 0.00% |
| 6640 | Go Daddy | 46 | 0.01% | | 0.00% | 46 | 0.00% |
| 6660 | Traffic | 891 | 0.29% | | 0.00% | 891 | 0.00% |
| 6670 | Marketing | 3,536 | 1.15% | 60,018 | 0.23% | 63,554 | 0.24% |
| | Total Marketing | $11,285 | 3.67% | $81,583 | 0.31% | $92,868 | 0.35% |
| 6800 | Business Taxes | | 0.00% | 50 | 0.00% | 50 | 0.00% |
| Vehicle | | | | | | | |
| 6930 | Vehicle Lease | | 0.00% | 2,541 | 0.01% | 2,541 | 0.01% |
| 6950 | Vehicle Repair & maintenance | 781 | 0.25% | 1,516 | 0.01% | 2,297 | 0.01% |
| | Total Vehicle | $781 | 0.25% | $4,057 | 0.02% | $4,838 | 0.02% |
| Other Expense | | | | | | | |
| 6998 | Miscellaneous | | 0.00% | | 0.00% | 0 | 0.00% |
| 6999 | Uncategorized Expense | | 0.00% | | 0.00% | 0 | 0.00% |
| 8100 | Interest Paid | | 0.00% | 72 | 0.00% | 72 | 0.00% |
| 8300 | Depreciation | | 0.00% | 12,872 | 0.05% | 12,872 | 0.05% |
| 8500 | Fraudulent Charges on Account | | 0.00% | 4,667 | 0.02% | 4,667 | 0.02% |
| 8888 | Misc to Fix | | 0.00% | 45,000 | 0.17% | 45,000 | 0.17% |
| | Total Other Expenses | $0 | 0.00% | $62,611 | 0.24% | $62,611 | 0.24% |
| | Total Expenses | $254,921 | 82.91% | $4,252,430 | 16.16% | $4,507,351 | 16.93% |
| Net Operating Income | | $48,567 | 15.80% | $3,441,743 | 13.08% | $3,490,310 | 13.11% |
| Other Adjustments: | | | | | | | |
| | Cost for Ascend Event Held March 8-11, 2017 | | 0.00% | (905,124) | -3.44% | (905,124) | -3.40% |
| | Cost for Marketing Mastery Held April 19-21 2017 | | 0.00% | (312,519) | -1.19% | (312,519) | -1.17% |
| | Estimated in 2017 for PEAK | | | (921,200) | -3.50% | (921,200) | -3.46% |
| | Estimated in 2017 for APEX | | | (435,000) | -1.65% | (435,000) | -1.63% |
| | Estimated in 2017 for RISE | | | (285,150) | -1.08% | (285,150) | -1.07% |
| | Estimated in 2017 for Leadership Retreat | | | (250,000) | -0.95% | (250,000) | -0.94% |
| **Adjusted Net Operating Income** | | $48,567 | 15.80% | $332,750 | 1.26% | $381,317 | 1.43% |

Footnotes:
(1) See Schedule 4
(2) See Schedule 5

Confidential - Attorneys' Eyes Only

EX 35
1110

Case 2:16-cv-05708-PA-KS   Document 109-2   Filed 06/20/17   Page 35 of 59   Page ID #:632

Digital Altitude LLC v. Michael Force
Digital Altitude LLC P&L 2015 (1)

Schedule 4

| Income | Jan 2015 | Feb 2015 | Mar 2015 | Apr 2015 | May 2015 | Jun 2015 | Jul 2015 | Aug 2015 | Sep 2015 | Oct 2015 | Nov 2015 | Dec 2015 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **4000 SOURCES OF INCOME** | | | | | | | | | | | | | |
| **4100 ASPIRE REVENUE** | | | | | | | | | | | | | |
| 4110 ASPIRE | | | | | | | | | | | | | $0 |
| 4120 ASPIRE Walker | | | | | | | | | | | | | $0 |
| 4122 ASPIRE Walker Trial | | | | | | | | | | | | | $0 |
| 4124 ASPIRE Walker + Affiliate fee | | | | | | | | | | | | | $0 |
| 4126 ASPIRE (Walker)+ Affiliate fee | | | | | | | | | | | | | $0 |
| 4130 ASPIRE Hiker | | | | | | | | | | | | 261 | $261 |
| 4132 ASPIRE (Hiker Annual) | | | | | | | | | | | | 804 | $804 |
| 4134 ASPIRE (Hiker)+Affiliate Fee | | | | | | | | | | | | | $0 |
| 4140 Aspire Climber | | | | | | | | | | | | | $0 |
| 4142 ASPIRE (Climber Annual) | | | | | | | | | | | | 889 | $889 |
| 4144 ASPIRE Climber + Affiliate Fee | | | | | | | | | | | | 9,144 | $9,144 |
| **Total 4100 ASPIRE REVENUE** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $11,098 | $11,098 |
| **4200 BASE REVENUE** | | | | | | | | | | | | | |
| 4210 BASE (Full Price) | | | | | | | | | | | | | $0 |
| 4220 BASE (Partial Payment) | | | | | | | | | | | | | $0 |
| **Total 4200 BASE REVENUE** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **4300 RISE REVENUE** | | | | | | | | | | | | | |
| 4310 RISE Bundle (Full Price) | | | | | | | | | | | | | $0 |
| 4320 RISE full pay + Admin Fee | | | | | | | 1,480 | | | | | | $1,480 |
| 4330 Rise Bundle (Partial Payment) | | | | | | | 2,569 | | 1,297 | | | 1,297 | $5,163 |
| 4340 RISE Bundle (Early Bird) | | | | | | | | | | | | | $0 |
| 4350 RISE + Admin fee | | | | | | | | | | | | | $0 |
| 4360 Rise 2 Pay | | | | | | | | | | | | | $0 |
| 4370 Rise 3 Pay | | | | | | | | | | | | | $0 |
| 4380 Rise 3 pay + Admin fee | | | | | | | | | | | | | $0 |
| 4390 RISE 4 PAY | | | | | | | | | 1,347 | 1,397 | | | $2,744 |
| 4398 RISE SYS & ENTERPRISE Transactions | | | | | | | | | | | | | $0 |
| **Total 4300 RISE REVENUE** | $0 | $0 | $0 | $0 | $0 | $0 | $4,049 | $0 | $2,644 | $1,397 | $0 | $1,297 | $9,367 |
| **4400 ASCEND REVENUE** | | | | | | | | | | | | | |
| 4410 Ascend Bundle (Full Price) | | | | | | | 9,997 | | | | | | $9,997 |
| 4420 Ascend - Partial Payment | | | | | | 8,744 | | 7,997 | 14,500 | 2,492 | 5,997 | 600 | $40,330 |
| 4430 Ascend + Admin fee | | | | | | | | | | | | | $0 |
| 4440 Ascend partial pay-5k | | | | | | | | | | | | | $0 |
| 4450 Unearned ASCEND Revenue | | | | | | | | | | | | | $0 |
| **Total 4400 ASCEND REVENUE** | $0 | $0 | $0 | $0 | $0 | $8,744 | $9,997 | $7,997 | $14,500 | $2,492 | $5,997 | $600 | $50,327 |
| **4500 PEAK REVENUE** | | | | | | | | | | | | | |
| 4510 PEAK Bundle (Full Price) | | | | | | | | | | | 7,000 | | $7,000 |
| 4520 Peak Partial Payment | | | | | | 10,750 | 18,480 | | 1,480 | 6,975 | | | $37,685 |
| 4550 Unearned PEAK Revenue | | | | | | | | | | | | | $0 |
| **Total 4500 PEAK REVENUE** | $0 | $0 | $0 | $0 | $0 | $10,750 | $18,480 | $0 | $1,480 | $6,975 | $7,000 | $0 | $44,685 |
| **4600 APEX REVENUE** | | | | | | | | | | | | | |
| 4610 Apex Bundle - Full Price | | | | | | | | | | | | | $0 |
| 4620 Apex - Partial Payment | | | | | 20,000 | 10,450 | 27,497 | 19,970 | 14,416 | 29,447 | 20,035 | 39,997 | $181,812 |
| 4650 Unearned APEX Revenue | | | | | | | | | | | | | $0 |
| **Total 4600 APEX REVENUE** | $0 | $0 | $0 | $0 | $20,000 | $10,450 | $27,497 | $19,970 | $14,416 | $29,447 | $20,035 | $39,997 | $181,812 |
| 4700 GEAR | | | | | | | | | | | | | $0 |
| 4800 TREK (prelaunch) | | | | | | | | | 1,480 | | | | $1,800 |
| **Total 4000 SOURCES OF INCOME** | $0 | $0 | $0 | $0 | $20,000 | $29,944 | $60,023 | $27,967 | $34,520 | $40,311 | $33,032 | $52,892 | $298,768 |
| **4900 OTHER INCOME** | | | | | | | | | | | | | |
| **4910 Payments** | | | | | | | | | | | | | |
| 4912 Check/Cash Deposits | | | | | | | | | | | | | $0 |
| 4914 EMS Merchant - Revenue | | | | | | | | | | | | | $0 |
| 4916 Parked Account | | | | | | | | | | | | | $0 |
| 4918 PayPal Income | | | | | | | | | | | | | $0 |
| 4920 Power pay | | | | | | | | | | | | | $0 |
| 4922 TSYS - Deposits Income | | | | | | | | | | | | | $0 |
| **Total 4910 Payments** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 4924 Stripes - Deposits Income | | | | | | | | | | | | | $0 |
| 4926 American Express Merchant - Income | | | | | | | | | | | | | $0 |

Confidential - Attorneys' Eyes Only

Page 1 of 4

Schedule 4

Digital Attitude LLC & Michael Force
Digital Attitude LLC P&L 2015 (1)

| Account | Jan 2015 | Feb 2015 | Mar 2015 | Apr 2015 | May 2015 | Jun 2015 | Jul 2015 | Aug 2015 | Sep 2015 | Oct 2015 | Nov 2015 | Dec 2015 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4928 BMO HARRIS BANK Merchant - Revenue | | | | | | | | | | | | | $0 |
| 4930 Remarketing Income | | | | | | | | | | | | | $0 |
| 4940 EventBrite Rev | | | | | | | | | | | | | $0 |
| 4950 Fee Revenue | | | | | | | | | | | | | |
| 4952 Admin fee | | | | | | | | | | | | | $0 |
| 4954 Affiliate Fee Revenue | | | | | | | | | | | | 391 | $391 |
| 4956 Affiliate Fee (Every 6 Month) | | | | | | | | | | | | | $0 |
| 4958 Affiliate Fee (Every Year) | | | | | | | | | | | | 204 | $204 |
| 4960 Wire fee | | | | | | | | | | | | | $0 |
| Total 4950 Fee Revenue | $0 | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $595 | $595 |
| 4980 Sales Income - Divide into Products | | | | | | | | 7,900 | | 187 | | | $8,087 |
| 4982 Sales | | | | | | | | | | | | | $0 |
| 4984 Sales of Product Income | | | | | | | | | | | | | |
| Total 4980 Sales Income - Divide into Products | $0 | | | | | $0 | $0 | $7,900 | $0 | $187 | $0 | $0 | $8,087 |
| 4990 Traffic Packages | | | | | | | | | | | | | $0 |
| 4991 Traffic Package Revenue | | | | | | | | | | | | | $0 |
| 4992 1,000 clicks | | | | | | | | | | | | | $0 |
| 4993 Hitter 2500 Clicks | | | | | | | | | | | | | $0 |
| 4994 Custom Traffic Package | | | | | | | | | | | | | $0 |
| 4995 Leader 5000 Clicks | | | | | | | | | | | | | $0 |
| 4996 Traffic Package 7500 Clicks | | | | | | | | | | | | | $0 |
| 4997 Produce 7500 Clicks | | | | | | | | | | | | | $0 |
| 49970 Unearned TRAFFIC Revenue | | | | | | | | | | | | | $0 |
| Total 4990 Traffic Packages | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 4999 REIMBURSED EXPENSES | | | | | | | | | | | | | $0 |
| Total 4800 OTHER INCOME | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $7,900 | $0 | $187 | $0 | $595 | $8,662 |
| 4998 Merchant Account Income In Reserves | | | | | | | | | | | | | $0 |
| Total Income | $0 | $0 | $0 | $0 | $20,000 | $29,944 | $60,023 | $35,867 | $34,520 | $40,498 | $33,032 | $53,587 | $307,470 |
| Cost of Goods Sold | | | | | | | | | | | | | |
| 5200 Events Expenses | | | | | | | | | | | | | $0 |
| 5210 Event Meals | | | | | | | | | | | | | $0 |
| 5220 Event Facilities | | | | | | | | | | | | | $0 |
| 5230 Event - Attendee Hotel Accommodations | | | | | | | | | | | | | $0 |
| 5240 Event Materials | | | | | | | | | | | | | $0 |
| 5260 Event - Video | | | | | | | | | | | | | $0 |
| 5270 Event Prizes | | | | | | | | | | | | | $0 |
| 5280 Event - Staff Travel Costs | | | | | | | | | | | | | $0 |
| Total 5200 Events Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5500 LABOR (DIRECT) | | | | | | | | | | | | | |
| 5510 Commissions | | | | | | | | | | | | | $0 |
| 5520 Affiliate Payouts | | | | | | | 465 | | | | | | $465 |
| 5530 Coach Commissions | | | | | | | 1,000 | | | | | | $1,000 |
| 5540 Coach & Affiliate Member - Split | | | | | | | | | | | | | $0 |
| Total 5500 LABOR (DIRECT) | $0 | $0 | $0 | $0 | $0 | $0 | $1,465 | $0 | $0 | $0 | $0 | $0 | $1,465 |
| 5800 Traffic Costs | | | | | | | | | | | | | $0 |
| 5700 RETURNS, REFUNDS, CHARGEBACKS | | | | | | | | | | | | | |
| 5710 ASPIRE (Return) | | | | | | | | | | | | | $0 |
| 5720 Power pay Refunds Given | | | | | | | | | | | | | $0 |
| 5730 Discounts/Refunds Given | | | | | | | | | | | | | $0 |
| 5740 Chargeback | | | | | | | | | | | | | $0 |
| 5750 CORE Return | | | | | | | | | | | | | $0 |
| 5760 Refund | | | | | | | | | | | | | $0 |
| 5780 Affiliate Fee (Return) | | | | | | | | | | | | | $0 |
| Total 5700 Returns, Refunds, Chargebacks | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5800 MERCHANT SERVICE FEES | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $615 | $273 | $398 | $1,233 | $2,518 |
| Total Cost of Goods Sold | $0 | $0 | $0 | $0 | $0 | $0 | $1,465 | $0 | $615 | $273 | $398 | $1,233 | $3,964 |
| Gross Profit | $0 | $0 | $0 | $0 | $20,000 | $29,944 | $58,558 | $35,867 | $33,905 | $40,226 | $32,634 | $52,354 | $303,487 |
| Expenses | | | | | | | | | | | | | |
| 6000 ADMINISTRATIVE EXPENSES | | | | | | | | | | | | | |
| 6010 Business Gifts | | | | | 99 | 13 | 332 | | 312 | 114 | | 241 | $734 |
| 6020 Business Management Services | | | | | | 109 | 406 | 411 | 312 | 213 | 276 | 20 | $2,153 |
| 6030 Dues & Subscriptions | | | | | | 37 | 397 | 37 | 37 | | 362 | | $528 |

Confidential - Attorneys' Eyes Only

Digital Attitude LLC & Michael Force
Digital Attitude LLC P&L 2015 (1)

Schedule 4

| Account | Jan 2015 | Feb 2015 | Mar 2015 | Apr 2015 | May 2015 | Jun 2015 | Jul 2015 | Aug 2015 | Sep 2015 | Oct 2015 | Nov 2015 | Dec 2015 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6040 Meals, Amusement & Entertainment | | | | | 15 | 900 | 1,297 | 312 | 637 | 27 | 838 | 20 | $4,045 |
| 6042 Recreational Activities | | | | | | | | | | | | | $0 |
| 6044 Business Meals | | | | | 243 | 258 | 1,334 | 2,329 | 837 | 1,015 | 701 | 2,176 | $8,993 |
| 6060 Insurance | | | | | | | | | | | | | $0 |
| 6070 Legal & Professional Fees | | | | | | | | | | 225 | | | $235 |
| 6080 Outsourced Service Providers | | | | | | | | | | 10 | 8 | 268 | $286 |
| 6090 Technology | | | | | 60 | | 668 | 384 | | 1,431 | 1,680 | 3,001 | $8,077 |
| 6100 Office Expenses & Supplies | | | | | 530 | 585 | 5,882 | 1,404 | 472 | 1,009 | 2,169 | 1,018 | $13,068 |
| 6160 Postage & Shipping | | | | | | | 40 | 40 | 40 | 8 | | | $217 |
| 6170 Phone Expenses | | | | | | 89 | 63 | 115 | 205 | 87 | | 21 | $480 |
| 6180 Website Expenses | | | | | | | | | | | | | |
| 6182 Web/Graphics Expenses | | | | | | | | | | | | | $177 |
| 6184 Website Tools, Plugins, Resources | | | | | 15 | 15 | | 36 | | 79 | 2 | 399 | $2,409 |
| 6186 Web Hosting | | | | | | | 448 | 547 | 367 | 646 | 493 | 205 | $2,959 |
| Total 6180 Website Expenses | | | | | $15 | $15 | $448 | | $732 | $1,955 | $495 | $604 | $5,545 |
| 6190 Travel Expenses | | | | | | | | | | | | | |
| 6192 Air Travel | | | | | | | | | | | | 5 | $5 |
| 6194 Ground Transportation Costs | | | | | 75 | 32 | 178 | 215 | 76 | 30 | 185 | | $792 |
| 6196 Lodging | | | | | | | | | | | | | $0 |
| 6197 Parking Expenses | | | | | | | 24 | | | | 15 | 2 | $41 |
| 6198 Travel Meals | | | | | | | | | | | | | $0 |
| 6199 Travel | | | | | 35 | 546 | 194 | 2,001 | 2,790 | 127 | 211 | 1,113 | $7,019 |
| Total 6190 Travel Expenses | | | | | $110 | $580 | $396 | $2,216 | $2,866 | $158 | $411 | $1,120 | $7,857 |
| Total 6000 ADMINISTRATIVE EXPENSES | $0 | $0 | $0 | $0 | $1,072 | $2,571 | $11,263 | $8,544 | $6,991 | $6,251 | $6,940 | $8,488 | $52,119 |
| 6200 FINANCING EXPENSES | | | | | | | | | | | | | |
| 5210 Bank Charges | | | | | 63 | 68 | 168 | 306 | 277 | 570 | 537 | 695 | $2,683 |
| 6260 Interest | | | | | | | 0 | | | | | | $0 |
| Total 6200 FINANCING EXPENSES | $0 | $0 | $0 | $0 | $63 | $68 | $168 | $306 | $277 | $570 | $537 | $695 | $2,683 |
| 6300 INDIRECT LABOR RELATED | | | | | | | | | | | | | |
| 6310 Support Services | | | | | | | | | | | | | $0 |
| 6315 Programming | | | | | | | | | | | | | $0 |
| 6320 Staff Wages | | | | | | | | | | | | | $0 |
| 6325 Copy Writers | | | | | | | | | | | | | |
| 6330 Executive Wages | | | | | 7,500 | 6,500 | 6,750 | 9,600 | 1,600 | 21,000 | 9,900 | 14,000 | $76,850 |
| 6350 Finance Division | | | | | | | | | 1,900 | 2,600 | 950 | 1,900 | $7,350 |
| 6360 Marketing Division | | | | | 10,000 | | | 8,000 | 13,500 | 8,000 | 6,000 | 3,750 | $49,250 |
| 6370 Subcontractor Work | | | | | | | | | | | | | |
| 6374 I2work | | | | | | | 1,647 | 2,281 | 307 | 363 | 651 | 38 | $5,286 |
| 6378 Subcontractors | | | | | | | | 3,461 | 2,229 | 3,313 | 831 | 346 | $10,220 |
| Total 6370 Subcontractor Work | | | | | | | $1,647 | | | | | | $15,500 |
| 6380 Payroll Expense | | | | | | | | | | 1,200 | 1,482 | 424 | $16,706 |
| 6392 Taxes (deleted) | | | | | | | | | | | | | $0 |
| 6394 Wages (deleted) | | | | | | | | | | | | | $0 |
| Total 6300 INDIRECT LABOR RELATED | $0 | $0 | $0 | $0 | $17,500 | $6,500 | $8,397 | $23,342 | $19,536 | $36,476 | $18,332 | $20,074 | $150,156 |
| 6400 FACILITIES & EQUIPMENT | | | | | | | | | | | | | |
| 6420 Computer & Internal Expenses | | | | | | 3,728 | 10 | 656 | 656 | 170 | 621 | 3,725 | $9,970 |
| 6450 Rent or Lease | | | | | | | | 15,800 | 2,775 | 1,375 | 3,250 | 3,250 | $26,450 |
| 6460 Software | | | | | | 135 | 79 | 272 | 572 | | | | $1,058 |
| 6490 Utilities | | | | | | 55 | 85 | 280 | | | | | $420 |
| Total 6400 FACILITIES & EQUIPMENT | $0 | $0 | $0 | $0 | $0 | $3,917 | $174 | $17,613 | $4,002 | $1,545 | $3,871 | $6,975 | $37,898 |
| 6600 MARKETING EXPENSES | | | | | | | | | | | | | |
| 6610 Advertising | | | | | | 1,870 | 1,870 | 1,984 | 1,000 | | 40 | 393 | $5,287 |
| 6620 Advertising/Promotional | | | | | | | | | | | | | $0 |
| 6630 Facebook Ad | | | | | | | | | | 1,379 | 29 | | $1,408 |
| 6640 Formidable Forms | | | | | | | | | | 117 | | | $117 |
| 6650 GoDaddy | | | | | | | | | | 146 | | | $46 |
| 6660 Traffic | | | | | | | | 694 | 197 | | | | $891 |
| 6670 Marketing | | | | | | 384 | 384 | 985 | 1,020 | 159 | 69 | 986 | $3,536 |
| Total 6600 MARKETING EXPENSES | $0 | $0 | $0 | $0 | $0 | $2,254 | $3,663 | $2,217 | $1,701 | $969 | $1,379 | $11,285 |
| 6800 BUSINESS TAXES PAID | | | | | | | | | | | | | |
| 6900 VEHICLE RELATED EXPENSES | | | | | | | | | | | | | $0 |

Digital Altitude Michael Force
Digital Altitude LLC P&L 2015 (1)

Schedule 4

| | Jan 2015 | Feb 2015 | Mar 2015 | Apr 2015 | May 2015 | Jun 2015 | Jul 2015 | Aug 2015 | Sep 2015 | Oct 2015 | Nov 2015 | Dec 2015 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6930 Vehicle Lease | | | | | | | | | | | | | $0 |
| 6950 Vehicle Repair & Maintenance | | | | | | 69 | | | | | 712 | | $781 |
| Total 6900 VEHICLE RELATED EXPENSES | $0 | $0 | $0 | $0 | $0 | $69 | $0 | $0 | $0 | $0 | $712 | $0 | $781 |
| Bank Errors (deleted) | | | | | | | | | | | | | $0 |
| Total Expenses | $0 | $0 | $0 | $0 | $18,634 | $13,124 | $22,257 | $53,268 | $33,023 | $46,543 | $30,461 | $37,611 | $254,921 |
| Net Operating Income | $0 | $0 | $0 | $0 | $1,366 | $16,820 | $36,301 | ($17,401) | $881 | ($6,317) | $2,173 | $14,743 | $48,565 |
| Other Expenses | | | | | | | | | | | | | |
| 8100 INTEREST PAID | | | | | | | | | | | | | $0 |
| 8300 DEPRECIATION EXPENSE | | | | | | | | | | | | | $0 |
| 8500 Fraudulent Charges on Our Account | | | | | | | | | | | | | $0 |
| Total Other Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Other Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Income | $0 | $0 | $0 | $0 | $1,366 | $16,820 | $36,301 | ($17,401) | $881 | ($6,317) | $2,173 | $14,743 | $48,565 |

Footnote:
(1) Source of Data: Excel file "Digital Altitude 2015 Profit and Loss"

Confidential - Attorneys' Eyes Only

EX 35
1114

Case 2:16-cv-05708-PA-KS   Document 1062-4   Filed 06/20/17   Page 39 of 59   Page ID #:0828

Digital Altitude LLC v. Michael Force
Digital Altitude LLC PAL 2016 (1)

Schedule 5

| Income | Jan 2016 | Feb 2016 | Mar 2016 | Apr 2016 | May 2016 | Jun 2016 | Jul 2016 | Aug 2016 | Sep 2016 | Oct 2016 | Nov 2016 | Dec 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **4000 SOURCES OF INCOME** | | | | | | | | | | | | | |
| **4100 ASPIRE REVENUE** | | | | | | | | | | | | | |
| **4110 ASPIRE** | | | | | | | | | | | | | $95 |
| 4120 ASPIRE Walker | | 258 | 858 | 98 | 53,467 | 159,433 | 224 | (482) | | 276 | | 148 | $489,106 |
| 4122 ASPIRE Walker Trial | | 48 | 60 | 407 | 6,105 | 9,008 | 211,660 | 66,265 | (2,649) | (482) | (259) | | $33,779 |
| 4124 ASPIRE Walker + Affiliate fee | | | | 97 | | 54 | 12,555 | 5,906 | | | | | $108 |
| 4126 ASPIRE Walker (Walker)+ Affiliate fee | | | | | | | | 54 | | | | | $54 |
| 4130 ASPIRE Hiker | 134 | 67 | 134 | 134 | 54 | 8,729 | 8,040 | 2,479 | | | | | $23,536 |
| 4132 ASPIRE (Hiker Annual) | | | | | | 134 | | | | | | | $134 |
| 4134 ASPIRE (Hiker)+Affiliate Fee | | | | | 84 | | | | | | | | $84 |
| 4140 Aspire Climber | 1,016 | 2,176 | 1,778 | 381 | 46,974 | 107,197 | 109,585 | 36,195 | | | | | $304,282 |
| 4142 ASPIRE (Climber Annual) | 127 | | 254 | | | 3,336 | 720 | 288 | | | | | $391 |
| 414 ASPIRE Climber + Affiliate Fee | | | | 1,872 | | | | | | | 1,218 | | $6,216 |
| Total 4100 ASPIRE REVENUE | $1,277 | $2,549 | $3,084 | $1,117 | $111,375 | $287,870 | $342,765 | $110,705 | ($2,649) | ($206) | ($259) | $148 | $857,776 |
| **4200 BASE REVENUE** | | | | | | | | | | | | 22,337 | |
| 4210 BASE (Full Price) | | | 1,194 | | 3,357 | 8,420 | 11,028 | 240 | (600) | (1,137) | 350 | 45,810 | $12,971 |
| 4220 BASE (Partial Payment) | | | | | 6,387 | 5,490 | | | 27,000 | | | | $23,145 |
| Total 4200 BASE REVENUE | $0 | $0 | $1,194 | $0 | $9,744 | $13,910 | $11,028 | $240 | $26,561 | $19,050 | $12,679 | $45,810 | $36,117 |
| **4300 RISE REVENUE** | | | | | | | | | | | | | |
| 4310 RISE Bundle (Full Price) | | 247 | 10,554 | 2,497 | 49,357 | 108,306 | 135,174 | 39,831 | 1,899 | 17,913 | 3,994 | 15,976 | $430,192 |
| 4320 RISE full pay + Admin Fee | | | | | 269,855 | 303,336 | | | 729,701 | 569,829 | 419,679 | 229,932 | $573,191 |
| 4330 RISE Bundle (Partial Payment) | | | | | 1,846 | 4,853 | 14,098 | 9,443 | 143,514 | 132,056 | 81,212 | 81,212 | $49,501 |
| 4340 RISE Bundle (Early Bird) | | | 5,684 | 4,494 | 79,172 | 187,691 | 10,475 | 10,475 | | | | | $297,991 |
| 4350 RISE + Admin fee | | | | | | 139,676 | 607,962 | 283,863 | (4,114) | (2,057) | 2,060 | 6,279 | $1,027,590 |
| 4360 RISE 2 Pay | | | | 2,200 | 38,557 | 64,515 | 71,493 | 31,526 | | | | | $306,201 |
| 4370 RIse 3 Pay | | | | | 46,063 | 65,116 | 25,988 | 8,415 | | | | | $146,208 |
| 4380 RIse 3 pay + Admin fee | | | | | | 12,608 | 29,944 | 9,456 | | | | | $52,008 |
| 4390 RISE 4 PAY | | | | | | 143,588 | 193,276 | 57,517 | | | | | $458,114 |
| 4396 RISE SYS & ENTERPRISE Transactions | | | | | | | | (50,000) | | | | | ($513) |
| Total 4300 RISE REVENUE | $0 | $247 | $16,237 | $11,886 | $544,407 | $1,074,977 | $1,088,391 | $400,326 | $26,561 | $19,050 | $12,679 | $45,810 | $3,240,771 |
| **4400 ASCEND REVENUE** | | | | | | | | | | | | | |
| 4410 Ascend Bundle (Full Price) | | | 21,491 | 64,990 | 161,068 | 508,306 | 678,030 | 661,574 | 729,701 | 569,829 | 419,679 | 229,932 | $4,004,801 |
| 4420 Ascend - Partial Payment | | | | 10,497 | 45,498 | 120,595 | 164,880 | 179,374 | 143,514 | 132,056 | 67,496 | 81,212 | $945,122 |
| 4430 Ascend + Admin fee | | | | | | 4,853 | 18,177 | 9,270 | | | | | $31,027 |
| 4440 Ascend partial pay+5k | | | | | | 44,897 | 76,632 | 5,000 | | | | | $126,529 |
| 4450 Unearned ASCEND Revenue | | | | | | | | | | | | (6,673,109) | ($6,673,109) |
| Total 4400 ASCEND REVENUE | $0 | $0 | $21,491 | $75,487 | $206,566 | $679,979 | $935,719 | $855,218 | $873,215 | $701,885 | $487,375 | (36,361,965) | ($7,525,000) |
| **4500 PEAK REVENUE** | | | | | | | | | | | | | |
| 4510 Peak Bundle (Full Price) | | | | 32,914 | 173,779 | 244,962 | 349,962 | 356,688 | 356,688 | 305,977 | 254,955 | 180,970 | $2,257,144 |
| 4520 Peak Partial Payment | | | | 552 | | 57,786 | 164,387 | 93,202 | 128,351 | 107,664 | 86,561 | 44,472 | $682,976 |
| 4550 Unearned PEAK Revenue | | | | | | | | | | | | (6,324,787) | ($6,324,787) |
| Total 4500 PEAK REVENUE | $0 | $0 | $0 | $33,466 | $173,779 | $302,748 | $514,349 | $450,138 | $485,040 | $413,641 | $341,516 | (36,099,344) | ($3,384,666) |
| **4600 APEX REVENUE** | | | | | | | | | | | | | |
| 4610 Apex Bundle - Full Price | 9,986 | | | | | 55,994 | 192,982 | 83,991 | 167,982 | 139,986 | 111,988 | 27,997 | $780,920 |
| 4620 Apex - Partial Payment | | | | | | | 97,241 | 192,457 | 104,542 | 64,645 | 95,677 | 24,360 | $588,928 |
| 4650 Unearned APEX Revenue | | | | | | | | | | | | (2,919,691) | ($2,919,891) |
| Total 4600 APEX REVENUE | $9,986 | $0 | $0 | $0 | $0 | $55,994 | $290,223 | $276,448 | $272,524 | $204,631 | $207,665 | (32,867,514) | ($1,550,043) |
| **4700 GEAR** | | $0 | | | | | | | | | | | $2,736 |
| 4800 TREK (prelaunch) | | 2,735 | | | | | | | | | | | $2,885 |
| Total 4000 SOURCES OF INCOME | $11,263 | 24,985 | $42,006 | $121,956 | $1,045,871 | $2,415,478 | $3,182,475 | $2,093,276 | $1,654,691 | $1,339,002 | $1,049,976 | (15,282,865) | ($2,297,355) |
| **4900 OTHER INCOME** | | $30,516 | | | | | | | | | | | $0 |
| **4910 Payments** | | | | | | | 5,634 | | | | | | $5,634 |
| 4912 Check/Cash Deposits | | | | | | | | | | | | | |
| 4848 Merchant - Revenue | | | | | 310 | 1,139 | 1,978 | 889 | 82,832 | | 816,404 | 167,551 | $1,008,878 |
| 4916 Parked Account | | | 7,846 | | 13,748 | 12,804 | | 50,000 | | | 10 | | $64,326 |
| 4918 PayPal income | | 1,297 | | 7,846 | | 12,824 | 60,675 | 142,629 | | | | | $85,695 |
| 4920 Power pay | | | | | | | | | | (67) | | | $216,061 |
| 4922 TSYS - Deposits Income | | | | | | | | | | 379,420 | 891,816 | 1,171,463 | $2,442,698 |
| 4824 Stripe - Deposits Income | | | | | | 26,767 | $68,288 | 507,279 | $82,832 | $379,353 | 1,708,320 | 1,339,014 | $3,821,293 |
| | $0 | $1,297 | $0 | $7,846 | $14,056 | | | $193,518 | | | 438,198 | 2,705 | $949,182 |

Confidential - Attorneys' Eyes Only

Page 1 of 4

EX 35
1115

Digital Attitude LLC - Michael Force
Digital Attitude LLC P&L 2016 (1)

Schedule 5

| Account | Jan 2016 | Feb 2016 | Mar 2016 | Apr 2016 | May 2016 | Jun 2016 | Jul 2016 | Aug 2016 | Sep 2016 | Oct 2016 | Nov 2016 | Dec 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4926 American Express Merchant - Income | 19,997 | 4,997 | 454 | 9,396 | (296) | (423) | 45 | 79,008 | | | 167,521 | 128 | 280,826 |
| 4928 BMO HARRIS BANK Merchant - Revenue | | | | | | | | | | 300,000 | | | 300,000 |
| 4930 Remarketing Income | | | | | | | | | | | 21,269 | 21,269 | 21,269 |
| 4940 EventBrite Rev | | | | | | | | | | | 120,103 | 120,103 | 120,103 |
| **4950 Fee Revenue** | | | | | | | | | | | | | |
| 4952 Admin fee | | | 50 | 75 | 176 | 315 | 360 | 170 | | 53 | 225 | 23 | 1,447 |
| 4954 Affiliate Fee Revenue | 374 | 586 | 643 | 170 | 12,308 | 23,121 | 25,914 | 8,558 | | | 4,517 | | 76,191 |
| 4956 Affiliate Fee (Every 6 Month) | 204 | | | | | 2,088 | 3,132 | 696 | | | | | 5,916 |
| 4958 Affiliate Fee (Every Year) | | | 40 | 45 | 279 | 5,661 | 3,978 | 1,683 | 1,145 | 818 | 620 | 507 | 11,526 |
| 4950 Admin fee | | | | | | | | | | | | | 5,646 |
| **Total 4950 Fee Revenue** | $578 | $586 | $733 | $290 | $12,763 | $31,751 | $34,117 | $12,000 | $1,145 | $871 | $5,362 | $530 | $100,726 |
| **4980 Sales Income - Divide into Products** | | | | | | | | | | | | | |
| 4982 Sales | | | 46,854 | 156,731 | 7,407 | 1,383 | | | 114,299 | | 18,988 | | 345,661 |
| 4984 Sales of Product Income | | | | | 22,943 | 50 | | | 58,719 | | | | 116,165 |
| **Total 4980 Sales Income - Divide into Products** | $0 | $0 | $46,854 | $156,731 | | | | | | | | | $461,826 |
| **4990 Traffic Packages** | | | | | | | | | | | | | |
| 4991 Traffic Package Revenue | | | | | | | | 6,440 | 2,900 | | | | 69,845 |
| 4992 1,000 clicks | | | | | | | | 1,250 | | | | | 3,750 |
| 4993 Hitter 2500 Clicks | | | | | | | | 2,875 | | | | | 5,775 |
| 4994 Custom Traffic Package | | | | 41,375 | 5,340 | 24,545 | 1,545 | | 5,275 | 6,688 | 7,194 | 8,739 | 72,805 |
| 4995 Leader 5000 Clicks | | | | | | | | | 7,125 | 10,000 | | 8,214 | 5,275 |
| 4996 Traffic Package 7500 Clicks | | | | | | | | | | | | 1,194 | 7,115 |
| 4997 Producer 7500 Clicks | | | | | | 7,115 | | | | | | 1,076 | 7,115 |
| 49970 Unearned TRAFFIC Revenue | | | | | | | | | | | (143,308) | (143,308) | (143,308) |
| **Total 4990 Traffic Packages** | $0 | $0 | $0 | $41,375 | $5,340 | $75,679 | $52,250 | $10,565 | $15,300 | $0 | $0 | ($143,308) | $57,201 |
| 4999 REIMBURSED EXPENSES | | | | | | | (1) | (1) | 15 | | | 487 | 500 |
| 7010 OTHER INCOME | $20,575 | $6,880 | $48,041 | $215,638 | $82,215 | $135,207 | $154,699 | $802,269 | $272,304 | $685,160 | $2,349,923 | $1,359,915 | $6,111,926 |
| 4998 Merchant Account Income in Reserves | | | | | | 12,558 | 123 | 1,328,256 | 2,402,013 | 1,490,098 | 1,093,253 | 112,835 | 454,646 |
| **Total Income** | $31,838 | $37,396 | $90,047 | $337,594 | $1,108,086 | $2,550,685 | $3,349,726 | $4,223,902 | $4,329,008 | $3,514,261 | $4,491,151 | ($13,810,075) | $10,263,619 |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| 5200 Events Expenses | | | | | | 81,897 | 77,420 | 4,143 | 22,316 | 107,361 | 32,784 | 42,108 | 368,029 |
| 5210 Event Meals | | | | | | | | | | 98,550 | 3,228 | 14,061 | 14,051 |
| 5220 Event Facilities | | | | | | | | | | | | 10,794 | 109,244 |
| 5230 Event - Attendee Hotel Accommodations | | | | | | 5,000 | 5,100 | | 9,800 | 6,688 | 7,194 | 8,739 | 53,208 |
| 5240 Event Materials | | | | | | | | | | 10,000 | | 8,214 | 15,427 |
| 5260 Event - Video | | | | | | | | | | | | 1,194 | 45,306 |
| 5270 Event Prizes | | | | | | | | | | | 495 | 1,076 | 1,194 |
| 5280 Event - Staff Travel Costs | | | | | | | | | | | | 1,571 | 1,571 |
| **Total 5200 Events Expenses** | $0 | $0 | $0 | $0 | $0 | $86,897 | $82,520 | $4,143 | $32,116 | $222,599 | $43,700 | $88,176 | $558,152 |
| **5500 LABOR (DIRECT)** | | | | | | | | | | | | | |
| 5510 Commissions | | | (14,297) | | 24,439 | 205,746 | 430,657 | 1,105,282 | 443,560 | 189,574 | 372,678 | 471,075 | 3,228,614 |
| 5520 Affiliate Payouts | | 1,908 | 77,123 | 750 | 201,254 | 339,676 | 845,682 | 1,638,209 | 1,112,765 | 728,758 | 1,390,106 | 2,330,684 | 3,466,166 |
| 5530 Coach Commissions | | | 750 | 2,255 | 234,784 | 252,166 | 337,334 | 502,023 | 493,800 | 366,253 | 451,837 | 620,658 | 3,027,077 |
| 5540 Coach & Affiliate Member - Split | 18,099 | 104,689 | | | 177,736 | 155,807 | 288,266 | 284,701 | 103,113 | 341,102 | 80,370 | 1,748,648 |
| **Total 5500 LABOR (DIRECT)** | $0 | $20,007 | $168,266 | $462,712 | $975,323 | $1,569,481 | $3,531,781 | $2,314,826 | $1,387,698 | $2,554,523 | $3,502,798 | $15,470,504 |
| 5800 Traffic Costs | $0 | $0 | $0 | $0 | 73,000 | 91,927 | 63,712 | 42,795 | 79,192 | 14,244 | 10,028 | 376,895 |
| **5700 RETURNS, REFUNDS, CHARGEBACKS** | | | | | | | | | | | | | |
| 5710 ASPIRE (Return) | | 150 | 702 | 7,009 | 2,594 | | 1,548 | | | 277 | | 296 | 11,183 |
| 5720 Power pay Refunds Given | | | | | | | | | | | | | 1,825 |
| 5730 Discounts/Refunds Given | | | | | | 2,124 | | | | | | | 2,124 |
| 5740 Chargeback | | | 2,500 | | 3,636 | 8,423 | 41,254 | 28,990 | 7,365 | 8,492 | 16,303 | 40,184 | 154,046 |
| 5750 CORE Return | | | | | | | | | | | | | 2,500 |
| 5760 Refund | | | 38 | 1 | 4,336 | 9,317 | 17,914 | 9,619 | 10,338 | 2,431 | 1,620 | 7,283 | 62,898 |
| 5780 Affiliate Fee (Return) | | 17 | | | | | | | | 35 | | | 52 |
| **Total 5700 Returns, Refunds, Chargebacks** | $0 | $167 | $3,240 | $7,010 | $10,568 | $20,295 | $60,717 | $38,609 | $17,703 | $11,234 | $17,923 | $47,764 | $235,028 |
| 5800 MERCHANT SERVICE FEES | 1,270 | 1,631 | 24,762 | 179,196 | 605,387 | 1,272,268 | 617,623 | 327,220 | 169,452 | 122,032 | 152,514 | 191,396 | 979,761 |
| **Total Cost of Goods Sold** | $1,270 | $1,798 | $24,762 | $179,196 | $605,387 | $1,272,268 | $1,272,873 | $3,707,465 | $2,576,073 | $1,862,754 | $2,784,005 | $2,539,141 | $16,630,540 |
| **Gross Profit** | $30,568 | $35,598 | $66,057 | $158,398 | $607,689 | $1,288,318 | $1,477,458 | $516,437 | $1,752,135 | $1,861,506 | $1,707,147 | ($17,349,223) | ($6,366,921) |
| **Expenses** | | | | | | | | | | | | | |
| **6000 ADMINISTRATIVE EXPENSES** | | | | | | | | | | | | | |
| 6010 Business Gifts | 171 | 109 | 141 | 49 | 317 | 131 | 608 | 3,551 | 1,243 | 1,011 | 3,000 | 5,305 | 12,444 |
| 6020 Business Management Services | | | 177 | | 455 | 2,880 | | 573 | | | 1,000 | 8,595 | 16,571 |

Confidential - Attorneys' Eyes Only

Digital Altitude — Michael Force
Digital Altitude LLC P&L 2016 (1)

Schedule 5

| | Jan 2016 | Feb 2016 | Mar 2016 | Apr 2016 | May 2016 | Jun 2016 | Jul 2016 | Aug 2016 | Sep 2016 | Oct 2016 | Nov 2016 | Dec 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6030 Dues & Subscriptions | 160 | 257 | 406 | 172 | 476 | 210 | 308 | 872 | 223 | 309 | 181 | 207 | $3,761 |
| 6040 Meals, Amusement & Entertainment | 304 | 32 | 517 | 115 | 142 | 569 | 218 | | 3,231 | | | | $5,128 |
| 6042 Recreational Activities | | | | | | | | | | | | 1,209 | $1,209 |
| 6044 Business Meals | 2,965 | 1,545 | 3,187 | 1,846 | 2,631 | 2,347 | 433 | 11,315 | 2,887 | 871 | 4,818 | 959 | $24,299 |
| 6060 Insurance | | | | | | | | | 144 | | 122 | 999 | $1,289 |
| 6070 Legal & Professional Fees | 396 | | 1,229 | 1,284 | 1,758 | 4,112 | 10,840 | 11,315 | 22,407 | 18,298 | 86,193 | 8,118 | $165,949 |
| 6080 Outsourced Service Providers | 651 | 468 | 1,313 | 2,004 | 7,913 | | 1,207 | 2,055 | 1,339 | 2,291 | 1,579 | 2,049 | $12,497 |
| 6090 Technology | 734 | 264 | 4,769 | 1,955 | 1,022 | 3,353 | 6,799 | 6,045 | 9,895 | 10,185 | 10,430 | 6,702 | $69,275 |
| 6100 Office Expenses & Supplies | 1,720 | 128 | 1,032 | 10 | 1,283 | 1,836 | 1,638 | 780 | 2,035 | 4,505 | 2,069 | 1,513 | $20,389 |
| 6110 Postage & Shipping | 160 | | 160 | 488 | 341 | 253 | 80 | 324 | 746 | 567 | | 430 | $3,568 |
| 6170 Phone Expenses | 100 | | 338 | | | 5,975 | 3,564 | 3,696 | 11,321 | 20,004 | 1,832 | 2,056 | $49,846 |
| 6180 Website Expenses | | | | | | | | | | | | | $109 |
| 6182 Web/Graphics Expenses | 1,141 | 398 | 398 | 199 | 199 | 199 | 1,351 | 1,195 | 693 | 4,910 | 1,128 | 938 | $12,309 |
| 6184 Website Tools, Plugins, Resources | 100 | 1,759 | 1,759 | 1,471 | 1,471 | 5,207 | | 12,855 | 11,237 | 6,395 | 5,057 | 6,752 | $50,833 |
| 6186 Web Hosting | 479 | 777 | 777 | 752 | 752 | 565 | 96 | 1,350 | 915 | 668 | 641 | 813 | $8,304 |
| **Total 6180 Website Expenses** | $1,720 | $2,934 | $2,934 | $2,422 | $2,422 | $6,128 | $1,447 | $15,400 | $12,845 | $12,081 | $7,026 | $8,503 | $71,554 |
| 6190 Travel Expenses | | | | | | | | | | | | | |
| 6192 Air Travel | 2 | 35 | 36 | 616 | 616 | 2,607 | 4,624 | 656 | 8,470 | 921 | 11,034 | 797 | $29,725 |
| 6194 Ground Transportation Costs | | | | 632 | 632 | 693 | 753 | 223 | 898 | 144 | 1,153 | 3,869 | $8,560 |
| 6196 Lodging | | | 4 | 134 | 134 | | 72 | | 735 | 3,844 | 14,412 | 15,398 | $34,462 |
| 6197 Travel Parking Expenses | | | | 6 | 6 | 1 | 28 | | 279 | 107 | 4 | | $509 |
| 6198 Travel Meals | | | | | | | 987 | 119 | 372 | 345 | 1,818 | 2,403 | $6,844 |
| 6199 Travel | 1,289 | 216 | 1,452 | 2,014 | 2,014 | 8,522 | 3,772 | | 725 | 6,185 | 1,130 | 75 | $27,903 |
| **Total 6190 Travel Expenses** | $1,291 | $256 | $1,492 | $3,397 | $3,397 | $11,822 | $10,235 | $996 | $11,480 | $11,525 | $29,550 | $22,543 | $107,262 |
| **Total 6000 ADMINISTRATIVE EXPENSES** | $10,311 | $3,551 | $17,694 | $11,163 | $21,010 | $39,295 | $37,388 | $45,608 | $79,097 | $91,427 | $148,469 | $69,183 | $564,196 |
| 6200 FINANCING EXPENSES | | | | | | | | | | | | | |
| 6210 Bank Charges | 417 | 435 | 655 | 1,427 | | 7,228 | 10,330 | 5,557 | 1,961 | 2,020 | 178 | 3,562 | $36,060 |
| 6220 Finance costs | | 32 | | | | 5,032 | 6,250 | 11,949 | 13,300 | 7,500 | 18,359 | 15,761 | $81,498 |
| **Total 6200 FINANCING EXPENSES** | $417 | $467 | $655 | $1,427 | $7,323 | $10,460 | $16,580 | $17,506 | $15,331 | $9,520 | $18,537 | $19,323 | $117,546 |
| 6300 INDIRECT LABOR RELATED | | | | | | | | | | | | | |
| 6310 Support Services | 5,000 | 1,500 | 4,500 | 1,584 | 460 | 2,680 | 1,064 | 12,847 | 11,014 | 12,384 | 15,599 | 28,268 | $85,899 |
| 6315 Programming | 10,245 | 7,290 | 6,780 | 5,050 | 7,700 | 19,200 | 25,950 | 38,315 | 20,819 | 37,070 | 27,220 | 19,335 | $200,659 |
| 6320 Web Design | 950 | 475 | 1,995 | 1,700 | | 1,187 | 14,274 | 6,015 | 848 | 4,542 | 7,393 | 4,504 | $30,477 |
| 6325 Copy Writers | 8,000 | 5,500 | 19,823 | 69,000 | 5,500 | 4,000 | 2,000 | 6,000 | 5,125 | 4,500 | 18,150 | 2,904 | $84,477 |
| 6330 Executive Wages | | | | | 56,950 | 56,581 | 181,542 | 254,583 | 252,182 | 77,490 | 204,120 | 1,030,905 | $2,257,618 |
| 6350 Finance Division | | | | 4,000 | 6,800 | 5,525 | 5,682 | 8,324 | 12,000 | 11,200 | 18,754 | 17,650 | $93,335 |
| 6360 Marketing Division | | | | 10,785 | 11,500 | 16,316 | 21,000 | 35,844 | 12,159 | 15,100 | 19,554 | 22,005 | $197,586 |
| 6370 Subcontractor Work | | | | | | | | | | | | | |
| 6374 Subcontractors | 973 | 1,807 | 1,807 | 740 | 11,252 | 3,052 | 15,332 | 34,577 | 50,636 | 45,646 | 68,350 | 117,386 | $349,751 |
| 6376 Subcontractors | | | | | | 190 | | 4,563 | | | | | $4,753 |
| **Total 6370 Subcontractor Work** | $973 | $1,807 | $1,807 | $740 | $11,252 | $3,242 | $15,332 | $39,140 | $50,636 | $45,646 | $68,350 | $117,386 | $354,504 |
| 6380 Payroll Expense | | | | | | | | | | | | | $0 |
| 6392 Taxes (deleted) | | | | | | | | | | | | | $0 |
| 6394 Wages (deleted) | $0 | | | | | | | | | | | | $0 |
| **Total 6380 Payroll Expense** | $0 | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total 6300 INDIRECT LABOR RELATED** | $25,168 | $14,765 | $34,875 | $92,859 | $100,102 | $158,732 | $266,823 | $413,568 | $367,377 | $211,432 | $379,139 | $1,246,754 | $3,311,654 |
| 6400 FACILITIES & EQUIPMENT | | | | | | | | | | | | | |
| 6420 Computer & Internet Expenses | 172 | 3,250 | 1,456 | 4,334 | 448 | 377 | 8,120 | 3,454 | 10,725 | 7,286 | 1,294 | 320 | $37,965 |
| 6450 Rent or Lease | 3,250 | | 3,250 | 3,250 | 3,337 | 3,252 | 3,250 | 3,250 | 3,250 | 3,500 | 3,500 | 6,000 | $42,339 |
| 6480 Software | 380 | | | | | 115 | 115 | 115 | 115 | 125 | 45 | 25,867 | $28,497 |
| 6490 Utilities | | | | | | 728 | 700 | 380 | 104 | | | | $1,934 |
| **Total 6400 FACILITIES & EQUIPMENT** | $3,802 | $3,250 | $4,706 | $7,584 | $5,426 | $4,472 | $12,185 | $7,199 | $14,194 | $10,891 | $4,839 | $32,188 | $110,736 |
| 6600 MARKETING EXPENSES | | | | | | | | | | | | | |
| 6610 Advertising | 6 | 384 | 199 | 199 | 99 | 99 | 99 | 615 | 99 | 1,001 | 778 | 178 | $3,736 |
| 6620 Advertising/Promotional | 550 | 738 | 99 | 64 | | | | 256 | | | | | $1,707 |
| 6630 Facebook Ad | 490 | 4,050 | 982 | 359 | 1,937 | 550 | 5,666 | 5,657 | 5,075 | 6,005 | 2,111 | 2,931 | $10,122 |
| 6670 Marketing | | | | | | | | | 8,686 | 5,093 | 1,636 | 4,899 | $65,918 |
| **Total 6600 MARKETING EXPENSES** | $1,046 | $5,162 | $1,280 | $622 | $2,036 | $649 | $5,765 | $6,528 | $13,863 | $12,099 | $14,524 | $18,000 | $81,583 |
| 6800 BUSINESS TAXES PAID | | | | | | | | | | | | 50 | $50 |
| 6900 VEHICLE RELATED EXPENSES | | | | | | | | | | | | | |
| 6930 Vehicle Lease | | | | | | | | | 2,541 | | | | $2,641 |
| 6950 Vehicle Repair & Maintenance | 23 | 23 | | | | 43 | 580 | | 6 | 574 | | 190 | $1,516 |

Confidential - Attorneys' Eyes Only

Schedule 5

**Digital Altitude LLC & Michael Force**
*Digital Altitude LLC P&L 2016 (1)*

| | Jan 2016 | Feb 2016 | Mar 2016 | Apr 2016 | May 2016 | Jun 2016 | Jul 2016 | Aug 2016 | Sep 2016 | Oct 2016 | Nov 2016 | Dec 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total 6900 VEHICLE RELATED EXPENSES | $0 | $23 | $0 | $0 | $0 | $43 | $680 | $0 | $2,547 | $674 | $0 | $190 | $4,057 |
| Bank Errors (deleted) | | | | | | | | | | | | | $0 |
| Total Expenses | $40,744 | $27,218 | $59,209 | $113,656 | $135,957 | $213,851 | $339,321 | $490,409 | $492,409 | $326,043 | $665,508 | $1,385,695 | $4,189,820 |
| Net Operating Income | ($10,176) | $8,360 | $6,828 | $44,743 | $471,742 | $1,054,667 | $1,138,138 | $26,028 | $1,259,726 | $1,335,463 | $1,141,639 | ($19,033,919) | ($12,556,741) |
| Other Expenses | | | | | | | | | | | | | |
| 8100 INTEREST PAID | | | | | | | | | | 72 | | | $72 |
| 8300 DEPRECIATION EXPENSE | | | | | | | | | 3,218 | 3,218 | 3,218 | 3,218 | $12,872 |
| 8500 Fraudulent Charges on Our Account | | | | | | | | | 1,615 | 5,890 | 14,891 | (17,729) | $4,667 |
| 8888 Misc to Fix | | | | | | | | | | | | 45,000 | $45,000 |
| Total Other Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,833 | $9,180 | $18,109 | $30,489 | $62,611 |
| Net Other Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($4,833) | ($9,180) | ($18,109) | ($30,489) | ($62,611) |
| Net Income | ($10,176) | $8,360 | $6,828 | $44,743 | $471,742 | $1,054,667 | $1,138,138 | $26,028 | $1,254,893 | $1,326,283 | $1,123,530 | ($19,064,408) | ($12,619,352) |
| Adjustments for Unearned Revenue | | | | | | | | | | | | | |
| 4450 Unearned ASCEND Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,673,109 | 6,673,109 |
| 4550 Unearned PEAK Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,324,787 | 6,324,787 |
| 4650 Unearned APEX Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,919,891 | 2,919,891 |
| 49970 Unearned TRAFFIC Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 143,308 | 143,308 |
| Adjusted Net Income | ($10,176) | $8,360 | $6,828 | $44,743 | $471,742 | $1,054,667 | $1,138,138 | $26,028 | $1,254,893 | $1,326,283 | $1,123,530 | ($3,003,314) | $3,441,742 |

**Footnote:**
(1) Source of Data: Excel file "Digital Altitude 2016 Profit and Loss"

Confidential - Attorneys' Eyes Only



Schedule 6

Digital Altitude LLC Michael Force
Digital Altitude LLC Common Customers with MOBE with Revenue of More Than $2,000 (1)

| No. | Digital Altitude Revenue | Name | Sponsor ID/Name | Sponsor Name | Date Joined Digital Altitude | Date Joined MOBE FB Group | MOBE Facebook Group | Notes |
|---|---|---|---|---|---|---|---|---|
| 1 | $58,169 | | | | 05/26/16 | | No | |
| 2 | $57,940 | | | | 07/19/16 | | No | |
| 3 | $57,815 | | | | 06/21/16 | | No | |
| 4 | $57,758 | | | | 08/11/16 | | No | |
| 5 | $57,527 | | | | 06/24/16 | | No | |
| 6 | $57,294 | | | | 07/24/16 | | No | |
| 7 | $57,177 | | | | 02/15/17 | | No | |
| 8 | $57,115 | | | | 02/09/17 | | No | |
| 9 | $41,325 | | | | 08/05/16 | | No | |
| 10 | $38,337 | | | | 07/14/16 | | No | |
| 11 | $38,076 (3) | | | | 07/03/16 | 05/02/13 | Yes | |
| 12 | $31,938 | | | | 08/18/16 | | No | |
| 13 | $31,925 | | | | 10/07/16 | | No | |
| 14 | $31,240 (2) | | | | 02/25/16 | | No | |
| 15 | $30,559 (3) | | | | 05/04/16 | 09/06/12 | Yes | |
| 16 | $29,918 | | | | 07/29/16 | | No | |
| 17 | $29,880 | | | | 08/09/16 | | No | |
| 18 | $29,828 | | | | 04/28/16 | | No | |
| 19 | $29,684 | | | | 04/23/16 | | No | |
| 20 | $29,648 | | | | 10/03/16 | | No | |
| 21 | $29,827 | | | | 03/31/16 | | No | |
| 22 | $29,827 | | | | 04/05/16 | | No | |
| 23 | $29,611 | | | | 09/23/16 | | No | |
| 24 | $29,574 | | | | 09/28/16 | | No | |
| 25 | $29,500 | | | | 08/29/16 | | No | |
| 26 | $21,267 | | | | 06/03/15 | | No | |
| 27 | $20,886 | | | | 07/09/15 | | No | |
| 28 | $20,533 | | | | 06/01/16 | | No | |
| 29 | $17,506 | | | | 08/18/16 | | No | |
| 30 | $17,223 | | | | 01/02/17 | | No | |
| 31 | $18,092 (2) | | | | 06/23/15 | | No | |
| 32 | $15,077 | | | | 09/30/16 | | No | |
| 33 | $14,648 | | | | 11/02/15 | 07/17/15 | Yes | Added by John Chow on July 17, 2015 |
| 34 | $14,404 | | | | 07/02/16 | | No | |
| 35 | $14,139 | | | | 06/25/16 | | No | |
| 36 | $13,633 | | | | 05/10/16 | | No | |
| 37 | $13,358 | | | | 07/21/16 | | No | |
| 38 | $13,324 | | | | 07/20/16 | | No | |
| 39 | $13,285 | | | | 04/16/16 | | No | |
| 40 | $13,175 | | | | 06/23/16 | | No | |
| 41 | $12,951 | | | | 06/11/16 | 04/13/16 | Yes | |
| 42 | $12,844 | | | | 08/15/16 | | No | |
| 43 | $12,821 (2) | | | | 03/29/16 | 04/03/14 | No | Added by John Chow on April 3, 2014 |
| 44 | $12,821 | | | | 07/20/16 | | Yes | |
| 45 | $12,819 | | | | 08/05/16 | | No | |
| 46 | $12,889 | | | | 08/08/16 | | No | |
| 47 | $12,850 | | | | 07/05/16 | | No | |
| 48 | $12,806 | | | | 05/10/16 | | No | |
| 49 | $12,794 | | | | 09/18/16 | | No | |

Confidential - Attorneys' Eyes Only

Page 1 of 8

1   Tyson K. Hottinger (CA State Bar No. 253221; E-Mail: thottinger@mabr.com)
2   C. J. Veverka (admitted *pro hac vice*; E-Mail: cveverka@mabr.com)
    R. Parrish Freeman (admitted *pro hac vice*; E-Mail: pfreeman@mabr.com)
3   Quincy J. Chuck (CA State Bar No. 307857; E-Mail: qchuck@mabr.com)
4   MASCHOFF BRENNAN LAYCOCK GILMORE ISRAELSEN & WRIGHT PLLC
    20 Pacifica, Suite 1130
5   Irvine, California 92618
6   Telephone:  (949) 202-1900
    Facsimile:   (949) 453-1104
7
8   Attorneys for Plaintiff and Counterdefendant MOBE, LTD.

9
                        UNITED STATES DISTRICT COURT
10
                      CENTRAL DISTRICT OF CALIFORNIA
11
                            WESTERN DIVISION
12

13
14   MOBE, LTD., a Malaysian company,        Case No. 2:16-cv-05708-PA (KSx)

15          Plaintiff,

16      v.                                   FIRST AMENDED JOINT
                                             DESIGNATIONS OF
17                                           DEPOSITION TESTIMONY
18   Digital Altitude LLC, a Delaware
     limited liability company;             HON. PERCY ANDERSON
19   Michael Force, an individual,          UNITED STATES DISTRICT JUDGE
                                            FIRST STREET, COURTROOM 9A
20
            Defendants.
21
22
23   AND RELATED COUNTERCLAIMS.
24
25
26
27
28

| Deposition Designation | Objection & Response |
|---|---|
| 12   with one more than the other? | |
| 13       A   Whoa.  Yes.  Yes.  And it was on and off.  It | |
| 14   was like a -- it was a really weird time there for me, | |
| 15   working with both companies. | |
| 16       Q   Can you explain that a little bit more? | |
| 17       A   Well, you know, you're working with one company | |
| 18   that's paying you 20 percent more that you don't enjoy | |
| 19   selling their products. | |
| 20       Q   Okay. | |
| 21       A   And you work for that company that you enjoy | |
| 22   selling their products, but you get paid a lot less. | |
| 23   So, you know -- back-and-forth in my head, you know, one | |
| 24   pays more money.  I wasn't having fun.  And that was the | |
| 25   reason why I left. | |
| | |
| 1       Q   And can you explain what you mean by you | **Defendants' Objections to 77:1-22:** |
| 2   weren't -- you didn't enjoy their products? | Mr. Aria's testimony is unsupported by |
| 3       A   Um, okay.  I've been in this industry for a | evidence that he had personal knowledge, |
| 4   long time.  You have a reputation, you have a name. | as required under FRE 602, about what |
| 5   When you're selling products, you want to make sure | activities were being prepared.  He worked |
| 6   they're going to be fulfilled on the back end. | in the sales department and not in the event |
| 7       I hadn't seen Digital Altitude -- I was selling | or product department.  Similarly, Mr. Aria |
| 8   hundreds and hundreds of thousands of dollars worth of | lacks personal knowledge about whether |
| 9   the products.  I had not seen an inkling an event was | "[t]he bank stopped trusting [Defendants.] The bank is purely speculative, irrelevant to the claims or defenses pursuant to FRE 401-402, and, even if relevant, should be |

EX 35
1121

| Deposition Designation | Objection & Response |
|---|---|
| 10   going to be set up soon, or people would be actually<br>11   trained.  And I went to Jeremy, I went to everyone -- I<br>12   said -- not everyone -- sorry.  General people -- "Hey,<br>13   what product" -- when are these people giving all this<br>14   money going to be fulfilled?"  And it was just dragging<br>15   and dragging and dragging and dragging.<br>16         And then they had merchant facilities, went<br>17   down.  The bank stopped trusting them.  The merchant<br>18   facilities went down, and we couldn't even put sales<br>19   through.<br>20         And then they stopped paying commissions on<br>21   time.  And I said, "You know what?  I don't like this,<br>22   anyway.  Why am I here?"  I went back to MOBE full-time. | excluded under FRE 403 as it would result in confusion or unfair prejudice.<br>Plaintiff's Response:<br>As a sales coach, Mr. Aria would be aware and have personal knowledge of Digital Altitude's financial issues affecting the customers he was responsible for.  Relevant, at least, to the calculation of damages, particularly the analysis of Digital Altitude's financial records. |
| Page78<br>3    Q   Okay.  And, you know, we discussed earlier that<br>4    this lawsuit -- part of it is about MOBE alleging that<br>5    Digital Altitude copied or stole some materials.<br>6    A   Yeah.<br>7    Q   Are you aware of any of that? | |

EX 35
1122

Tyson K. Hottinger (CA State Bar No. 253221; E-Mail: thottinger@mabr.com)
C. J. Veverka (admitted *pro hac vice*; E-Mail: cveverka@mabr.com)
R. Parrish Freeman (admitted *pro hac vice*; E-Mail: pfreeman@mabr.com)
Quincy J. Chuck (CA State Bar No. 307857; E-Mail: qchuck@mabr.com)
MASCHOFF BRENNAN LAYCOCK GILMORE ISRAELSEN & WRIGHT PLLC
20 Pacifica, Suite 1130
Irvine, California 92618
Telephone: (949) 202-1900
Facsimile: (949) 453-1104

Attorneys for Plaintiff and Counterdefendant MOBE, LTD.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| MOBE, LTD., a Malaysian company,<br><br>Plaintiff,<br><br>vs.<br><br>Digital Altitude LLC, a Delaware limited liability company; Michael Force, an individual,<br><br>Defendants.<br><br>———————————————<br><br>AND RELATED COUNTERCLAIMS | Case No. CV16-5708 PA (KSx)<br><br>**MOBE, LTD.'S SHORTENED EXPERT WITNESS PROFFER**<br><br>HON. PERCY ANDERSON<br>UNITED STATES DISTRICT JUDGE<br>FIRST STREET, COURTROOM 9A<br><br>Trial Date:     none set |

EX 35
1123

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 96 of 157   Page ID
#:1280
Case 2:16-cv-05708-PA-KS   Document 182   Filed 07/27/17   Page 8 of 18   Page ID #:7195

| Bases for Opinion: | Expert Disclosure: | Additional Sources: |
|---|---|---|
| hypothetical scenario of authorized use. | | |
| 11. Digital Altitude obtained a head start from copying the MTTB System and avoided the time and/or expense of creating an original program.  MOBE asserts that Digital Altitude, despite agreeing to modify the infringing materials, continues to infringe in violation of that agreement. | Nelson Preliminary Report, p. 31 Nelson Supplemental Report, p. 15 | Nelson Proffer Ex. 81 |

**Opinion D:  Several factors may be considered for apportioning Digital Altitude's profits to the copyrighted material.**

Relevancy:   Apportionment; contribution to Defendants' profits

| Bases for Opinion: | Expert Disclosure: | Additional Sources: |
|---|---|---|
| 12. Mr. Force testified that at least 90% of Digital Altitude's customers come through the Aspire program. | Nelson Supplemental Report, pp. 14-15 | Deposition of Michael Force (Digital Altitude Founder/CEO), April 6, 2017, pp. 219-221 |
| 13. Digital Altitude reports that customers who did not purchase the Aspire product account for only approximately $446,000 in revenue. | Nelson Preliminary Report, Schedule 5.2 Nelson Supplemental Report, pp. 14-15 | Nelson Proffer Exs. 51-52 |
| 14. Both Mr. Force and Mr. Lloyd testified | Nelson Supplemental Report, pp. 14-15 | Deposition of Michael Force (Digital Altitude |

| Bases for Opinion: | Expert Disclosure: | Additional Sources: |
|---|---|---|
| that factors other than the infringing copyrights such as management, relationships, affiliates, and other factors contribute to the sales and profits of the accused products. | | Founder/CEO), April 6, 2017, p. 313 Deposition of Matt Lloyd McPhee (MOBE Founder/CEO), May 25, 2017, pp. 240-241 |
| 15. A customer wanting to purchase any product via Digital Altitude's website is redirected and required to purchase the Aspire Program. | Nelson Supplemental Report, pp. 14-15 | Nelson Proffer Ex. 12 |
| 16. Mr. Aria testified that the steps in the Aspire (and MTTB) program are an integral part of selling customers the next product. | Nelson Supplemental Report, pp. 14-15 | Deposition of Max Aria (Digital Altitude and MOBE Business Coach), April 28, 2017, pp. 31-32, 39-41, 176-177 |
| 17. Mr. Cody testified that "everything is based around the ASPIRE" program and that "you have to come into the ASPIRE program before you can do anything else in the -- in the system." | Nelson Supplemental Report, pp. 14-15 | Deposition of Travis Cody (Digital Altitude Copyrighter), May 17, 2017, p. 78 |
| 18. Digital Altitude's continued use of the infringing materials is further indication of the importance of the infringing copyrights and their contribution to its profit. | Nelson Supplemental Report, pp. 14-15 | Nelson Proffer Ex. 81 |

EX 35
1125

1   Tyson K. Hottinger (CA State Bar No. 253221; E-Mail: thottinger@mabr.com)
2   C.J. Veverka (admitted *pro hac vice*; E-Mail: cveverka@mabr.com)
    R. Parrish Freeman (admitted *pro hac vice*; E-Mail: pfreeman@mabr.com)
3   Quincy J. Chuck (CA State Bar No. 307857; E-Mail: qchuck@mabr.com)
4   MASCHOFF BRENNAN LAYCOCK
      GILMORE ISRAELSEN & WRIGHT PLLC
5   20 Pacifica, Suite 1130
    Irvine, California 92618
6   Telephone:  (949) 202-1900
7   Facsimile:  (949) 453-1104

8   Attorneys for Plaintiff and Counterdefendant MOBE Ltd.

9

10             **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12                **WESTERN DIVISION**

13

| | |
|---|---|
| MOBE, LTD., a Malaysian company, | Case No. 2:16-cv-05708-PA (KSx) |
| Plaintiff, | **ORDER OF DISMISSAL** |
| v. | |
| Digital Altitude LLC, a Delaware limited liability company; Michael Force, an individual, | HON. PERCY ANDERSON UNITED STATES DISTRICT JUDGE FIRST STREET, COURTROOM 9A |
| Defendants. | |
| AND RELATED COUNTERCLAIMS. | |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EX 35
1126

1    The Court, having considered the "Joint Stipulation of Dismissal" and taking

2    notice that plaintiff MOBE, Ltd. and defendants Digital Altitude LLC and Michael Force

3    (collectively, "the Parties") have settled this matter and have agreed to comply with the

4    terms of the binding and enforceable settlement agreement entered on the record at the

5    Settlement Conference before the Honorable Magistrate Judge Jay C. Gandhi on

6    September 29, 2017 (the "Settlement Agreement").

7    Pursuant to Federal Rules of Civil Procedure Rule 41 THE COURT HEREBY

8    ORDERS AS FOLLOWS:

9    1.  All claims and counterclaims in this case are dismissed, with prejudice, in

10   accordance with the terms of the Settlement Agreement; and

11   2.  Each of the parties shall bear its own attorneys' fees, costs, and expenses.

14   IT IS SO ORDERED.

16   Dated: October 13, 2017

17   _____
     Honorable Percy Anderson
18   United States District Judge

1

EX 35
1127

Case 2:17-cv-03949-JJ   Document 12-2   Filed 7/18/21   Page 1 of 4

# EXHIBIT 2

EX 36
1128

## DECLARATION OF MARY DEE
## PURSUANT TO 28 U.S.C. § 1746

I, Mary Dee, hereby make the following declaration in support of Digital Altitude's Motion for Preliminary Injunction (the "Motion"). I have read the Motion and all factual statements set forth therein are true and correct to the best of my knowledge and belief and are hereby incorporated by reference. Additionally, all documents attached to the Motion are true and correct copies of what the documents purport to be. Unless otherwise indicated, I have personal knowledge of the facts set forth below. If called to testify, I could and would testify as follows:

1. My name is Mary Dee. I have been employed by Digital Altitude, LLC ("Digital Altitude") has its Chief Operating Officer for over the past two years. My responsibilities include overseeing all daily operations of Digital Altitude. Through my own work or my direct reports, I have direct knowledge of all business transactions Digital Altitude enters.

2. Digital Altitude operates in the digital sales of educational material. The business provides online training, coaching and events designed to help its customers improve their ability to market products in an online environment.

3. Digital Altitude accepts the vast majority of payments from its customers via credit card and thereby considers itself to be a merchant.

4. Digital Altitude and NetCents Technology, Inc. ("NetCents") were connected through NetCents's agent, Timothy Rocho, on or around September 2016. Timothy Rocho provided Digital Altitude with a copy of NetCents' application titled "New Merchant Account Application".

5. On October 14, 2016, Digital Altitude tendered a New Merchant Account Application to NetCents via Timothy Rocho, the "Submitting Agent".

6. NetCents approved Digital Altitude's application to act as a Merchant Processor on or about November 1, 2016.

7. NetCents' fee for processing Digital Altitude's credit card payments was agreed

1

1  to be 3.5% of each transaction plus forty (40) cents per transaction.  NetCents was to hold 10% of

2  transaction dollars as a reserve against chargebacks or refunds, for a time period not to exceed six

3  months.

4      8.    On or about November 1, 2016 NetCents began to process credit card

5  transactions on behalf of Digital Altitude.

6      9.    Between November 1, 2016 and November 12, 2016 NetCents processed

7  $779,960.72 of credit card transactions on behalf of Digital Altitude.

8      10.   On November 10, 2016, NetCents CEO Gordon Jessop sent an email to Digital

9  Altitude advising that its processor, which Digital Altitude has taken to mean its acquirer, had

10  determined that the transactions are of higher risk and are therefore withholding the remittance of

11  $245,000 to NetCents until February 6th, 2017.  Nevertheless, Gordon Jessop further

12  acknowledged that NetCents would continue to process Digital Altitude's transactions.

13      11.   NetCents ceased to process Digital Altitude's payments as of November 13,

14  2016.

15      12.   On February 13, 2017 NetCents remitted payment to Digital Altitude in the

16  amount of $424,980.

17      13.   NetCents continued to hold the balance of the funds owed to Digital Altitude

18  through June of 2017, claiming that a processor they used was holding the remaining funds to

19  process refunds or chargebacks that may continue to come in, for up to six months.

20      14.   On June 14, 2017, Clayton Moore, a representative for NetCents emailed me to

21  advise that "A wire for the remaining balance to Digital Altitude will be sent next week –

22  Thursday or Friday."

23      15.   On June 26, 2017, Jessop emailed me to advise that NetCents would in fact not

24  be releasing the funds owed to Digital Altitude.  In relevant part, the email states "As we

25  confirmed last week, the funds were released into our account.  We now hold those funds…" and

26  "…we do acknowledge monies are owing to Digital Altitude".

27      16.   As a result of not having access to its property, Digital Altitude has been left

28  unable to fully service its client base and to pay its creditors.

2

1        17.     Digital Altitude has been forced to obtain large cash advances as result of the

2  lack of access to its own funds.  This has cost Digital Altitude $67,500 in lost revenue.

3        18.     As of the date of this Declaration, the $327,405 remains in the possession of

4  NetCents.

5        19.     In an attempt to avoid filing this Motion, Digital Altitude requested

6  NetCents to place the Funds in escrow pending resolution of this lawsuit.  However,

7  NetCents refused. Accordingly, it appears that NetCents is planning to spend the Funds,

8  and Digital Altitude will be left without a remedy after the insolvent company goes out of

9  business.

10

11  I declare under penalty of perjury that the foregoing is true and corrected

12  Executed on this 20th day of November, 2017, in Azle, TX .

13

14  *Mary Dee*

15           Mary Dee

16

17

18

19

20

21

22

23

24

25

26

27

28

3

EX 36
1131

# EXHIBIT 3

Case 2:18-cv-00729-JAK-MRW Document 20 Filed 01/29/18 Page 105 of 157 Page ID
Case 2:17-cv-03049-JJT Document 18-5 Filed 11/21/17 Page 2 of 4
#:1289

 netcents
pay your way

# New Merchant Account Application

## General Information

| | |
|---|---|
| **Company Name:** | Digital Altitude LLC |
| **Doing Business As:** | Digital Altitude |
| **Business Address:** | 16192 Coastal Hwy Lewes, DE 19958 |
| **Country** | US |
| **Mailing Address (if different):** | Same |
| **Primary Contact:** | Mary Dee |
| **Office** | 800-820-7589 ext 700 |
| **Cell:** | ███████ |
| **Email:** | mdee@digitalaltitude.co |
| **Website:** | www.digitalaltitude.co |

**Description of Business:** Digital elearning system. We provide online training, coaching and events.

**Business Entity** (Please forward a copy of the Articles of Incorporation if applicable)

**Corporation (Public):** Click here to enter text. **Corporation (Private):** Click here to enter text.

NetCents Technology Inc
Suite 1500, 885 West Georgia Street
Vancouver, BC, Canada, V6C 3E8
**Submitting Agent: Tim Rocho**
PO Box 40026, Mesa Arizona, USA,
Office: (480) 855-1299, Email: rocho1@msn.com

EX 36
1133



**Sole Proprietorship:** Click here to enter text. **Non Profit:**Click here to enter text.

**Partnership:** Click here to enter text.     **Other:**Click here to enter text.

| Anticipated Number of Monthly Transactions: | 40k |
|---|---|
| Anticipated Average Transaction Size: | 60 |

### Merchant's Bank Information

| | |
|---|---|
| Bank Name: | **Bank of America** |
| Address: | **555 California St** |
| City: | **San Francisco** |
| Country: | **US** |
| ZIP / Postal Code: | **94104** |
| Account Name: | **Digital Altitude LLC** |
| Account Number: | ▮▮▮▮ |
| Bank Number: | ▮▮▮▮ |
| Iban code: | n/a |
| Swift Code: | **BOFAUS3NXXX** |
| Transit Number: | n/a |

### Account Manager or Contact Person

| | |
|---|---|
| Account Manager Name: | **Morgan Johnson** |
| Direct Number: | ▮▮▮▮ |
| Email: | **mjohnson@digitalaltitude.co** |
| | |

NetCents Technology Inc
Suite 1500, 885 West Georgia Street
Vancouver, BC, Canada, V6C 3E8
**Submitting Agent: Tim Rocho**
PO Box 40026, Mesa Arizona, USA,
Office: (480) 855-1299, Email: rocho1@msn.com

EX 36
1134



**TO: NetCents Technology Inc.**

We (Applicant) certify that all information supplied to you (NetCents Technology Inc.) in our application is true and complete. If you approve our application, you will send us the applicable Merchant Agreement(s) and Service Agreement(s) for the related point of sale services we have applied for. If we use any of your point of sale services after you approved our application, it will mean that we have received and read the Merchant Agreement(s) and Service Agreement(s). It will also mean that we have understood and agreed with you to everything written there.

You may collect credit and other financially related information about us ("information") from us, from credit bureaus and from other parties. You may use information as follows: (i) you may give it to credit bureaux and other parties who have or may have financial or other business dealings with us, (ii) you may use it to determine our financial situation, (iii) you may use it for any purpose related to the provision to us of services we request from you. You may also give it to anyone who works with or for you, but only as needed for the provision of those services, (iv) you may use it to promote your services to us. You may also add it to client lists you prepare and use for this purpose, and (v) you may share it with your affiliates (where the law allows for this), in the form of client lists or otherwise, so that they may promote their services to us. Please note, NetCents reserves the right to request additional information before final approval is granted.

**Date: 10/14/2016**

**Name of Signing Officer: Mary Dee**

**Title: Owner**

**Signature:** *Mary Dee*

NetCents Technology Inc
Suite 1500, 885 West Georgia Street
Vancouver, BC, Canada, V6C 3E8
**Submitting Agent: Tim Rocho**
PO Box 40026, Mesa Arizona, USA,
Office: (480) 855-1299, Email: rocho1@msn.com

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 108 of 157   Page ID
Case 2:17-cv-03945-JJ-   Document 1   Filed 1/21   Page 1 of 3
#:1292

# EXHIBIT 4

9/22/2017
Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 109 of 157   Page ID
Case 2:17-cv-03945-JJP   Document 15-4   Filed 11/21   Page 2 of 3   Page ID
#:1293


GORDONLAWGROUP                                    Michael R <michael@gordonlawltd.com>

---

## Update

**Andrew Gordon** <abg@gordonlawltd.com>                    Tue, Jun 27, 2017 at 11:52 AM
To: Mary Dee <mdee@digitalaltitude.co>, michael <Michael@gordonlawltd.com>

Thanks, Mary.

On Mon, Jun 26, 2017 at 7:04 PM, Mary Dee <mdee@digitalaltitude.co> wrote:

Live Exceptionally!

**MARY DEE**

Chief Operating Officer
Digital Altitude, LLC

---------- Forwarded message ----------
From: **Gord Jessop** <gord.jessop@net-cents.com>
Date: Thu, Nov 10, 2016 at 2:08 PM
Subject: Update
To: Mary Dee <mdee@digitalaltitude.co>, Morgan Johnson <mjohnson@digitalaltitude.co>
Cc: tim rocho ███████████████████████ >, Clayton Moore <claytonmoore@net-cents.com>

Hi Mary, Morgan, Tim,

As you are aware our processor is reviewing our account with them as they deem the transactions to be higher
risk. So far to date, we have processed @ $620,000 in transactions.  As part of the review of the account our
processor has changed the dates for the delivery of the funds. Initially, funds were to be deposited into our
account on the 9th.  This date has been moved back until November 14th. They are holding back $245,000
until February 6th to offset any charge backs which may occur. In addition, they may put further restrictions on
our account and we will know more later.

We have been on the phone all morning in an effort to resolve this matter. We would like to keep this account
with DA and are working to provide a solution whereby we will be able to accomplish this. For the time being,
we are still processing DA transactions, if there is any change or update we will inform you right away.

Gord Jessop
President/COO

EX 36
1137

9/22/2017　　　　Case 2:18-cv-00729-JAK-MRW　Document 20　Filed 01/29/18　Page 110 of 157　Page ID
　　　　　　　　　　Case 2:17-cv-03949-JP　Document 15-4　Filed 11/21/18　Page 3 of 3
#:1294

NetCents Technology Inc.
Office: (604) 676-5249
Cell: ███████
Email: gord.jessop@net-cents.com
Web: www.net-cents.com / www.netcents.biz
blog: blog.net-cents.com


--

ANDREW B. GORDON

ATTORNEY AT LAW
CERTIFIED PUBLIC ACCOUNTANT

GORDON LAW GROUP, LTD
400 CENTRAL AVE, SUITE 340
NORTHFIELD, IL 60093
**DIRECT** (847) 235-6095
**OFFICE** (847) 580-1279
**FAX** (847) 305-1202
**EMAIL** ABG@GORDONLAWLTD.COM

The information contained in this electronic mail message, including any attachments, is confidential, may be privileged and is protected
by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2522. Unauthorized use, copying or distribution of this message,
including any attachments, is strictly prohibited and may be unlawful. If this message was sent to you in error, please notify the sender by
return email and destroy this message, including any attachments.

Any tax advice contained in this communication was not intended or written to be used, and cannot be used, to rely on for the purpose of
avoiding any penalties that may be imposed by any governmental taxing authority.

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 111 of 157   Page ID
#:1295
Case 2:17-cv-03949-JJ-   Document 12-6   Filed 7/18/21   Page 1 of 4

# EXHIBIT 8

9/22/2017
Case 2:18-cv-00729-JAK-MRW  Document 20  Filed 01/09/18  Page 112 of 157  Page ID
Case 2:17-cv-03953-JT  Document 19-6  Filed 11/21  Page 2 of 4
#:1296



Michael R <michael@gordonlawltd.com>

## Fwd: Funds
1 message

**Andrew Gordon** <abg@gordonlawltd.com>                                      Tue, Jun 27, 2017 at 11:49 AM
To: michael <Michael@gordonlawltd.com>

See Gord's email and Mary's reply.  I filed in Clio under communication

---------- Forwarded message ----------
From: **Mary Dee** <mdee@digitalaltitude.co>
Date: Mon, Jun 26, 2017 at 6:56 PM
Subject: Re: Funds
To: Gord Jessop <gord.jessop@net-cents.com>
Cc: Clayton Moore <claytonmoore@net-cents.com>, Cory Kent <Cory.Kent@mcmillan.ca>, Andrew Gordon
<abg@gordonlawltd.com>


Hi Gord-

So as of last week, you told us you would release our funds; then when asked again you further confirmed with us that we
were getting our funds, and now you are saying that you do not want to give us our funds? So in effect, saying our funds
were sent was an out right lie?

We answered any and all questions on your application with transparency and honesty. We've worked together with each
merchant for any issues that have come up, and at the end of the day anyone who held a higher reserve has released our
funds.

Except for you.

Our attorney is on copy here and you'll need to deal with the team at the firm from this point forward if you are going to
hold our funds any longer. If you choose to go this route, please note that we will have no choice but to consider litigating
against Net Cents for damages because we have fulfillment costs to both our Affiliates and Customers and you are
greatly hindering our ability to service our business.


Sincerely,

**MARY DEE**



Chief Operating Officer
Digital Altitude, LLC




On Mon, Jun 26, 2017 at 4:27 PM, Gord Jessop <gord.jessop@net-cents.com> wrote:

    Good Afternoon Mary,


EX 36
1140

9/22/2017    Case 2:18-cv-00729-JAK-MRW    Document 20    Filed 01/09/18    Page 113 of 157    Page ID
          Case 2:17-cv-03953-JT    Document 18-9    Filed 11/21/17    Page 3 of 4
                                  #:1297

As was confirmed last week, the funds were released into our account. We now hold those funds, but given the significant losses in revenue which NetCents incurred as a result of the business relationship with Digital Altitude we are in discussions with our legal counsel to have the funds transferred into their Trust Account.

It has come to our attention that Digital Altitude had prior issues with credit card approvals. A fact which was not made known to NetCents at the onset of the business relationship. In total, there were 969 transactions, of which 438 failed, and 431 were approved. This information was provided to Digital Altitude at the time of each dispute. Digital Altitude was responsible for reviewing the transactions and making the decision whether or not the transaction was fraudulent.

On 11/3/2016 an internal email was sent which stated, "*Of the last 80 or so transactions over half (43) have either been blocked or have failed completely. I'm not too sure about processing percentages but this is not a great approval, we don't want our processor to shut us down. We should speak with Digital Altitude and get a better understanding of their pricing, this was not what we agreed too.*"

On 11/14/2016 a call was placed from NetCents to Digital Altitude, to discuss the above, but was not returned. A week later, NetCents' had their processing terminated. NetCents never received a return call from Digital Altitude.

While we do acknowledge monies are owing to Digital Altitude, and we desire to resolve this in an amicable manner, we will not hesitate to pursue available legal remedies to recover any and all lost revenues and or costs incurred which NetCents realized as a result of Digital Altitude not informing NetCents of any prior processing issues.

To be clear, NetCents had all of their processing shut down as a result of their business dealings with Digital Altitude. We wish to resolve this as expeditiously as possible with the minimum amount of negative ramifications.

Regards,


Gord Jessop
President/COO
NetCents Technology Inc.
Office: (604) 676-5249
Cell: ███████
Email: gord.jessop@net-cents.com
Web: www.net-cents.com / www.netcents.biz
blog: blog.net-cents.com



--
ANDREW B. GORDON

ATTORNEY AT LAW

CERTIFIED PUBLIC ACCOUNTANT


GORDON LAW GROUP, LTD

400 CENTRAL AVE, SUITE 340

NORTHFIELD, IL 60093

**DIRECT** (847) 235-6095

**OFFICE** (847) 580-1279

EX 36
1141

**FAX** (847) 305-1202

**EMAIL** ABG@GORDONLAWLTD.COM

The information contained in this electronic mail message, including any attachments, is confidential, may be privileged and is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2522. Unauthorized use, copying or distribution of this message, including any attachments, is strictly prohibited and may be unlawful. If this message was sent to you in error, please notify the sender by return email and destroy this message, including any attachments.

Any tax advice contained in this communication was not intended or written to be used, and cannot be used, to rely on for the purpose of avoiding any penalties that may be imposed by any governmental taxing authority.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WEALTH MASTERS INTERNATIONAL, | § | |
| LTD a/k/a WEALTH MASTERS | § | |
| INTERNATIONAL, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. _____ |
| | § | |
| JASON "JAY" KUBASSEK AND JAY | § | |
| KUBASSEK, INC., INDIVIDUALLY AND | § | |
| d/b/a CARBONCOPYPRO a/k/a CARBON | § | |
| COPY PRO, AARON PARKINSON, OMNI | § | |
| INDUSTRIES, LLC d/b/a | § | |
| CARBONCOPYPRO a/k/a CARBON COPY | § | |
| PRO AND PRO U, ANDREW CASS, | § | |
| JEFFREY LERNER, AARON AND SOPHIA | § | |
| RASHKIN, AND MICHAEL FORCE, | § | |
| | § | |
| *Defendants.* | § | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §1446, Defendants Jason "Jay"

Kubassek and Jay Kubassek, Inc., Individually, d/b/a CarbonCopyPro, a/k/a Carbon Copy Pro

("KUBASSEK"), Omni Industries, L.L.C., d/b/a CarbonCopyPro a/k/a Carbon Copy Pro ("CCP")

and Pro U, Inc. ("Pro U"), hereby removes the matter of *Wealth Masters International, Ltd. a/k/a*

*Wealth Masters International, L.L.C. v. Jason "Jay" Kubassek and Jay Kubassek, Inc., Individually*

*and d/b/a Carboncopypro a/k/a Carbon Copy Pro, Aaron Parkinson, Omni Industries, LLC d/b/a*

*Carboncopypro a/k/a Carbon Copy Pro and Pro U, Andrew Cass, Jeffrey Lerner, Aaron and Sophia*

*Rashkin, and Michael Force*, Cause No. 12-DCV-201261, from the 268th Judicial District Court of

Fort Bend County, Texas to the United States District Court for the Southern District of Texas.  The

1

grounds for removal are as follows:

**A.    INTRODUCTION**

1.    On September 27, 2012, Plaintiffs Wealth Masters International, Ltd. a/k/a Wealth

Masters International, L.L.C. ("Wealth Masters") filed a petition against Defendants initiating the

Texas state court action in the 268th Judicial District Court of Fort Bend County, Cause No. 12-

DCV-201261 (the  "State Action").  A copy of the State Action is attached hereto as Exhibit 1.

2.    In the State Action, Plaintiffs assert causes of action against KUBASSEK, CCP, and

PRO U along with co-defendants Andrew Cass ("Cass"), Jeffrey Lerner ("Lerner") Arron and Sophia

Rashkin (" the Rashkins") and Michael Force ("Force") for: a) breach of contract ; b)

misappropriation of trade secrets; c) tortious interference with a contract; d) breach of fiduciary duty

e) conversion; f) unjust enrichment; g) conspiracy; h) defamation and business disparagement.

Plaintiff further seeks punitive damages in the action.

**B.    DIVERSITY OF CITIZENSHIP EXISTS**

3.    Plaintiff alleges that it is incorporated under the laws of Texas with its principal place

of business in Sugar Land, Fort Bend County Texas.  Plaintiff's Original Petition ("Pl.'s Pet.")

4.    Defendant KUBASSEK is a citizen and resident of the State of New Jersey.

5.    Defendants JAY KUBASSEK INC., CARBON COPY PRO, OMNI INDUSTRIES

LLC were New Mexico corporations and have all been consolidated into PRO U.  Defendant PRO U

is a New Jersey corporation with its principal place of business in New Jersey.

6.    Defendant AARON PARKINSON ("Parkinson") is a citizen of Canada and believed

to be residing in Victoria, BC Canada and has not made an appearance.

7.    Defendant ANDREW CASS ("Cass") is a citizen and resident of the State of Florida

EX 37
1144

that has filed a special appearance challenging jurisdiction.

8.      Defendant JEFFREY LERNER ("Lerner") is believed to be a citizen and resident of

Utah and has not made an appearance.

9.      Defendants AARON and SOPHIA RASHKIN ("the Rashkins") are citizens and

residents of the State of Colorado and have filed a special appearance challenging jurisdiction.

10.     Defendant MICHAEL FORCE ("Force") is a citizen and resident of the State of

California and has filed a special appearance challenging jurisdiction.

Accordingly, there is complete diversity among the parties.

11.     As required by 28 U.S.C. § 1441(b)(2), no citizen of the State of Texas is a defendant

in this action.

## C.    AMOUNT IN CONROVERSY

12.     The amount in controversy exceeds the sum or value of $75,000, exclusive of costs

and interests under 28 U.S.C. § 1332(a).

13.     To determine if the amount in controversy requirement is met, the Court must look

first to the Plaintiffs' complaint.  *See St. Paul Mercury Indem. Co. v. Red Cab Co*., 303 U.S. 283

(1938).  Plaintiffs allege that defendants collectively damaged WMI in excess of $10 Million.

Accordingly, from the face of Plaintiffs' Petition the amount in controversy exceeds the threshold for

diversity actions.

## D.    REMOVAL IS TIMELY

14.     Defendants KUBASSEK and PRO U were served by agreement through their counsel

in New York with the pleading and citation in the State Action on October 27, 2012.  Less than thirty

(30) days have elapsed since KUBASSEK and PRO U's service, and therefore this Notice of

3

EX 37
1145

Removal is timely under 28 U.S.C. §1446.

**E.     CONSENT OF CO - DEFENDANTS**

15.     Pursuant to 28 U.S.C. § 1446 (b)(2)(A) all Defendants that have been joined and served consent to this removal.  Defendants Force, Cass and the Rashkins have consented in writing attached hereto as Exhibit 2.  Defendants Lerner and Parkinson have not been served, properly joined or otherwise appeared in this suit.

**F.     VENUE IS PROPER**

9.     The United States District Court for the Southern District of Texas, Houston Division encompasses Fort Bend County, the county in which the state court action was filed.  See 28 U.S.C. § 124(b)(2).  Accordingly, removal to the Southern District of Texas is proper pursuant to 28. U.S.C. § 1441(a).

**G.     APPROPRIATE NOTICE WILL BE PROVIDED**

10.     Pursuant to 28 U.S.C. §§ 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the 268th Judicial Court of Fort Bend County, Texas, where this case was originally filed.  KUBASSEK, CCP, and PRO U are also serving Plaintiff with this Notice of Removal.

DATED:     November 20, 2012

Respectfully submitted,

GRIMES & FERTITTA, P.C.

Julian J. Fertitta, III

_____

Julian J. Fertitta, III
SBN:  00795060
Federal Bar No.:  21954
440 Louisiana, Ste. 1818
Houston, TX 77002

4

(713) 224-7644 Telephone
(713) 224-0733 Facsimile

ATTORNEY FOR DEFENDANT,
JASON "JAY" KUBASSEK AND JAY KUBASSEK,
INC., INDIVIDUALLY, D/B/A CARBONCOPYPRO,
A/K/A CARBON COPY PRO, OMNI INDUSTRIES,
L.L.C., D/B/A CARBONCOPYPRO A/K/A CARBON
COPY PRO, AND PRO U, INC.

5

Case 2:12-cv-03421 Document 1 Filed 09/11/2012 Page 5 of 6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of November, 2012, a true and correct copy of Defendants' Notice of Removal has been served on all counsel of record by U.S. mail, postage prepaid, facsimile and email as follows:

Kenneth M. Krock                                                     FAX:  (713) 759-9967
Terri S. Morgan
Megan N. Brown
3050 Post Oak Boulevard, Ste. 1425
Houston, Texas 77056

Joanee M. Vorpahl                                             FAX: (713) 226-6307
TBN 20619950
Megann McConnell Myers
TBN  24067753
Porter & Hedges L.L.P.
1000 Main Street, 36th Floor
Houston, Texas 77002
713-226-6707 telephone
713-226-6307 facsimile
jvorpahl@porterhedges.com
mmyers@porterhedges.com

Catherine Than                                                 FAX: (713) 984-2894
TBN 24034704
John R. Jones
TBN 10919500
Bickerstaff, Heath, Delgado, Acosta L.L.P.
950 Echo Lane, Suite 357
Houston, Texas 77024
713-984-9997 telephone
713-984-2894 facsimile
cthan@bickerstaff.com

_____
Julian J. Fertitta, III

6

Case 2:18-cv-00729-JAK-MRW Document 29 Filed 01/29/18 Page 121 of 157 Page ID
#:1305
Case 4:12-cv-03412 Document 1 Filed 11/21/12 Page 12 of 25

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Wealth Masters International, LTD a/k/a Wealth Masters International, LLC,

## DEFENDANTS

Jason "Jay" Kubassek and Jay Kubassek, Inc., Individually and d/b/a Carboncopypro a/k/a Carbon Copy Pro, Aaron

**(b)** County of Residence of First Listed Plaintiff   Fort Bend County, Tex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Kenneth M. Krock (SBN: 00796908) Rapp & Krock, Pc. 3050 Post Oak Blvd., Ste. 1425, Houston, TX 77056 (713) 759-9977

Attorneys (If Known)

Julian J. Fertitta, III (SBN: 00796542) Grimes & Fertitta, P.C. 440 Louisiana, Ste. 1818, Houston, TX 77002 (713)224-7644

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

| | | | |
|---|---|---|---|
| ❏ 1 | U.S. Government Plaintiff | ❏ 3 | Federal Question (U.S. Government Not a Party) |
| ❏ 2 | U.S. Government Defendant | ☒ 4 | Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ❏ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 900Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | Alien Detainee | | ❏ 950 Constitutionality of |
| | Other | | ❏ 465 Other Immigration | | State Statutes |
| | ❏ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN    (Place an "X" in One Box Only)

| | | | | | | | Appeal to District |
|---|---|---|---|---|---|---|---|
| ❏ 1 Original Proceeding | ☒ 2 Removed from State Court | ❏ 3 Remanded from Appellate Court | ❏ 4 Reinstated or Reopened | ❏ 5 Transferred from another district (specify) | ❏ 6 Multidistrict Litigation | ❏ 7 | Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
28 USC 1446
Brief description of cause:
Alleged breach of contract; fiduciary duty; conversion; defamation and conspiracy

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ❏ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE
11/20/2012

SIGNATURE OF ATTORNEY OF RECORD
*John Fertitta III*

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

EX 37
1149

12-DCV-201261
ORPE
Original Petition
2077547

Filed
12 September 27 P3:54
Annie Rebecca Elliott
District Clerk
Fort Bend District

CAUSE NO. **12 DCV 201261**

| | | |
|---|---|---|
| WEALTH MASTERS INTERNATIONAL, LTD a/k/a WEALTH MASTERS INTERNATIONAL, LLC, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § | |
| v. | § § | FORT BEND COUNTY, T E X A S |
| JASON "JAY" KUBASSEK AND JAY KUBASSEK, INC., INDIVIDUALLY AND d/b/a CARBONCOPYPRO a/k/a CARBON COPY PRO, AARON PARKINSON, OMNI INDUSTRIES, LLC d/b/a CARBONCOPYPRO a/k/a CARBON COPY PRO AND PRO U, ANDREW CASS, JEFFREY LERNER, AARON AND SOPHIA RASHKIN, AND MICHAEL FORCE, | § § § § § § § § § § § § | |
| *Defendants.* | § § | **268** JUDICIAL  DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION, REQUEST FOR DISCLOSURE, AND RULE 193.7 NOTICE

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Wealth Masters International, Ltd. a/k/a Wealth Masters International, L.L.C. (collectively "Plaintiff" or "WMI") files this Original Petition, Request for Disclosure, and Rule 193.7 Notice against Defendants Jason "Jay" Kubassek and Jay Kubassek, Inc., individually and d/b/a CarbonCopyPro a/k/a Carbon Copy Pro ("Kubassek"), Aaron Parkinson, Omni Industries, LLC d/b/a CarbonCopyPro a/k/a Carbon Copy Pro ("CCP") and Pro U ("Pro U"), Andrew Cass, Jeffrey Lerner, Aaron and Sophia Rashkin, and Michael Force, and would respectfully show the following:

### I.   NATURE OF THE CASE

1.      This case involves Defendants' breach of an agreement to exclusively market WMI's financial education and consulting products; breach of consulting contracts with WMI

Exhibit 1

concerning conflicts of interest and solicitation of other consultants; breach of and/or participating in the breach of fiduciary duties to WMI; misappropriation of WMI's trade secrets; breach of employment agreements not to disclose confidential information, not to solicit employees, and not to compete with WMI while employed and/or contracted by WMI (and thereafter); wrongful interference with WMI's employment agreements with its employees and consulting agreements with its consultants; slander, libel, and business disparagement; unjust enrichment; and conspiracy. Specifically, Defendants Kubassek, Parkinson, and Cass, who each signed an employment contract and/or consulting contract with WMI and served on WMI's Executive Committee, and their company, CCP, provided online marketing services for WMI, a network marketing company that sells financial education and consulting products around the world. After WMI paid Kubassek, Parkinson, Cass, and CCP millions of dollars based on their agreement that they would develop WMI's business exclusively and further based on their consulting and/or employment agreements not to solicit WMI's consultants and/or compete with WMI, Kubassek, Parkinson, Cass, Lerner, and CCP began to secretly recruit WMI's employees and consultants to sell a competing product based on David Bach's *Automatic Millionaire* concept, using a network marketing program that CCP/Pro U had been developing for a year. Kubassek, Parkinson, Cass, and CCP required these recruits to sign nondisclosure agreements, and specifically told these recruits not to tell WMI's management about the competing product or that they had been recruited to develop and sell it instead of WMI's product. Eventually, Defendants Jeff Lerner, Aaron and Sophia Rashkin, and Michael Force, members of WMI's Executive Committee who had also signed consulting agreements with WMI, abruptly left WMI and, along with the other Defendants, violated their agreements and convinced other WMI consultants to violate their consulting agreements and sell CCP's competing product. WMI has

2

Exhibit 1

EX 37
1151

had its multi-million dollar business gutted, lost substantial profits, lost good and highly profitable sales consultants, and has suffered damage to its goodwill and reputation from a competing product and which was developed using WMI's products and WMI's confidential business plans, strategies, and customer information that is strikingly similar in look and feel and that is marketed by the same WMI consultants, and is therefore confusing in the marketplace.

2.      WMI seeks damages for Defendants' wrongful conduct, including their violation of the terms of the Individual Defendants' employment and/or consulting agreements with WMI, by soliciting WMI's employees and consultants; disclosing and using WMI's confidential information and trade secrets; and, with regard to Kubassek and Cass who signed non-compete agreements to be effective for one year following termination, from competing with WMI. Plaintiff seeks damages for each Defendant's wrongful conduct and recovery of WMI's attorney's fees and costs. Defendants' conduct has caused damages of approximately $10,000,000, and these damages will likely increase.

## II.  PARTIES

3.      Plaintiff is a Texas limited partnership doing business in Sugar Land, Fort Bend County, Texas.

4.      Defendant Jason "Jay" Kubassek (a/k/a/ Jay Kubassek, Inc.) ("Kubassek") is an individual residing in New Jersey and/or New York, and doing business in Texas. Kubassek signed a Consulting Agreement with WMI, agreeing to jurisdiction and venue in Fort Bend County, Texas. Kubassek also signed an Employment Agreement with WMI and served on WMI's Executive Committee. Kubassek was also WMI's Senior Vice President of Business Development. At all relevant times Kubassek conducted business in the State of Texas pursuant to his contract with WMI, a Texas resident, and he performed the contract in whole or in part in

3

Exhibit 1

EX 37
1152

this State. Further, Kubassek committed a tort in whole or in part in this State, as more fully specified herein. Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, Kubassek may be served with process by serving the Secretary of State of Texas. The Secretary of State may forward the process to Jason "Jay" Kubassek (a/k/a/ Jay Kubassek, Inc.) at ▮▮▮▮▮▮ Fair Haven, New Jersey▮▮▮▮ and at ▮▮▮▮▮▮▮▮ New York, New York ▮▮▮. Alternatively, Kubassek may be served with process wherever he may be found.

5.     Defendant Jay Kubassek, Inc., individually and d/b/a CarbonCopyPro a/k/a Carbon Copy Pro, is a Kansas corporation. It holds the U.S. trademark for CarbonCopyPro. Jay Kubassek, Inc. individually and d/b/a CarbonCopyPro a/k/a Carbon Copy Pro does business in the State of Texas. Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, Jay Kubassek, Inc., individually and d/b/a CarbonCopyPro a/k/a Carbon Copy Pro may be served with process by serving the Secretary of State of Texas. The Secretary of State may forward the process to Jay Kubassek, the Defendant's registered agent, whose most recent address on file with the Kansas Secretary of State is ▮▮▮▮▮▮ Fair Haven, New Jersey▮▮▮▮, and at the registered office listed in the Kansas public records, ▮▮▮▮▮▮▮ Lawrence, Kansas ▮▮▮▮ or anywhere else where he may be found, or otherwise by law. Upon information and belief, at all relevant times Kubassek acted for and on behalf of Jay Kubassek, Inc., and Jay Kubassek, Inc. is the alter ego of Jason "Jay" Kubassek.

6.     Defendant Aaron Parkinson is an individual believed to be residing in Victoria, BC, Canada. Parkinson signed a Consulting Agreement with WMI, agreeing to jurisdiction and venue in Fort Bend County, Texas. Parkinson also served on WMI's Executive Committee. At all relevant times Parkinson conducted business in the State of Texas pursuant to his contract with WMI, a Texas resident, and he performed the contract in whole or in part in this State.

4

Exhibit 1

Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, Parkinson may be served with process by serving the Secretary of State of Texas. The Secretary of State may forward the process to Aaron Parkinson at ▆▆▆▆▆▆ Langford (Victoria), BC ▆▆▆ Canada, and at Box 31249, 26B Villa Royale WB, Seven Mile Beach, Grand Cayman, Cayman Islands, CYM, KY1-1205, or anywhere else where he may be found, or otherwise by law.

7.      Defendant Omni Industries, LLC d/b/a CarbonCopyPro a/k/a Carbon Copy Pro and Pro U ("CCP") is purportedly a New York limited liability company which has its principal place of business in Fort Bend County, Texas, where it provided online marketing support as part of WMI's business. CCP does business in the State of Texas. Upon information and belief it is operated by Kubassek, Cass, Parkinson, and/or the other Individual Defendants. Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, Omni Industries, LLC d/b/a CarbonCopyPro a/k/a Carbon Copy Pro and Pro U may be served with process by serving the Secretary of State of Texas. The Secretary of State may forward the process to Omni Industries, LLC d/b/a CarbonCopyPro a/k/a Carbon Copy Pro and Pro U at ▆▆▆▆▆▆ New York, New York ▆▆▆ and at ▆▆▆▆▆ Fair Haven, New Jersey ▆▆▆ or anywhere else where it may be found, or otherwise by law.

8.      Defendant Andrew Cass is an individual believed to be residing in Miami, Florida. Cass signed a Consulting Agreement with WMI, agreeing to jurisdiction and venue in Fort Bend County, Texas. Cass also signed an Employment Agreement with WMI and served on WMI's Executive Committee. At all relevant times Cass conducted business in the State of Texas pursuant to his contract with WMI, a Texas resident, and he performed the contract in whole or in part in this State. Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, Parkinson may be served with process by serving the Secretary of State of Texas. The Secretary

5

Exhibit 1

EX 37
1154

of State may forward the process to Andrew Cass at █████████████████████████

Miami, Florida ██████ or anywhere else where he may be found, or otherwise by law.

9.      Defendant Jeffrey Lerner is an individual believed to be residing in Washington, Utah. Lerner signed a Consulting Agreement with WMI, agreeing to jurisdiction and venue in Fort Bend County, Texas. Lerner also served on WMI's Executive Committee and signed a WMI "Executive Committee Agreement and Non Disclosure/Non-Compete." At all relevant times Lerner conducted business in the State of Texas pursuant to his contract with WMI, a Texas resident, and he performed the contract in whole or in part in this State. Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, Lerner may be served with process by serving the Secretary of State of Texas. The Secretary of State may forward the process to Jeffrey Lerner at █████████████ Washington, Utah, █████ or anywhere else where he may be found, or otherwise by law.

10.     Defendants Aaron Rashkin and Sophia Rashkin (the "Rashkins") are individuals believed to be residing in Parker, Colorado. The Rashkins signed a Consulting Agreement with WMI, agreeing to jurisdiction and venue in Fort Bend County, Texas. The Rashkins also served on WMI's Executive Committee and signed a WMI "Executive Committee Agreement and Non Disclosure/Non-Compete." At all relevant times the Rashkins conducted business in the State of Texas pursuant to their contract with WMI, a Texas resident, and they performed the contract in whole or in part in this State. Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, the Rashkins may be served with process by serving the Secretary of State of Texas. The Secretary of State may forward the process to both Aaron Rashkin and Sophia Rashkin at █████████ ████████████, Parker, Colorado ████████, or anywhere else where they may be found, or otherwise by law.

6

Exhibit 1

EX 37
1155

11.     Defendant Michael Force is an individual believed to be residing in Miami, Florida.  Force signed a Consulting Agreement with WMI, agreeing to jurisdiction and venue in Fort Bend County, Texas.  Force also served on WMI's Executive Committee and signed a WMI "Executive Committee Agreement and Non Disclosure/Non-Compete."  At all relevant times Force conducted business in the State of Texas pursuant to his contract with WMI, a Texas resident, and he performed the contract in whole or in part in this State.  Pursuant to §17.044 of the Texas Civil Practice & Remedies Code, Force may be served with process by serving the Secretary of State of Texas.  The Secretary of State may forward the process to Michael Force at ██████████████████ Miami, Florida ██████ or anywhere else where he may be found, or otherwise by law.

12.     Kubassek, Parkinson, Cass, Lerner, the Rashkins, and Force may be referred to herein collectively as the "Individual Defendants."

### III.  FACTS

13.     The following facts support Plaintiff's claims as alleged herein.

**WMI's Business**

14.     WMI began its business in 2005.  WMI is a network marketing company that sells financial education and consulting products and access memberships around the world.  WMI sells three basic products designed to educate people on financial planning and consulting: (1) self study courses; (2) face to face seminars; and (3) a top-level, exclusive international conference.  While WMI has a number of key employees who, under employment agreements, manage business operations and develop marketing strategies for WMI, almost all of WMI's sales force (approximately 99%) is made up of independent consultants who sign consulting agreements and sell WMI's individual products ("consultants").  WMI uses a network and direct

7

Exhibit 1

EX 37
1156

sales marketing program that rewards consultants who bring in other consultants and thus expand the sales network, and by paying commissions for sales made by each consultant and those consultants working as a team. Thus, the sales consultants and their individual networks are critical to the success of WMI's business.

**WMI and CCP**

15.    According to his website, Kubassek first launched CCP in 2004 as an online marketing business. CCP was an internet marketing company that was owned by Kubassek, Parkinson, and Alan Moore ("Moore"), but primarily controlled by Kubassek. In 2006, Kubassek and Parkinson became consultants in the WMI network, and in 2007 they began earning substantial commissions from WMI. In 2008, Kubassek, Parkinson, and CCP approached WMI and offered to create, as part of WMI, an internet marketing program which would allow Internet users to access WMI through CCP for the purpose of allowing them to become customers of WMI. This "funnel" created by CCP was to attract Internet users and direct those users to WMI's products. WMI would pay CCP based on each customer referred through this Internet "funnel" or "pipeline" that CCP created for WMI. WMI ultimately paid substantial sums to CCP through this referral program.

16.    WMI's products were considered to be the top tier products in this "funnel" system and thus were the primary products that CCP was to market. Accordingly, while users signed up through CCP, almost all of them joined CCP for the purpose of allowing them to purchase WMI's products and become customers of WMI. WMI also consented to CCP keeping the profits it made from the WMI "funnel," which resulted in an enormous amount of revenue being generated for CCP. WMI's consent to allow CCP to market WMI's products, which also served as a draw for CCP's products, was based on the agreement that CCP would not offer a

8

Exhibit 1

competing product. In exchange, WMI agreed not to compete with the CCP "funnel" by creating another online marketing program that would divert customers from the CCP-created funnel, thus further allowing CCP to profit substantially from the funnel it created for WMI. In addition, WMI agreed to pay and did pay CCP's Kubassek bonus payments from this network that he otherwise would not have received. These bonus payments were also substantial. In total, WMI paid the CCP parties approximately $3.5 million in the last three years relating to the above. WMI felt this "WMI/CCP Marketing Program" agreement was a "win-win" for both WMI and CCP, and invested these sums because WMI could grow its sales force of consultants for its products and CCP could grow a network for its products, none of which competed with each other.

**WMI's Proprietary Strategies, Consultant and Customer Information and Sales Consultant Network**

17. WMI has spent years and invested substantial amounts of money into developing proprietary strategies and consultant networks to allow it to compete as a network marketing company selling financial education and consulting products, attract new consultants and customers to its business, and make profits. The strategies and networks were developed by WMI's founders and other key personnel, at significant expense to the company.

18. WMI goes to great lengths to protect itself from solicitation of its consultants and to protect its marketing strategies and consultant information as confidential trade secrets. At the basic level, all WMI consultants, including Defendants Kubassek, Parkinson, Cass, Lerner, the Rashkins, and Force, are required, when they sign up, to execute independent consultant agreements and agree to WMI's Statement of Policies and Procedures.[1] Those procedures

_____

[1] The WMI consultants sign up online and are required to accept the WMI Independent Consultant and Business Center Agreement that expressly incorporates the WMI Statement of Policies and Procedures ("Policies"), as may be amended from time to time. The relevant portions of the Policies quoted herein have remained the same from

9

Exhibit 1

provide in relevant part:

### 4.8 – Conflicts of Interest
### 4.8.1 – Non-solicitation

WMI Consultants are free to participate in other multi-level or network marketing business ventures or marketing opportunities (collectively "network marketing"). *However, during the term of this Agreement, Consultants may not recruit other WMI Consultants for any other network marketing business. Following the cancellation of this Agreement, and for a period of six months thereafter, a former Consultant may not recruit any WMI Consultant for another network marketing business.* The term "recruit" means actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way, either directly or through a third party, another WMI Consultant or customer to enroll or participate in another multi-level marketing, network marketing or direct sales opportunity. This conduct constitutes recruiting even if the Consultant's actions are in response to an inquiry made by another Consultant.

*Consultants must not sell, or attempt to sell, any competing non-WMI products or services to WMI customers or Consultants. Any product or service in the same generic category as a WMI product or service is deemed to be competing.*

*Consultants may not display WMI products or services with any other products or services in a fashion that might in any way confuse or mislead a prospective customer or Consultant into believing there is a relationship between the WMI and non-WMI products or services.* Consultants may not offer the WMI opportunity, products or services to prospective or existing customers or Consultants in conjunction with any non-WMI program, opportunity, product or service. Consultants may not offer any non-WMI opportunity, products or services at any WMI-related meeting, seminar or convention, or immediately following such event....

(Exhibit A) (emphasis added).

19.     WMI's employees, including Defendants Kubassek and Cass, are required to sign employment agreements wherein the employee expressly acknowledges his fiduciary relationship with WMI.  While common law requires employees not to disclose their employers' confidential information, WMI goes further and requires its employees to sign agreements to maintain WMI's confidential information and not to disclose such information outside the company.  For example, Kubassek, who was WMI's Senior Vice President of Business

---

2006 through the present date.

10

Exhibit 1

Development, and Cass, who was WMI's Vice President of Business Development, signed employment contracts which provided:

5.    Confidential Information/Non-Disclosure.

(a)    Disclosure of Information. During the Employment Term, and continuing in perpetuity, Employee shall not, except as permitted by the Board of Directors of WMI in writing, in any manner, at any time, directly or indirectly, disclose to any persons other than authorized employees of WMI any Confidential Information, as hereinafter defined, of either WMI or WMI's current or prospective clients. As used in this Agreement, the term "Confidential Information" means, in addition covered by any definition of "trade secrets" or any equivalent term under state, local or federal law, all information regarding WMI or WMI's activities, business or clients that is not generally known to persons not employed by WMI, and that is not generally disclosed by WMI to persons not employed by WMI. "Confidential Information" shall include, but is not limited to, sales and marketing techniques and plans, market studies and business plans, distribution techniques, purchase and supply information, pricing information, customer billing information, financial plans and data concerning WMI, management planning and financial information, client and customer lists, database of client information, know-how, information about client and customer requirements, terms of license agreements, product development techniques or plans, computer software programs (including object code and source code), data base systems and information, terms of contracts with customers and suppliers, and any and all information concerning the financial educational seminars or services business or other business operations of WMI, the disclosure of which could reasonably be anticipated to harm WMI's competitive advantage or give WMI's competitors an advantage, which Employee learns or obtains as a consequence of or through his performance of services for WMI, that is not generally known to the business community in the financial educational seminars or services business or to the general public and which would reasonably be expected by WMI to be held in confidence. During the course of conducting business for WMI, and in furtherance of WMI's business interests, it is anticipated that certain information concerning the financial educational seminars and services business or other business operations which is not generally known to the business community or to the general public will be communicated to potential suppliers, customers and/or other persons in order to enhance a business transaction for the benefit of WMI, and such communications are not violations of this Agreement when reasonably communicated for the purpose of furthering WMI's interests. "Confidential Information" also includes, but is not limited to, all files, reports and documents pertaining to the financial educational seminars and services business and other business operations and suppliers and customers of WMI, and the services rendered to them or products purchased from or sold to them by WMI, and these items and matters shall belong exclusively to and shall remain the exclusive property of WMI. Employee shall, at the termination of this

11

Exhibit 1

EX 37
1160

Agreement, promptly return or deliver to WMI all property in the Employee's possession or under the Employee's control belonging to WMI, including all tangible forms of Confidential Information in his possession or under his control, including, but not limited to, any list of WMI's suppliers, customers, clients or business partners. The prohibition on the use of Confidential Information as provided herein shall exist for the term of this Agreement, and in perpetuity following the termination of this Agreement.

Defendants Kubassek and Cass's employment agreements also made it clear that WMI was relying on them as fiduciaries and entrusting WMI's confidential trade secrets to them as part of their employment:

(b)   Fiduciary Relationship. The relationship between WMI and Employee shall be one in which WMI reposes special trust and confidence in Employee, and one in which Employee shall have a fiduciary relationship with WMI. As a result, WMI shall, in the course of Employee's employment, entrust Employee with Confidential Information. Employee recognizes that Confidential Information has been developed by WMI at great expense, is proprietary to WMI, and is and shall remain the exclusive property of WMI. Employee acknowledges the confidentiality of Confidential Information and acknowledges that Employee could not competently perform Employee's job duties without access to such information. Employee acknowledges that any use of such Confidential Information by persons not in the employ of WMI would provide persons an unfair competitive advantage that they would not have without the use of such Confidential information.

Finally, Defendants Kubassek and Cass specifically agreed that WMI could enforce these confidentiality provisions through injunctive relief:

(a)   Wealth Masters' Remedies. In addition to any and all other remedies allowed in law or equity, in the event of the Employee's breach or threatened breach of this Section 5, WMI *shall be entitled to a preliminary restraining order and an injunction restraining and enjoining the Employee from disclosing all or any part of the Confidential Information.*

(emphasis added).

20.    WMI also limits access to business and marketing strategies to members of the Executive Committee ("EC"), WMI's functional equivalent to a board of directors and its business advisory council. Members of the EC sign additional agreements acknowledging the

12

Exhibit 1

EX 37
1161

confidential nature of the information to which they have access, affirming their loyalty to WMI,

and agreeing not to compete with or own a company that competes with WMI. All of the

Individual Defendants have served as members of the EC.[2]

**WMI's Investment In Training Consultants and Employees**

21. WMI invests considerable time in training its consultants via Internet programs,

one-on-one seminars, and conventions. In fact, many of the WMI consultants do not have any

background or experience in financial education and consulting, or in direct sales. WMI pays

considerable commissions to these consultants to encourage them to take advantage of the

training WMI offers, and to grow their networks and sell WMI's products.

22. As discussed above, WMI includes non-solicitation agreements in its consulting

agreements with each consultant. WMI also uses its employment agreements to protect the

investment it makes in its human capital. The employment agreements executed by Defendants

Kubassek and Cass provide:

    8.    Non-Solicitation.
    (a)    General Terms. Employee agrees and covenants that for a period of three
(3) years following the termination of his or her employment with WMI for any
reason, he or she shall not solicit or call upon any employee of WMI for the
purpose or with the intent of enticing them away from or out of the employ of
WMI for any reason whatsoever. Employee further agrees and covenants that *for
a period of three (3) years following the termination of his or her employment
with WMI for any reason, he or she shall not solicit or call upon any party
which is then, or has been within the two (2) year period immediately preceding
the date Employee's employment is terminated, a customer or client of WMI for
the purpose or with the intent to enticing them away from WMI for any reason
whatsoever.*

    (b)    Injunctive Relief. Because of the difficulty of measuring economic looses
to WMI as a result of the breach of the foregoing covenants, and because of the
immediate and irreparable damage that would be caused to WMI for which it
would have no adequate remedy, Employee agrees that, in the event of a breach

---

[2] Parkinson and Cass joined the EC several years ago, before the EC Agreement was created, and thus did not sign
an EC Agreement at the time they joined the EC. However they were aware of the confidential nature of the
discussions of the EC and their fiduciary duty to WMI as a member of its board of advisors.

Exhibit 1

by him or her of the foregoing covenants, the covenants may be enforced by WMI
by injunctions and restraining orders.

(emphasis added).

23.     WMI also uses its EC Agreement, which was signed and/or agreed to by all of the
Individual Defendants, to protect its investment in its consultants, by providing the following
averment: "I will have no ill will to do damage, compete, or do harm to either WMI, an EC
member, or Consultant of WMI."

**WMI Ensures that Its Key Employees and Executive
Committee Members Will Not Become Competitors**

24.     WMI protects itself from having its key employees compete against WMI.  The
employment agreements executed by Kubassek and Cass further provide:

7. **Noncompetition.**
(a)     **Noncompetition During Employment.** During the Employment Term, and
continuing while Employee is employed by WMI, Employee shall not at any time
or place or to any extent whatsoever, either directly or indirectly, without the
express written consent of the Board of Directors of WMI (i) engage in the
financial educational seminars and services business, except under and pursuant
to the terms of this Agreement, or (ii) engage in any activity competitive with or
adverse to WMI, whether on his own behalf, as a partner, or as an owner, officer,
director, employee, agent, consultant, advisor, promoter, independent contractor,
partner or equity security holder of any person, corporation, partnership, joint
venture, agency, company or any other form of business enterprise or as a trustee,
fiduciary or other representative.  Employee further agrees that while employed
Employee will not influence or attempt to influence any other employee of WMI
to terminate his or her employment for any reason or to work for any actual or
potential competitor of WMI

(b)     The preceding paragraph shall not be construed to prohibit the ownership
by the Employee of not more than five percent (5%) of any class of securities of
any corporation which is engaged in the foregoing businesses having a class of
securities registered pursuant to the Securities Exchange Act of 1934, as
amended, provided that such ownership represents a passive investment and that
neither the Employee nor any group of persons including the Employee in any
way, either directly or indirectly, manages or exercises control of any such
corporation, guarantees any of its financial obligations, otherwise takes any part
in its business, other than exercising Employee's rights as a shareholder, or seeks
to do any of the foregoing.

14

Exhibit 1

EX 37
1163

* * *

(c)     Noncompetition After Termination. Except for the limited exceptions set forth in Section 7(b) of this Agreement, upon termination of Employee's employment in accordance with Section 9(b) or 9(c) or 9(e) of this Agreement (the "Termination Date"), then in consideration of the promises and for the protection of WMI's established businesses, and the further knowledge and good will and expanded business opportunities provided to Employee, Employee hereby agrees and covenants that Employee will not, at any time during and for a *period of one (1) year beginning on the Termination Date, directly or indirectly, for his own behalf or for any other person(s), firm(s), company(ies), partnership(s), joint ventures(s), agency(ies), corporations(s) or any other form of business enterprise(s), buy, sell, engage in, carry on, deliver, distribute, advertise, solicit or aid or participate in the financial educational seminars and services business within the United States and Canada, if such solicitation is made subsequent to the date of this Agreement.* In making this Non-competition Agreement, Employee acknowledges that the same is reasonable in view of the compensation granted Employee under this Agreement and that the covenants made by Employee under this Section 7 are necessary to protect WMI in the businesses which it has established in the areas served by it and the goodwill attaching thereto. The limitation is on the area of employment in which Employee is engaged, the geographic area is the same geographical area in which Employee operates in his capacity as an Employee, and the term is reasonable (with regard to) compensation to be paid to Employee. Employee further agrees during such term not to influence or attempt to influence any other employee of WMI to terminate his or her employment for any reason or to work for any actual or potential competitor of WMI.

(emphasis added).

25.     The EC Agreements, which were signed and/or agreed to by all of the Individual Defendants, provide that: "I agree that I do not have currently, nor shall I have in the future, any financial interest in any Alliance, Product, Service or Financial Opportunity without full-disclosure."

**Discovery of Defendants' Disclosure of Confidential Information,
Theft of Plaintiff's Trade Secrets, Solicitation of Plaintiff's Employees
and Consultants, Illegal Competition, and Breach of Fiduciary Duty**

26.     WMI sponsors seminars called m2 Wealth Conferences, in which it gathers consultants together and provides them with information concerning market trends and wealth creation opportunities. At these conferences, consultants have personal access to some of the

15

Exhibit 1

world's most successful wealth and development experts. Beginning in 2008, WMI provided for CCP to have a marketing day at the end of each m2 conference, for which WMI paid a substantial amount of the expense because CCP promoted WMI at these conferences. WMI's eleventh m2 Wealth Conference was scheduled for November 14-17, 2010 in Las Vegas. WMI understood that, as had occurred during the previous m2 conferences, CCP would conduct its marketing day on November 18, the day after the conference, at the same hotel used for WMI's m2 Wealth Conference. However, Kubassek, Parkinson, and Cass, on behalf of CCP, informed WMI in late summer 2010 that CCP would not have its marketing day in conjunction with the WMI conference, but instead would do its own marketing day. Upon information and belief, Kubassek, Parkinson, and Cass, on behalf of CCP, then booked their marketing day event on November 20, 2010 at a different hotel in Las Vegas, with the intent to launch CCP's competing product directly to WMI's consultants who had participated in the WMI m2 conference.

27.    What was unknown at the time but has now become apparent, upon information and belief, is that the decision of CCP, Kubassek, Parkinson, and Cass to distance themselves from WMI at the November 2010 m2 Wealth Conference was just part of a larger conspiracy among all of the Defendants. The Individual Defendants were apparently working with CCP on its competing product and planning their departure months before they left the employ of WMI.

28.    In the summer and fall of 2010, while planning their separate conference and product launch, Kubassek, Parkinson and/or Cass contacted key consultants of WMI and requested they sign non-disclosure agreements ("NDAs") in order to look at a new product Kubassek, Parkinson, Cass, Force, Lerner, and/or CCP were developing. Cass and Force were also WMI consultants at the time. Cass was also serving on the EC at WMI. Kubassek, Parkinson and/or Cass specifically told these consultants not to tell WMI's management about

16

Exhibit 1

the competing product or that they had been recruited to sell it instead of WMI's product.  As described at the time, the new product used a network marketing/affiliate program to sell a financial education product based on financial analyst David Bach's *Automatic Millionaire* concept.  Like the WMI product, the new CCP/Pro U product had three levels, which included a base program, a set of seminars/meetings, and an exclusive top-level meeting/conference.  The pricing strategy was the same, and even the prices were similar.  The look and feel of the new CCP/Pro U product, including its packaging, was similar to that of WMI.  WMI was later provided copies of presentations on the new CCP/ Pro U product that were extremely similar to the ones WMI had done for its products.[3]

29.    WMI's management, Kip Herriage and Karl Bessey, initiated a call with Kubassek, Parkinson, and Lerner to discuss whether CCP was launching a competing financial education product.  Herriage asked Kubassek point blank if CCP was launching a competing product at WMI's m2 conference in Las Vegas.  Kubassek said "no."  Kubassek did not tell WMI's management that the product CCP was preparing was similar in many ways to WMI's product, that the CCP product would be marketed to WMI's consultants using WMI's network, and that CCP was replacing WMI's product in the top tier of the CCP marketing funnel.  Kubassek said he would allow the CCP marketing system to market both products, but did not disclose to WMI's management that CCP was setting the system up to sell the Bach product.  The CCP funnel was being set up to point purchasers toward the CCP Bach product, and make it difficult for those purchasers to find the WMI product.  The way CCP set up the online store was

---

[3] The new CCP/Pro U product included a number of items that were substantially the same or similar to WMI's program, including an online wealth management tool that calculated debts and how to pay them down faster, financial education books and DVDs, and a fee structure that copied WMI's one-time membership fee and monthly recurring fee.  In addition, CCP/Pro U's product uses "Silver, Gold, Platinum, and Black" products (WMI uses "Silver," "Gold," and "Platinum" products ); CCP/Pro U uses "Elite Marketers" (WMI uses "Elite Consultants"); CCP/Pro U calls its training a "University" (WMI uses the term "Academy"); and CCP/Pro U utilizes "Creative Finance Calls" (WMI uses "Creative Finance Calls").  CCP (CarbonCopyPro) has "carbon copied" WMI's program.

Exhibit 1

EX 37
1166

equivalent to putting the Bach product on a store shelf at eye level or on an end cap, and putting WMI's product in the store room. Kubassek was clearly taking advantage of his superior knowledge about the online marketing funnel that CCP had developed for WMI, and which it would now be using for the benefit of the new CCP Bach product.

30. Following the telephone conference between WMI's management and Kubassek, Parkinson, and Lerner on behalf of CCP, and without knowing the true nature of the CCP Bach product and plan, WMI allowed Cass to serve as the emcee at WMI's m2 conference in Las Vegas. At this time WMI had not been made aware that Cass was working on the new Bach financial education product at CCP. Further, and based on Kubassek's assurances during the call, WMI agreed to allow CCP to give a 15-20 minute presentation on its marketing system, including its funnel to WMI, at the m2 conference, which Lerner was to present. At the last minute Kubassek showed up at the November 2010 WMI m2 conference and gave a presentation on Pro U and its products. Basically, Kubassek presented CCP's product to WMI's consultants at a WMI sponsored event, at WMI's cost.

31. During November and December 2010, the Individual Defendants' WMI sales production fell off dramatically as they prepared to leave WMI and/or began selling CCP/Pro U competing products that had been developed using the Bach plan. In December 2010 Cass ultimately elected to disclose his secret relationship with CCP, and advised WMI that he did not feel like he could be part of two competing teams, and he terminated his relationship with WMI on December 1, 2010, having already solicited the consultants that he had recruited for WMI to leave WMI and join CCP, and after having produced a sales video with Force to sell the new Pro U product line before his departure on December 1, 2010. The other Individual Defendants, who were actively marketing as WMI consultants, continued their charade, confusing WMI's

18

Exhibit 1

EX 37
1167

customers by selling/promoting or soliciting them for competing products along with WMI products.[4] In addition, when consultants attempted to get clarification of the products and their sponsorship from Kubassek, Parkinson, Cass, and CCP, Cass sent an email to a substantial number of WMI's consultants stating that the online marketing system being employed by WMI was not tested and did not work and that WMI lacked integrity in the business. Eventually, Defendants Lerner, the Rashkins, and Force left WMI and solicited their WMI consultants to go with them to CCP to sell the CCP financial education product.

32.     WMI was forced to do damage control with a number of consultants, advising them that under their agreements with WMI they could not sell the CCP/Pro U product which competed with WMI. When these consultants refused to cease selling the CCP/Pro U product, WMI had to terminate their consulting agreements to try to prevent further confusion and injury to its reputation.

**Damages**

33.     WMI has lost its confidential information, its trade secrets, and its key employees and consultants to Defendants because of the conspiracy of the Defendants. Moreover, it appears, upon information and belief, that CCP used the Individual Defendants to orchestrate all of the departures of WMI's employees, consultants, and EC members and to assist CCP in the creation and marketing of its competing product. WMI is suffering the loss of its confidential information and the loss of its key employees and consultants, as well as losses resulting from the sales of a similar product by these same consultants, all of which are irreparable losses for which there is no adequate remedy at law. Moreover, the Defendants are competing with WMI

---

[4] In fact, Defendants went as far as to tell the WMI consultants that if they purchased the CCP/Pro U products Defendants would give credit for the WMI products previously purchased, and that the products would complement each other. A number of consultants contacted WMI and expressed confusion as to whether these new CCP/Pro U products were sponsored by WMI.

19

Exhibit 1

EX 37
1168

for consultants, and the Defendants have an unfair, unlawfully gained advantage over WMI because the Individual Defendants have taken with them marketing strategies and consultant networks developed and paid for by WMI.[5]

34.     Furthermore, WMI is suffering damage to its consultant-lead network marketing program. The Defendants have been directly competing against WMI in financial education and consulting products. In fact, the Individual Defendants, whose confidential networks of sales consultants were developed at WMI's great expense and investment, would necessarily have to disclose and use WMI's confidential information in those sales consultants' financial education and consulting and training, as well as marketing strategies, for the benefit of CCP/Pro U. Moreover, because their knowledge was based upon using WMI's business strategies, programs, and consultant networks, the Defendants would be competing against WMI in this complex market for financial planning and consulting products. Thus, by having access to WMI's marketing strategies, consultant networks, and products, the Defendants cannot only develop the competing product, but they can also identify more profitable consultants, undercut WMI's product prices, and offer increased compensation to WMI's consultants if they switch from the WMI product to the CCP/Pro U product, which will affect whether WMI will be successful in continuing to market its product to current and prospective consultants. In essence, WMI's ability to compete is compromised by the Defendants, and there is no way to determine how WMI would have fared without the Defendants' wrongful actions.

---

[5] Some of these consultants had signed up directly with WMI and some had signed up under WMI's agreement with CCP. WMI's agreement with CCP had been for CCP to create a marketing internet "funnel" where a potential customer/consultant would sign up with CCP and then be provided access to WMI's financial-education products and sign up with WMI as a consultant. WMI paid CCP millions of dollars for these referrals through CCP's internet "funnel." Because CCP did not compete and by agreement was not to compete with WMI, WMI originally did not mind that CCP/Pro U had its own products which would also be sold to these same customers. However, once CCP/Pro U decided to sell a competing product with WMI, CCP/Pro U began to interfere directly with WMI's consultant base, in which WMI had invested millions of dollars with CCP and millions of dollars in commissions to the consultant teams to develop. Moreover, CCP/Pro U changed the "funnel" to allow internet consumers to choose between the CCP/Pro U product and the WMI product.

20

Exhibit 1

35.     Defendants' conduct has caused and will continue to cause WMI damages.  At this point, the damages are approximately $10,000,000.

## IV.  CLAIMS

A.     **Breach of Contract**

36.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

37.     Plaintiff entered into the "WMI/CCP Marketing Program" agreement with CCP/Pro U, Kubassek, and Parkinson.  Plaintiff also had employment agreements and consulting agreements with Defendants Kubassek and Cass, as well as consulting agreements and EC Agreements with the Individual Defendants.  CCP/Pro U breached its "WMI/CCP Marketing Program" agreement by developing and selling a competing program using the WMI/CCP funnel in which WMI had invested substantial sums to create.  In addition, the Individual Defendants breached those contracts by disclosing and using confidential information of Plaintiff, soliciting Plaintiff's employees and consultants, and/or competing with Plaintiff while employed with Plaintiff and while they were members of the EC (and thereafter).  Defendants' breach of their contracts has caused Plaintiff's damages.

B.     **Misappropriation of Trade Secrets**

38.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

39.     Plaintiff is in the business of selling financial education and consulting products and memberships to consultants via a network marketing program.  Plaintiff has a competitive advantage over others in the same business because Plaintiff has a unique marketing strategy, internally-developed programs, and a consultant network not generally known or readily

21

Exhibit 1

EX 37
1170

available to the general public. Plaintiff has protected its trade secrets with limited access and employment agreements, consulting agreements, and EC Agreements expressly providing for the non-disclosure of such information.

40.    The Individual Defendants acquired knowledge of Plaintiff's trade secrets through a contractual relationship with Plaintiff that prohibited the Individual Defendants from using or disclosing Plaintiff's trade secrets and through a relationship of trust with Plaintiff that gave rise to a duty of confidentiality because of WMI's relationship with the Individual Defendants. The Individual Defendants were employees and/or consultants of Plaintiff and members of Plaintiff's EC, who were given access to the trade secrets only after signing confidentiality agreements and agreeing that they were fiduciaries of Plaintiff. The Individual Defendants violated their employment and/or consulting agreements, their EC Agreements, and the common law duty to maintain an employer's confidential information by disclosing Plaintiff's trade secrets to CCP and using the trade secrets to further CCP's business.

41.    Defendants' disclosure and use of Plaintiff's trade secrets caused injury to Plaintiff, which has resulted in damages to Plaintiff's goodwill and ability to maintain and attract consultants. Plaintiff has suffered damages as a result of Defendants' conduct.

42.    Plaintiff's injury resulted from Defendants' gross negligence, malice or actual fraud, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a). Plaintiff's injury also resulted from Defendants' misapplication of fiduciary property and/or a felony theft in the third degree or higher under the Texas Penal Code, which exempts this claim from the cap on exemplary damages under Texas Civil Practice & Remedies Code Section 41.008(c).

22

Exhibit 1

EX 37
1171

**C.** **Tortious Interference with a Contract**

43. Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

44. Plaintiff had valid contracts with the Individual Defendants. CCP knew or had reason to know of Plaintiff's contracts with the Individual Defendants and Plaintiff's interest in these contracts. Defendants willfully and intentionally interfered with Plaintiff's contracts with the Individual Defendants and other employees and consultants. Defendants' interference proximately caused injury to Plaintiff, which resulted in the actual damages to Plaintiff. Plaintiff has suffered damages as a result of Defendants' conduct.

45. Plaintiff's injury resulted from Defendants' malice or actual fraud, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).

**D.** **Breach of Fiduciary Duty**

46. Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

47. The Individual Defendants are liable to Plaintiff for their breach of fiduciary duty to Plaintiff. Plaintiff had a fiduciary relationship with the Individual Defendants. The Individual Defendants breached their fiduciary duty to Plaintiff by disclosing Plaintiff's confidential information, soliciting Plaintiff's employees and consultants, and/or competing with Plaintiff while employed by Plaintiff. The Individual Defendants' breach of fiduciary duty has injured Plaintiff. The Individual Defendants' breach of fiduciary duty has benefited Defendants by allowing CCP to make substantial profits using Plaintiff's product, marketing strategies, and consultant networks, as well as employees and consultants in whom Plaintiff invested considerable resources to train in financial planning, consulting, and marketing strategies.

23

Exhibit 1

EX 37
1172

Plaintiff has suffered damages as a result of Defendants' conduct.

48.     Plaintiff's injury resulted from Defendants' intentional act, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).

E.     **Participation in Breach of Fiduciary Duty**

49.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

50.     CCP is liable to Plaintiff for participating in the Individual Defendants' breach of fiduciary duty to Plaintiff. The Individual Defendants owed Plaintiff a fiduciary duty. The Individual Defendants breached those fiduciary duties. CCP induced and participated in the Individual Defendants' breach of their fiduciary duties. The Individual Defendants' breach of fiduciary duties benefited Defendants by allowing CCP to make substantial profits using Plaintiff's product, marketing strategies, and consultant networks, as well as employees and consultants in whom Plaintiff invested considerable resources to train in financial planning, consulting, and marketing strategies. Plaintiff has suffered damages as a result of Defendants' conduct.

51.     Plaintiff's injury resulted from Defendants' intentional act, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).

F.     **Conversion**

52.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

53.     Plaintiff owned the personal property at issue, namely the proprietary marketing strategies and consultant networks, as well as Plaintiff's financial education and consulting product. The Individual Defendants, who legally acquired possession of Plaintiff's personal

24

Exhibit 1

EX 37
1173

property through their employment with and/or consulting for Plaintiff, and through their service on Plaintiff's Executive Committee, wrongfully exercised dominion and control over the property by using it in a way that departed from the conditions under which it was received. CCP wrongfully acquired and exercised dominion and control over Plaintiff's personal property that was provided to CCP by the Individual Defendants. Defendants' acts amounted to a clear repudiation of Plaintiff's rights. A demand for the return of the personal property would have been useless. Defendants' wrongful acts proximately caused injury to Plaintiff. Plaintiff seeks return of the converted property and unliquidated damages within the jurisdictional limits of this court.

54.     Plaintiff's injury resulted from Defendants' malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).

**G.     Unjust Enrichment**

55.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

56.     Defendants have been unjustly enriched because they have obtained a benefit from Plaintiff by fraud, duress or the taking of an undue advantage, and have wrongfully secured a benefit or passively received one which would be unconscionable for them to retain. Defendants should be required to pay restitution and/or be enjoined from continuing to disclose and use Plaintiff's confidential information and from soliciting Plaintiff's employees and consultants. Plaintiff has suffered damages as a result of Defendants' conduct.

**H.     Conspiracy**

57.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

25

Exhibit 1

EX 37
1174

58.     CCP, in combination with the Individual Defendants, agreed to steal Plaintiff's trade secrets, to solicit Plaintiff's employees and consultants and interfere with those employees' and consultants' contracts with Plaintiff, and to induce the Individual Defendants to breach their own contracts with Plaintiff and breach fiduciary duties they owed to Plaintiff.  Defendants knew that the agreed acts would result in harm to Plaintiff.   To accomplish the object of their agreement, Defendants disclosed and used Plaintiff's confidential information and trade secrets. The Individual Defendants worked with CCP to take Plaintiff's trade secrets and/or solicit Plaintiff's employees and consultants while they were still employed by and/or a consultant for Plaintiff, and while they served on Plaintiff's Executive Committee and, as such, were privy to confidential information.   The agreement between CCP and the Individual Defendants proximately caused injury to Plaintiff.  Plaintiff has suffered damages as a result of Defendants' conduct.

I.      **Defamation and Business Disparagement**

59.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

60.     CCP and its agent Cass are liable to Plaintiff for slander, libel, and business disparagement.  Plaintiff has obtained a copy of an email Cass sent to a number of third parties who have business relationships with Plaintiff in which Cass made false, derogatory, and disparaging statements concerning Plaintiff and its operations and product.  Upon information and belief, Cass made similar statements orally. These statements were such that the law presumes damages, and Plaintiff was damaged.  Plaintiff has suffered damages as a result of the conduct of Defendants CCP and Cass.

26

Exhibit 1

EX 37
1175

61.     Plaintiff's injury resulted from Defendants CCP and Cass's intentional act and/or malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).

## V. ATTORNEYS' FEES AND INTEREST

62.     Plaintiff incorporates all of the preceding paragraphs in their entirety for all purposes.

63.     Pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code, Plaintiff is entitled to its attorneys' fees and hereby requests that it be compensated for its reasonable and necessary attorneys' fees incurred as a result of bringing this action against Defendants.

64.     Furthermore, Plaintiff is entitled to prejudgment and post-judgment interest under Texas Finance Code § 302.002.

## VI.     REQUEST FOR DISCLOSURE

65.     Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request or such other shorter period as may be ordered by the Court, the information or material described in Rule 194.2.

## VII.     RULE 193.7 NOTICE

66.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiff hereby gives actual notice to Defendants that any and all documents produced by Defendants may be used against Defendants at any pretrial proceeding and/or at the trial of this matter without the necessity of authenticating the documents.

27

Exhibit 1

## VIII. PRAYER

WHEREFORE, Plaintiff respectfully requests that the Court issue citation and upon final trial of this cause, award judgment as follows:

    a.  award Plaintiff damages from Defendants, jointly and severally;

    b.  order Defendants, jointly and severally, to disgorge all profits earned by them based on the sales of competing products using Plaintiff's strategy, trade secrets or confidential information;

    c.  award Plaintiff its attorneys' fees in this cause from Defendants, jointly and severally;

    d.  award costs of suit, jointly and severally, against Defendants;

    e.  grant Plaintiff all relief in law and in equity to which it is entitled.

Respectfully submitted,

**RAPP & KROCK, PC**

Kenneth M. Krock
State Bar No. 00796908
Terri S. Morgan
State Bar No. 08286500
Megan N. Brown
State Bar No. 24078269
3050 Post Oak Boulevard, Suite 1425
Houston, Texas 77056
(713) 759-9977 telephone
(713) 759-9967 facsimile
kkrock@rk-lawfirm.com
tmorgan@rk-lawfirm.com
mbrown@rk-lawfirm.com

28

Exhibit 1

EX 37
1177

Case 2:18-cv-00729-JAK-MRW Document 20 Filed 01/29/18 Page 150 of 157 Page ID
Case 4:12-cv-03421 Document 53 Filed 05/29/13 in TXSD Page 5 of 8
#:1334

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WEALTH MASTERS INTERNATIONAL, | § | |
| LTD, a/k/a WEALTH MASTERS | § | |
| INTERNATIONAL, L.L.C., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:12-CV-03421 |
| | § | |
| JASON "JAY" KUBASSEK, ET AL., | § | |
| | § | |
| *Defendants.* | § | JURY TRIAL DEMANDED |

## REQUEST FOR ENTRY OF DEFAULT AGAINST
## DEFENDANT MICHAEL FORCE

Comes now Plaintiff Wealth Masters International, Ltd., a/k/a Wealthmasters
International, L.L.C. and hereby requests the Clerk to enter a default against Defendant
Michael Force on the basis that the record in this case demonstrates that there has been a
failure to plead or otherwise defend as provided by Rule 55(a) of the Federal Rules of
Civil Procedure.

Respectfully submitted,

*/s/ Kenneth M. Krock*＿＿＿＿＿＿＿＿
Kenneth M. Krock
State Bar No. 00796908
Federal ID No. 20449
RAPP & KROCK, PC
3050 Post Oak Blvd., Suite 1425
Houston, Texas 77056
(713) 759-9977 (Telephone)
(713) 759-9677 (Facsimile)
kkrock@rk-lawfirm.com
**ATTORNEY IN CHARGE**
**FOR PLAINTIFF**

EX 37
1178

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 151 of 157   Page ID
#:1335
Case 4:12-cv-03421   Document 63   Filed 05/29/13 in TXSD   Page 2 of 3

<u>Of Counsel:</u>
Terri S. Morgan
Texas Bar No. 08286500
Federal ID No. 10591
Megan N. Brown
State Bar No. 24078269
Federal ID No. 1588432
RAPP & KROCK, PC
3050 Post Oak Blvd, Suite 1425
Houston, Texas 77056
(713) 759-9977 telephone
(713) 759-9967 facsimile
tmorgan@rk-lawfirm.com
mbrown@rk-lawfirm.com

Case 2:18-cv-00729-JAK-MRW Document 20 Filed 01/29/18 Page 152 of 157 Page ID
Case 4:12-cv-03421 Document 53 Filed 10/29/13 Page 3 of 3
#:1336

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of October, 2013, a true and correct copy of the foregoing was served on counsel of record according to the E-filing procedures and via first class mail and email:

***Via Regular Mail and Email***
Joanne M. Vorpahl
Meghann McConnell Myers
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
*Attorneys for Defendants*
*Aaron and Sophia Rashkin*

***Via Regular Mail and Email***
J. Cole Dowsley, Jr.
Melissa Martin Burton
Thompson Burton PLLC
840 Crescent Centre Drive, Ste. 140
Franklin, Tennessee 37067
*Attorneys for Defendants*
*Aaron and Sophia Rashkin*

***Via Regular Mail and Email***
Julian J. Fertitta, III
Richard M. Grimes
Grimes & Fertitta, P.C.
440 Louisiana, Ste. 1818
Houston, Texas 77008
*Attorneys for Defendants*
*Jason "Jay" Kubassek and Jay Kubassek,*
*Inc., Individually and d/b/a*
*CarbonCopyPro a/k/a Carbon Copy Pro,*
*Omni Industries, L.L.C. d/b/a Carbon*
*Copy Pro a/k/a CarbonCopyPro and Pro*
*U, Inc.*

***Via Regular Mail and Email***
Andrew Cass

Miami, Florida
*Pro se Defendant*

***Via Regular Mail and Email***
Michael Force

Miami, Florida
*Pro se Defendant*

***Via Regular Mail and Email***
Jeffrey Lerner

Houston, Texas
*Pro se Defendant*

  */s/ Kenneth M. Krock*
Kenneth M. Krock

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 153 of 157   Page ID
#:1337
Case 4:12-cv-03421   Document 53-1   Filed in TXSD on 10/04/13   Page 1 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

WEALTH MASTERS INTERNATIONAL,　§
LTD, a/k/a WEALTH MASTERS　　　　§
INTERNATIONAL, L.L.C.,　　　　　§
　　　　　　　　　　　　　　　　§
　　　Plaintiff,　　　　　　　　§
　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　§　　CIVIL ACTION NO. 4:12-CV-03421
　　　　　　　　　　　　　　　　§
JASON "JAY" KUBASSEK, ET AL.,　§
　　　　　　　　　　　　　　　　§
　　　Defendants.　　　　　　　§　　JURY TRIAL DEMANDED

## AFFIDAVIT IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT
## AGAINST DEFENDANT MICHAEL FORCE

I, Kenneth M. Krock, declare under penalty of perjury that the following facts are

true and correct to the best of my information and belief:

1.　　I am the attorney in charge for the Plaintiff, Wealth Masters International,

Ltd., a/k/a Wealthmasters International, L.L.C. in this action.

2.　　Plaintiff's Original Petition was filed in the 268th Judicial District Court of

Fort Bend County, Texas in Cause No. 12-DCV-201261 on September 27, 2012 (the

"State Court Lawsuit"), and service of process was had on Defendant Michael Force

("Force") on October 4, 2012, by serving him via the Texas Secretary of State pursuant to

§17.044 of the Texas Civil Practice & Remedies Code.  Force filed a Sworn Special

Appearance in the State Court Lawsuit on November 14, 2012.

3.　　On November 21, 2012 Defendants Jason "Jay" Kubassek and Jay

Kubassek, Inc., Individually and d/b/a Carboncopypro a/k/a Carbon Copy Pro, Omni

Industries, L.L.C., d/b/a CarbonCopyPro a/k/a Carbon Copy Pro and Pro U, Inc. filed a Notice of Removal of the State Court Lawsuit to this Court [Doc. #1], based upon diversity jurisdiction. Force did not re-urge the Sworn Special Appearance that he had filed in the State Court Lawsuit after removal, nor did he file a Motion to Dismiss for Lack of Personal Jurisdiction or an Answer in this cause.

4.      Under Federal Rule of Civil Procedure 81(c)(2), Force had at most twenty one (21) days after removal to file an Answer in this cause. More than twenty-one (21) days have elapsed since November 21, 2012, when the State Court Lawsuit was removed to this Court, and since that date Force has failed to plead or otherwise defend, as required by the Federal Rules of Civil Procedure.

Kenneth M. Kroek
Attorney for Plaintiff

Sworn to and subscribed before me this _4th_ day of October, 2013.

Notary Public in and for
The State of Texas

JOSEFINA S. GOMEZ
Notary Public, State of Texas
My Commission Expires
September 19, 2016

2

EX 37
1182

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WEALTH MASTERS INTERNATIONAL, LTD, a/k/a WEALTH MASTERS INTERNATIONAL, L.L.C., | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. 4:12-CV-03421 |
| JASON "JAY" KUBASSEK, ET AL., | § § | |
| *Defendants.* | § | JURY TRIAL DEMANDED |

### <u>ENTRY OF DEFAULT AGAINST DEFENDANT MICHAEL FORCE</u>

It appearing that Plaintiff's Original Petition was filed in the 268th Judicial District Court of Fort Bend County, Texas in Cause No. 12-DCV-201261 on September 27, 2012 (the "State Court Lawsuit"); that the Summons and Plaintiff's Original Petition in the State Court Lawsuit were duly served upon Defendant Michael Force; that Defendant Michael Force filed a Sworn Special Appearance in the State Court Lawsuit on November 14, 2012; that the State Court Lawsuit was removed to this Court by other defendants on November 21, 2012; and that since the November 21, 2012 removal Defendant Michael Force has not filed any answer or other pleading in this cause as required by law;

Therefore, upon request of Plaintiff Wealth Masters International, Ltd., a/k/a Wealthmasters International, L.L.C., default is hereby entered against Defendant Michael Force, as provided in Rule 55(a), Federal Rules of Civil Procedure.

Case 2:18-cv-00729-JAK-MRW   Document 20   Filed 01/29/18   Page 156 of 157   Page ID
#:1340
Case 4:12-cv-03451-MRW   Document 59-1   Filed in TXSD on 10/00/13   Page 2 of 2

David J. Bradley, CLERK


By _____

    Deputy Clerk

EX 37
1184

## <u>HEARING MINUTES AND ORDER</u>

**Cause Number**: <u>12CV3421</u>

**Style**:  <u>Wealth Masters International, LTD., v. Jason Jay Kubassek, *et al.*</u>
**Appearances**:
**Counsel**:                                                    **Representing**:

<u>Scott Alford                                                    Plaintiff</u>
<u>Julian Fertitta III                                            Defendant Julian Fertitta III/Carbon Copy</u>
<u>                                                                       Pro/Aaron Parkinson/Omni Industries, LLC.</u>
<u>                                                                       Pro U/Jay Kubassek Inc</u>
<u>No appearance                                          Defendant Andrew Cass</u>
<u>No appearance                                          Defendant Jeffrey Lerner</u>
<u>No appearance                                          Defendant Michael Force</u>
<u>Meghann McConnell Myers                     Defendants Aaron and Sophia Raskin</u>

**Date**: <u>April 7, 2014</u>                              **ERO**:<u>                                        </u>
**Time**: <u>12:53 p.m. - 1:10 p.m.</u>                 **Interpreter:** <u>                              </u>

**At the hearing the Court made the following rulings**:

<u>Discovery conference held.</u>

<u>The Court stated: Defendants Andrew Case, Jeffre Lerner and Michael Force failed to appear for this conference. The Court concluded that failure to appear at this conference after actual notice from the Court gives rise to an inference that the defendants do not intend to continue to defend this case. If any Defendant  fails to appear at the mediation that has been scheduled for **April 25, 2014,**  the Court will issue sanctions and a default judgment may be entered against them.  Plaintiff must present proof that the Defendants had actual knowledge of the mediation and nevertheless failed to appear, before Plaintiff may seek the default judgment and sanctions. The mediation is court ordered and is confidential. Formal mediation order will follow.</u>

**SIGNED** at Houston, Texas this <u>7th</u> day of April, 2014.

<u>Nancy F. Atlas</u>
United States District Judge

EX 37
1185